## 2025-1281(L); 25-1282

# United States Court of Appeals
# for the Federal Circuit

MELINTA THERAPEUTICS, LLC, MELINTA SUBSIDIARY CORP.,
REMPEX PHARMACEUTICALS, INC.,

*Plaintiffs-Appellees,*

*v.*

NEXUS PHARMACEUTICALS, INC.,

*Defendant-Appellant.*

*Appeals from the United States District Court for the Northern District of
Illinois, in Case Nos. 1:21-cv-02636, 1:21-cv-05995
(Hon. John F. Kness, Judge)*

## CORRECTED BRIEF FOR DEFENDANT-APPELLANT

IMRON T. ALY
KEVIN M. NELSON
HELEN H. JI
MATTHEW T. WILKERSON
ARENTFOX SCHIFF LLP
233 S Wacker Drive, Suite 7100
Chicago, Illinois 60606
(312) 258-5500
imron.aly@afslaw.com

*Counsel for Defendant-Appellant*
FEBRUARY 20, 2025

## U.S. Patent No. 9,084,802
### Claims 1, 7, 18

**1.** A method of treating a bacterial infection in a subject, wherein the method consists of:

administering a therapeutically effective amount of a composition to a subject in need thereof via an intravenous route of administration,

wherein the composition consists of an aqueous solution consisting of minocycline or a salt thereof, a salt that comprises a magnesium cation, and a base,

wherein the molar ratio of magnesium cation to minocycline is greater than about 4:1, and

wherein the composition has a pH that is no less than 4 and no greater than 6,

whereby injection site hemolysis of red blood cells is reduced relative to intravenous administration of a composition that does not include magnesium.

**7.** The method of claim 1, wherein the composition has a pH between about 4.5 to about 5.5.

**18.** The method of claim 1, wherein the total volume of the composition administered is less than 500 ml.

## U.S. Patent No. 9,278,105
### Claim 27

1. A method of treating a bacterial infection in a subject, wherein the method comprises administering a therapeutically effective amount of a composition to a subject in need thereof via an intravenous route of administration, wherein the composition comprises an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a magnesium cation, wherein the molar ratio of magnesium cation to 7-dimethylamino-tetracycline antibiotic is greater than 3:1 and wherein the solution does not comprise a pharmaceutically acceptable oil, has a pH greater than 4 and less than 7, and has an osmolality less than about 500 mOsmol/kg.

**27.** The method of claim 1, wherein the 7-dimethylaminotetracycline is minocycline.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 25-1281 |
| **Short Case Caption** | Melinta Therapeutics, LLC v. Nexus Pharmaceuticals, Inc. |
| **Filing Party/Entity** | Nexus Pharmaceuticals Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/20/2024

Signature: /s/ Helen H. Ji

Name: Helen H. Ji

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Nexus Pharmaceuticals Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☑   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

Melinta Therapeutics, LLC v. Nexus Pharmaceuticals, Inc.

## CERTIFICATE OF INTEREST

**4. Legal Representatives** (continued from page 3):

ArentFox Schiff LLP:

- Imron T. Aly

- Kevin M. Nelson

- Joel M. Wallace

- Helen H. Ji

- Matthew T. Wilkerson

- Jieun Lee

# TABLE OF CONTENTS

I.    Statement of Jurisdiction ................................................. 1

II.    Statement of the Issues .................................................. 1

III.    Statement of the Case ................................................... 2

    A.    Minocycline and Magnesium ................................. 2

    B.    The District Court's Finding of Facts and Conclusions of
    Law    .............................................................. 3

IV.    Summary of the Argument ............................................. 3

V.    Standard of Review ...................................................... 5

VI.    Argument ................................................................. 6

    A.    The District Court Incorrectly Construed
    "Administering," And Nexus Does Not Infringe the '802 Patent
    Claims As Properly Construed .................................. 6

        1.    Properly Construed, "Administering" Refers to the
        Claimed "Composition" ...................................... 7

        2.    Nexus's ANDA Product Does Not Satisfy the
        Closed-End "Composition" Claim Term, Because It
        Cannot be Administered Without a Diluent ................ 12

    B.    The Claims Of The '802 Patent Lack Written Description
    Because The Inventors Did Not Show Possession of Reduced
    ISH Compared To "A Composition That Does Not Include
    Magnesium" .................................................... 14

    C.    The District Court Disregarded Full Scope Requirements
    For Enablement and Written Description of Claim 27 Of The
    '105 Patent ...................................................... 18

        1.    The District Court's Enablement Analysis Never
        Considered the Full Scope Requirement ................... 19

        2.    The District Court's Written Description Analysis
        Never Considered the Full Scope Requirement ........... 21

D.     The District Court Erred In Concluding Claim 27 Of The '105 Is Not Invalid For Lack Of Enablement For The Full Scope Of The Claimed pH Range .................................................23

    1.     The District Court Failed to Apply the Full Scope Inquiry .........................................................................24

    2.     The Patent Specification Shows Formulations Do Not Work For The Claimed Purpose At pH 6-7 ..................................25

VII.   Conclusion And Relief Sought .....................................................30

# TABLE OF AUTHORITIES

*AK Steel Corp. v. Sollac & Ugine,*
    344 F.3d 1234 (Fed. Cir. 2003)................................................. 23, 25, 26, 30
*Alcon Research, Ltd. v. Apotex Inc.,*
    687 F.3d 1362 (2012)........................................................ 19, 21, 30
*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
    598 F.3d 1336 (Fed. Cir. 2010)......................................................22
*Atlantic Thermoplastics Co., Inc. v. Faytex Corp.,*
    5 F.3d 1477 (Fed. Cir. 1993).........................................................17
*Bayer Pharma AG v. Watson Labs., Inc.,*
    874 F.3d 1316 (Fed. Cir. 2007).......................................................17
*Biogen Int'l GmbH v. Mylan Pharma. Inc.,*
    18 F.4th 1333 (Fed. Cir. 2021)........................................................22
*Genentech, Inc. v. Novo Nordisk A/S,*
    108 F.3d 1361 (Fed. Cir. 1997)........................................................19
*Hospira, Inc. v. Amneal Pharms., LLC,*
    285 F. Supp. 3d 776 (D. Del. 2018)....................................................12
*Interactive Gift Express, Inc. v. CompuServe Inc.,*
    256 F.3d 1323 (Fed. Cir. 2001).......................................................15
*Jenneric/Pentron, Inc. v. Dillon Co., Inc.,*
    205 F.3d 1377 (Fed. Cir. 2000).......................................................14
*Juno Therapeutics, Inc. v. Kite Pharma, Inc.,*
    10 F.4th 1330 (Fed. Cir. 2021)........................................................18
*K-2 Corp. v. Salomon S.A.,*
    191 F.3d 1356 (Fed. Cir. 1999).........................................................7
*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    481 F.3d 1371 (Fed. Cir. 2007).......................................................21
*Limelight Networks, Inc. v. Akamai Techs., Inc.,*
    572 U.S. 915 (2014)...................................................................13
*LizardTech, Inc. v. Earth Resource Mapping, Inc.,*
    424 F.3d 1336 (Fed. Cir. 2005).......................................................23
*MagSil Corp. v Hitachi Global Storage Tech.,*
    687 F.3d 1377 (Fed. Cir. 2012)................................................. 19, 20, 24
*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.,*
    166 F.3d 1190 (Fed. Cir. 1999).......................................................24
*Nuvo Pharmaceuticals (Ireland) Designated Activity Company,*
    923 F.3d 1368 (Fed. Cir. 2019).........................................................5
*Pfizer, Inc. v. Apotex, Inc.,*
    480 F.3d 1348 (Fed. Cir. 2007)......................................................5, 6

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).....................................................10
*Schriber-Schroth Co. v. Cleveland Trust Co.*,
    305 U.S. 47 (1938).........................................................................21
*Shire Development, LLC v. Watson Pharmaceuticals, Inc.*,
    848 F.3d 981 (Fed. Cir. 2017)................................................ 13, 14
*Shire LLC v. Amneal Pharms.*,
    No. 11-3781, 2013 WL 4045622 (D.N.J. Aug. 8, 2013) ..............11
*Sitrick v. Dreamworks LLC*,
    516 F.3d 993 (Fed. Cir. 2008)................................................ 19, 24
*Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*,
    785 F.3d 625 (Fed. Cir. 2015)........................................................13
*Trustees of Boston Univ. v. Everlight Elecs. Co.*,
    896 F.3d 1357 (Fed. Cir. 2018)............................................. 24, 26
*U.S. v. Singer Mfg. Co.*,
    374 U.S. 174 (1963).........................................................................6
*UCB, Inc. v. Actavis Labs. UT, Inc.*,
    65 F.4th 679 (Fed. Cir. 2023) ........................................................6
*Vehicular Tech. v. Titan Wheel Int'l*,
    212 F.3d 1377 (Fed. Cir. 2000)......................................................6
*Vita-Mix Corp. v. Basic Holding, Inc.*,
    581 F.3d 1317 (Fed. Cir. 2009)....................................................11
*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)............................................... 7, 10
*Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*,
    19 F.3d 1418 (Fed. Cir. 1994).......................................................9

## STATEMENT OF RELATED CASES

*Melinta Therapeutics, LLC, et al. v. Nexus Pharmaceuticals, Inc.*, 24-cv-4180 (N.D. Ill.) concerns a patent (U.S. Patent No. 11,944,634) issued after and claiming priority to a patent at issue in this appeal (U.S. Patent No. 9,278,105). The -4180 matter has been dismissed without prejudice with leave to reinstate on or before 6/30/2026.

## I.      Statement of Jurisdiction

Melinta filed lawsuits against Nexus in the Northern District of Illinois asserting infringement of U.S. Patent Nos. 9,084,802 ("the '802 Patent") and 9,278,105 ("the '105 Patent"). At trial, the only asserted claims were 1, 7, and 18 of the '802 Patent and claim 27 of the '105 Patent. After a bench trial before the Honorable John F. Kness in June 2023, the district court entered Findings of Fact and Conclusions of Law on November 15, 2024, along with a final judgment finding infringement and no invalidity of the disputed claims. Nexus timely filed its notice of appeal. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a).

## II.     Statement of the Issues

1.      Whether Nexus infringes claims 1, 7, and 18 of the '802 patent because the claims, as properly construed, require "administering" a "composition" without an added diluent, whereas Nexus's administered composition contains a diluent.

2.      Whether claims 1, 7, and 18 of the '802 patent satisfies the full scope written description requirement, where the claims as properly construed include reduced injection site hemolysis ("ISH") compared to formulations with calcium, but all data showed no benefit.

3.      Whether claim 27 of the '105 patent satisfies the full scope enablement and written description requirements, where the claims cover the entire osmolality range "less than about 500 mOsm/kg" but all evidence showed that low osmolalities

1

within the range were dangerous and unworkable.

4.    Whether claim 27 of the '105 patent satisfies the full scope enablement requirement for the entire claimed pH range "pH greater than 4 and less than 7," where all evidence showed that the portion of the pH range 6-7 was not soluble at useful minocycline concentrations.

## III.    Statement of the Case

Melinta sued Nexus alleging infringement of the '802 and '105 patents based on Nexus's filing of an Abbreviated New Drug Application ("ANDA") seeking to market a generic version of MINOCIN®, the active ingredient of which is minocycline.  Nexus appeals the district court's finding of infringement and no invalidity of the disputed claims.  The disputed patent claims are each directed to methods of treating bacterial infection by intravenously administering a magnesium-containing formulation of the drug minocycline.

### A.    Minocycline and Magnesium

Minocycline was commercially available as an intravenous administration product to treat bacterial infections since 1972 under the trade name Minocin IV. Appx6.  Appellees added magnesium to the prior art minocycline formulation.  As the district court found, "[t]he final patented Minocin product differs from the prior art minocycline in one primary respect: the addition of magnesium. The addition of magnesium at a high ratio in relation to minocycline enables the pH of the solution

2

to be adjusted to a more physiologic range. In turn, if the pH can be adjusted higher, a high injection volume can be decreased because it is no longer needed to improve pH, thereby reducing injection site tolerability issues." Appx10.

The asserted claims are all directed to methods of using magnesium-minocycline formulations to treat bacterial administration, but with specific additional requirements. Claims 1, 7, and 18 of the '802 patent require administering a composition "consisting of" certain listed components, and wherein "injection site hemolysis of red blood cells is reduced relative to intravenous administration of a composition that does not include magnesium." Appx12-Appx13. Claim 27 of the '105 patent requires administering a composition that "has a pH greater than 4 and less than 7, and has an osmolality less than about 500 mOsmol/kg." Appx13.

## B.    The District Court's Finding of Facts and Conclusions of Law

On November 15, 2024, the district court issued its Findings of Fact and Conclusions of Law. Appx1-Appx125. The district court found (1) Plaintiffs proved by a preponderance of the evidence infringement of all four asserted claims; and (2) Defendant failed to show by clear and convincing evidence that the claims are invalid. Appx124. The district court's opinions were based on an incorrect view of the law as well as clearly erroneous view of the facts, and should be reversed.

## IV.    Summary of the Argument

1.    Nexus does not infringe claims 1, 7, and 18 of the '802 patent, as

3

properly construed. These claims require "administering … a composition … consisting of" certain claimed components. "Consisting of" is a well-understood closed-ended term, meaning that the claim is limited to only the claimed components. When administering Nexus's formulation, however, additional components including a diluent must be added, and therefore Nexus cannot infringe. The district court erred by construing the term "administering" to mean additional components could be added to the claimed composition.

2.    Claims 1, 7, and 18 of the '802 also require reducing ISH compared to formulations "without magnesium," which the district court construed to mean only "without magnesium," so that other divalent cations, like calcium, could be included in the comparator formulation. All tests showed that the extent of hemolysis for calcium-minocycline formulations was the same or better than magnesium-minocycline formulations. The district court erred by failing to consider the full scope requirement, and ignored comparisons to divalent cations including calcium.

3.    Claim 27 of the '105 patent purport to claim administering formulations across the full osmolality range of 0 to 500 mOsm/kg, with the claim term "less than about 500 mOsm/kg." But experts on both sides agreed that this range includes osmolality values that are not workable and unsafe. The district court erred by assuming that a claimed range is enabled and described so long as some value within the range is suitable for administration, rather than the entire claimed range.

4.    Claim 27 of the '105 patent also purports to cover stable formulations across the full scope of "pH greater than 4 and less than 7." Plaintiffs' own data, however, showed that the portion of the pH range 6-7 was not soluble at useful minocycline concentrations.  Again, the district court erred by assuming that a claimed range is enabled so long as any value within the range is suitable for administration, rather than the entire claimed range.

## V.    Standard of Review

This Court reviews a decision following a bench trial for errors of law and clearly erroneous findings of fact. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). Each of indefiniteness, enablement, and claim construction is a question of law reviewed *de novo*, but may rely upon subsidiary fact findings that are reviewed for clear error.  *Nevro Corp. v. Boston Scientific Corp.*, 955 F.3d 35, 37 (Fed. Cir. 2020) (indefiniteness); *In re Wands*, 858 F.2d 731, 735 (Fed. Cir. 1988) (enablement); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318 at 319-20 (2015) (claim construction).  Infringement and written description are questions of fact reviewed for clear error to the extent it is separate from claim construction. *Merck Sharp & Dohme Corp. v. Amneal Pharm. LLC*, 881 F.3d 1376, 1384 (Fed. Cir. 2018) (infringement); *Nuvo Pharm. (Ireland) Designated Activity Company*, 923 F.3d 1368, 1376 (Fed. Cir. 2019) (written description).

A factual finding is clearly erroneous if, despite some supporting evidence,

"the reviewing Court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Pfizer*, 480 F.3d at 1359. Factual findings that rest on a mistaken view of the law are not entitled to deference. *UCB, Inc. v. Actavis Labs. UT, Inc.*, 65 F.4th 679, 687 (Fed. Cir. 2023) (citing *U.S. v. Singer Mfg. Co.*, 374 U.S. 174, 194 n.9 (1963)).

## VI.    Argument

### A.    The District Court Incorrectly Construed "Administering," And Nexus Does Not Infringe the '802 Patent Claims As Properly Construed

Claim 1 of the '802 patent, and thus dependent claims 7 and 18, require in pertinent part:

> 1. A method of treating a bacterial infection in a subject, wherein the method consists of:
> **administering** a therapeutically effective amount of a **composition** to a subject in need thereof via an intravenous route of administration,
> **wherein the composition consists of** an aqueous solution **consisting of** minocycline or a salt thereof, a salt that comprises a magnesium cation, and a base, [. . .]

These bolded terms show that the claim expressly requires administering the claimed "composition." The composition, in turn, is an aqueous solution "consisting of" certain listed components, and it is a well-established closed term that is limited to only what is listed in the claims and nothing more. *Vehicular Tech. v. Titan Wheel Int'l*, 212 F.3d 1377, 1382-83 (Fed. Cir. 2000); *see also* Appx24. Together, the claim thus requires that the thing to be administered is the composition, and the

composition is limited to ("consisting of") certain components.

Nexus's accused ANDA product will only be administered with certain components excluded by the claim language, and thus cannot infringe the asserted claims. The product is a freeze-dried solid that requires two steps before administration: (1) reconstituting in water and (2) adding a diluent (excluded by the "consisting of" term). Appx12, Appx29. The diluents required by Nexus's label, which add sodium chloride or dextrose, are excluded by the "consisting of" claim term. *See* Appx7, Appx2541; *see also* Appx2483 (Minocin IV label). The district court nevertheless found infringement, even though it understood that "consisting of" was a limiting term, because it erred by separately construing "administering" to permit adding ingredients to the claimed "composition."

### 1. Properly Construed, "Administering" Refers to the Claimed "Composition"

The starting point of claim construction is the words of the claims themselves. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The claims expressly require "administering…a composition" containing only the ingredients claimed, not administering some modified composition such as adding diluent. The Court cannot rewrite the claims. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364-65 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

The claim structure shows that the "composition" must be the thing that is "administer[ed]," and Nexus cannot infringe because its product requires adding a diluent that is not permitted by the "consisting of" claim.[1]  Appx7.  As to the closed-ended construction of "consisting of," the district court correctly understood that term excludes any added diluent.  Appx23-Appx26.  Nevertheless, even though the district court construed "composition" to <u>exclude</u> added diluent, it inconsistently used the word "administering" to <u>include</u> diluents.  *Compare* Appx23 *with* Appx31. That approach meant eviscerating the "consisting of" requirement for the claims, and giving that phrase no meaning at all, by permitting the claim to include unlisted excipients like diluents that could still be infringing administered compositions.

The language of claim 1 of the '802 patent (and thus dependent claims 7 and 18) plainly requires "**administering** [. . .] a **composition** to a subject".  The gerund "administering" applies to the noun "composition," and does not open the door to further modifying the composition.  In other words, the plain language of the claim requires the composition to be what is administered.  The patent specification, too, shows examples of formulations with and without diluents, all of which are labeled "suitable for intravenous administration."  Appx163, 38:1-39:55 (Example 13,

---

[1] The district court's opinion refers to "inconsistency" in Nexus's claim constructions, Appx27, but Nexus has always maintained that the "composition" is the thing "administered."  Appx1074.  The three terms "composition," "consisting of," and "administering" apply to the same formulation.  Appx1073-1076.

Formulations 1-4).  In fact, Formulations 1-4 of Example 13 include only the very three components required by the claims: minocycline, a magnesium salt, and a base. Appx163, 38:6-44.  Had the patentee intended to allow for the inclusion of additional ingredients such as a diluent, it could have easily done so, for example by applying the open ended "comprises" language that is used in the '105 patent. Appx195.

The district court resorted to rewriting the claim terms specifically to justify infringement, as opposed to first construing the claims based on the intrinsic evidence and then applying those construed terms to Nexus's product.  It is fundamental to patent law that these are two distinct steps, and that one should not consider the patentee's commercial embodiment or the accused product when construing claims. *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994) ("As we have repeatedly said, it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment… the only proper comparison is with the claims of the patent.").  But the district court committed these errors.  In particular, the district court emphasized Plaintiff's expert testimony that the ***commercial*** minocycline products could only be administered by adding a diluent.  Appx29.  That turned the two-step infringement analysis upside down, by first starting with commercial products and working backwards; those products did not even exist at the time the patent specification was filed.  Adding to its error, the district court expressly labeled

9

this extrinsic expert testimony as "intrinsic evidence." Appx30; *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (expert testimony is extrinsic evidence).

Before considering the expert testimony about commercial products, the district court recognized that "administering" has the plain meaning "to give the composition remedially." Appx27-28. But after the expert testimony about commercial products, the district court erroneously modified that plain meaning instead to mean "to remedially *give the diluted composition* to a patient via an intravenous route." Appx31 (emphasis added). This was legal error. *See, e.g., Phillips*, 415 F.3d at 1318 ("A court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves.") (internal quotations omitted). It was "improper to rely on extrinsic evidence" where the claim language itself and the plain language definitions are clear. *Vitronics*, 90 F.3d. at 1583. The court's predisposition is evident in its consideration of Plaintiffs' argument that "[Defendant's] construction cannot be correct, because under Defendant's constructions of these claim terms, no one could ever possibly follow the patent's specification—therefore, infringement too would be impossible." Appx27. That improperly starts with the assumption that infringement must be possible for the accused product, and then works backwards for a construction.

Moreover, by focusing on the expert testimony on how later FDA-approved pharmaceutical products are prepared, the district court committed legal error. It is

axiomatic that claims must be construed "without the objective of capturing or excluding the accused device." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009).  But here, the expert testimony relied upon by the district court pertained to administration of either Plaintiffs or Nexus's products under FDA review—not the broader administration permitted by the claims themselves.  Appx29.

As explained above, the court construed "composition … consisting of" to exclude a diluent, but used the word "administering" to undo the "consisting of" term.  The district court cited two cases, raised *sua sponte*, to expand "administering" beyond its plain and ordinary meaning, but each case stands for the opposite of the court's findings and support reversal.  The district court first pointed to the unpublished *Shire LLC v. Amneal Pharms.*, No. 11-3781, 2013 WL 4045622 (D.N.J. Aug. 8, 2013), but that case supports Nexus's position.  The *Shire* court declined to construe "administering" and "orally administered" as "physically delivering into the body of the patient" in part because these are commonly understood terms and were not new ways of giving drugs to patients.  2013 WL 4045622 at *17-18. Just like in *Shire*, there is no dispute here about whether the claimed route of administration is new; it is not.  The old Minocin IV product was already administered intravenously.  Appx6-7.  Moreover, *Shire* considered other intrinsic evidence and concluded that construing "administering" one way would contradict

another limitation. 2013 WL 4045622 at *18. The same is true here: "administering" cannot be construed to contradict and override other limitations, such as "consisting of." The district court next pointed to *Hospira, Inc. v. Amneal Pharms., LLC*, 285 F. Supp. 3d 776, 803 (D. Del. 2018), for the proposition that "administration" must include storage conditions. Appx30. *Hospira* concerned whether a "no more than about 2% decrease" limitation should be measured under long-term or accelerated conditions and was indefinite for not defining those conditions. 285 F. Supp. 3d. at 802-04. The *Hospira* court never considered the construction for "administering" itself, and looked to other storage conditions not at issue here. *Id.* At best *Hospira* informs the district court to consider intrinsic evidence, which again here includes compositions without diluents due to the "consisting of" term.

### 2. Nexus's ANDA Product Does Not Satisfy the Closed-End "Composition" Claim Term, Because It Cannot be Administered Without a Diluent

Applying its incorrect construction of "administering," the district court held a physician using Nexus's ANDA product would directly infringe claims 1, 7, and 18 of the '802 patent. Appx97. That must be reversed. The proper construction of "administering" is how the district court started its analysis when it noted that "administering" means "to give the composition remedially." Appx27-28. The district court already properly construed "consisting of" to exclude any unclaimed

ingredients.  Appx24-26.  Thus, adding a diluent to the claimed composition and then administering that combined formulation does not infringe.

The undisputed record shows Nexus's ANDA product cannot be administered without a diluent following Nexus's label.  *See* Appx24, Appx29, Appx1073.  The district court already found that Nexus's label shows that its product can only be administered with additional components such as saline, dextrose, or Lactated Ringer's.  Appx75.  Appellees similarly admitted in post-trial briefing that "the reconstituted solution of minocycline is never directly administered [without diluent]".  Appx1019.  The diluent thus is an additional component that precludes literal infringement as a matter of law.  *See, e.g.*, *Shire Development, LLC v. Watson Pharmaceuticals, Inc.*, 848 F.3d 981, 985-86 (Fed. Cir. 2017) (finding no infringement by accused ANDA product containing excipient excluded by "consisting of" limitation).

Direct infringement is a necessary prerequisite to indirect infringement, so the proper "administering" construction precludes a finding of indirect infringement.  *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 920–21 (2014).  Nexus's label does not "encourage, recommend, or promote" administration of its ANDA product without a diluent, so cannot induce infringement.  *Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015).  Additionally, Nexus's product is not "especially made or especially adapted" for

infringing, and to the contrary use according to label would be "substantial noninfringing use" that precludes contributory infringement.  35 U.S.C. § 271(c).

Because claim 1 is not infringed, claims 7 and 18 also cannot be infringed, as it is a "fundamental principle of patent law" that "dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed." *Jenneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1383 (Fed. Cir. 2000) (quotations omitted); *see also Shire*, 848 F.3d at 986-87.  The district court's decision should be reversed because Nexus's formulation does not infringe the asserted claims of the '802 patent.

### B.    The Claims Of The '802 Patent Lack Written Description Because The Inventors Did Not Show Possession of Reduced ISH Compared To "A Composition That Does Not Include Magnesium"

Claim 1 of the '802 patent (and therefore also asserted dependent claims 7 and 18) require that, upon administering the claimed formulation, "injection site hemolysis of red blood cells is reduced relative to intravenous administration of a composition that does not include magnesium."  Appx164.  The claim requires comparing the claimed formulation on the one hand, with another formulation "that does not include magnesium."  As to the comparison required by the claim, the district court correctly construed this term in the claim construction section of its opinion, but applied the construction incorrectly in the invalidity section.

For claim construction, the parties disputed the required comparator, i.e., what

in particular had to be compared to the claimed invention to assess whether ISH had been reduced. Plaintiffs proposed that the comparator should be only the old minocycline IV formulation, which did not contain magnesium. Appx38-Appx39. Nexus proposed that the comparator had to be any minocycline formulation that does not contain magnesium, including both the old minocycline IV formulation and a formulation that contained another divalent cation, like calcium. Appx38-Appx39. The district court agreed with Nexus, adopting the construction that "does not include magnesium" means "does not include magnesium," and rejected Plaintiffs' proposed construction that would have been "does not include magnesium or another metal cation." Appx38-Appx40. The district court properly rejected "Plaintiffs' interpretation that 'does not include magnesium' should be construed to exclude magnesium *and* any other metal cation." Appx40. The district court clearly held that "[t]he exclusion of any other metal cations is not expressed in any way in the claim language." Appx40. The district court's construction was proper because excluding other metal cations from the scope of the comparison in the claims would have been inconsistent with the plain language of the claims themselves as drafted by Plaintiffs. *See Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1331-33 (Fed. Cir. 2001) (reversing claim construction inconsistent with the plain language of the claims and holding "[i]n construing claims, the analytical focus must begin and remain centered on the language of the claims themselves").

To show possession of the invention, therefore, the patent specification had to show both reduced ISH when compared to (a) a formulation without magnesium *and* (b) a formulation without any other metal cation. That was the district court's resolution of the claim construction dispute, which it resolved in Nexus's favor. For the claim to have adequate written description, as construed, the claimed magnesium-minocycline formulation must have been shown to reduce ISH relative to calcium-minocycline formulations. The evidence showed the opposite.

It was undisputed at trial—and Plaintiffs' own evidence showed—that minocycline-calcium and minocycline-magnesium formulations both worked in the same way, and both reduced ISH compared to a saline control. Appx1806-Appx1807, 393:20-394:8. Figure 1 of the '802 patent itself makes clear that each minocycline-calcium formulation yielded lower or equivalent hemolysis than the corresponding minocycline-magnesium formulation (2.2-2.94% hemolysis vs. 2.3-3.2%). *See also* Appx1824-26, 411:4-413:10. The district court found that "[a]ccording to Plaintiffs, a POSA would understand this data to show that reduced incidence or risk of injection site hemolysis occurred in a solution containing minocycline and a metal cation." Appx35. Named inventor Mr. Griffith testified that "both" the magnesium and calcium containing formulations "reduce hemolysis to a low level." Appx1825-Appx1826, 412:23-413:10. Again, the district court found that "Griffith first testified that the patents-in-suit describe the use of a 7-

dimethylamino-tetracycline (such as tetracycline, glycylcycline, doxycycline, and minocycline) with a metal cation (such as magnesium, calcium, or iron), but the patents-in-suit specifically focus on minocycline with magnesium." Appx47. In the secondary considerations section, the district court reinforced the benefit attributable to either magnesium or calcium, noting that "an "unexpected discovery" revealed that hemolysis could be decreased by formulating minocycline with a ***divalent cation*** with high molar ratios." Appx51-Appx52 (emphasis added). In sum, all the evidence confirmed that the calcium-containing formulations were the same or better than magnesium-containing formulations.

Yet the district court failed to make any findings on the ISH written description issue, even though the district court acknowledged that Nexus "argues that the Asserted Claims in both patents are invalid for lack of written description and lack of enablement," including for "the injection site hemolysis reduction claim (Claims 1, 7, and 18 of the '802 Patent)." Appx122-Appx123. Under Rule 52(a)(1), the district court was required to have addressed this issue, so at a minimum, the district court's judgment should be vacated and remanded. *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 5 F.3d 1477, 1479-81 (Fed. Cir. 1993). In view of the undisputed record evidence summarized above, however, the district court's judgment should be reversed. *See Bayer Pharma AG v. Watson Labs., Inc.*, 874 F.3d 1316, 1319 (Fed. Cir. 2007) (reversing judgment based on "the district court's clear

error together with the remainder of its fact findings" to invalidate claims).  Although Plaintiffs sought to exclude "another cation" like calcium from the claimed comparator, the district court rejected that position.   Appx40.  Thus, based on the district court's own claim construction, the claimed formulation in fact does <u>not</u> reduce hemolysis when compared to a minocycline formulation that contains calcium, but "does not include magnesium."  *See Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1336 (Fed. Cir. 2021) (reversing denial of JMOL and holding no reasonable jury could find that the inventors possessed the full scope of the claimed invention).  The claims are invalid because they lack written description across their full scope.

### C.    The District Court Disregarded Full Scope Requirements For Enablement and Written Description of Claim 27 Of The '105 Patent

The district court erred in both its enablement and written description determinations with respect to the full scope of the "less than about 500" osmolality limitation of claim 27 of the '105 patent.  The district court failed to address whether the specification demonstrated possession of the full scope of the claimed range, or taught a POSA how to make and use formulations across the claimed range.  To the contrary, the district court only found that a POSA would be able to determine examples that worked within the range.  That finding is insufficient to show the claims are fully enabled and supported by an adequate written description.

### 1.    The District Court's Enablement Analysis Never Considered the Full Scope Requirement

"To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *MagSil Corp. v Hitachi Global Storage Tech.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012) (quoting *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997)).  "This important doctrine prevents both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented." *Id*. at 1381.  What is claimed must be "less than or equal to the scope of the enablement." *Id*. (quoting *Sitrick v. Dreamworks LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008)).

Claim 27 of the '105 patent (by virtue of its dependence on claim 1) requires an aqueous minocycline solution that "has an osmolality less than about 500 mOsmol/kg." Appx2023, 610:6-9; Appx1370, ¶ 423.  Nexus asserted that this entire scope was not enabled, because this claimed range includes low osmolalities unsuitable for administration.  The district court ignored the full claimed range, and instead suggested that a POSA "would know the appropriate and safe ranges for [osmolality]" and select accordingly from within the claimed range.  Appx124.  But one cannot "simply disavow the invalid portion and keep the valid portion of the claim" when assessing enablement. *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368 (2012).  "This is not how patent law works." *Id.*

Plaintiffs drafted a claim that was not enabled to its full scope, and as written includes unworkable osmolality levels, invalidating the claim as "a problem of its own making." *See MagSil*, 687 F.3d at 1384. It was undisputed that at low osmolality values within the claimed range, that osmolality would "affect the therapeutic effectiveness of a formulation and cause substantial tissue damage." Appx89; *see also* Appx87 ("[Defendant's expert testified] an osmolality or volume level that was too low within those wide ranges could be unsafe and harmful to a patient."); Appx80 ("[Plaintiffs' expert testified] A POSA would not consider reducing osmolality at a level close to 0."). It is thus undisputed that claim 27 includes osmolality values that a POSA would never administer, but they remain within the claimed scope.

Yet rather than apply the correct legal standard for full scope enablement—whether a POSA could make and use formulations across the **whole** claimed range without undue experimentation—the district court instead answered the question whether a POSA could make formulations within any **portion** of the claimed range. The district court thus stated that "[a] POSA would know the appropriate and safe ranges for each element and would adjust them accordingly to ensure that the administered formulation was not insoluble, toxic, or intolerable for the patient" and "[a] POSA would never administer—or even consider administering—a drug at a dangerously low osmolality or pH, or a dangerously high injection volume."

20

Appx124.  In other words, the district court reported that the only trial evidence confirmed that the full claimed range would not and could not be used, but instead of invalidating the claim for that reason, rewrote it to assume some implied lower workable range.  That was error.  Even if a POSA could find a suitable osmolality within the claimed scope, the whole claim is invalid as long as other osmolalities within the claimed scope lack enablement.  *See Alcon*, 687 F.3d at 1368 ("When you claim a concentration range of 0.0001–5% w/v (as claim 2), you can't simply disavow the invalid portion and keep the valid portion of the claim. If everything up to 0.001% w/v is admittedly not enabled, then the entire claim is invalid."); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379-80 (Fed. Cir. 2007) (rejecting patentee's argument that enablement of embodiment for injector with pressure jacket was insufficient to enable claim covering injector with or without pressure jacket).  The district court's judgment should be reversed.

### 2.    The District Court's Written Description Analysis Never Considered the Full Scope Requirement

Similarly, claim 27 of the '105 patent also failed the written description requirement, because the specification fails to show that the named inventors possessed the full scope of the claimed invention.  "[T]he patent monopoly does not extend beyond the invention described…; that it cannot be enlarged by claims in the patent not supported by the description." *Schriber-Schroth Co. v. Cleveland Trust Co.*, 305 U.S. 47, 57 (1938).  "[A] separate requirement to describe one's invention

is basic to patent law." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1345 (Fed. Cir. 2010).   The appropriate test for written description "is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date" via "an objective inquiry into the four corners of the specification from the perspective of a [POSA]." *Id.*  The '105 patent fails that test because the inventor was not in possession of the full scope of claimed osmolality range.

The full scope of osmolality ranges was expressly claimed, and thus "must be supported by adequate disclosure in the specification." *Biogen Int'l GmbH v. Mylan Pharma. Inc.*, 18 F.4th 1333, 1343 (Fed. Cir. 2021).   Two specification examples tested for osmolality, and one disclosed the range "275 mOsm/kg-375 mOsm/kg" and the other disclosed "150 mOsm/kg-50 mOsm/kg."   Appx194, 39:6-16 (Formulation 2), 39:24-34 (Formulation 4); *see* Appx2246, 833:12-19.   The specification demonstrates no support that the inventor had possession of the full scope of what was claimed, particularly for the portion of the claimed range from 0-150 mOsm/kg.   Claim 27 of the '105 patent thus fails the written-description requirement, which "limits patent protection only to individuals who perform the difficult work of producing a complete and final invention featuring all its claimed limitations and publicly disclose the fruits of that effort." *Biogen*, 8 F.4th at 1344.

22

The district court did not apply any full scope analysis and instead assumed that if a POSA could use any of the claimed scope, then the claim satisfied the written description requirement. Despite the specification's deficiency, and the district court's recognition that experts on both sides agreed that too low an osmolality could not work, the district court still concluded that "[a] POSA would be able to understand the purpose of the invention and how to use it." Appx124. That is not the written description standard, and the district court's judgment should be reversed. The district court's flawed approach "would lead to sweeping, overbroad claims because it would entitle an inventor to a claim scope far greater than what a person of skill in the art would understand the inventor to possess." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005).

### D.    The District Court Erred In Concluding Claim 27 Of The '105 Is Not Invalid For Lack Of Enablement For The Full Scope Of The Claimed pH Range

To satisfy the enablement requirement, the specification "must enable one of ordinary skill in the art to practice the full scope of the claimed invention." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003). Claim 27 of the '105 patent requires administering an "aqueous solution" "via an intravenous route of administration," to treat bacterial infections, and purports to cover the entire pH range of 4 to 7. That full range is not enabled because the patent does not teach how to make and use higher pH values of 6-7 and instead shows such values did not work.

23

## 1.    The District Court Failed to Apply the Full Scope Inquiry

The district court addressed the wrong question—whether a POSA could have used ***any one pH within*** the claimed range—whereas the required question for full scope enablement is whether a POSA could use ***any pH across the entire*** claimed range.    The enablement "doctrine prevents both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than what was actually invented." *MagSil*, 687 F.3d at 1381.    For that reason, the specification is required to enable the <u>full</u> scope of the claimed invention, and not merely a subset of the claimed scope.    *Trustees of Boston Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018); *Sitrick*, 516 F.3d at 999 ("The full scope of the claimed invention must be enabled."); *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195–96 (Fed. Cir. 1999) ("The scope of the claims must be less than or equal to the scope of the enablement.").

The district court committed legal error when it failed to address this "full scope" requirement.    The district court understood that Defendant's argument was "under some conditions that fall within the scope of the claims, a POSA would not be able to make formulations at some of the claimed pH levels because they would become insoluble and thus unsuitable for intravenous administration."    Appx123.    The district court, however, did not address this full scope requirement requiring workable solutions across the claimed pH ranges—including pH 6 and 7.    Instead,

the district court found that a POSA could find some workable pH within the claimed pH range, because the POSA "would know the appropriate and safe pH level, osmolality, and injection volume and would be able to adjust them accordingly to ensure that the administered formulation was not insoluble, toxic, or intolerable for the patient." Appx121.

### 2.    The Patent Specification Shows Formulations Do Not Work For The Claimed Purpose At pH 6-7

When the correct legal test is applied to the facts, the evidence showed that the claims are not enabled across the entire pH range. Claim 27 of the '105 patent is a method claim, and requires administering minocycline intravenously to treat a bacterial infection with a "pH greater than 4 and less than 7." Appx13. The district court construed this claim term to mean that "the pH level of the 'composition' stated in the claims is the pH level of the reconstituted solution without a diluent." Appx23. It was undisputed below that if a formulation is insoluble and forms crystals, then it cannot be administered intravenously. Appx9, Appx86, Appx116 (minocycline when insoluble is "unsuitable and dangerous for intravenous administration"); Appx2151, 738:19-23 (Friedman).

Under the correct full scope analysis, the specification shows that aqueous solutions suitable for intravenous administration could <u>not</u> be achieved across the entire claimed pH range. The specification itself is grounds for showing lack of enablement. *AK Steel*, 344 F.3d at 1243-45. In *AK Steel*, this Court found that

because the "specification's teaching is itself evidence" of non-enablement, there was no need to separately show remaining factors for undue experimentation. *Id.* at 1244. Similarly in *Trustees of Boston University*, the Court found a patent claim not enabled as a matter of law where the specification failed to teach one of six possible permutations covered by the claim. *Trustees of Boston Univ.*, 896 F.3d at 1364-65 (Fed. Cir. 2018). Just like in *AK Steel*, where the specification data "tells the public that higher amounts of silicon will not work. Nothing further need be said about the matter," so too here the data tells the public that the high pHs of 6-7 will not work. *AK Steel*, 344 F.3d at 1244. Where, as here, the specification itself confirms the full scope is not enabled, the claims should have been found invalid.

As the district court found, the prior art posed two problems with minocycline formulations: low pH and high volumes. Because minocycline is very pH sensitive, at higher pHs, the drug becomes less soluble. As the court summarized, "A POSA could not try to increase the pH of the prior art minocycline because it would lead to solubility issues, nor could a POSA decrease the minimum injection volume because lower pH required higher injection volumes to avoid tolerability issues." Appx75. The core of the invention thus related to adding magnesium to enable higher pH and lower infusion volumes (i.e. higher drug concentration). The district court found that "[t]he addition of magnesium at a high ratio in relation to minocycline enables the pH of the solution to be adjusted to a more physiologic range." Appx10.

26

Claim 27 of the '105 patent, however, claims pH ranges above what the patent discloses and enables. That claim covers the entire range for "a pH greater than 4 and less than 7," although the patent does not enable formulations with a pH above 6.0 that still could meet the claim requirements for intravenous administration and treating bacterial infections. The patent specification contains stability data, reported in Table 30, which showed that the full scope of the claimed pH ranges are not described or enabled. Appx1939-Appx1940, 526:2-527:14 (Klibanov); Appx1115-Appx1116. Table 30 is reproduced here (Appx192 at 32:1-25) in its entirety:

TABLE 30

| | | Molar ratio cation ($Mg^{2+}$):Minocycline | | | | | | | | | | | | | | |
| | | 0 | | 1:2 | | 1:1 | | 2:1 | | 3:1 | | 5:1 | | 7:1 | | 10:1 | |
| Time (hr) | | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 mg/ml | pH 4 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 6 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 7 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| 5 mg/ml | pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 6 | ○ | ○ | ● | ● | ● | ● | ● | ● | ● | ● | ○ | ● | ○ | ● | ○ | ○ |
| 10 mg/ml | pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ○ | ○ | ○ | ○ | ○ | ● | ○ | ● | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 6 | ○ | ○ | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| 20 mg/ml | pH 4 | ○ | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ○ | ○ | | | | | | | | | ○ | ● | ○ | ● | ○ | ● |
| 30 mg/ml | pH 4 | ○ | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ○ | ● | | | | | | | | | ○ | ● | ○ | ● | ○ | ● |

●: insoluble;
○: soluble

Table 30 shows a "binary end point, insoluble/soluble," looking at whether or not minocycline maintained an aqueous solution. Appx2298, 885:17-24 (deVries).

Table 30 demonstrates that the inventors did not even report stability results at pH 7, except for the trivial case of 1 mg/ml minocycline, where there was no difference with or without magnesium.  In fact, even for 5 mg/ml, the test results already showed solubility could not be maintained at pH 6.  Also at pH 6, for the 10 mg/ml concentration, Table 30 showed that adding magnesium never resulted in a soluble formulation; all magnesium-minocycline formulations were insoluble.

The specification itself summarized the Table 30 results this way: "minocycline stays in solution upon introduction of a cation at concentrations of 10mg/ml and less *if the pH is less than 5*."  Appx191, 33:46-48.

The specification reported no tests for efficacy regarding the "treating a bacterial infection" at any concentration or pH.  The 10 mg/ml concentration was thus particularly important because all four example minocycline formulations "suitable for intravenous administration" in the specification (denoted Formulations 1-4) used 10 mg/ml concentrations.  Appx163, 38:1-43; *see also* Appx193-194.  The only pH reported for those formulations, however, was 4.5-5.5, and nothing higher.  Appx163, 38:11, Appx20, Appx31, Appx38.  The 10 mg/ml concentration is also significant because it is the concentration that has been shown to treat a bacterial infection, as claim 27 requires.  Appx164, 40:48.  In fact, Appellees' formulation expert Dr. Tina deVries testified that Formulation 4 corresponded to the commercial Minocin IV embodiment.  Appx1618, 205:1-9.  The Minocin IV label reports that

the reconstituted solution has a pH of "4.5 to 5.0", and even the further diluted solution has a pH that goes up to "4.5 to 6.0." Appx10. No evidence supported efficacy at any concentration with a pH of 6-7, and named inventor Mr. Griffith testified that "large volumes" associated with lower concentrations presented "tolerance issues." Appx1743-Appx1744, 330:6-331:18. Only at the pH range of 4.5-5.5, therefore, did the patent enable "that the formulation could be diluted into a lower volume of solution to prepare it for administration." Appx45. As Table 30 also shows, any higher concentrations did not even report test results using pH 6-7. Appx2300, 887:1-3, 16-25 (deVries). The patent specification thus does not provide guidance about the delicate balance between magnesium levels, concentration, and efficacy for pH 6-7 formulations within the claimed range.

Because the trial court undertook the wrong analysis—about whether any individual pH could work and not whether the full scope had been enabled—it did not discuss Table 30 or any pH greater than 6. Nevertheless, the district court acknowledged Nexus's full scope argument was that "a POSA would not be able to make formulations at some of the claimed pH levels because they would become insoluble and thus unsuitable for intravenous administration." Appx123. Yet in finding the claims enabled, the district court only looked to any individual workable embodiment within the claimed range rather than the full scope: "A POSA would know the appropriate and safe ranges for each element and would adjust them

accordingly to ensure that the administered formulation was not insoluble, toxic, or intolerable for the patient." Appx124. In making this conclusion, the district court confused obviousness (where only one obvious example within the claimed ranges invalidates the entire claim) with enablement (where only one workable example within the claimed ranges does not enable the full scope of the claim).

Claim 27 of the '105 patent purports to claim and preclude others from using the entire pH range of "pH greater than 4 and less than 7," but that includes the pH 6-7 that was not enabled. Table 30 showed that "the specification clearly and strongly warns that such an embodiment" using pH 6-7 and concentrations sufficient to treat bacterial infections would not work. *AK Steel*, 344 F.3d at 1244. The claims are therefore not fully enabled as one cannot "simply disavow the invalid portion and keep the valid portion of the claim." *Alcon*, 687 F.3d at 1368. Claim 27 is not enabled, and the district court's conclusion to the contrary should be reversed.

## VII. Conclusion And Relief Sought

For the above stated reasons, Nexus respectfully requests that the Court reverse the holdings of the district court as to claims 1, 7, and 18 of the '802 patent and claim 27 of the '105 patent. Nexus further respectfully requests the Court reverse the district court's preliminary injunction barring approval of Nexus's ANDA and of its ANDA products.

Respectfully submitted,

/s/ Helen H. Ji
Imron T. Aly
Kevin M. Nelson
Helen H. Ji
Matthew T. Wilkerson
ARENTFOX SCHIFF LLP
233 S Wacker Drive, Suite 7100
Chicago, Illinois  60606
(312) 258-5500
imron.aly@afslaw.com

*Counsel for Appellant*

# ADDENDUM

**INDEX TO DESIGNATED RECORD ON APPEAL**
**U.S.C.A. Fed. Cir. No. 25-1281 (consolidated)**
**ND. Ill. Case Nos. 21-cv-2636, -5995**

| Date | Case No. | Dkt./Trial Exhibit No. | Document | Appx Pages |
|---|---|---|---|---|
| 11/15/2024 | 2636 | 276 | Court Opinion containing Finding of Facts and Conclusions of Law | Appx1-125 |
| 11/15/2024 | 2636 | 277 | Final Judgment | Appx126-129 |
| 11/15/2024 | 5995 | 54 | Final Judgment | Appx130-133 |
| 11/15/2024 | 2636 | 275 | Minute Entry re Judgment and Opinion | Appx134 |
| 11/15/2024 | 5995 | 53 | Minute Entry re Judgment and Opinion | Appx135 |
| 07/21/2015 | 2636 | PTX-001 | United States Patent 9,084,802 | Appx136-165 |
| 3/26/2020 | 2636 | PTX-002 | United States Patent 9,278,105 | Appx166-196 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MELINTA THERAPEUTICS, LLC,
MELINTA SUBSIDIARY CORP, and
REMPEX PHARMACEUTICALS, INC.,

           Plaintiffs,

           v.

NEXUS PHARMACEUTICALS, INC.,

           Defendant.

No. 21-cv-02636

Judge John F. Kness

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court for decision on the infringement and validity of Claims 1, 7, and 18 of the U.S. Patent No. 9,084,802 (the " '802 Patent") and Claim 27 of the U.S. Patent No. 9,278,105 (the " '105 Patent") (together, the "patents-in-suit"). The patents-in-suit cover the intravenous administration of Minocin® (minocycline) for injection ("Minocin") product, an aqueous solution consisting of minocycline and magnesium that is used to treat bacterial infections. The matter was before the Court for a bench trial over four days from June 6, 2023 to June 9, 2023. Closing arguments were heard separately on August 15, 2023. This is a Hatch-Waxman patent infringement action brought by Melinta Therapeutics, LLC; Melinta Subsidiary Corp.; and Rempex Pharmaceuticals, Inc. (together, the "Plaintiffs") against Nexus Pharmaceuticals, Inc. (the "Defendant"). It arises out of Defendant's filing of Abbreviated New Drug Application ("ANDA") No. 214934 containing a

Paragraph IV certification with the Food and Drug Administration ("FDA") seeking approval to market a generic version of Minocin identified in the ANDA.

Having considered the evidence presented during the bench trial, the parties' proposed findings of fact and conclusions of law, the relevant authorities, and the record as a whole, the Court finds that Plaintiffs have shown by a preponderance of the evidence that Defendant infringed on the asserted claims (the "Asserted Claims") in the patents-in-suit, and Defendant has failed to show by clear and convincing evidence that the Asserted Claims of the patents-in-suit are invalid for obviousness, indefiniteness, inadequate description, or lack of enablement. The Asserted Claims of the patents-in-suit are valid and enforceable. For the reasons set forth below, judgment is entered in favor of Plaintiffs and against Defendant, and a permanent injunction shall be entered accordingly.

In support of this decision, the Court makes the following findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure. Because the parties raised claim construction disputes on the first day of trial, this Memorandum also construes the several disputed claims. To provide clarity on the disputed claims, the Court begins with some findings of fact (Part II), detours with claim construction (Part III), finishes its findings of fact by describing the evidence the parties presented at trial (Part IV), and concludes with conclusions of law (Part V).

## I.     LEGAL STANDARD

In a bench trial "tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1).

The primary purpose of Rule 52(a)(1) is to "aid[] the trial court's adjudication process by engendering care by the court in determining the facts." *Garner v. Kennedy*, 713 F.3d 237, 242 (5th Cir. 2013); *see also McKee v. Brunswick Corp.*, 354 F.2d 577, 580 (7th Cir. 1965). The trial court "need only make brief, definite, pertinent findings and conclusions upon the contested matters" such that the findings are "explicit enough to enable appellate courts to carry out a meaningful review." Fed. R. Civ. P. 52(a)(1) advisory committee's note to 1946 amendment; *Garner*, 713 F.3d at 243.

## II. FINDINGS OF FACT

### A. The Parties and Procedural Posture

Plaintiffs are biopharmaceutical companies that develop antibiotics to treat infectious diseases. (Dkt. 252 ¶ 4.) Plaintiffs own New Drug Application No. 050444 (the "NDA") for the FDA-approved Minocin product. (Dkt. 228-1 ¶ 5.) Plaintiffs own the '105 Patent and the '802 Patent, which are both listed in the FDA's Orange Book[1] in connection with the NDA and Minocin. (Dkt. 228-1 ¶¶ 7, 16–17, 26–27.) The inventors of the patents-in-suit are David C. Griffith, Serge Boyer, Scott Hecker, and Michael N. Dudley. (*Id.* ¶¶ 9, 20.) The priority date of the patents-in-suit is May 12, 2010. (*Id.* ¶¶ 8, 19.)

Defendant Nexus Pharmaceuticals, Inc. is a pharmaceutical company that makes generic versions of FDA-approved injectable drug products. (Dkt. 252 ¶ 7.)

---

[1] The "Orange Book" is a publication authored by the FDA that "identifies drug products approved on the basis of safety and effectiveness [by the FDA] under the Federal Food, Drug, and Cosmetic Act . . . and related patent and exclusivity information." *Approved Drug Products with Therapeutic Equivalence Evaluations—Orange Book: Background*, U.S. Food & Drug Admin. (Jan. 25, 2024), https://www.fda.gov/drugs/drug-approvals-and-databases/approved-drug-products-therapeutic-equivalence-evaluations-orange-book.

Defendant owns the ANDA, which Defendant submitted to the FDA on October 16, 2020 seeking to develop a generic version of Minocin prior to the expiration of the patents-in-suit. (Dkt. 228-1 ¶ 6.) As part of the ANDA approval process, Defendant sent a notice to Plaintiffs asserting that its ANDA did not infringe the patents-in-suit, or, alternatively, that the patents-in-suit were invalid. (*Id.*) Plaintiffs responded to the notice by filing this lawsuit, which triggered an automatic thirty-month stay[2] of regulatory approval of Defendant's ANDA. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

Plaintiffs filed this lawsuit on May 14, 2021. (Dkt. 1.) On December 7, 2021, this case was consolidated with related Case No. 21-cv-05995, which was originally filed in the District Court for the District of New Jersey and transferred to this Court on November 5, 2021. (Dkts. 42; 45.) The related case asserts the same claims against Defendant and was, therefore, consolidated to save judicial time and resources. (Dkt. 42.) The cases were consolidated for pretrial and trial matters but were not merged, thereby requiring separate judgments. (Dkt. 45.)

Plaintiffs' complaint contains three counts. (Dkt. 1.) Count I, brought under 21 U.S.C. § 335(j)(5)(B)(iii) and 21 C.F.R. § 314.95, seeks a declaratory judgment to resolve whether the thirty-month stay of FDA approval was triggered. (*Id.* ¶¶ 1, 28–38.) Counts II and III were brought under 35 U.S.C. § 271(e)(2)(A), alleging that Defendant infringed upon the patents-in-suit when Defendant submitted its ANDA seeking approval to engage in the commercial manufacture, sale, use, and/or importation of Defendant's ANDA products before Plaintiffs' patents had expired. (*Id.*

---

[2] The stay ended on September 30, 2023. (Dkt. 228 ¶¶ 89–90.)

¶¶ 39–62.) Count II alleges infringement of the '105 Patent and Count III alleges infringement of the '802 Patent. (*Id.* ¶¶ 40, 52.) Defendant filed an answer and counterclaims. (Dkt. 9.) Defendant argues in Count I of the counterclaim that it did not infringe on the '105 Patent because the patent was invalid. (*Id.* ¶¶ 27–31.) Defendant makes identical arguments in Count II of the counterclaim, but for the '802 Patent. (*Id.* ¶¶ 32–36.)

Defendant moved to dismiss Count I of the complaint for lack of subject matter jurisdiction, or, alternatively, for failure to state a claim or under the doctrine of primary jurisdiction. (Dkt. 39.) This motion was stayed pending resolution of a related action in the District of Columbia. (Dkt 189; Dkt. 192.) *Melinta Therapeutics, LLC v. FDA*, No. 22-2190, 2022 WL 610018 (D.D.C. Oct. 7, 2022). In that case, the court granted Melinta's motion for a temporary restraining order and preliminary injunction, vacated the FDA's approval of the ANDA, and remanded the case to the FDA. *Melinta*, 2022 WL 610018, at *10. Defendant appealed this decision, but the District of Columbia Circuit dismissed the appeal for lack of jurisdiction and agreed that the case should remain remanded to the FDA. *Melinta Therapeutics, LLC v. FDA*, No. 22-5288, 2022 WL 19723218, at *1 (D.C. Cir. Dec. 1, 2022). The parties have since reported that the FDA has approved the ANDA. (Dkt. 271.) Accordingly, Count I is dismissed as moot. Counts II and III of Plaintiffs' complaint, along with Counts I and II of Defendant's counterclaims, proceeded to trial.

A bench trial took place over four days from June 6, 2023 to June 9, 2023. Closing arguments were heard separately on August 15, 2023. Plaintiffs called three

witnesses: (1) Dr. Bruce Friedman ("Dr. Friedman"), (2) Dr. Tina deVries ("Dr. deVries"), and (3) David Griffith ("Griffith"). (Dkt. 228¶ 16.) Defendant called two witnesses: (1) Dr. Henry F. Chambers ("Dr. Chambers"), and (2) Dr. Alexander Klibanov ("Dr. Klibanov"). (Dkt. 228 ¶ 18.) After Plaintiffs rested their case, Defendant moved for an oral Rule 52(c) judgment on partial findings in its favor. (Tr. 455:14–16.) The Court took the oral motion under advisement and reserved ruling until the close of evidence. (Tr. 456:3–21.) *See* Fed. R. Civ. P. 52(c). The Rule 52(c) motion is subsumed with the Court's following evaluation of the case.

After the conclusion of the bench trial, the parties submitted proposed findings of fact and conclusions of law with citations to the record. (Dkts. 252; 253; 255.) Because the issue of claim construction arose during the bench trial, both parties' proposed findings of fact and conclusions of law include their proposed constructions of several disputed claim terms within the allegedly infringing claims. (Dkt. 252 ¶¶ 45–91; Dkt. 255 ¶¶ 20–41.) The Court begins by first explaining the prior art minocycline, Minocin, and the ANDA product, and then reciting the disputed claims. With an understanding of the products at issue, the Court construes the disputed claims in Part III.

### B. Plaintiffs' Minocin Product

Plaintiffs' Minocin product replaced an old intravenous (IV) minocycline formulation (the "prior art minocycline"), a product approved in 1972 to treat bacterial infections caused by the Acinetobacter baumannii bacteria. (Tr. 75:17, 322:17–323:14; DTX-0027.) The prior art minocycline was removed from the market

in 2005 but returned in 2009 because no other similar product existed to treat bacterial infections. (Tr. 705:8–10, 707:13–708:1.) Around that time, the inventors began research for the patents-in-suit, hoping to improve the prior art minocycline. (Tr. 320:9–22.) A few years later, Plaintiffs acquired the NDA for the prior art minocycline and shortly thereafter filed a supplemental NDA seeking to replace the prior art minocycline with their new Minocin formulation. (Dkt. 255 ¶¶ 10–11; DTX-0072.)

Both the prior art minocycline and Minocin are intended to be administered to a patient intravenously, *i.e.*, injected into the patient's vein. An intravenous product begins as a powder or other dried substance. But to be administered intravenously, the powder must be dissolved to create an aqueous[3] solution. Both the prior art minocycline and Minocin require dissolution—or, in scientific terms, reconstitution—in 5 mL of sterile water. (*See* DTX-110; DTX-112.) The reconstituted liquid solution is then a fully dissolved aqueous solution suitable for intravenous injection. Accordingly, the term "reconstituted solution" used in this Memorandum refers to the drug product dissolved in 5 mL of water before it is further diluted. After reconstitution, the reconstituted solution must be diluted further with an additional diluent to prepare it for intravenous administration. The prior art minocycline label instructs a POSA to further dilute the reconstituted solution in 500 mL to 1,000 mL of a compatible diluent. (DTX-112.) The Minocin label instructs further dilution in 100 mL to 1,000 mL of specific diluents, but the relevant claims in this action instruct

---

[3] "Aqueous" means "of the nature of water." Aqueous, *Taber's Medical Dictionary Online* (24th ed.).

an injection volume of "less than 500 mL." (DTX-110; PTX-1.) The diluted solution is also referred to as the "admixture."

The inventors of the patents-in-suit set out to improve the prior art minocycline. Although the prior art minocycline effectively treated bacterial infections, it suffered from several faults. First, it had a low pH level. Second, it required a high injection volume. Although Defendant disputes this, the low pH level and high injection volume created a risk of irritability, tolerability, and other injection site hemolysis[4] issues.

First, the prior art minocycline had a low pH level. A pH level is a "measure of acid intensity," and the lower the pH level, the more acidic a solution is. (Tr. 611:7–8.) The prior art minocycline pH levels range from 2.0 to 6. The pH level for the reconstituted solution is 2.0 to 2.8, 2.5 to 4 after dilution, and 4.5 to 6 after dilution in a particular diluent called Lactated Ringer's. (Tr. 328:25–329:5, 480:10–481:3, 611:9–18, 797:18–20, 890:8–17; DTX-112.) Dr. Friedman testified that those prior art minocycline pH levels were low, and that a pH level closer to 7.35 to 7.45 is needed for safe administration to patients. (Tr. 117:7–13.) A pH level that is too low—and therefore more acidic—can trigger injection site hemolysis. (*Id.* at 117:14–20, 117:25–118:14.)

Second, the prior art minocycline required a high injection volume. The prior art minocycline instructed an administration at a volume of at least 500 mL and up to 1,000 mL per infusion. A higher volume was required because more diluent

---

[4] The definition of "injection site hemolysis" follows in Section III.C.4 of this Memorandum.

increased the pH level and thus reduced injection site hemolysis. (*Id.* at 119:10–12, 323:25–324:7.) But a high infusion volume would put patients at risk of fluid overload, especially those patients who were already receiving other intravenous fluids. An overload of intravenous fluids then created a risk of other serious medical issues. (*Id.* at 118:15–19:9, 331:2–18.)

These issues caused the prior art minocycline to be used as a last resort before being removed from the market entirely. (Dkt. 252 ¶ 182; Tr. 704:18–05:15.) The product was reintroduced to the market a few years later because no other efficacious product existed to treat bacterial infections, but it continued to suffer from the same problems. Attempts to improve the prior art minocycline were "valiant" but ultimately unsuccessful due to solubility,[5] stability,[6] or injection site tolerability issues. (Dkt. 252 ¶ 183; Tr. 325:7–20, 709:17–710:14, 798:14–22.) Solubility was a problem because an intravenous product must be administered as an aqueous solution, and if the product is not completely dissolved, it cannot be intravenously administered safely. Stability was a problem because the minocycline molecule needs to remain unchanged to be effective against the bacteria it is intended to treat. And injection site tolerability issues were a problem because the aqueous formulation needed to be administered intravenously without causing harmful effects to the skin or the blood cells.

---

[5] "Solubility" refers to the "capability [of a substance] of being dissolved," a necessary property of all drugs in order for them to be administered to a patient. Solubility, *Taber's Medical Dictionary Online* (24th ed.). (*See also* Tr. 197:20–198:12.)

[6] "Stability" refers to "the condition of remaining unchanged, even in the presence of forces that would normally change the state or condition." Stability, *Taber's Medical Dictionary Online* (24th ed.). (*See also* Tr. 332:19–333:6.)

The inventors thus set out to improve the prior art minocycline without any solubility, stability, or tolerability issues. The final patented Minocin product differs from the prior art minocycline in one primary respect: the addition of magnesium. The addition of magnesium at a high ratio in relation to minocycline enables the pH of the solution to be adjusted to a more physiologic[7] range. In turn, if the pH can be adjusted higher, a high injection volume can be decreased because it is no longer needed to improve pH, thereby reducing injection site tolerability issues. (Tr. 121:18–23.) The pH levels for Minocin, according to its label, are as follows: 4.5 to 5.0 for the reconstituted solution, and 4.5 to 6 after dilution in compatible solutions. (DTX-110.) The injection volume for Minocin is 100 mL to 1,000 mL when diluted in various solutions, or 250 mL to 1,000 mL when diluted in Lactated Ringer's. (*Id.*)

The patents-in-suit elaborate on what the Minocin label states. They describe the use of minocycline (a 7-dimethylamino-tetracycline) with divalent[8] metal cations[9]. (Tr. 421:9–19; PTX-1; PTX-2.) The particular divalent metal cation specified in the patents-in-suit is magnesium. (*Id.*) The patents-in-suit specify that a higher molar ratio of divalent cations (specifically, magnesium) to a tetracycline (specifically,

---

[7] "Physiologic" means "characteristic of or appropriate to an organism's healthy or normal functioning." So, the characteristics of solution at a physiologic range are characteristics that match or are similar to those characteristics within an organism such as a human. Physiologic, *Mirriam-Webster Unabridged Dictionary*.

[8] "Divalent" describes the property of a molecule "having an electric charge of two." Divalent, *Taber's Medical Dictionary Online* (24th ed.).

[9] A "cation" is an "ion with a positive electric charge." Cation, *Taber's Medical Dictionary Online* (24th ed.). When used in the context of patient care, a cation is "a positively charged ion[] that contribute[s] to the pH of human plasma." *Id.* Examples of such cations are calcium, magnesium, potassium, and sodium. *Id.*

minocycline) successfully decreases hemolysis in relation to a formulation like the prior art minocycline that does not have magnesium. (*Id.*) The '802 Patent instructs a molar ratio of magnesium to minocycline that is greater than about 4 to 1, and the '105 Patent one that is greater than 3 to 1. (Tr. 107:15–108:2, 424:13–17; PTX-1 at 40:51–52; PTX-2 at 41:40.)

In addition, the '105 Patent specifies one additional property in its Minocin product. In Claim 1, the patent specifies "an osmolality[10] of less than about 500 milliosmols per kilogram (mOsmol/kg)." (PTX-002 at 41:43.) Osmolality is a measurement that can be calculated by a POSA after reading the ingredients and amounts of those ingredients on a product label. Neither the prior art minocycline label nor the Minocin label specify the osmolality level of their respective products.

## C.    Defendant's ANDA

Defendant filed its ANDA on October 16, 2020 seeking approval to develop a generic magnesium-based minocycline product before the expiration of the patents-in-suit, certifying that the patents-in-suit were either invalid or not infringed by the ANDA. (Dkt 228-1 at 1.) Because Minocin is an intravenous product, FDA regulations require generic products such as Defendant's ANDA to have the same active and inactive ingredients in the same amounts as Minocin. (Tr. 205:21–206:5.) The ANDA

---

[10] "Osmolality" refers to the "concentration of a solution expressed in osmoles of solute particles per kilogram of soluent." Osmolality, *Stedmans Medical Dictionary* (2014). Another medical dictionary defines "osmolality" as the "concentration of an osmotic solution by the concentration of the dissolved substances per 100 g [or 1 kg] of solvent." Osmolality, *Taber's Medical Dictionary Online* (24th ed.). In other words, osmolality measures (by weight) the concentration of dissolved particles in a solvent. (*See* Tr. 135:22–24.) The general standard of care for osmolality with respect to IV medications is less than 500 mOsmol/kg. (Tr. 136:15–18, 762:16–19.) A higher osmolality may cause tissue damage. (Tr. 137:10–12.)

describes a minocycline for injection product that contains three ingredients: (1) minocycline, (2) magnesium, and (3) a base. (PTX-042.) Defendant explained in several statements to the FDA that the purpose of magnesium in its ANDA product is reduction of injection site hemolysis. (Tr. 230:9–231:9; *see, e.g.*, PTX-021; PTX-206; PTX-211.) The ANDA does not identify a diluent in the list of ingredients. (*Id.*) But the ANDA label instructs that the composition be diluted in 100 to 1,000 mL of a diluent for adult use. (PTX-042.) According to the ANDA's label, the pH level of the ANDA composition before dilution is 4.5 to 5. (PTX-028; PTX-042.) After dilution, the pH "usually ranges from 4.5 to 6.0." (PTX-042.) The label does not specify the ANDA product's molar ratio or osmolality. The label explains that the ANDA minocycline for injection product is designed with the preceding ingredients and properties for the purpose of treating or preventing bacterial infections. (PTX-042.)

### D. The Asserted Claims

#### 1. *The '802 Patent*

Plaintiffs first assert infringement of Claims 1, 7, and 18 of the '802 Patent. (Dkt. 228-1 ¶ 12.) Claim 1 of the '802 Patent recites:

> 1. A method of treating a bacterial infection in a subject, wherein the method consists of:
>
> administering a therapeutically effective amount of a composition to a subject in need thereof via an intravenous route of administration,
>
> wherein the composition consists of an aqueous solution consisting of minocycline or a salt thereof, a salt that comprises a magnesium cation, and a base,
>
> wherein the molar ratio of magnesium cation to minocycline is greater than about 4:1, and

wherein the composition has a pH that is no less than 4 and no greater than 6,

whereby injection site hemolysis of red blood cells is reduced relative to intravenous administration of a composition that does not include magnesium.

(*Id.* ¶ 13.)

Claim 7 of the '802 Patent depends from Claim 1 and recites: "7. The method of Claim 1, wherein the composition has a pH between about 4.5 to about 5.5." (*Id.* ¶ 14.)

Claim 18 of the '802 Patent depends from claim 1 and recites: "18. The method of claim 1, wherein the total volume of the composition administered is less than 500 mL." (*Id.* ¶ 15.)

### 2. *The '105 Patent*

Plaintiffs next assert infringement of Claim 27 of the '105 Patent, which depends from Claim 1 of the '105 Patent. (*Id.* ¶ 23.) Claim 27 recites: "27. The method of claim 1, wherein the 7-dimethylamino-tetracycline is minocycline." (*Id.* ¶ 25.)

Claim 1 is an unasserted claim, but for clarity, because Claim 27 depends from it, Claim 1 recites:

1. A method of treating a bacterial infection in a subject, wherein the method comprises administering a therapeutically effective amount of a composition to a subject in need thereof via an intravenous route of administration, wherein the composition comprises an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a magnesium cation, wherein the molar ratio of magnesium cation to 7-dimethylamino-tetracycline antibiotic is greater than 3:1 and wherein the solution does not comprise a pharmaceutically acceptable oil, has a pH greater than 4 and less than 7, and has an osmolality less than about 500 mOsmol/kg.

(*Id.* ¶ 24.)

## III. CLAIM CONSTRUCTION

The claims of a patent are questions of law to be determined by the district court, not a question of fact to be determined by the factfinder. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). This process, dubbed "claim construction," is the "process of giving proper meaning to the claim language" which then "defines the scope of the protected invention." *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997). Claim construction "frames and ultimately resolves all issues of claim interpretation." *Id.*

The court typically construes claims and terms within claims before trial, after the parties submit claim construction briefs and the court conducts a claim construction hearing. *See* N.D. Ill. L. Pat. R. 4.1–4.3. But the court's understanding of claims may change as the trial proceeds. The court can thus engage in "rolling" claim construction, "in which the court revisits and alters its interpretation of the claim terms as its understanding of the [case] evolves." *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) (quoting *Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002)).

On March 21, 2022, over one year before the bench trial was held, the parties filed a joint status report stating that "neither Plaintiffs nor Defendant identified any terms requiring construction. Accordingly, the parties agree that no briefing, hearing or claim construction ruling by the Court is necessary." (Dkt. 70 at 1–2.) But on June 6, 2023, the first day of the bench trial, Defendant informed the Court of a claim construction issue that arose the previous day that was "significant enough to raise"

at trial. (Tr. 3:13–19.) Defendant stated that after reviewing Plaintiffs' materials, it believed "plaintiffs intend to change the words or add to the words in the claim." (Tr. 4:8–12.) Plaintiffs denied that they were "arguing or proffering a special meaning of any of the claims," nor were they "attempting to add words to the claim." (Tr. 4:18– 21.) The Court decided, with the parties' input and approval, to move forward with the trial, listen to the arguments, and determine after trial whether any claim construction issue persisted. (Tr. 7:17–10:3.) The parties were instructed to object during trial when a claim construction issue arose and file a post-trial motion or brief regarding the claim construction dispute if they deemed it necessary. (Tr. 7:17–10:3.) Both made claim construction objections during trial and presented various claim construction arguments in post-trial briefings. (Dkts. 249; 250; 251; 252; 253; 254; 255.) Accordingly, this Court must engage in post-trial rolling claim construction and will construe the several disputed claims raised by the parties.

## A.    Legal Standard

Claim construction begins with a "heavy presumption" that words in a claim are given their "ordinary and customary meaning." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The "ordinary and customary meaning" of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). The court stands in the shoes of a person of ordinary skill in the art (a "POSA") and "review[s] the same resources as would" a POSA. *Multiform*

*Desiccants, Inc. v. Medzam*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). The court, acting as a POSA, reads the claim terms "with an understanding of their meaning in the field" and applies "knowledge of any special meaning and usage [of the terms] in the field." *Phillips*, 415 F.3d at 1313.

Often, the ordinary and customary meaning of a claim term, even when read from the perspective of a POSA, is "readily apparent" and can be determined with "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In more complex cases, however, "because the meaning of a claim term as understood by [a POSA] is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to" other sources to define the claim. *Id.* The court primarily looks to intrinsic evidence contained in the record, such as the claims themselves, the patent's specification, and the patent's prosecution history. *Id.*

The patent's claims themselves, along with the context in which the terms appear in the claim, "provide substantial guidance as to the meaning of particular claim terms." *Id.*; *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). Second, the patent's specification is "highly relevant" because new patents are required to be described in "full, clear, concise, and exact terms." *Vitronics*, 90 F.3d at 1582; 35 U.S.C. § 112. Accordingly, the construction "that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). An exception to this "ordinary and customary

meaning" rule exists when the inventor acts as the patent's lexicographer and expresses in the specification that a claim term has "a special definition . . . that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. In such a circumstance, the inventor's definition is dispositive. *Id.* Third, the patent's prosecution history, which includes the "complete record of the proceedings before the [United States Patent and Trademark Office ("USPTO")] and includes the prior art cited during the examination of the patent," is helpful to claim construction because it provides insight into how the USPTO and inventor understood the patent and accurately represents what the patentee intended with the patent. *Id.* at 1317.

District courts are also authorized to look to extrinsic evidence such as dictionaries, treatises, and expert testimony to determine the "ordinary and customary meaning" of a claim term. *See id.* at 1317–18 (quoting *Markman*, 52 F.3d at 980). But the use of extrinsic evidence should be limited. Extrinsic evidence may not contradict the intrinsic evidence. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008). Because extrinsic evidence is removed from the facts of the patent in question, it is less reliable than intrinsic evidence; extrinsic evidence should therefore only be "considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.

### B.      Person of Ordinary Skill in the Art

Because patent claims are construed from the perspective of a POSA, the Court must begin its claim construction analysis by defining who a POSA is in this case. A POSA is a hypothetical person "deemed to read the words used in the patent

documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Id.* at 1313 (citing *Multiform Desiccants, Inc.*, 133 F.3d at 1477). A POSA is presumed to be aware of all pertinent prior art, regardless of whether the patentee is actually aware of the existence of all prior art. *See Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985).

The parties disagree slightly on the proper definition of a POSA. Plaintiffs' expert Dr. deVries testified that a POSA is "a chemist, a formulator, a pharmaceutical scientist or infectious disease or critical care doctor with an advanced degree and experience with chemistry, formulation, and / or administration of tetracyclines [who] . . . would collaborate with other POSAs as necessary." (Tr. 203:22–204:3.) Defendant's expert Dr. Klibanov testified that a POSA is an "individual with an advanced degree in pharmacy, chemistry, or a related field, plus practical experience with pharmaceutical formulations, including their methods of preparation, stability, characterization, and administration, along with a physician or a medical professional who administers injectable formulations." (Tr. 463:11–17.) The key difference between these proposed definitions is whether the POSA has experience working with tetracyclines. Both experts, however, stated that their opinions would not change if they applied the opposing party's definition of a POSA. (Tr. 204:8–11, 464:3–5.) Accordingly, this Court defines a POSA in this case with elements that are common to both parties: "an individual with an advanced degree in chemistry,

pharmacy, or a related field, and with experience in pharmaceutical formulations and administrations."

### C. The Disputed Claim Terms

#### 1. *"Composition"*

The parties first dispute the claim term "composition." This claim term appears multiple times in Claim 1 of the '802 Patent, which reads (with the relevant claim term underlined):

> 1.    A method of treating a bacterial infection in a subject, wherein the method consists of:
>
> > administering a therapeutically effective amount of a <u>composition</u> to a subject in need thereof via an intravenous route of administration,
> >
> > wherein the <u>composition</u> consists of an aqueous solution consisting of minocycline or a salt thereof, a salt that comprises a magnesium cation, and a base,
> >
> > wherein the molar ratio of magnesium cation to minocycline is greater than about 4:1, and
> >
> > wherein the <u>composition</u> has a pH that is no less than 4 and no greater than 6,
> >
> > whereby injection site hemolysis of red blood cells is reduced relative to intravenous administration of a <u>composition</u> that does not include magnesium.

The claim term also appears in Claims 7 and 18 of the '802 Patent, which depend on claim 1. Claim 7 reads: "The method of claim 1, wherein the <u>composition</u> has a pH between about 4.5 to about 5.5." Claim 18 reads: "The method of claim 1, wherein the total volume of the <u>composition</u> administered is less than 500 ml." Claim 27 of the '105 Patent also includes the word "composition," because it depends on Claim 1. Claim 27 reads: "The method of claim 1, wherein the 7-dimethylamino-tetracycline is minocycline." And Claim 1 reads:

> 1.     A method of treating a bacterial infection in a subject, wherein the method comprises administering a therapeutically effective amount of a <u>composition</u> to a subject in need thereof via an intravenous route of administration, wherein the <u>composition</u> comprises an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a magnesium cation, wherein the molar ratio of magnesium cation to 7-dimethylamino-tetracycline antibiotic is greater than 3:1 and wherein the solution does not comprise a pharmaceutically acceptable oil, has a pH greater than 4 and less than 7, and has an osmolality less than about 500 mOsmol/kg.

In their post-trial briefings, Plaintiffs extensively argue that the plain and ordinary meaning of "composition" is the concentrated, reconstituted solution in the vial prior to dilution. (Dkt. 249 at 3.) Plaintiffs explain that everywhere the term "composition" is mentioned in the claims, it is in reference to the solution before dilution. (*Id.*; Dkt. 251 at 3–4.) In one place, "composition" is followed by a list of ingredients, none of which are a diluent. (Dkt. 249 at 3.) It follows, then, according to Plaintiffs, that "composition" includes only the listed ingredients before a diluent is added. (*Id.*) Plaintiffs' expert witnesses testified at trial that a POSA would agree, based on the patent's specification, that "composition" refers to the reconstituted solution before dilution. (Tr. 103:2–19; 217:19–218:10, 19–24.) In post-trial briefings, Plaintiffs emphasize that it is undisputed that the Asserted Claims are specific only to minocycline "compositions"—not all "compositions" in the specification—and the references to minocycline compositions in the specification do not include a diluent. (Dkt. 251 at 3–4.) Plaintiffs also cite the pH levels stated in the patents as further support for their proposed construction of "composition," arguing that all references to the pH of the "composition" in the patent specifications is to the pH levels of the reconstitute solution before adding a diluent. (Dkt. 249 at 4; Dkt. 252 ¶¶ 46–49.)

Defendant disagrees. Defendant argues that the plain and ordinary meaning of "composition" is whatever is administered to a patient. (Dkt. 250 at 16; Dkt. 254 at 8–10.) Defendant cites the patent specifications, which state that "composition" refers to what is administered—and because the solution can only be administered *after* it is diluted, "composition" must mean the diluted solution. (*Id.*)

The Federal Circuit has long viewed the term "composition" as a term of art in chemistry and patent law and has regularly interpreted a chemical "composition" to exist "at the moment the ingredients are mixed together. Before the creation of the mixture, the ingredients exist independently." *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1558 (Fed. Cir. 1995). Consequently, a patentee's claims are a "composition that contains the specified ingredients at any time from the moment at which the ingredients are mixed together. This interpretation of [the patentee's] claims preserves their identity as product claims, and recognizes as a matter of chemistry that the composition exists from the moment created." *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1244 (Fed. Cir. 2002) (quoting *Exxon*, 64 F.3d at 1558); *see also Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1374 (Fed. Cir. 2004); *Kim v. The Earthgrains Co.*, 2005 WL 66071, at *11 (N.D. Ill. Jan. 11, 2005) (construing "composition" in the patent as the "specific ingredients . . . at any time from the moment they are mixed together").

Applying this standard, the plain and ordinary meaning of "composition" refers to the specified ingredients stated in the claim the moment they are mixed together. There are three specified ingredients in Claim 1 of the '802 Patent: "an aqueous

solution consisting of minocycline or a salt thereof, a salt that comprises a magnesium cation, and a base." (PTX 1 at 40:48–50.) And there are two specified ingredients in Claim 1 of the '105 Patent: "an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a magnesium cation." (PTX 2 at 41:37–48.) A diluent is not mentioned in either. The "composition" thus means the three ingredients specified in Claim 1 of the '802 Patent claims and the two ingredients specified in Claim 1 of the '105 Patent at the moment they are mixed, without a diluent.

The '802 Patent and '105 Patent specifications do not, as Defendant contends, provide a basis for deviating from this plain and ordinary meaning. The word "composition" is used many times throughout the specifications, but the Asserted Claims in the case are directed in particular to the minocycline "compositions" mentioned in the specifications. (Tr. 203:13–18.) The four minocycline compositions in the specifications do not include a diluent in the list of ingredients. (PTX-1 at 3:38–55; PTX-2 at 3:32–49.) Defendant cites to several places in the specifications that allegedly prove the existence of a diluent in the "composition," but the examples Defendant points to are not specifically minocycline "compositions," and they do not say anything about a diluent as an ingredient. (*See* Dkt. 250 at 16; PTX-1 at 6:26–36, 12:13–34.) None of the minocycline "compositions" in the specifications provide any basis for deviating from the plain and ordinary meaning of the phrase "composition." Defendant does not argue that the prosecution history suggests otherwise.

Based on this construction, the Court agrees with Plaintiffs that all references in the specifications to the pH of the composition describe the pH of the reconstituted

solution without a diluent. All pH references in the specifications follow an ingredient list (none of which include a diluent) or explicitly say that the stated pH level is "the pH of a reconstituted solution." (PTX-1 at 3:38–4:24, 14:46–15:56, 38:1–39:55; PTX-2 at 3:32–4:18, 14:32–15:42, 38:59–40:45.)

For these reasons, this Court holds that the term "composition" as used in Claims 1, 7, and 18 of the '802 Patent refers to the three ingredients—minocycline, magnesium, and a base—explicitly listed in the claims at the moment the ingredients have been mixed together. In Claims 1 and 27 of the '105 Patent, the claim term "composition" refers to the two ingredients—minocycline and magnesium—explicitly listed in Claim 1 at the moment the ingredients have been mixed together. It therefore follows that the pH level of the "composition" stated in the claims is the pH level of the reconstituted solution without a diluent.

### 2. *"Consists / consisting of"*

The second disputed claim term is "consists of" or "consisting of." This claim term is closely related to "composition." The terms are adjacent to one another in Claim 1 of the '802 Patent: " . . . wherein the composition <u>consists of</u> an aqueous solution <u>consisting of</u> minocycline or a salt thereof, a salt that comprises a magnesium cation, and a base . . . ." Like "composition," the parties dispute whether the claim term "consists / consisting of" includes a diluent.

Diverting from its position on the term "composition," Defendant argues that "consists / consisting of" *does not* include a diluent. Defendant argues that the claim

term "consists / consisting of" can only refer to the three ingredients that are listed in the patent (minocycline, magnesium cation, and a base). (Dkt. 250 at 16–18.)

Plaintiffs do not explicitly construe "consists / consisting of," and only mention the claim term in their post-trial briefings to respond to Defendant's proposed construction. Plaintiffs argue that Defendant's construction of "consists / consisting of" is at odds with its proposed construction of "composition." (Dkts. 249 at 5–6; 251 at 5–6.) It is Plaintiffs' position that Defendant's constructions of "composition" and "consists / consisting of" cannot both be correct. (Dkt. 251 at 5–6.) According to Plaintiffs, if Defendant is correct that "composition" *does* include a diluent, but "consists / consisting of" *does not* include a diluent, the patent could never be infringed—which "cannot be correct." (Dkts. 249 at 5–6; 251 at 5–6.)

Like "composition," the claim term "consists of" or "consisting of" is a well-established term of art in patent law. The Federal Circuit has repeatedly held that the phrase "consists of" or "consisting of" is generally understood to be a closed phrase that excludes any element, step, or ingredient not specified in the claim. *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331 (Fed. Cir. 2004) (" 'Consisting of' is a term of patent convention meaning that the claimed invention contains only what is expressly set forth in the claim."). *See also, e.g., Shire Dev., LLC v. Watson Pharms., Inc.*, 848 F.3d 981, 984 (Fed. Cir. 2017); *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1358 (Fed. Cir. 2016); *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1245 (Fed. Cir. 2001); *Ga.-Pac. Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1327–28 (Fed. Cir. 1999). This general presumption can

be overcome if the specification and prosecution history "unmistakably manifest an alternative meaning." *Shire Dev., LLC*, 848 F.3d at 984 (quoting *Multilayer Stretch*, 831 F.3d at 1359).

Claim 1 of the '802 Patent uses the phrases "consists of" and "consisting of" to list three ingredients in the composition. The ingredients listed in the claim are minocycline, magnesium, and a base. Applying the Federal Circuit's precedent, this Court construes "consists / consisting of" to mean those three ingredients and to exclude all other ingredients. Neither party argues that the specification or patent history manifests an alternative meaning.

This construction of both "composition" and "consists / consisting of" is supported by the fact that, as Plaintiffs argue, an alternative claim construction construing "composition" to include a diluent and "consists / consisting of" to not include a diluent would render the claim incoherent and "nonsensical." (Dkt. 251 at 6.) *See Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1301 (Fed. Cir. 2014). To simultaneously hold, as Defendant argues, that "composition" includes a diluent but that "consists / consisting of" does not include a diluent is inconsistent at best, because both terms describe the same list of ingredients. Such a construction also "renders the claimed invention inoperable," as it would be impossible for the invention to work, much less be infringed. *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1278 (Fed. Cir. 2011) (quoting *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir. 2002)). The Court views such a construction with "extreme skepticism" and thus rejects Defendant's construction. *Id.* at 1278.

These constructions are consistent with the language of the claims, the patents' specifications, and Federal Circuit precedent, and the Court is not "redrafting" these claim terms in coming to these conclusions, as Defendant suggests. (Dkt. 250 at 17–18.) *See Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

### 3. "Administering"

The parties next dispute the term "administering." The term "administering" is related to both "composition" and "consists / consisting of." The term is used once in Claim 1 of the '802 Patent to describe the method of using the composition: " . . . wherein the method consists of: <u>administering</u> a therapeutically effective amount of a composition to a subject in need thereof via an intravenous route of administration . . . ." (PTX 1.) The term is used similarly in Claim 1 of the '105 Patent: " . . . wherein the method comprises <u>administering</u> a therapeutically effective amount of a composition to a subject in need thereof via an intravenous route of administration . . . ." (PTX-2.) The parties' claim construction dispute with the term "administering" is, like "composition" and "consists / consisting of," whether the act of administering the composition includes dilution.

Although Plaintiffs construe "composition" to not include a diluent, Plaintiffs construe "administering" to mean delivering the "composition" to the patient with a diluent. (Dkt. 249 at 4; Dkt. 251 at 2–3.) Plaintiffs argue that since the claims "recite administering the composition intravenously," a POSA would recognize that "administering" the solution through an intravenous route is a "one-step process" involving the mixing of a diluent into the reconstituted solution to ready it for

intravenous administration to the patient. (Dkt. 249 at 4; Tr. 100:10–16, 102:12–103:1.) A POSA would know that the solution could not be administered intravenously by itself without a diluent. (Dkt. 249 at 4; Dkt. 251 at 3.) Accordingly, "administering" must involve a diluent; otherwise, the claim would describe an unusable product.

Elaborating on its construction of "consists / consisting of," Defendant argues that because its proposed construction of that claim term does not include a diluent, the claim term "administering" also does not involve a diluent. Defendant asserts that the term "administering" means the injection into a patient of the reconstituted solution without a diluent. (Dkt. 250 at 15–16.) Plaintiffs object to Defendant's construction of this term by pointing out Defendant's inconsistency in arguing that "composition" means the three ingredients plus a diluent, yet also arguing that "administering" the composition does not include a diluent (Dkt. 249 at 6.) Plaintiffs conclude that such a construction cannot be correct, because under Defendant's constructions of these claim terms, no one could ever possibly follow the patent's specification—therefore, infringement too would be impossible. (Dkt. 249 at 6.)

The word "administer" is a "[c]ommon English word" understood by any ordinary person. *ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 355 F. Supp. 3d 785, 795 (D. Minn. 2019). A lay judge can therefore easily conclude that the plain and ordinary meaning of the word is, in the medical sense, " 'to introduce into or ingest' a medication." *Id.* According to Miriam-Webster's unabridged dictionary, "administer" means "to give remedially (as in medicine)." *Administer*, Miriam-Webster Unabridged

Dictionary. That definition, in combination with the term as it is used in the patent claims, informs the Court that "administering" means "to give the composition remedially." The exact method, however, of "administering" the composition requires looking at the patent claims and specifications from the perspective of a POSA.

As to claim language, Claim 1 of the patents-in-suit specifies that the composition is to be administered "intravenously." (PTX-1; PTX-2.) The claims explain that the "administering" of the composition is for the purpose of "treating a bacterial infection." (*Id.*) The patent specifications, in turn, repeatedly specify that "administering" must be done "via an intravenous route" or "intravenously." (*Id.*) The specifications also explicitly discuss the addition of a diluent to prepare the solution for intravenous administration: "To prepare an admixture, sufficient reconstituted solution is mixed in an intravenous bag containing a pharmaceutically acceptable diluent." (PTX-2 at 13:23–42.) The specification continues, stating that once the reconstituted solution is mixed with a diluent, the "solution is ready for administration." (*Id.*; *see also* Tr. 219:6–22.)

That the composition is to be administered intravenously is an important consideration. It implies that the composition can be administered to a patient only by a POSA who knows how to administer medication intravenously. Exactly how a POSA would intravenously give the composition to a patient is therefore relevant. For example, in *Shire LLC v. Amneal Pharms.*, No. 11-3781, 2013 WL 4045622 (D.N.J. Aug. 8, 2013), the court held that the defendants' proposed construction of "administering" an oral medication did not mean "physically delivering into the body

of the patient" because the patents did not envision physical delivery of the medication to a patient by a physician. *Id.* at \*17–19. That court noted that if the medication were one that was "given intravenously, there might be a case" for defendant's proposed construction. *Id.* at \*17. This case is distinct from *Shire LLC* because the patents-in-suit do envision physical—specifically, intravenous—delivery of the composition into a patient. Accordingly, the Court must consider how a POSA is to safely deliver the composition to a patient intravenously.

At trial, the expert witnesses confirmed the method of intravenously administering the composition to treat a bacterial infection. Dr. Friedman testified that to use the composition, a POSA would "take th[e] reconstituted solution and mix it into an appropriate diluent, which will then be provided for intravenous administration to the patient." (Tr. 102:20–23.) He continued, confirming that the reconstituted solution must "be further diluted" before being administered to a patient. (Tr. 102:24–104:25; *see also id.* 436:23–437:6, 720:1–10.) Plaintiffs' second expert witness Dr. deVries then testified that the "admixture" of the composition plus a diluent "is what is administered or injected into the vein of the patient." (Tr. 219:21–22.) Defendant's expert witness Dr. Chambers testified on cross-examination that the composition could not be administered "in any way directly to a patient" without first being "further diluted in a diluent." (Tr. 675:8–676:4.) The testimony of these three expert witnesses strongly indicates that a POSA would understand that proper administration of the aqueous solution would require dilution of the composition before intravenously injecting it into a patient's vein.

The Court sympathizes with Defendant's argument for the exclusion of a diluent in administration, because the claim language in both patents does not mention a diluent. But with due respect to Defendant's position, the Court cannot agree that "administering" excludes a diluent. The intrinsic evidence demonstrates that the meaning of "administering" cannot begin and end with the words in these claims. First, the language of Claim 1 in the patents-in-suit states that the purpose of the claimed invention is to "treat[] a bacterial infection." The composition can only effectively treat a bacterial infection if diluted. Second, both the specifications and the claim language require the composition to be administered intravenously. The composition can only be intravenously administered to a patient if diluted. Third, the specifications contemplate the mixture of a diluent with the composition before intravenous administration. Fourth, the trial testimony of three expert witnesses (all of whom would qualify as a POSA) confirmed the necessity of diluting the composition before it can be safely administered to a patient. Examining this intrinsic and extrinsic evidence, this Court holds that diluting the composition is a necessary prerequisite to "administering" the composition and is therefore included in the construction of that claim. *See, e.g., Hospira, Inc. v. Amneal Pharms., LLC*, 285 F. Supp. 3d 776, 803 (D. Del. 2018) (quoting *Phillips*, 415 F.3d at 1314) (although the claim language did not explicitly specify the storage condition of a pharmaceutical composition, the term "administration" included storage condition because "even a lay judge can recognize that proper storage of a pharmaceutical is a prerequisite to administering the pharmaceutical intravenously to a patient").

The Court's construction does not divert from the plain and ordinary meaning of the word "administering," which is, as stated earlier, "to give remedially." Indeed, the Court's construction still means "to give remedially." *Cf. ecoNugenics, Inc.*, 355 F. Supp. 3d at 795–96 (rejecting a proposal to construe "administer" as "make available," "provide," "market," or "sell" and instead construing the term in its "obvious and ordinary meaning" of "to introduce into or ingest" a medication). This construction merely recognizes that the composition cannot be given remedially to a patient consistent with the patent claims and specifications without the use of a diluent. A POSA would read the patent claims and specifications and know to add a diluent to the composition for safe and effective intravenous administration. In short, the composition can only be "given remedially"—or "administered"—intravenously if diluted. This conclusion is supported by the intrinsic and extrinsic evidence and does not divert from the plain and ordinary meaning of the word "administering." Accordingly, this Court holds that "administering" means "to remedially give the diluted composition to a patient via an intravenous route."

### 4. "Injection Site Hemolysis"

The parties also dispute the term "injection site hemolysis," which appears once in Claim 1 (and, therefore, in Claims 7 and 18) of the '802 Patent: "A method of treating a bacterial infection in a subject . . . whereby <u>injection site hemolysis</u> of red blood cells is reduced relative to intravenous administration of a composition that does not include magnesium." (PTX-1.)

Plaintiffs argue that the plain and ordinary meaning of "injection site hemolysis" is "damage to red blood cells . . . that is caused by intravenously administered formulations, which in turn causes a cascade of events that can clinically manifest near the injection site . . . in various ways including, for example, phlebitis (skin inflammation), erythema (redness), skin damage / necrosis, thrombophlebitis (swelling / clot in the vein), and pain." (Dkt. 249 at 7; Dkt. 252 ¶ 62–63.) Plaintiffs add that a "POSA would understand the 'injection site' region to be the area around or above where the intravenous port enters the skin and goes into the vein, and 'injection site hemolysis' also includes issues downstream due to blood flow." (Dkt. 249 at 7; Dkt. 252 ¶ 63.)

Plaintiffs argue that the '802 Patent's specification supports this definition. For instance, the specification states, "hemolysis can lead to venous phlebitis at the site of injection when administered intravenously, resulting in irritation . . . ." (Dkt. 249 at 7; Dkt. 252 ¶ 66.) A POSA would be able to recognize the signs and symptoms of injection site hemolysis and how to reduce the risk after reading the patent's specification. (Dkt. 249 at 7–8; Tr. 115:3–116:3.)

Defendant's view on the claim term "injection site hemolysis" is that it is indefinite and undefined. (Dkt. 254 at 10–11.) This view is stated through Dr. Klibanov's testimony: "the claim term 'injection site hemolysis' is somewhat vague, in that there is no teaching in the asserted patents how to measure it, how to know whether the injection site hemolysis is reduced or not." (Tr. 505:6–9.) Dr. Chambers agreed with this view, testifying that "injection site hemolysis" is not a defined term

in the medical field and does not have an agreed meaning across drug usage. (Tr. 595:2–597:8.) He added that "injection site hemolysis" is also not defined in the patent's specification, much less a method of determining or measuring its occurrence. (Tr. 596:21–597:8.)

Defendant accurately argues that "injection site hemolysis" is not a defined medical term. "Hemolysis" is a scientific term meaning the "destruction of red blood cells." *Hemolysis*, Taber's Medical Dictionary Online (24th ed.); *Hemolysis*, Stedmans Medical Dictionary. "Injection site" is a term a POSA would understand to mean the region around or above where the intravenous port enters the skin and goes into the vein. (*See* Tr. 113:24–115:17, 696:5–25.) But the term "injection site hemolysis" is not one with a "plain and ordinary meaning" in the medical field. Accordingly, the Court will turn to the '802 Patent's claim language and specification to determine the plain and ordinary meaning of the claim term.

The claim language only mentions "injection site hemolysis" once, to explain that the method in the claimed invention reduces injection site hemolysis "relative to intravenous administration of a composition that does not include magnesium." (PTX 1.) The patent specification does not use the term "injection site hemolysis" at all, but it does use "hemolysis" often. Most references to "hemolysis" in the specification describe hemolysis rates of rabbit red blood cells when experiments were conducted. (*Id.*) One pertinent mention of "hemolysis" connects the term to intravenous injection of the solution. (*Id.* at 1:61–67.) The specification describes the background of the invention, explaining that tetracyclines (such as minocycline) cause tetracycline-

induced hemolysis, which can "lead to venous phlebitis at the site of injection when administered intravenously, resulting in irritation and potentially limiting the volumes of infusion that can be tolerated." (*Id.*) The specification continues, "It was unexpectedly discovered that the incidence of tetracycline-induced hemolysis can be greatly decreased by formulating the tetracycline with divalent or trivalent cations." (*Id.* 7:31–33.) These references to "hemolysis" in the specification lead the Court to conclude that "injection site hemolysis" is intended to describe hemolysis that results from the intravenous administration of the composition, which can be noticed by a POSA when the injection site shows phlebitis (inflammation), swelling, redness, or other symptoms familiar to a POSA.

The parties appear to be less concerned about the meaning of "injection site hemolysis" and more concerned about the lack of instruction on how to measure its occurrence or reduction. Dr. Klibanov and Dr. Chambers expressed this concern in their testimony. (Tr. 505:6–9, 595:2–597:8.) Plaintiffs respond by citing data in the '802 Patent specification and prosecution history from experimental models that directly measured injection site hemolysis, examined injection site reactions, and examined the effect of the formulation on other cell types. (Dkt. 249 at 8; Tr. 223:11–226:22, 344:13–346:15; PTX-71; PTX-196.) These in vivo[11] and in vitro[12] experiments were conducted in solutions containing minocycline and metal cations, and in

---

[11] "In vivo" is a scientific term referring to a "laboratory study performed on whole, living organisms, usually animals (including humans) and plants as opposed to a partial or dead organism." *In vivo*, Taber's Medical Dictionary Online (24th ed.).

[12] "In vitro" is a scientific term referring to a "laboratory study performed on isolated tissue, organs, or cells outside their normal context, as proteins in solution, or cells in an artificial culture medium." *In vitro*, Taber's Medical Dictionary Online (24th ed.).

solutions of prior art minocycline (without metal cations) and then compared. (Dkt. 249 at 8.) The experiments showed reduced hemolysis in the solutions containing minocycline and metal cations. (*Id.*) According to Plaintiffs, a POSA would understand this data to show that reduced incidence or risk of injection site hemolysis occurred in a solution containing minocycline and a metal cation. (*Id.*) With this understanding, a POSA would be able to accurately measure the occurrence and reduction of injection site hemolysis in a patient.

Defendant disagrees that the results of these experiments are appropriate benchmarks. They argue that because none of the experiments were performed in live humans, they cannot be used in construing the claim term "injection site hemolysis," a term used in a patent for a drug to be used in live humans. (Dkt. 249 at 11; Tr. 597:18–600:1.) Plaintiffs respond by citing a prior art reference justifying the use of in vitro tests as a valid model for measuring hemolysis in live patients. (Dkt. 249 at 10; Tr. 835:9–23; PTX 177.) *See* D.M. Hoover et al, *Comparison of* in Vitro *and* in Vivo *Models to Assess Venous Irritation of Parenteral Antibiotics*, 14 FUNDAMENTAL & APPLIED TOXICOLOGY 589 (1990).

The Court agrees with Plaintiffs. The '802 Patent specification discusses the signs and symptoms of hemolysis at the injection site, and the experimental data cited in the specification provides a plethora of evidence for a POSA to assess the occurrence and reduction of hemolysis in a patient. Defendant's concern for the applicability of the in vitro experimental models is unpersuasive, because a POSA would be aware that the in vitro experimental models cited in the specification are

reliable and well-known in scientific literature for evaluating injection site hemolysis. (Tr. 123:24–124:3, 124:5–8, 124:24–125:2, 223:11–225:15, 226:23–227:3, 357:4–10.) A POSA would also be aware of the Hoover article cited by Plaintiffs, which was published well before the patents-in-suit were filed and explicitly concludes that in vitro hemolysis tests like the ones Plaintiffs conducted are valid models for measuring hemolysis in humans. *See* Hoover et al., at 597 ("The coordinated use of these in vitro and in vivo models to evaluate venous irritancy may assist preclinical assessment of potential clinical reactions to new parenteral drug formulations."). A POSA therefore would have sufficient information to determine how to measure the occurrence and reduction of hemolysis when using this product.

The understood meanings of "hemolysis" and "injection site," in combination with the '802 Patent specification's references to "hemolysis" and what a POSA would know about measuring the occurrence and reduction of hemolysis leads the Court to adopt the Plaintiffs' proposed definition of "injection site hemolysis." (Dkt. 249 at 7.) Accordingly, this Court construes "injection site hemolysis" to mean "damage to red blood cells that is caused by intravenously administered formulations, which in turn causes a cascade of events that can clinically manifest near the injection site (or downstream therefrom in the blood) in various ways, including, for example, phlebitis, erythema, skin damage / necrosis, thrombophlebitis, and pain."

### 5. *"Subject"*

The parties next dispute the claim term "subject." The term "subject" appears once in Claim 1 (and, therefore, in Claims 7 and 18) of the '802 Patent and once in

Claim 1 (and, therefore, in Claim 27) of the '105 Patent: "A method of treating a bacterial infection in a <u>subject</u> . . . ." (PTX-1; PTX-2.) Plaintiffs argue that a "subject" can only be a human, but Defendant argues that "subject" means any animal, including humans. Plaintiffs do not construe this term in post-trial briefings. At trial, however, when Dr. Friedman stated that "subject" means "a human," Defendant objected, and Plaintiffs' counsel explained that he did not think "subject" was a claim construction issue. (Tr. 98:22–99:23.) Plaintiffs' counsel explained that "subject" was defined in the opening report and the patent's specification and was "not something that's new, nor is it claim construction." (Tr. 99:18–23.)

Defendant does address the term "subject" in its post-trial briefings. According to Defendant, "subject" means any animal, including humans. (Dkt. 250 at 18.) Defendant argues that the term cannot be limited to humans because the term "human" is used later in the specification. (*Id.*; *see* PTX-1 at 37:6–15.) Therefore, if the patentee truly meant for "subject" to be limited to humans, the patentee would have used "human" instead of "subject" in this instance. (*Id.*) Accordingly, Defendant argues, "subject" must include all animals in addition to humans.

The Court construes "subject" to match Defendant's construction: "any animal, including humans." The intrinsic evidence cited by Defendant, specifically the '802 Patent and '105 Patent specifications, reveal that the term "subject" should not be limited only to humans. Nowhere in the patent specifications does the patentee express that the composition is to be administered only to human subjects. The term "subject" appears repeatedly throughout the specifications to define the purpose of

the invention (to "treat[] or prevent[] a bacterial infection in a subject") and to explain how the invention could be administered (either "to the subject via a topical route" or "to the subject via an intravenous route"). (PTX-1 at 6:26–51, 19:15–35, 40:43–47; PTX-2 at 6:19–43, 19:3–25, 41:33–36.) Nothing in that language suggests that "subject" is to be limited to humans. The patent specifications do not provide any additional context implying that "subject" is to refer only to humans. On the contrary, the specifications imply the opposite, since all experiments cited in the specifications were conducted on non-humans (specifically, rabbit and sheep red blood cells). (PTX-1; PTX-2). A POSA reading the claim term in the context of the specifications would not, therefore, have any reason to think that "subject" was limited to "humans." Accordingly, this Court holds that "subject" is construed to mean "any animal, including humans."

### 6.    *"Does not include magnesium"*

The final claim construction dispute is the claim term "does not include magnesium." This term appears once in Claim 1 (and, therefore, in Claims 7 and 18) of the '802 Patent: "A method of treating a bacterial infection in a subject, . . . whereby injection site hemolysis of red blood cells is reduced relative to intravenous administration of a composition that <u>does not include magnesium</u>." (PTX-1.)

Defendant construes the claim term in its post-trial briefing, arguing that the claim term should be construed to mean exactly what it says: "does not include magnesium." (Dkt. 250 at 18–19; Dkt. 254 at 10–11.) Defendant then alleges that Plaintiffs are misconstruing the term to mean "does not include magnesium *or*

*another metal cation*." (*Id.*) Defendant explains that if the patentee wanted to include other metal cations in this claim term, it would have done exactly that. (*Id.* at 10.) But because the patentee only used the word "magnesium," the claim term must be limited to only magnesium. (*Id.*)

In Plaintiffs' post-trial briefing, they respond that "does not include magnesium" refers to a comparison between the composition and prior art minocycline formulations without metal cations. (Dkt. 251 at 7.) Plaintiffs further argue that all experiments cited in the intrinsic evidence also compare minocycline formulations with metal cations (such as magnesium) to minocycline formulations without metal cations. (*Id.*) Presumably, then, Plaintiffs are arguing for a broadened construction of the claim term—apparently arguing that "does not include magnesium" actually means "does not include any metal cation."

The construction of this claim term was also mentioned briefly at trial. Defendant objected on claim construction grounds to a question asked to Dr. Friedman regarding this claim term, and Dr. Friedman's answer appeared to equate "magnesium" to "metal cations." (Tr. 122:20–123:15.) On cross-examination, when Defendant pressed the issue, Dr. Friedman would not say whether the term "magnesium" necessarily excluded all other metal cations, but he did confirm that magnesium is the particular metal cation that the inventors chose to include in their invention, "the only metal cation that's in the solution," and the only metal cation in Defendant's product. (Tr. 146:17–154:5.)

The Court agrees with Defendant's construction. In some cases of claim construction, the "ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Philips*, 415 F.3d at 1314. Such is the case here. The plain and ordinary meaning of "does not include magnesium" describes a formulation that does not include magnesium. The exclusion of any other metal cations is not expressed in any way in the claim language. Plaintiffs used the term "metal cation" in numerous places throughout the patent specification yet chose to limit the claim term to "magnesium." And Plaintiffs' own expert witness confirmed that magnesium is the metal cation specifically chosen to be used in the invention, the only metal cation in the solution. The Court cannot agree with Plaintiffs' interpretation that "does not include magnesium" should be construed to exclude magnesium *and* any other metal cation. Accordingly, "does not include magnesium" is construed to mean "does not include magnesium."

## IV. CONTINUED FINDINGS OF FACT: EVIDENCE PRESENTED AT TRIAL

### A. The Testifying Witnesses

Five witnesses testified over the course of the trial. As for the credibility of each testifying witness, the Court did not find any witness to lack credibility. Each witness provided believable testimony and did not express any hallmarks of hiding facts or twisting the truth. Instead, any differing testimony about a variety of issues was due to a difference in opinions, which were likely sincerely held by each witness. The Court finds no reason to question the testimony of each witness. What follows in

this Section is an introduction to each testifying witness, and the following Sections describe the expert witnesses' testimony on infringement and invalidity of the Asserted Claims.

### 1. Dr. Bruce Friedman

Plaintiffs' expert witness Dr. Bruce Friedman testified as an expert in infectious disease complications in critically ill patients, including in the clinical knowledge, use, and administration of tetracycline antibiotics, and in particular the clinical knowledge, use, and administration of intravenous minocycline to patients with infectious diseases. (Tr. 85:22–86:3.)

Dr. Friedman is a medical doctor, professor of internal medicine and anesthesiology, and clinical researcher. He has been practicing for forty years and currently works at a burn and wound hospital. (Tr. 72:15–25.) Dr. Friedman's field of expertise is intensive care medicine with a specialty in burn and wounds, which includes significant work with infectious diseases. (Tr. 84:9–18.)

Dr. Friedman testified that he regularly treats patients with skin injuries, which are often injuries that lead to infectious disease complications. (Tr. 73:6–19.) To treat these patients, Dr. Friedman regularly administers intravenous minocycline to them, which he testified was a very effective medication, and he regularly has four to eight patients on minocycline in any given week. (Tr. 74:1–6.) He has treated approximately one thousand patients with the prior art minocycline. (Tr. 76:13–15.) He has treated approximately ten thousand patients with Minocin and no longer treats patients with the prior art minocycline. (Tr. 78:17–21.) When asked about his

familiarity with intravenous minocycline products on the market, Dr. Friedman testified that he was aware of two: the prior art minocycline, and Minocin. (Tr. 74:7–10.) He stated that he understood that the two were different because Minocin included the addition of magnesium cations. (Tr. 74:11–16.) He testified that Minocin improved the prior art minocycline because it adjusted the pH to be slightly higher, which, in combination with adding magnesium cations, enabled the product to be delivered to the patient at a lower volume. (Tr. 78:2–7.) Dr. Friedman testified that these changes made Minocin a more tolerable and reliable product than the prior art minocycline. (Tr. 78:8–11.)

### 2. Dr. Tina deVries

Plaintiffs' expert witness Dr. Tina deVries testified as an expert witness regarding all aspects of pharmaceutical research and development, drug formulation, the FDA regulatory approval process for drug products, and the FDA process for making changes to drug product labels, and specifically regarding aqueous pharmaceutical compositions of tetracyclines, including minocycline and doxycycline, in combination with metal cations in preparation as a pharmacist of intravenous formulations. (Tr. 202:6–14.)

Dr. deVries is a pharmaceutical development scientist with over thirty years of experience in pharmaceutical research and development, along with experience in "all aspects of FDA requirements and the drug product approval process" for both generic and patented drugs. (Tr. 192:25–193:6, 196:15–18; PTX-129.) As part of that FDA experience, Dr. deVries has personally and directly communicated with the FDA

regarding drug product labels and approvals. (Tr. 198:21–199:2.) She has specific experience in formulation development, which involves determining how to transform a powder drug into an aqueous product suitable for intravenous administration to patients after combining it with other ingredients. (Tr. 195:12–25.) Dr. deVries has never worked on an intravenous formulation of a tetracycline (such as Minocin), but she maintained that her experience is directly relevant to her testimony in this case because she has worked on products before they are dissolved into a solution suitable for intravenous administration. (Tr. 199:19–200:8.) She has also supervised and observed several projects involving minocycline and a divalent metal cation, including magnesium. (Tr. 200:9–14.)

### 3.    Mr. David Griffith

David Griffith, a nonparty witness, is one of the inventors listed on the patents-in-suit. (Tr. 317:1–3.)

Griffith began initial research on Minocin in 2005 while working as the director of nonclinical and clinical sciences at Mpex Pharmaceuticals. (Tr. 318:5–7.) He does not have experience administering tetracyclines, although he does have experience diluting them. (Tr. 381:19–382:3.) He clarified that his research on Minocin was his first interaction with tetracyclines, and he became familiar with the properties of tetracyclines by reading literature. (Tr. 386:2–9.) That research led him to understand that tetracyclines had issues with storage, stability, tolerability, and low pH. (Tr. 391:19–392:14.) Around 2011, Mpex became Rempex Pharmaceuticals, and

Griffith, along with the other inventors, acquired the NDA for Minocin. (Tr. 318:8–13.)

Griffith testified that the '105 Patent and the '802 Patent related to a new formulation of the antibiotic minocycline that sought to improve the low pH, which led to injection site pain and inflammation, and large infusion volumes required by the prior art minocycline. (Tr. 320:7–14, 323:15–324:7.) Griffith stated that he understood that the prior art minocycline had a low pH (between 2.0 and 2.8 for the reconstituted solution) in order to make it more stable. (*Id.* 325:7–20, 326:12–17.) He explained that in order to increase the pH of the prior art minocycline to make it suitable for administration, the solution needed to be diluted in large volumes of diluent in order to avoid venous tolerance issues. (Tr. 328:8–18.) After dilution, the pH would rise to 2.5 to 4, which Griffith testified was still quite low. (Tr. 328:25–329:5.) Griffith testified that administering a solution with such a low pH caused injection site pain, a side effect described on the prior art minocycline's product label. (Tr. 329:6–13.) In addition to the low pH causing injection site problems, the large injection volume was a problem with the prior art minocycline. Griffith explained that the product needed to be administered to patients twice a day every day for ten to fourteen days, which was a very a high volume of intravenous fluid to enter a body and could have a harmful effect on patients who needed other drugs. (Tr. 331:2–18.)

Griffith began working with dimethylamino tetracyclines such as minocycline because it was effective against a particular type of bacteria (Acinetobacter baumannii). (Tr. 322:17–323:14.) Griffith and the other inventors began

experimenting with molar ratios of 3:1 (magnesium:minocycline), which caused solubility and stability issues. (Tr. 332:1–9.) They changed their approach and began using a 10:1 molar ratio of magnesium to minocycline, which they found to "surprisingly" lead to more stability. (Tr. 332:13–17.) Along with an increased molar ratio, Griffith and the other inventors unexpectedly found that they could change pH of the formulation and still maintain stability. (Tr. 333:14–16.) In addition, they unexpectedly found that the formulation blocked hemolysis. (Tr. 333:17–334:3.) Because of the higher pH and reduced hemolysis in the newer formulation, the inventors realized that the formulation could be diluted into a lower volume of solution to prepare it for administration. (Tr. 334:4–11.) Griffith testified that each of these benefits is described in the '802 Patent specification. (Tr. 335:6–21.)

Griffith explained that the specification also lists examples of several tests that the inventors performed, which varied different properties of the Minocin formulation to compare it to the prior art minocycline (Tr. 336:15–19.) One experiment they performed used the same formulation but with doxycycline, a different tetracycline, instead of minocycline, but they found that the same formulation using doxycycline caused solubility issues—the same issues they had expected with minocycline. (Tr. 343:10–344:11.) They performed several in vitro experiments to test hemolysis reduction in the formulation. (Tr. 344:21–351:6.) They discovered that their new formulation, which added divalent cations (such as magnesium) to minocycline at a higher molar ratio resulted in "significant inhibition" of hemolysis and "improve[d]

venous tolerance" compared to the prior art minocycline that did not include divalent cations. (Tr. 350:24–351:10, 360:21–361:6.)

Griffith testified that from 2011 to 2015, he was involved in discussions with the FDA regarding the process of getting FDA approval for the new minocycline formulation. (Tr. 364:22–365:24.) They initially sought a 505(b)(2) mechanism, which would have used previous findings of efficacy and safety of a previously approved minocycline product, but the approach changed when they decided to acquire that product directly. (Tr. 366:3–23.) They filed a supplemental NDA for their new minocycline product, and the previous formulation was removed from the market. (Tr. 367:1–368:4.) The new formulation included an updated label noting the changes in pH level and volume of fluid for administration. (Tr. 368:5–11.) There were some discussions with the FDA about potential human clinical studies for the new formulation, but those studies were not performed because they were not required for approval of the new formulation. (Tr. 372:16–373:12.) He clarified on cross-examination that the FDA would have required clinical trials if Plaintiffs wanted to remove standard information about tetracyclines (such as risk of hemolysis) to show how the new formulation differed from the original formulation, which they decided not to do. (Tr. 382:8–18.) Instead, the FDA's approval relied on data from the experiments and tests Griffith conducted. (Tr. 373:13–18; *see* PTX-71.) Without the clinical trial, the FDA therefore approved a label including the improved pH and lower infusion volume but without a claim of improved tolerability or reduced injection site hemolysis. (Tr. 384:7–385:25.) The FDA approved the new minocycline

formulation with magnesium at a 5:1 molar ratio to minocycline with a reduced infusion volume of 100 mL to 1,000 mL and a higher pH. (Tr. 380:7–17.)

On cross-examination, Defendant's counsel questioned Griffith about the literature he read before creating the Minocin formulation. Griffith first testified that the patents-in-suit describe the use of a 7-dimethylamino-tetracycline (such as tetracycline, glycylcycline, doxycycline, and minocycline) with a metal cation (such as magnesium, calcium, or iron), but the patents-in-suit specifically focus on minocycline with magnesium. (Tr. 421:9–19, 422:1–10.) Defendant asked Griffith about a 2006 patent that lists minocycline as an active component and identifies magnesium as a preferable metal for complexing. (Tr. 424:13–426:4; DTX-11.) Griffith stated that even though this patent discussed using divalent cations with tetracyclines, the patent used a much lower molar ratio, and Griffith's higher molar ratios had not been tested before. (Tr. 426:8–18.) Griffith explained that it was commonly known information that there were issues with combining metal cations with tetracyclines, and no one had ever tested that formulation as a higher concentration because the assumption was that the formulation would be insoluble and create no new benefits. (Tr. 426:8–24.)

### 4. Dr. Alexander Klibanov

Dr. Alexander Klibanov, Defendant's expert witness, testified as an expert in medicinal chemistry and pharmaceutical formulations. (Tr. 462:12–13.) Dr. Klibanov is a professor of chemistry and bioengineering with expertise in pharmaceutical formulation and medicinal chemistry. (Tr. 459:18–460:3.) Dr. Klibanov has published

hundreds of publications and owns over thirty patents. (Tr. 460:12–21.) He is a consultant for several pharmaceutical companies, member of numerous journal editorial boards, and has received many professional awards for his work. (Tr. 461:1–22.) Dr. Klibanov testified that he has substantial experience in tetracycline formulation, and he has been involved in many projects involving intravenous formulations. (Tr. 464:6–15.) Dr. Klibanov has not, however, treated a patient with minocycline. (Tr. 528:24–529:1.) Nor, according to his testimony, has he been involved in any FDA tetracycline drug approval process. (Tr. 530:5–9.)

### 5. Dr. Henry Chambers

Defendant's expert witness Dr. Henry Chambers testified as an expert in the field of treatment of infectious diseases and the use of antimicrobial agents, including tetracyclines and minocycline. (Tr. 570:19–579:22.) Dr. Chambers is a physician specializing in infectious diseases. (Tr. 565:9–15.) He has published hundreds of publications in the field of infectious diseases and serves as editor on the Stanford Guide, a manual covering bacterial infections and other infectious diseases. (Tr. 567:1–24.) This manual includes information on minocycline, but Dr. Chambers has never personally prescribed or used intravenous minocycline. (Tr. 568:5–10, 568:25–569:10, 571:12–572:11.)

Dr. Chambers has never had occasion to use intravenous minocycline because it is "almost identical in terms of spectrum" to doxycycline, which is his go-to tetracycline antibiotic. (Tr. 569:3–10.) He explained that doxycycline and minocycline have minor differences on the top of their chemical structure, but are identical on the

bottom of the structure, which is where the antibacterial interaction happens. (Tr. 683:4–14.) When probed about this testimony on cross-examination, he conceded that minocycline and doxycycline do have some differences. Dr. Chambers testified that minocycline is more active than doxycycline against Acinetobacter baumannii, the bacteria Minocin treats, as well as other bacteria. (Tr. 630:3–631:23.) He added on cross-examination that he did not have any firsthand experience with whether intravenous minocycline formulations have any injection site tolerability issues such as phlebitis, thrombophlebitis, erythema, pain, or skin necrosis. (Tr. 632:11–633:12.) Nor does he have any firsthand experience reconstituting minocycline or selecting a diluent in order to prepare the formulation for administration to patients. (Tr. 633:13–20.) Dr. Chambers does have experience preparing intravenous formulations for administration to patients, a process that is driven by the instructions on the product label. (Tr. 570:5–18.)

Dr. Chambers has participated in clinical trials involving the use of minocycline, including one with Minocin. (Tr. 573:13–15, 573:16–574:9; PTX-139; PTX-140.) When asked about this clinical trial on cross-examination, Dr. Chambers agreed that minocycline is one of very few antimicrobials that is effective against Acinetobacter baumannii and other multidrug-resistant bacteria. (Tr. 637:5–10, 640:17–641:20.) He also agreed that one of the benefits of the Minocin formulation, which was always diluted with 100 mL of normal saline before administering to a test patient, is a lower minimum injection volume of 100 mL. (Tr. 638:1–639:20.)

### D. Rounds One and Two: Testimony on Infringement

The bench trial proceeded in four rounds of testimony. Round One consisted of Plaintiffs' evidence on infringement. Round Two consisted of Defendant's testimony on non-infringement and invalidity (obviousness and Section 112 arguments). Round Three consisted of Plaintiffs' response on invalidity and offering secondary considerations. Round Four consisted of Defendant's response to the secondary considerations. This Section discusses both parties' testimony on infringement, which was presented in Rounds One and Two.

#### 1. *Dr. Bruce Friedman's Testimony on Infringement*

On the issue of infringement, Dr. Friedman concluded, based on his knowledge, experience, and review of the available literature, that "there was induced and contributed-to infringement by [Defendant]." (Tr. 87:16–23.) His conclusion was based on a three-part methodology: (1) determining what elements are required by the asserted patent claims, including the plain and ordinary meaning and a POSA's understanding; (2) determining whether physicians would directly infringe on the claims when using the ANDA product; and (3) determining whether Defendant intends to and will encourage, recommend, or promote a physician to perform the claimed methods, including whether the ANDA product has no other substantial non-infringing use. (Tr. 91:18–92:6.)

When he analyzed whether Defendant indirectly infringed on the patents-in-suit, Dr. Friedman focused on the ANDA product label and how a POSA might interpret that label when administering the product and compared it to Minocin and

the prior art minocycline. (Tr. 93:1–6.) He testified about the ANDA's common technical document summaries (PTX-021), a document which was provided to the FDA as part of Defendant's ANDA filings. (Tr. 94:10–16.) He testified that the ANDA product and Minocin were identical to each other and used the same ingredients: same amount of minocycline, same amount of magnesium, and an adjustment of the pH. (Tr. 94:22–95:3.) The ANDA product would therefore have the same benefits of Minocin (reduced delivery volume, stabilized pH, reduced tolerability issues). (Tr. 96:3–13.)

### a.     Claim 1 of the '802 Patent

Dr. Friedman testified about each of the claims at issue. He concluded that a physician following the ANDA label would infringe on Claim 1 of the '802 Patent because the label instructs that it is meant to treat bacterial infections (like Minocin) and explains how to reconstitute and administer the ANDA product. (Tr. 101:9–17.) A POSA would understand that the "composition" discussed in Claim 1 meant the reconstituted solution (which he noted to be different than the diluted solution) because the '802 Patent specification repeatedly defines the "composition" as such. (Tr. 101:18–103:22.) A POSA would mix that "composition" with a diluent as specified in the label, and then it would be ready for intravenous administration. (Tr. 104:1–5.) A POSA administering the ANDA product would go through that same process. (Tr. 6–10.)

Dr. Friedman also testified that a POSA would understand that the reconstituted solution mentioned in Claim 1 of the '802 Patent meant a solution

consisting of minocycline, magnesium, a base, and a water-based solvent. (Tr. 106:21–25.) He testified that the ANDA product infringed on this Claim 1 because its label specified the same ingredients: minocycline, magnesium, a base (sodium hydroxide), and a solvent (sterile water). (Tr. 107:2–9.) A physician following the ANDA label would, therefore, meet this element of Claim 1. (Tr. 12–14.)

Dr. Friedman testified that a POSA following the ANDA label would also meet the molar ratio element of Claim 1. Claim 1 states that the molar ratio of magnesium to minocycline is greater than about 4:1. (PTX-001.) Dr. Friedman testified that the ANDA product meets that element because it defines the amount of minocycline and the amount of magnesium in the product, and when a POSA calculates those amounts in terms of molar ratio, it is about a 5:1 ratio, which meets the "greater than about 4:1" element. (Tr. 108:3–11.)

He then testified that a POSA following the ANDA label would meet the pH element of Claim 1. That element states that the composition has a pH "that is no less than 4 and no greater than 6." (PTX-001.) The ANDA product label would meet that claim element because it states that the pH for the product is between 4.5 and 5. (Tr. 109:1–4.)

Dr. Friedman testified that the ANDA would also meet the injection site hemolysis element of Claim 1. A POSA would understand what injection site hemolysis meant and would understand the benefits of a product that reduced hemolysis. (Tr. 114:4–116:9.) He testified about several properties of a product that affects the rate of hemolysis. First, an "unexpected discovery" revealed that hemolysis

could be decreased by formulating minocycline with a divalent cation with high molar ratios. (Tr. 116:12–16.) He also explained that a pH level that is too low (around 2 to 4) would trigger injection site hemolysis. (Tr. 117:5–24.) A higher injection volume triggers higher hemolysis as well, a fact he testified would be commonly known based on several publications coming to that conclusion. (Tr. 117:25–118:8, 119:18–12012; PTX-231; PTX-188; PTX-225.) The Minocin product helped resolve the issue of injection site hemolysis because Minocin's high molar ratio allowed the pH to be adjusted to a physiologic range, which in turn permitted the reduction of the volume of delivery. (Tr. 121:18–23.) Due to these changes, injection site hemolysis and tolerability issues were greatly diminished when Minocin was used as compared to a formulation without magnesium. (Tr. 122:1–8.) On cross-examination, Defendant pressed Dr. Friedman about whether each patient who received the prior art minocycline truly experienced observable injection site hemolysis and other tolerability issues. (Tr. 155:24–159:25.) Dr. Friedman conceded that each patient likely experiences different symptoms of hemolysis, but he maintained an opinion that the tolerability issues with the prior art minocycline were "well-known in the literature." (Tr. 156:13–158:16.)

Dr. Friedman testified that a POSA would know that reduced injection site hemolysis would be a benefit of Minocin simply by looking at the formulation and ingredients. (Tr. 123:20–23.) The ANDA product label discloses a similar reduction of injection site hemolysis because it specifies a higher pH range, a reduction in injection volume, and the inclusion of magnesium. (Tr. 125:3–126:8.) A POSA following the

ANDA label would, therefore, meet the injection site hemolysis element of Claim 1, according to Dr. Friedman. (Tr. 126:9–11.)

On cross-examination on the hemolysis issue, Defendant questioned Dr. Friedman about the lack of clinical trials on hemolysis. Defendant cited a letter from the FDA when Minocin was in the approval process, in which the FDA discussed running clinical trials to support the statement on Minocin's label that the product would reduce hemolysis and tolerability issues as compared to the prior art minocycline. (Tr. 163:9–23; DTX-131.) This discussion was not a recommendation to perform a trial and cited later communications where the FDA stated that a trial was not necessary. (Tr. 163:24–164:11.)

b.     Claims 7 and 18 of the '802 Patent

Dr. Friedman next testified that the ANDA product meets Claims 7 and 18 of the '802 Patent, both of which depend from Claim 1. Claim 7 states that the composition has a pH "between about 4.5 to about 5.5," and the ANDA label specifies that its solution has a pH of 4.5 to 5. (Tr. 126:18–127:10.) Claim 18 states that the total volume of the composition administered is less than 500 mL, which a POSA would understand to mean the diluted solution prepared for administration to a patient. (Tr. 127:22–128:14.) And the ANDA product label states that the product can be administered from 100 to 1000 mLs, but Dr. Friedman testified that this meets Claim 18 because a POSA would always choose to administer the minimum permissible volume. (Tr. 129:9–21.) Accordingly, Dr. Friedman concluded that a physician following the ANDA label would meet Claims 7 and 18 of the '802 Patent.

c.     Claims 1 and 27 of the '105 Patent

Claim 27 of the '105 Patent depends from Claim 1, which Dr. Friedman testified to be substantially similar to Claim 1 of the '802 Patent. (Tr. 132:3–13.) Dr. Friedman's conclusions relating to the ingredients (minocycline and magnesium), injection volume, pH level (between 4 and 7), and molar ratio (greater than 3:1) in the '802 Patent apply equally to the '105 Patent. Thus, a physician following the ANDA label would meet those claim elements of Claim 1. (Tr. 132:22–135:17.)

The '105 Patent also includes an element on osmolality, which Dr. Friedman defined as a measure of the weight of particles in a solvent in milliosmols per kilogram, a measurement that can be easily calculated and is often calculated by the pharmacy. (Tr. 135:22–136:3, 138:7–10.) Claim 1 of the '105 Patent defines an osmolality of "less than about 500 mOsmol/kg." (PTX-002.) The general physiologic standard of care, which is supported by several publications, is to maintain osmolality of less than 500 mOsmol/kg. (Tr. 136:15–137:9; PTX-184; PTX-229.) Dr. Friedman testified that the ANDA product infringes this osmolality element of Claim 1 because the ANDA also inevitably will have an osmolality less than 500 mOsmol/kg to be within the standard of care. (Tr. 140:2–21, 430:8–18.) Even though the ANDA label doesn't expressly mention osmolality, it is still infringing because osmolality can be easily calculated by looking at the ingredients listed on the label. (Tr. 141:10–142:4.) A pharmacist, who typically mixes the drug, is often the one who calculates the osmolality of a formulation before sending it to the patient, but osmolality is nevertheless not a complex calculation. (Tr. 435:7–19.) He concluded that a physician

following the ANDA label would therefore meet the osmolality element of Claim 27. (Tr. 143:23–25.)

### 2. *Dr. Tina deVries's Testimony on Infringement*

#### (a) <u>Claims 1, 7, and 18 of the '802 Patent</u>

Dr. deVries testified about the FDA regulatory process for Minocin and any generic drug that copied Minocin. Because Minocin is parenterally (intravenously) administered, it must be a solution to be suitable for administration, and FDA regulations require a copy of an aqueous parenteral drug to have the same active and inactive ingredients in the same amounts as the patented drug. (Tr. 205:24–206:5.) This means, by necessity, that the ANDA product is required to exactly copy Minocin. (Tr. 206:19–21.) Because the copy of the drug is the same as the original, clinical trials are not necessary. (Tr. 206:15–22, 254:5–12.) Dr. deVries testified that these regulatory requirements, in combination with Defendant's literature search when creating the ANDA product, showed that Defendant knew its product would infringe on Plaintiffs' patents. (Tr. 208:20–211:14.)

Dr. deVries compared the Asserted Claims to the ANDA product and label when analyzing whether the ANDA product infringed. Minocin and the ANDA product share the same properties: (1) treat only bacterial infections; (2) administered only intravenously, (3) described as minocycline for injection, (4) ingredients include minocycline, magnesium, and a base; (5) the same amounts of each of those ingredients; (6) a molar ratio of greater than 4:1; and (6) a pH of the reconstituted solution between 4 and 6. (Tr. 212:15–218:15.) The pH stated in Claim

7 of the '802 Patent (between about 4.5 to about 5.5) refers to the pH of the reconstituted solution, not the diluted solution, and Dr. deVries cited a reference to support that opinion. (Tr. 218:11–221:25; 271:11–21; PTX-225.)

Defendant cross-examined Dr. deVries on the volume element of Claim 18. Defendant noted that the Minocin label permits the reconstituted solution to be diluted in up to 1,000 mL of diluent, whereas Claim 18 limits the total volume of the administered composition to be less than 500 mL. (Tr. 274:7–10; PTX-130.) Dr. deVries testified that a physician who administers anywhere between 501 and 1,000 mL as permitted by the label would not meet the elements of Claim 1. (Tr. 274:16–275:7.) But she stressed that no physician would choose to administer that high of a volume to a patient because it would be against the standard of care; rather, any physician would choose to administer the lowest volume permitted by the label, which is 100 mL. (Tr. 274:11–23.) Dr. deVries testified that the ANDA label also specified an administration volume ranging from 100 mL to 1,000 mL, and a physician following this label would also choose to administer the lowest volume possible. (Tr. 275:16–25.)

Dr. deVries then discussed the various studies and experiments on hemolysis that Plaintiffs conducted and submitted to the FDA during the approval process for Minocin. (Tr. 223:11–225:5; PTX-71; PTX-196.) Plaintiffs did not conduct any clinical trials in patients relating to Minocin's improved tolerability claim. (Tr. 252:4–5.) This is because the FDA did not require additional human clinical trials on the hemolysis claim, as the label clearly states the improved pH and improved injection volume. (Tr.

251:3–10.) Clinical trials would have been necessary had Plaintiffs sought to make a change to the clinical claim, something Dr. deVries called "class labeling" that would have the effect of changing the clinical claim for all formulations of all tetracyclines. (Tr. 251:11–19.)

Dr. deVries testified that the inventors conducted some experiments on animals such as mice (because human trials would be harmful), which were still applicable because the experiments studied the same type of blood cells in animals that also appear in humans and would cause the same type of injection site hemolysis. (Tr. 225:6–13.) These studies varied the molar ratio, pH, and other properties and compared the results to a formulation without magnesium to discover whether the formulation with magnesium reduced injection site hemolysis. (Tr. 225:20–226:15.) What they found is that a higher pH and an "unexpected" discovery of a high ratio of magnesium to minocycline were associated with lower injection site hemolysis. (Tr. 284:18–285:5.) Dr. deVries testified that these experiments are well-recognized and reliable models for evaluating injection site hemolysis. (Tr. 227:2–3.) The FDA granted approval to Minocin to completely replace the prior art minocycline because the experiments showed that Minocin reduced the risk of injection site hemolysis as compared to a formulation without magnesium. (Tr. 227:23–228:6.)

Dr. deVries testified that when Defendant submitted its ANDA to the FDA, it explained that its product included magnesium, and that the function of magnesium was hemolysis reduction. (Tr. 230:9–19.) Defendant repeatedly stated that the purpose of magnesium in its ANDA product was to reduce injection site hemolysis.

(Tr. 230:23–231:22; PTX-22; PTX-206; PTX-207; PTX-210; PTX-211.) The FDA then confirmed to Defendant that magnesium in its product was used for hemolysis reduction. (Tr. 231:23–232:8; PTX-220; PTX-19.) Dr. deVries testified that based on this evidence, use of the ANDA product according to its label would meet the elements of Claims 1, 7, and 18 of the '802 Patent. (Tr. 232:16–233:8.)

On cross-examination, Dr. deVries conceded that the ANDA product label does not explicitly state that the product will reduce injection site hemolysis. (Tr. 247:4–14.) But just looking at the information on the label would inform her and any other POSA that hemolysis will be reduced and there will be better tolerability as compared to the prior art minocycline. (*Id.*)

(b)    <u>Claims 1 and 27 of the '105 Patent</u>

Dr. deVries's conclusions about the '802 Patent applied equally to the same claim elements and limitations that appear in Claims 1 and 27 of the '105 Patent. (Tr. 233:9–14.)

She then went into the osmolality element of Claim 1, which states an "osmolality less than about 500 mOsmol/kg." (PTX-002.) Dr. deVries defined osmolality as a property related to the concentration of dissolved molecules or particles in a solution such as an intravenously administered drug. (Tr. 234:1–13.) Osmolality is not mentioned on either Minocin's label or the ANDA product's label, but it is not necessary because osmolality can be calculated based on the amounts of ingredients in the composition that are listed on a product's label. (Tr. 235:22–236:6; 252:14–20.) The osmolality stated in the specification describes the osmolality of the

reconstituted solution, not the admixture, because Claim 1 is describing the reconstituted solution and not the admixture. (Tr. 237:17–239:1.) Accordingly, the osmolality of less than 500 mOsmol/kg listed in the specification is based on the amounts of three ingredients in the composition: magnesium, sodium hydroxide, and 5 mL of water. (Tr. 238:16–25.) When the reconstituted solution is diluted to prepare it for administration to a patient, it should be isotonic, meaning having the same osmolality as blood (around 300 mOsmol/kg). (Tr. 241:3–14, 261:20–21.)

On cross-examination, Dr. deVries was questioned about a manufacturing process development report that Plaintiffs had sent to the FDA when developing Minocin. (DTX-75.) Defendant noted that this report noted the use of 10 mL for reconstitution of the solution in osmolality tests. (Tr. 265:16–21.) Dr. deVries clarified that she understood that a 10 mL vial was used in these tests, rather than 10 mL used in the solution. (*Id.*) She testified that if the results of this experiment were calculated for 5 mL for reconstitution, she approximated that the osmolality would double. (Tr. 307:20–308:5.)

Dr. deVries testified that this same composition was used in the ANDA product and specified on its label, which would necessarily mean that administering the ANDA product according to its label would also result in an osmolality of less than 500 mOsmol/kg. (Tr. 240:14–20.) Dr. deVries testified that in her opinion, the label for the ANDA product would encourage, recommend, and promote physicians to administer the ANDA product intravenously, an act that would meet every Asserted

Claim. (Tr. 244:12–245:6.) Accordingly, she concluded, there will be direct infringement, and Defendant induced that infringement. (Tr. 244:24–245:6.)

### 3. Dr. Alexander Klibanov's Testimony on Infringement

Dr. Klibanov testified of his opinion that Defendant did not infringe on Plaintiffs' product. His opinion is largely based on a disagreement with the meaning of the terms "composition" and "administer" in the patents-in-suit specifications. Dr. Klibanov understands "composition" to be limited to the three listed components (minocycline, magnesium, and a base), so the Minocin label instructing a physician to "administer" the "composition" would mean administering those three ingredients (the reconstituted solution) without a diluent. (Tr. 521:20–522:20.) He testified that the ANDA label, on the other hand, instructs the administration of a diluted solution, not the reconstituted solution. (Tr. 522:25–523:3; DTX-0101.) Dr. Klibanov's opinion is that a POSA administering the ANDA product could not infringe on the claim elements of the '802 Patent because the POSA would follow the instructions on the ANDA product label requiring him to add a diluent—which he testified was not a component of the '802 Patent. (Tr. 524:16–525:10.) Accordingly, Dr. Klibanov testified, there can be no infringement. (Tr. 525:10.)

On cross-examination, Dr. Klibanov testified that he understood there are no differences between the ANDA product and Minocin. (Tr. 549:21–23.) Although he would not concede that Defendant copied Minocin with its ANDA product, Dr. Klibanov did agree that all ingredients and amounts of ingredients between the two

products in their reconstituted forms are identical as required by law. (Tr. 549:24–551:5.)

### 4. *Dr. Henry Chambers's Testimony on Infringement*

Dr. Chambers testified that there are three primary differences between the ANDA product label and the Minocin label: (1) description of what is in the vial; (2) how the drug is diluted; and (3) warnings relating to potential side effects of magnesium. (Tr. 581:12–20; DTX-101; DTX-110.) He also compared the old and new Minocin labels, testifying that they are essentially the same except for different volume administration, pH, and diluent volume. (Tr. 583:9–20.) Dr. Chambers's understanding about the pH level on the label is that it describes the pH of the solution after dilution, because the diluted solution is what is actually administered to the patient. (Tr. 584:2–9.) On cross-examination, he agreed that the Minocin product has an overall improved pH profile compared to the prior art minocycline, which is beneficial because the higher pH profile in Minocin means a lower likelihood of irritation, pain, and toxicity issues. (Tr. 643:17–644:24.) He also testified that there is no relationship between pH levels, volume of administration, and injection site hemolysis, because that relationship is not demonstrated on the label. (Tr. 584:18–22.)

#### (a) The '105 Patent

Dr. Chambers testified that the ANDA label does not provide any instructions on osmolality, but a physician would likely ensure that the product is administered at an osmolality "around 500," a measurement that can be easily calculated by

knowing the osmolality of the other ingredients in the product. (Tr. 585:14–586:21, 634:4–25.) Accordingly, Dr. Chambers's opinion was that the ANDA label does not infringe because it does not include any information about osmolality on the label, which means it cannot encourage a physician to aim for a particular osmolality. (Tr. 588:2–14.)

(b)    <u>The '802 Patent</u>

For the same reason, Dr. Chambers testified that Defendant did not induce infringement on the injection site hemolysis claim in the '802 Patent because hemolysis is not mentioned in the Minocin label. (Tr. 590:8–9.) He testified that the label only mentions hemolytic anemia and thrombophlebitis, neither of which are a direct mention of hemolysis. (Tr. 590:9–592:19.) In his opinion, neither phlebitis nor thrombophlebitis (which are mentioned on the Minocin label) are related to hemolysis. (Tr. 597:9–17.) He added that the in vitro tests cited by Plaintiffs in support of the opposing opinion are not sufficient comparators to measuring injection site hemolysis in a patient because those test conditions are very sensitive, so in vitro test results do not apply equally to how a product might affect a human patient. (Tr. 597:20–599:21.) Dr. Chambers was not aware of any agreed-upon definition of the term "injection site hemolysis," nor any description of its occurrence and how to measure it. (Tr. 596:17–597:8.)

On cross-examination, Dr. Chambers did not recall reviewing statements by Defendant to the FDA that the function of magnesium in its ANDA product was for hemolysis reduction. (Tr. 656:5–20.)

E.    **Rounds Two, Three, and Four: Testimony on Obviousness**

This Section discusses both parties' testimony on the obviousness element of invalidity, which includes both parties' arguments on secondary considerations. This testimony was presented in Rounds Two, Three, and Four.

1.    *Dr. Alexander Klibanov's Testimony on Obviousness*

Dr. Klibanov testified about the basics of intravenous pharmaceutical formulations, including how a solid drug product cannot be administered intravenously but must be dissolved first. (*See* Tr. 465:1–466:16.) He testified that when developing an intravenous formulation, the formulator would consider stability, solubility, and tolerability of the drug. (Tr. 466:17–468:10.)

He explained that pH and osmolality are important to intravenous administration because the pH and osmolality levels of a formulation should be close to the pH and osmolality levels of blood in order to reduce stress on the patient's body. (Tr. 468:24–470:8.) Dr. Klibanov testified as to the chemical structure of tetracyclines, which is a class of drug compounds that treats bacterial infections. (Tr. 470:14–19.) All tetracyclines share a chemical structure, but minocycline differs from other tetracyclines in specifically the upper portion of the molecule. (Tr. 470:20–22; 474:2–7.) All tetracyclines are able to strongly bind magnesium by forming a complex called a chelate. (Tr. 475:7–16.)

Dr. Klibanov testified about the prior art minocycline and its label. The prior art minocycline label taught that the product was used to treat bacterial infections, and it was a solid powder that needed to be reconstituted in water and then further

diluted to a total volume of 500–1,000 mL to make it suitable for administration. (Tr. 478:10–479:3.) Depending on the type of diluent used, the pH of prior art minocycline varied from 2.0 to 2.8 after reconstitution and 2.5 to 6 after dilution. (Tr. 480:10–481:9.) He testified that a POSA would likely not care about the reconstitution pH and would instead focus on the diluted pH because that is what gets administered into the patient's body. (Tr. 481:4–9.) Dr. Klibanov testified that there were no significant problems with the prior art minocycline, but if a POSA wanted to improve the formulation, he would review literature on minocycline. (Tr. 482:22.5–11.) Two such references Dr. Klibanov discussed were a Chinese patent application referred to as CN'268 (2008) and a patent application referred to as Gibbs (1989). (Tr. 482:12–16, 489:8–12; DTX-0014; DTX-0012.)

(a)    Prior Art Reference CN'268

CN'268 discusses improving doxycycline (a tetracycline that is similar to minocycline) by adding magnesium ions in order to increase pH values and minimize irritability when administered. (Tr. 483:7–25.) CN'268 achieved better solubility, stability, and tolerability by adding magnesium ions to the formulation. (Tr. 484:1–3.) CN'268 increased solubility in the formulation, which then allowed a lower volume in administration. (Tr. 485:21–24.) CN'268 used magnesium ions in higher molar ratios to doxycycline and had a pH value between 3 and 7. (Tr. 486:1–9.)

Dr. Klibanov testified that CN'268 would be relevant to a researcher seeking to improve prior art minocycline because CN'268 studies doxycycline, a close relative of minocycline with structural similarities. (Tr. 486:19–24.) And even though CN'268

is not an intravenous formulation, it would still be relevant from Dr. Klibanov's perspective because CN'268 is also an injectable formulation that happens to be injected into the muscle as opposed to the vein. (Tr. 487:1–12.) CN'268 is also a product designed for veterinary use, which Dr. Klibanov considered to be irrelevant because animals are well-established models for human drug administration. (Tr. 487:16–488:4.) Dr. Klibanov testified that a POSA looking to modify the prior art minocycline would, upon reviewing CN'268, be motivated to add magnesium to a minocycline intravenous formulation to improve stability, solubility, tolerability, and pH. (Tr. 489:1–7.) On cross-examination, Dr. Klibanov confirmed that CN'268 does not mention minocycline, and that he did not discuss on direct examination the function or effects of other ingredients (also called excipients) included in the CN'268 formulation. (Tr. 540:19–541:20.)

(b)    Prior Art Reference Gibbs

Dr. Klibanov also testified about a second publication, referred to as the "Gibbs" reference. (DTX-0012.) Gibbs researched adding magnesium ions to minocycline at a molar ratio between 1:1 and 8:1, a formulation that resulted in "improved formulation properties." (Tr. 489:8–490:14.) The Gibbs formulation used the same ingredients as the prior art minocycline but added magnesium, because magnesium formed chelates with doxycycline and minocycline, causing beneficial effects (such as improved solubility and stability and reduced toxicity and irritability). (Tr. 491:16–492:13, 500:14–23.) Dr. Klibanov explained that doxycycline and minocycline were listed together in the Gibbs reference more than two dozen

times, which a POSA would understand to mean that doxycycline and minocycline are essentially interchangeable in terms of their interaction with magnesium. (Tr. 491:21–492:4.) When read in relation to CN'268, Dr. Klibanov testified that Gibbs reinforced the idea that what CN'268 revealed about doxycycline's relationship with magnesium also applies to minocycline. (Tr. 492:5–13.) But on cross-examination, Dr. Klibanov conceded that Gibbs does not expressly disclose any data on minocycline formulations but instead focuses on doxycycline formulations. (Tr. 541:25–542:12.) Dr. Klibanov maintained, however, that the doxycycline examples specified in Gibbs provide procedures for making minocycline formulations, and a POSA could follow the procedure specified for doxycycline but use minocycline instead. (Tr. 544:22–547:2.)

(c)      Additional Prior Art References

In addition to CN'268 and Gibbs, Dr. Klibanov pointed out four other prior art references that taught a molar ratio of 3:1 to 8:1 of magnesium ions to a tetracycline. (Tr. 494:6–15; DTX-0008; DTX-0009; DTX-0006; DTX-0007.) Of these four references, none is specific to minocycline, but Dr. Klibanov argued that a POSA seeking to make a minocycline formulation would not ignore these references because of minocycline's similarity to other tetracyclines. (Tr. 495:3–12.) None of these references explicitly disclose intravenous formulations, but they disclose parenteral formulations, which encompass intravenous formulations. (Tr. 548:9–20.)

(d)     <u>Chemical Similarities Among Tetracyclines</u>

Dr. Klibanov testified that there are "profound structural similarities" among all tetracyclines, particularly with respect to the structure of the lower portion of the tetracycline ring. (Tr. 495:11–21.) Magnesium complexation to tetracyclines has been extensively studied, and it is well known that magnesium binds with all tetracyclines in the lower portion of the B and C tetracycline rings as shown in the figure below— the portion of a tetracycline molecule that does not change across all tetracyclines. (Tr. 495:13–496:15, 479:11–18; DTX-0174.)



On cross-examination, Plaintiffs asked Dr. Klibanov about previous statements he had made about how seemingly small structural differences between two molecules can result in large differences in the properties of the substance, a statement Dr. Klibanov agreed remained true today. (Tr. 531:13–532:20.) Dr. Klibanov then agreed with Plaintiffs that there are three structural differences between minocycline and doxycycline. (Tr. 532:23–533:1.)

(e)     <u>Ultimate Opinions on Obviousness of the '802 Patent</u>

Based on an understanding of the chemical structure of minocycline and a familiarity with CN'268 and Gibbs, Dr. Klibanov testified that a POSA should

reasonably expect to successfully create a minocycline formulation with magnesium that improved stability, solubility, and hemolysis. (Tr. 500:24–501:6.) He testified that a POSA following the prior art minocycline's label would have diluted the reconstituted solution to bring the volume to 500–1,000 mL and obtain a final pH of 4.5 to 6, but that same POSA who was familiar with CN'268 and Gibbs would have been motivated to add magnesium at a ratio of up to 8:1 to that prior art minocycline formulation because they would have an understanding that magnesium would improve solubility and enable a lower dosage. (Tr. 501:12–502:9.)

Regarding Claim 1 of the '802 Patent, Dr. Klibanov testified that the prior art minocycline covers all claim elements except the addition of magnesium, but a POSA familiar with CN'268 and Gibbs would have been motivated to add magnesium to the prior art minocycline. (Tr. 504:16–22.) He also testified that the term "injection site hemolysis" in Claim 1 is vague because there is no agreed-upon teaching for how to measure it, but a POSA would nevertheless reasonably expect hemolysis to be reduced in a formulation that included magnesium. (Tr. 505:1–15.) This is because hemolysis reduction is a necessary and "inherent" result of administering a formulation with magnesium and minocycline. (Tr. 505:20–506:10.) Dr. Klibanov also testified that Gibbs taught a magnesium to minocycline molar ratio of up to 8:1, which overlaps with the claimed range of 4:1 in Claim 1. (Tr. 508:3–9.) He also stated that the pH claim limitation in Claim 1 (a pH between 4 and 6) overlaps with the pH in the prior art minocycline when diluted (4.5–6), and the pH levels in the prior art (3–7 in CN'268 and 5–7 in Gibbs). (Tr. 508:18–23.) Dr. Klibanov thus concluded that the

Claim 1 elements about magnesium, reduced hemolysis, a higher molar ratio, and a higher pH level were obvious. (Tr. 507:14–508:2.)

Regarding Claim 7 of the '802 Patent, which narrows the pH range to between 4.5 and 5.5, Dr. Klibanov testified that the prior art references (the prior art minocycline label, CN'268, and Gibbs) teach a pH range that overlaps and encompasses the range in Claim 7. (Tr. 510:1–11.)

Regarding Claim 18 of the '802 Patent, which limits the total administered volume of the composition to 500 mL, Dr. Klibanov testified that Gibbs specifically taught a low injection volume of 5 mL, and the prior art minocycline label also allowed a volume of 500 mL. (Tr. 510:19–511:6.) Based on this prior art, Dr. Klibanov testified that a POSA would have understood that an administration volume of less than 500 mL would have been obvious. (Tr. 511:9–12.)

Dr. Klibanov's ultimate opinion regarding the Asserted Claims of the '802 Patent, based on the prior art references (the prior art minocycline label, CN'268, and Gibbs), was that the Asserted Claims would have been obvious to a POSA. (Tr. 511:13–18.)

(d)     Ultimate Opinions on Obviousness of the '105 Patent

Dr. Klibanov first testified that all the opinions he had about the '802 Patent claim elements applied equally to the same claim elements in the '105 Patent. (Tr. 512:4–8, 513:15–515:13.)

Dr. Klibanov also testified about the osmolality element of Claim 1 of the '105 Patent, which teaches an osmolality of less than 500 mOsmol/kg. (*See* PTX-002.) He

testified that the prior art references do not explicitly discuss osmolality, but a POSA would know that the osmolality of the formulation must be near the 300 mOsmol/kg osmolality level of blood, which is within the claimed range of 500 mOsmol/kg. (Tr. 512:17–24, 515:16–21; *see also* DTX-0175.) He stated that the osmolality level of the formulation is "unequivocally dictate[d]" by and an "inevitable result of" the ingredients and concentrations within the formulation. (Tr. 512:25–513:4.)

Dr. Klibanov's ultimate opinion regarding obviousness of the Asserted Claims in the '105 Patent was that all Asserted Claims would have been obvious to a POSA, based on prior art references including the prior art minocycline label, CN'268, and Gibbs. (Tr. 516:10–18.)

### 2. *Dr. Richard Chambers's Testimony on Obviousness*

Dr. Chambers testified that he agreed with Dr. Klibanov's assessment of obviousness. (Tr. 618:6–11.) He did not rely on any references other than Gibbs and CN'268 in making this conclusion. (Tr. 676:25–677:7.)

### (a) Prior Art Reference Gibbs

Dr. Chambers first testified that a physician reviewing Gibbs, which focuses on doxycycline, would apply conclusions and research about doxycycline to minocycline because the two tetracyclines have similar chemical structures and identical magnesium binding. (Tr. 618:14–22.) Gibbs, which studies an intramuscular formulation, describes the use of oil in its formulation, but Dr. Chambers argued that a POSA would disregard that oil use for an intravenous formulation because injecting oil into a patient's bloodstream would be dangerous. (Tr. 619:1–621:3.) But that same

POSA would still find the remaining information in Gibbs to be helpful because it includes information about how magnesium interacts with doxycycline and, by extension, with minocycline. (Tr. 620:19–622:13.)

When asked about this inclusion of oil on cross-examination, Dr. Chambers testified that oil acts as a "surfactant" in the Gibbs formulation, which increases the solubility of doxycycline. (Tr. 662:2–15.) Gibbs requires an antioxidant to be added to the doxycycline formulation in order to stabilize it. (Tr. 16–19.)

(b) <u>Prior Art Reference CN'268</u>

Dr. Chambers testified about the toxicity and tissue irritability disclosures mentioned in the CN'268 publication. (*See* PTX-14.) CN'268, like Gibbs, studies an intramuscular formulation, and is directed to veterinary use. But he maintained that CN'268 is still relevant to intravenous formulations because high toxicity and irritability at the site of an intramuscular injection would translate to lower toxicity and irritability at the site of an intravenous injection. (Tr. 624:12–23.) He also testified on cross-examination that CN'268 only concerns formulations of doxycycline injection for veterinary use and does not mention minocycline anywhere. (Tr. 666:5–19.)

He also testified that CN'268 describes that magnesium improves a doxycycline formulation by increasing its solubility, improving the pH, and reducing toxicity and tissue irritability. (Tr. 624:5–9.) But all claims in the CN'268 publication require the use of a dissolvent and an antioxidant. (Tr. 670:12–22.) Dr. Chambers then discussed an experiment described in CN'268, which was conducted via

intramuscular administration in pigs, that resulted in no toxicity and other side effects. (Tr. 625:2–5.) But he conceded that CN'268 does not explicitly and directly mention or disclose hemolysis. (Tr. 671:10–12.)

Dr. Chambers concluded that a POSA would be motivated to combine the prior art minocycline, Gibbs, and CN'268 to achieve the claimed formulation and would have a reasonable expectation that developing such an improved formulation would be successful. (Tr. 625:6–22.)

### 3. *Dr. Bruce Friedman's Testimony on Obviousness*

#### (a) Prior Art References

Dr. Friedman repeated his testimony about the issues he witnessed with prior art minocycline. He testified that the problems included injection site tolerability issues, improper pH, and large minimum injection volumes. (Tr. 696:1–3.) As to injection tolerability issues, he explained that a POSA would understand that injection site hemolysis is a risk for any patient that is triggered when injected, and it can create signs and symptoms such as thrombophlebitis, phlebitis, erythema, pain, and potentially skin damage. (Tr. 696:5–25.) As to improper pH, he explained that a lower pH (such as 2–2.8 in prior art minocycline) is more likely to induce injection site hemolysis, a fact he said was supported by two publications: the 2002 Jan-Peter paper and the 1982 Jones paper. (Tr. 697:25–699:7; PTX-179; PTX-181.) As to injection volumes, Dr. Friedman testified that a higher volume of fluid administered to a patient (such as a minimum 500 mLs in prior art minocycline) means increased cell contact and, therefore, increased risk of intolerability. (Tr. 699:8–700:1.)

Dr. Friedman cited several publications to support his opinion that there were known issues with the prior art minocycline. First, a 1995 Klein paper includes research on only doxycycline because all other parenteral tetracyclines (such as minocycline) were associated with thrombophlebitis and hepatic toxicity (liver damage). (Tr. 700:2–23; PTX-182.) Klein teaches that using minocycline carries many risks, and a physician administering it to a patient with a bacterial infection needs to be careful. (Tr. 701:24–702:9.) Second, Dr. Friedman cited a 1996 Sweetana paper. (*See* PTX-233.) Sweetana measures pH from the reconstituted solution, and the prior art minocycline had one of the lowest pHs of several other formulations studied in the Sweetana paper. (Tr. 702:11–17, 703:9.) Dr. Friedman did not cite to any article that showed reduced hemolysis of Minocin as compared to the prior art minocycline. (Tr. 753:4–7.) Nor did he discuss the Gibbs reference or the CN'268 reference. (Tr. 762:20–763:4.)

(b)     Secondary Considerations

Dr. Friedman also relied on his own experience to support his opinion. At the burn and wound center where he is employed, he saw many patients who were treated with prior art minocycline and had hemolysis symptom such as skin breakage and damage, which would then extend the length of their stay. (Tr. 704:5–14.) But he continued to use prior art minocycline because they had few other options to treat a bacterial infection. (Tr. 704:25–705:7.) Dr. Friedman testified that minocycline was especially effective against bacterial infections as opposed to other tetracyclines such as doxycycline because of the addition of nitrogen on the second methyl ring, which

changes the minocycline's chemical structure to afford it unique features such as a lower likelihood of resistance patterns. (Tr. 706:11–25.) Because of this difference, Dr. Friedman testified, a POSA would not extrapolate disclosures and findings about doxycycline and apply them to minocycline. (Tr. 707:1–10.)

Based on this testimony, Dr. Friedman concluded that there was a long-felt but unmet need for an improved intravenous formulation of minocycline that reduced injection site tolerability issues. (Tr. 708:18–709:3.) He testified that there were "valiant efforts" to improve prior art minocycline, but no one was successful. (Tr. 709:17–19.) A POSA could not try to increase the pH of the prior art minocycline because it would lead to solubility issues, nor could a POSA decrease the minimum injection volume because lower pH required higher injection volumes to avoid tolerability issues. (Tr. 709:21–710:7; PTX-175.)

Dr. Friedman testified that the Minocin product was a "much-needed breakthrough." (Tr. 711:13–14.) Minocin added magnesium at a 5:1 molar ratio, and had a lower pH and injection volume than prior art minocycline. (Tr. 711:1–8.) Minocin was effective against several bacteria that other antibiotics could not treat, and it reduced the risk of injection site hemolysis, allowing it to be routinely used to treat patients. (Tr. 711:11–23.)

On cross-examination, Dr. Friedman was questioned about the pH element of the minocycline formulations. Both the prior art minocycline and Minocin's product labels require dilution before the formulation is administered using diluents such as Lactated Ringer's or a normal saline. Lactated Ringer's is an option to use as a diluent

but not the standard of care, and normal saline was the recommended standard of care. (Tr. 722:5–724:24.) This is because Lactated Ringer's is a formulation used primarily to restore fluids to patients low on volume due to trauma or burns, not a diluent for pharmaceuticals. (Tr. 765:18–766:2.) If Lactated Ringer's was used as a diluent in an administration of the prior art minocycline (although it would be highly unlikely for a POSA to use that diluent), the pH of the diluted solution would be 4.5 to 6.0. (Tr. 728:3–729:7.)

### 4. Dr. Tina deVries Testimony on Obviousness

#### (a) Response to Defendant's Obviousness Arguments

Dr. deVries testified about the Gibbs and CN'268 references that Dr. Chambers and Dr. Klibanov discussed. First, Gibbs was considered by the patent examiner during prosecution of the patents-in-suit. (Tr. 809:21–24; PTX-132.) Gibbs does not disclose any examples of minocycline, nor any attempts to make a minocycline formulation; instead, Gibbs only studies doxycycline. (Tr. 809:6–810:8.) The Gibbs compositions were administered intramuscularly without any examples of intravenous administration. (Tr. 810:20–25.) Dr. deVries explained that a POSA would not extrapolate this data and apply it to intravenous minocycline formulations. First, a POSA would want to see additional data on minocycline specifically, especially in the context of the prior art references she previously testified about. (Tr. 810:9–15.) Second, a POSA could not extrapolate findings about intramuscular formulations to intravenous formulations because intravenous formulations must be administered as a solution to avoid precipitation, whereas an intramuscular injection

does not have to be a solution and can accommodate another phase such as an oil to help solubilize the formulation. (Tr. 811:3–812:2.) Gibbs also teaches an antioxidant was necessary to stabilize doxycycline, without any discussion or implication that magnesium could improve stability or solubility. (*Id.* 812:18–24.) But Gibbs does explain that an antioxidant is optional if a POSA wants to ensure stability. (Tr. 896:2–12.) Although Gibbs discusses an 8:1 ratio of magnesium to drug, it does not discuss the significance of the molar ratio of metal cations. (Tr. 812:25–813:2, 845:25–846:4.) Accordingly, Dr. deVries testified that a POSA would not have considered the Gibbs reference to be relevant. (Tr. 813:6–8.)

The CN'268 reference studies an intramuscular doxycycline injection for veterinary use. (Tr. 813:13–814:2.) CN'268 does not disclose anything about either minocycline or intravenous formulations. (Tr. 813:13–14, 814:3–5.) Like Gibbs, CN'268 taught that an antioxidant is necessary to stabilize doxycycline, rather than magnesium. (Tr. 814:25–815:7.) Nor does CN'268 discuss the significance of a higher molar ratio. (Tr. 815:8–10.) CN'268 does discuss magnesium. (Tr. 845:19–21.) Dr. deVries agreed that CN'268 was not considered by the patent office during the Minocin approval process. (Tr. 846:5–10.)

Dr. deVries testified about the other prior art references Dr. Klibanov discussed (Weidenheimer, 1967; Beutel, 1972; Akazawa, 1974; Noseworthy, 1976). She explained that none of those references mentioned minocycline at all, all taught the addition of other excipients to stabilize the formulation, and all studied intramuscular formulations. (Tr. 815:14–816:5.) She testified that a POSA seeking to

make a minocycline solution for intravenous administration would not have learned anything from these references. (Tr. 816:10–13.)

> (b) Chemical Structures of Minocycline and Doxycycline

Dr. deVries testified that doxycycline is not a 7-dimethylamino-tetracycline, which the claims of the patents-in-suit are directed to. (Tr. 821:7–16.) Doxycycline and minocycline have three structural differences in the upper group of the molecule, as indicated in R1, R2, and R4 of Rows D and E in the below figures from the 1998 Nelson reference:



| Tetracycline Natural Products | R | $R_1$ | $R_2$ | $R_3$ | $R_4$ |
|---|---|---|---|---|---|
| A. Chlortetracycline | $N(CH_3)_2$ | H | $CH_3$ | H | Cl |
| B. Oxytetracycline | $N(CH_3)_2$ | OH | $CH_3$ | OH | H |
| C. Tetracycline | $N(CH_3)_2$ | H | $CH_3$ | H | H |
| Tetracycline Semi-synthetic Compounds | | | | | |
| D. Minocycline | $N(CH_3)_2$ | H | H | H | $N(CH_3)_2$ |
| E. Doxycycline | $N(CH_3)_2$ | OH | $CH_3$ | H | H |
| F. Methacycline | $N(CH_3)_2$ | OH | $= CH_2$ | - | H |

(Tr. 821:22–822:5; PTX-151.) Although it is true that magnesium only binds to the lower region of the tetracycline structure, the Nelson reference says other studies show that the upper group is also implicated. (Tr. 822:6–15.) The Nelson reference also teaches that modification of the upper group may "drastically alter" chemical attributes of a tetracycline, which can lead to changes in solubility. (Tr. 823:2–7.) Accordingly, Dr. deVries explained, a POSA would understand that the three structural differences between minocycline and doxycycline in the upper region could significantly affect how the molecules interact with metal cations. (Tr. 823:22–824:1.)

Dr. deVries also testified that the 1974 Barringer reference teaches that the differences between minocycline and doxycycline, including solubility, are attributed

specifically to the presence of a 7-dimethylamino group in minocycline that does not appear in doxycycline. (Tr. 824:6–19; PTX-152.)

Based on these references, Dr. deVries concluded that a POSA would not have been motivated to attempt minocycline formulations based on prior art references that only disclose information on doxycycline. (Tr. 825:1–4.) A POSA attempting such a strategy would not have had a reasonable expectation of success. (Tr. 825:5–8.)

(c)     Secondary Consideration #1: Teaching Away

Dr. deVries testified on objective teaching away in prior art references. She began by testifying about her own 2006 publication. (PTX-134.) Her experiments involved an aqueous solution of minocycline with metal cations (such as magnesium) and an increased pH, which resulted in immediate formation of insoluble particles (which she described as "suspension"). (Tr. 775:4–19.) The molar ratio of metal cations to minocycline used in her experiments ranged from 1:3 to 3:1. (Tr. 775:20–23.) Thus, she testified that her experiments taught that a molar ratio up to 3:1 became insoluble when a base was added, at which point the formulation was at a pH level near 4. (Tr. 776:4–7, 782:12–18.) That a higher molar ratio of magnesium to minocycline did not result in solubility issues was therefore surprising to Dr. deVries, especially in combination with other literature warning about the combination of metal cations with minocycline. (Tr. 776:24–777:15.)

Dr. deVries testified about this other literature. First, a 1998 Yalkowsky paper explains how hemolysis and phlebitis are major adverse effects of intravenous administration. (Tr. 780:15–781:1.) Next, a 1974 Barringer paper that studies the

solubility of minocycline at a 2:1 molar ratio of magnesium ions resulted in a seven-fold reduction in solubility in the presence of magnesium at a pH of 6.5. (Tr. 782:23–783:20; PTX-152.) Dr. deVries testified that a POSA reading Barringer would learn that calcium or magnesium should not be included in a minocycline formulation because it would react with minocycline and precipitate[13] out of solution. (Tr. 783:21–784:1.) She testified that this information is applicable to intravenous solutions, which must be solutions for administration, so the potential for precipitation and insolubility is important. (Tr. 788:7–14.) With this understanding, she testified that the inventors of the patents-in-suit surprisingly found that adding magnesium into a minocycline formulation at a 5:1 ratio was able to result in a solution suitable for intravenous administration. (Tr. 788:15–789:4.)

Third, a 1983 Berthon reference studied the interaction between magnesium and minocycline. (Tr. 789:5–11; PTX-158.) This reference found the presence of precipitation in fluids that combined magnesium and minocycline at a higher pH. (Tr. 789:17–790:3.) She stated that a POSA would have learned from Berthon to avoid combining magnesium with minocycline for an intravenous solution. (Tr. 790:4–8.) Fourth, a 1976 Allen reference conveyed the same message. (Tr. 790:20–23.) The Allen reference surveyed the treatment and use of minocycline in a clinic, concluding that minocycline chelates with metal cations with a loss of solubility. (Tr. 790:12–19; PTX-157.)

---

[13] "Precipitation" is a process by which a substance is "separated from a solution by the action of a reagent so that a precipitate forms. *Precipitation*, Taber's Medical Dictionary Online (24th ed.).

Fifth, a 1982 Pawelczyk reference considered by the FDA investigates the stability of minocycline in aqueous solutions within a broad pH range. (Tr. 791:9–22; PTX-133.) DeVries testified that Pawelczyk taught that the degradation of minocycline increased at a pH of 4 to 6, meaning that a POSA reading Pawelczyk would learn to keep the pH of a minocycline formulation between 2 and 3 to maintain stability. (Tr. 793:4–20.) Pawelczyk also studies the effect of metal ions on the degradation rate of minocycline, which showed that the addition of magnesium did not have any distinct effect on the rate of degradation versus a formulation without magnesium. (Tr. 794:3–13.) Pawelczyk was pre-formulation work reporting data on experiments, not attempting to create a pharmaceutical formulation. (Tr. 850:25–851:7.)

In summary, Dr. deVries testified that these five references would teach a POSA away from the claimed invention in the patents-in-suit. (Tr. 795:1–3.) This is because the reference taught a POSA to avoid formulating solutions of minocycline over a pH of 4, avoid adding metal cations, and avoid adding high molar ratios of metal cations to minocycline. (Tr. 4–11.)

(d)    Secondary Consideration #2: Length of Intervening Time

Dr. deVries testified that the length of intervening time between the prior art minocycline (1973) and the patents-in-suit (2010) is evidence of non-obviousness. (Tr. 799:8–13.) She cited several publications to support her opinion that no one could determine how to fix the prior art minocycline for almost forty years. (Tr. 14–16.) Dr. deVries testified in particular about the pH of the prior art minocycline, which is 2 to

2.8 for the reconstituted solution and 2.5 to 4 for the diluted solution. (Tr. 796:19–797:2.) The Broadhead article teaches an avoidance of a pH less than 3, which may cause pain and phlebitis. (Tr. 796:3–15; PTX-225.) A 1998 Kokotis article found that an acidic drug with a pH below 4.1 could damage a vein's inner layer. (Tr. 797:7–17; PTX-185.) The 2002 Jan-Peter article stated that the risk of hemolysis, precipitation, phlebitis, and pain is well-known to be higher at a lower pH level. (Tr. 797:21–798:4; PTX-179.) Dr. deVries testified that a POSA would be aware of all these publications and, in view of that, would know that the pH of the prior art minocycline was so low to maintain solubility and stability. (Tr. 798:11–22.) No changes were made to the prior art minocycline formulation until Minocin was approved forty years later because no one knew how to improve it. (Tr. 799:8–16.)

On cross-examination, Dr. deVries was asked about the Broadhead reference. She testified that Broadhead stated a parenteral product should have a pH close to physiological range (approximately 7.4) unless precluded by solubility or stability problems, but a wide pH range can be tolerated when administered intravenously. (Tr. 852:19–853:15.) Broadhead also taught that hypertonic solutions (osmolality above 500) were preferable to hypotonic solutions (a lower osmolality) because of a risk of hemolysis associated with hypotonic solutions. (Tr. 854:23–855:15.) Dr. deVries did not agree that Broadhead was thus teaching that increased osmolality reduced hemolysis. (Tr. 855:3–7.) Dr. DeVries also did not agree that hypotonic formulations are included in the '105 Patent. (Tr. 857:19–21.)

(e)    Secondary Consideration #3: Unexpected Results

Dr. deVries disagreed with Defendant's argument that CN'268 and Gibbs were the closest prior art and should have been used as comparators. (Tr. 800:25–801:3.) Both references were void of any data about minocycline formulations, did not concern intravenous formulations, and taught the addition of stabilizers and solubilizers. (Tr. 801:4–9.) Dr. deVries testified that the inventors of the patents-in-suit had "unexpected and surprising results." (Tr. 801:16.) They "found that by adding high molar ratios of magnesium cations greater than 3 to 1, they were able to successfully create an aqueous solution of minocycline . . . suitable for intravenous administration" with a composition and administration pH over 4 for all diluents. (Tr. 801:17–24.) And this formulation did not have significant solubility or stability issues, was able to be administered at a volume less than 500 mLs, and reduced injection site hemolysis. (Tr. 801:17–802:2.) Dr. deVries testified that she was surprised by these results because they were the exact opposite of her findings in the 2006 publication. (Tr. 802:3–17.)

Dr. deVries stated that the FDA reviewed all experimental data generated by the inventors. (Tr. 802:13–15.) The FDA concluded that those experiments showed that the addition of magnesium to minocycline improved stability and solubility at higher pH values, had the potential to reduce injection site hemolysis compared to the prior art minocycline, and enabled administration at a smaller volume. (Tr. 804:8–22.) The FDA thus was saying that the studies and data showed that the new formulation improved the prior art minocycline. (Tr. 806:6–14.)

In summary, Dr. deVries affirmed that the results of the inventors' experiments showed that compositions that meet the limitations of the Asserted Claims are sufficiently stable and soluble for intravenous administration and reduce the risk of injection site hemolysis relative to compositions that do not include magnesium. (Tr. 807:7–17.) She testified that the unexpected results were due to the claimed features of the invention, including a molar ratio of magnesium to minocycline of greater than 3:1. (Tr. 807:18–22.) Dr. deVries concluded that there is a nexus between the unexpected results and the claimed invention, which is objective evidence of non-obviousness. (Tr. 807:23–808:3.)

Dr. deVries concluded that a POSA would not have been motivated to combine these prior art references with the prior art minocycline because they did not discuss minocycline, intravenous formulations, or molar ratios, and they discussed the presence of additional solubilizing agents not in the Asserted Claims. (Tr. 817:11–25.) She added that even if a POSA was so motivated, the POSA could not have had a reasonable expectation of success in achieving the claimed invention. (Tr. 818:17–21.)

### 5. Round Four: Defendant's Response on Secondary Considerations

#### (a) Dr. Klibanov's Response

In Round Four of argument, Dr. Klibanov testified in response to Plaintiffs' secondary considerations arguments. First, he responded to Dr. deVries's teaching away arguments. He explained that in order to teach away, a reference must criticize, discredit, or otherwise discourage a POSA from making a claim, which he testified

Dr. deVries had not done for the pH, magnesium, or molar ratio claims. (Tr. 911:16–912:12.) Dr. Klibanov also discussed Dr. deVries's testimony about the Barringer article. He disagreed that it teaches away from intravenous formulations with high concentrations of metal cations, because the article concerns oral absorption, not aqueous solutions or intravenous formulations. (Tr. 912:13–915:1.) Accordingly, he testified, Barringer would not have taught a POSA away from creating an aqueous solution of minocycline with a high molar ratio of magnesium at a pH above 4. (Tr. 916:5–22.) But on cross-examination, he agreed that Barringer did teach that the minocycline and magnesium complex can precipitate from an aqueous solution depending on the pH value, becoming unsuitable for intravenous administration. (Tr. 920:20–921:23.) Dr. Klibanov also disagreed with Dr. deVries that a POSA would have expected such a formulation to have stability and solubility issues based on the prior art. (Tr. 916:23–917:5.)

Dr. Klibanov's ultimate opinions on obviousness were: (1) there were no surprising and unexpected results; (2) no references taught away from the claimed invention; (3) there was no long-felt need met by the formulation; and (4) copying did not suggest the claims were innovative. (Tr. 917:6–19.)

(b)    Dr. Chambers's Response

In round four of argument, Dr. Chambers testified that Minocin did not change the use, efficacy, and safety of the prior art minocycline. (Tr. 908:14–21.) Both formulations treated the Acinetobacter bacteria, and the prior art minocycline could have continued to have been used to treat that bacteria if it had not been removed

from the market. (Tr. 909:2–15.) He again concluded that the Asserted Claims in the '105 Patent and the '802 Patent are obvious. (Tr. 909:19–23.)

### F. Rounds Two and Three: Testimony on Section 112

This Section discusses both parties' testimony on the Section 112 arguments of invalidity, including lack of enablement and lack of written description. This testimony was presented in Rounds Two, Three, and Four.

#### 1. Dr. Alexander Klibanov's Testimony on Section 112

Dr. Klibanov testified as to his invalidity opinion regarding lack of enablement and lack of written description of the patents-in-suit. This opinion applied only to the pH claims asserted: (1) Claim 1 of the '802 Patent requiring a pH between 4 and 6, and (2) Claim 1 of the '105 Patent requiring a pH between 4 and 7. (Tr. 525:18–526:1.) Dr. Klibanov testified that based on the disclosures in the patents-in-suit, a POSA would not be able to make formulations suitable for intravenous administration at the pH levels claimed. (Tr. 527:11–14.) This is because under some conditions that would fall within the scope of the claims, minocycline would be insoluble and thus unsuitable for administration to a patient. (Tr. 526:12–527:14.)

#### 2. Dr. Richard Chambers's Testimony on Section 112

Dr. Chambers testified that the '802 Patent specification suffers from lack of written description and enablement because it does not define, measure, or report injection site hemolysis, and therefore does not teach a POSA how to reduce it. (Tr. 600:9–17.)

Dr. Chambers testified that he was not aware of any report that the prior art minocycline was withdrawn from the market due to problems of injection site tolerability. (Tr. 607:21–24.) Several changes were made with the new Minocin formulation, including the addition of magnesium and an added base to adjust the pH. (Tr. 608:2–6.) But he stated neither safety nor efficacy was improved with Minocin because the product label had not changed, and the steps for preparing the product for administration had also not changed. (Tr. 608:7–609:2.) Dr. Chambers's testimony followed strict adherence to the product labels. For instance, he stated that the '105 Patent covered an osmolality range from 0 to 500 because the label stated an osmolality "less than about 500 mOsmol/kg," and that the '802 Patent covered a volume administration range of 0 to 500 mL because the label did not specify a lower limit. (Tr. 610:4–611:3, 614:6–615:15.) In his opinion, an osmolality or volume level that was too low within those wide ranges could be unsafe and harmful to a patient. (Tr. 610:10–22, 614:15–18.) Because no lower limits are specified, Dr. Chambers testified that there was a lack of written description and enablement as to these two matters. (Tr. 615:12–15.)

But on cross-examination, Dr. Chambers testified that a POSA would be able to adjust the volume of administration to a therapeutically effective amount by looking at the label. (Tr. 649:18–650:15.) Similarly, a POSA would be familiar with the diluents listed on the label and would be able to select and use an appropriate diluent to ensure that the administered solution has an osmolality of less than 500 mOsmol/kg. (Tr. 650:19–654:20.)

### 3. Dr. Bruce Friedman's Testimony on Section 112

Dr. Friedman testified in response to Defendant's claim of lack of written description and lack of enablement as to the administration volume in the '802 Patent and osmolality in the '105 Patent and the injection site hemolysis claims.

Dr. Friedman first testified that the total volume of the administered composition in the '802 Patent was 500 mL, and this referred to the diluted solution. (Tr. 713:18–23.) But a POSA would know that some embodiments of the formulation could be formulated with much lower volumes and could adjust the formulation accordingly. (Tr. 713:25–714:13.) A POSA would never administer such a low formulation as to make the drug toxic or no longer therapeutically effective. (Tr. 714:14–18.) It is true that the '802 Patent does not specify a lower limit of volume, but a POSA would know how much to decrease the volume of a formulation to avoid toxicity. (Tr. 746:20–747:2.) Even though the '802 Patent does not have any examples of tests conducted at less than 50 mL of volume, a POSA would not have to conduct experiments to determine how low of a volume would be appropriate because they would know based on their experience. (Tr. 746:10–748:17.) Dr. Friedman also testified on cross-examination that there were several articles submitted to the FDA on the use of minocycline (without magnesium) at a volume between 100 mL and 500 mL. (*Id.* 754:2–759:5.) Ultimately, Dr. Friedman testified that he believed the '802 Patent was enabled and supported by adequate written description. (Tr. 715:4–5.)

Dr. Friedman then testified that the injection site hemolysis claims were not indefinite because a POSA would know what injection site hemolysis is, how it's

related to tolerability issues, and that it will be reduced in any patient who is treated with Minocin because it is a property of the formulation. (Tr. 716:7–16.) A POSA would know that hemolysis would be reduced in the Minocin formulation or the ANDA product because the POSA would be able to see a higher pH range and a reduced volume due to the addition of magnesium at an appropriate molar ratio. (Tr. 768:15–769:3.) On cross-examination on the hemolysis issue, Defendant pointed out several tests mentioned in the '802 Patent that resulted in an insoluble formulation and insinuated that the formulation could not be administered and could not reduce hemolysis. (Tr. 736:18–739:4.) Dr. Friedman also testified on cross-examination that the '802 Patent does not inform a POSA of where injection hemolysis starts and stops in the vein, nor does it teach how to measure the rate or extent of hemolysis in the bloodstream. (Tr. 742:12–743:10.)

Finally, Dr. Friedman testified that a POSA would know to avoid the lower limit of osmolality. A POSA would know that there is a lower limit that would affect the therapeutic effectiveness of a formulation and cause substantial tissue damage. (Tr. 717:1–10.) He testified that the osmolality element of the '105 Patent does not, therefore, suffer from lack of enablement or written description because the label specifies an osmolality less than 500 mOsmol/kg, and a POSA would know how to adjust certain parameters of the formulation to intravenously administer a therapeutic amount of the formulation at an acceptable osmolality. (Tr. 717:11–25.)

4.     *Dr. Tina deVries's Testimony on Section 112*

Dr. deVries testified that a POSA reading the patents-in-suit's specifications would understand how to make and use the claimed invention across the full pH range specified (4 to 7 in the '105 Patent and 4 to 6 in the '802 Patent). (Tr. 831:15–20.) She testified that the claimed invention works at every pH value included in the scope of the Asserted Claims, and that Defendant has not pointed to any pH value at which the claimed invention does not work. (Tr. 832:9–19.)

As to osmolality, Dr. deVries testified that a POSA would know how to measure osmolality and make the claimed composition at the instructed osmolality of less than 500 mOsmol/kg. (Tr. 832:21–25.) A POSA would not consider reducing osmolality at a level close to 0. (Tr. 834:4–6.) And Defendant has not pointed to any osmolality value at which the claimed invention would not work or would be unsuitable for intravenous administration. (Tr. 834:7–11.)

As to hemolysis, Dr. deVries testified that a POSA would understand, after reviewing the hemolysis data in the specifications, that a formulation within the scope of the Asserted Claims would reduce hemolysis. (Tr. 835:1–5.) A POSA would not be concerned that the hemolysis experiments in the specifications were conducted in vitro versus on human patients. (Tr. 835:14–18.) The FDA knew that the inventors used in vitro tests as a model for hemolysis. (Tr. 836:7–11.) Specifically, Dr. deVries stated that the inventors' use of rabbit blood cells in the experiment was a good thing because those cells are very sensitive, so any improvement or benefit that can be seen in rabbit ear blood cells will mean that the inventors can reliably assume that the same benefit will be seen in other cells. (Tr. 836:23–637:13.) On cross-examination,

Defendant examined Dr. deVries about these rabbit blood cell tests. (*See* Tr. 864:11–872:8.) Defendant questioned the results of three in vitro tests that the inventors conducted and Plaintiffs relied on, even though these tests only showed "minor differences." (Tr. 869:4–16.) Dr. deVries did not agree with how Defendant construed this experiment. (Tr. 869:17–18.)

## V.    CONCLUSIONS OF LAW

In patent infringement cases, the patentee bears the burden of proving infringement of every claim by a preponderance of the evidence. *Creative Compounds, LLC v. Starmark Lab'ys*, 651 F.3d 1303, 1314 (Fed. Cir. 2011) (quoting *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1123 (Fed. Cir. 1985)). If the patentee does not meet that burden, "the patentee loses regardless of whether the accused comes forward with any evidence to the contrary." *Id.*

An accused infringer can respond by asserting affirmative defenses: (1) non-infringement; (2) invalidity of the patent on any ground specified as a condition for patentability (e.g., obviousness or lack of novelty); or (3) invalidity of the patent or any claim in suit for failure to comply with any requirement of § 112 (e.g., indefiniteness, lack of enablement, or lack of written description). 35 U.S.C. § 282(b). A patent is presumed valid, but a defendant asserting an invalidity defense may rebut that presumption by proving invalidity by a heightened standard of clear and convincing evidence. *Id.* § 282(a); *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 97 (2011). Then, in response to an invalidity for obviousness defense, the plaintiff can rebut by presenting secondary considerations establishing objective evidence of non-

obviousness by a preponderance of the evidence. *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016). Secondary considerations of non-obviousness can include (1) commercial success, (2) copying, (3) long-felt but unmet need, (4) skepticism or disbelief, (5) positive recognition, and (6) unexpected results. *In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998). But evidence of secondary considerations does not always overcome a strong showing of obviousness. *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008).

Plaintiffs allege that Defendant has infringed on Claims 1, 7, and 18 of the '802 Patent and Claim 27 of the '105 Patent. Defendant argues that it has not infringed and, even if it had infringed, the patents-in-suit are invalid for obviousness, indefiniteness, lack of enablement, and lack of written description. Plaintiffs respond by presenting several secondary considerations to argue non-obviousness. The Court's analysis of each argument follows.

### A. Infringement

#### 1. Direct Infringement

Plaintiffs argue that Defendant's marketing and use of its ANDA product will indirectly infringe the patents-in-suit. But to prevail on an indirect infringement claim, a plaintiff must first prove direct infringement by a third party. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961); *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 920–21 (2014). A party directly infringes when it "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . ." 35 U.S.C. § 271(a). To determine

infringement, the court must compare the "asserted claim as properly construed" to the "accused method or product." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581–82 (Fed. Cir. 1996); *see also Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998). To prevail on direct infringement claims, the plaintiff must show infringement of every claim limitation by a preponderance of the evidence. *See, e.g.*, *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

To prove direct infringement, Plaintiffs must show that "if [Defendant's ANDA product] were put on the market, if would infringe the [patents-in-suit]." *Genentech, Inc. v. Sandoz Inc.*, 55 F.4th 1368, 1379 (Fed. Cir. 2022) (quoting *Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018)). This determination requires " 'consideration of all the relevant evidence,' including the proposed label's instructions and physician practice." *Id.* (quoting *Ferring B.V. v. Watson Lab'ys, Inc.-Fla.*, 764 F.3d 1401, 1408 (Fed. Cir. 2014). Courts may also consider the ANDA product itself, any materials the generic drug company submitted to the FDA, and "other pertinent evidence provided by the parties." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1570 (Fed. Cir. 1997). In short, courts are permitted to—and regularly do—consider relevant evidence outside the ANDA product's label to evaluate whether the product directly infringes the claims. *See Genentech*, 55 F.4th at 1379–80; *Ferring B.V.*, 764 F.3d at 1409–10; *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383–84 (Fed. Cir. 2022) ("If the ANDA specification does not speak clearly and directly to the question of infringement, courts may look to other relevant evidence . . . to assess whether a proposed product will infringe.").

Plaintiffs argue that Defendant is liable for indirect infringement because a physician using the generic ANDA product would directly infringe on the patents-in-suit. They contend that because the allegedly infringing generic product's label instructs a physician on how to use the product, that physician's act of following the ANDA product label would meet the claim elements at issue in this case, thus directly infringing on the patents-in-suit. (Dkt. 252 ¶¶ 102, 151; Dkt. 253 ¶ 30.) Defendant argues that Plaintiffs have failed to prove that the ANDA product directly infringes on the osmolality element of the '105 Patent and the injection site hemolysis element of the '802 Patent. (Dkt. 250 at 21–27; Dkt. 254 at 11–15; Dkt. 255 ¶¶ 46–48.)

(a)     <u>A Physician Using Defendant's ANDA Product Will Directly Infringe on Claim 27 of the '105 Patent.</u>

Claim 27 of the '105 Patent depends on Claim 1, which specifies that administering Minocin according to the specified instructions will cause an osmolality of less than 500 mOsmol/kg. (PTX-002.) Neither the Minocin label nor the ANDA label explicitly mentions osmolality. Plaintiffs argue that even though neither label explicitly mentions osmolality, a physician following the ANDA label nevertheless infringes because the product will inevitably have an osmolality of less than 500 mOsmol/kg due to its chemical composition. (Dkt. 252 ¶¶ 135–38.) Plaintiffs cite "numerous direct measurements of osmolality" of the ANDA product that they performed, all of which resulted in an osmolality of less than 500 mOsmol/kg; thus, Plaintiff argues, the ANDA product is within the scope of the '105 Patent's osmolality claim. (*Id.* ¶ 139.) Defendant counters that Plaintiffs' experiments used a different composition volume (10 mL) than what was specified in the ANDA (5 mL), so the test

results cannot show infringement of the osmolality limitation. (Dkt. 255 ¶¶ 43–44.) But Plaintiffs insist that they did rely on experimental data using 5 mL of composition. (Dkt. 251 at 11.)

Osmolality is a property of a composition, meaning it is measured through simple calculations based on the ingredients in a composition. *See Osmolality*, Taber's Medical Dictionary Online (24th ed.). Accordingly, a POSA looking at the amounts of ingredients in a product described on its label would be able to discern the osmolality of the solution. (Dkt. 252 ¶ 138; Tr. 235:22–236:20, 651:18–21.) The parties agree on the following three facts: (1) osmolality is a property of the composition that can be calculated by looking at the ingredients on the label; (2) the osmolality standard of care is a level below 500 mOsmol/kg; and (3) the Minocin and ANDA product labels are identical and use identical ingredients at identical amounts, as required by the FDA.

Thus, a physician following the ANDA label will perform the same exact process as a physician following the Minocin label. There is no evidence that a physician using Defendant's ANDA product will deviate from the standard of care; accordingly, a physician administering either product will ensure that the osmolality level is less than 500 mOsmol/kg. Just as administering Minocin will inevitably lead to an osmolality of less than 500 mOsmol/kg, administering the ANDA product will also inevitably lead to an osmolality of less than 500 mOsmol/kg. Defendant does not dispute this.

Defendant yet argues that it does not infringe the osmolality element of the '105 Patent because osmolality is not explicitly stated on the Minocin product label. But it does not need to be stated on the label for Defendant to infringe. Osmolality is a property of the composition, as both parties agree. It will be infringed if the physician follows the ANDA label because of the amounts of ingredients stated on the label. *See Sanofi v. Watson Lab'ys Inc.*, 875 F.3d 636, 644–46 (Fed. Cir. 2017) ("The content of the label in this case permits . . . . the required factual inferences about intended effects to rest on circumstantial evidence in appropriate circumstances."); *see Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1368–69 (Fed. Cir. 2017) ("When the alleged inducement relies on a drug label's instructions, '[t]he question is not just whether [those] instructions describ[e] the infringing mode, . . . but whether the instructions teach an infringing use *such that* we are willing to infer from those instructions an affirmative intent to infringe the patent.' " (quoting *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015))); *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1334 n.6 (Fed. Cir. 2021) ("[W]hen a label instructs or teaches an infringing use, it can be considered evidence of intent to encourage that use.").

Defendant also argues that there would be no direct infringement because Plaintiffs did not rely on any experimental data or osmolality measurements for a product reconstituted with 5 mL of water. (Dkt. 250 at 22.) Defendant focuses on Dr. deVries's testimony, arguing that she admitted to using 10 mL of water in reconstitution and guessed that a 5 mL measurement would "double." But Defendant

mischaracterizes the tests Plaintiffs conducted and Dr. deVries's testimony. All experimental osmolality measurements for Minocin resulted in an osmolality of less than 500 mOsmol/kg, thereby within the claim element of the '105 Patent. And all used a composition of 5 mL of water for reconstitution. Dr. deVries never admitted that she used 10 mL in an experiment; rather, she explained that a 10 mL sized vial was used. She never agreed that she relied on data that used 10 mL of water but instead relied on data that used 5 mL of water.

There is plenty of evidence that Plaintiffs relied on data using 5 mL reconstitution volume. (*See* PTX-197; PDX-2039; PTX-042; DTX-075.) Each of these data resulted in an osmolality of less than 500 mOsmol/kg. Dr. deVries's passing reference to the osmolality approximately doubling when asked about a report that she did not rely on does not change that. And at bottom, it is undisputed that the osmolality standard of care is less than 500 mOsmol/kg, an osmolality level that is explicitly stated in the '105 Patent, and an osmolality level that will necessarily be reached when a POSA uses Defendant's ANDA product with its specified 5 mL of water. Accordingly, a POSA who uses the ANDA product will directly infringe on Claim 27 of the '105 Patent.

        (b)     <u>A Physician Using Defendant's ANDA Product Will Directly Infringe on Claims 1, 7, and 18 of the '802 Patent.</u>

Defendant does not dispute that a physician following its ANDA label meets most of the limitations in the Asserted Claims. First, Claim 1 of the '802 Patent claims a method of treating a bacterial infection by intravenously administering a therapeutically effective amount of the composition. (PTX-1.) The ANDA label also

instructs the treatment of bacterial infections through an intravenous route. (PTX-042.) Second, Claim 1 claims an aqueous composition consisting of minocycline, magnesium, and a base. So does the ANDA label. Third, Claim 1 claims a molar ratio of magnesium to minocycline at a molar ratio greater than 4:1. The ANDA label instructs a molar ratio of 5:1, which meets the claimed greater than 4:1 ratio. Fourth, Claim 1 claims a pH of 4 to 6 for the reconstituted solution, and Claim 7 claims a pH of 4.5 to 5.5 for the reconstituted solution. The ANDA label instructs a reconstituted pH of 4.5 to 5.0, which fits within both Claims 1 and 7. Finally, Claim 18 of the '802 Patent claims a total admixture volume of less than 500 mL. The ANDA label teaches a total admixture volume of 100 mL to 1,000 mL. A physician who uses 501 mL to 1,000 mL when administering the ANDA label would not, therefore, meet Claim 18, as Dr. deVries testified. But Dr. Friedman, Dr. deVries, and Dr. Chambers all testified that a lower injection volume is beneficial and preferred. A POSA would never choose to administer more volume (over 500 mL) if less volume (less than 500 mL) is sufficient. Accordingly, a physician following the ANDA label would infringe on those elements of Claims 1, 7, and 18 of the '802 Patent.

Defendant disputes the injection site hemolysis element of Claim 1. Claim 1 claims that administration of the composition reduces injection site hemolysis relative to administration of a composition that does not include magnesium. (PTX-1.) The ANDA label does not explicitly discuss injection site hemolysis. (PTX-042.) Defendant argues that Plaintiffs' experiments cannot justify any improvements in hemolysis because the experiments were done on rabbit red blood cells, not humans.

(Dkt. 250 at 26; Dkt. 254 at 12–13.) Defendant contends that an experiment conducted on non-human subjects cannot prove that hemolysis will be reduced in Plaintiffs' product designed for human use, much less prove that Defendant's ANDA product will reduce hemolysis in human subjects. (Dkt. 250 at 26.) Defendant also argues that Plaintiffs' tests did not truly show reduced injection site hemolysis relative to a composition that does not include magnesium. (*Id.* at 26–27.) And Defendant finds fault in Dr. Friedman's "say-so" testimony about his experience and observations of hemolysis in his patients because Dr. Friedman did not corroborate that testimony with any documentation. (*Id.* at 27; Dkt. 254 at 12–13.)

But, as with the osmolality element of the '105 Patent, injection site hemolysis reduction is a property of both Minocin and the ANDA label. It is not a specific step that a physician who administers either product must do before injecting it into a patient; instead, hemolysis reduction is a beneficial property that all patients who receive the products will experience. As with osmolality, that the ANDA product is meant to reduce hemolysis is not explicitly stated on the product label. But what is clear from the label is that it has a higher pH and a lower injection volume. A POSA reading that label would understand that if an intravenous formulation has a pH that is too low, it would cause irritation, pain, and other tolerability issues to the patient. As such, a POSA would immediately know that a high pH and low injection volume would mean reduced hemolysis for the patient in comparison to the prior art minocycline with its lower pH and higher injection volume. This alone means that a

physician following Defendant's ANDA instructions would directly infringe on the injection hemolysis element of Claim 1 of the '802 Patent.

As to Defendant's argument about the lack of comparator human trials, such trials would be cost prohibitive and would inappropriately put patients at harm because prior art minocycline had known issues. (Dkt. 249 at 21.) Nor did the FDA require such trials. The FDA approved Minocin as an improvement over the prior art minocycline based on the existing data presented by the inventors showing an improvement in hemolysis reduction as compared to the prior art minocycline. The FDA only required clinical human trials if Plaintiffs were seeking to change the side effect warnings on the label—information called "class labeling" that appears on all formulations of all tetracyclines. Because Plaintiffs did not set out to do this, human clinical trials were not necessary.

Plaintiffs instead appropriately relied on substantial experimental data from in vitro and in vivo studies directly measuring the incidence of injection site hemolysis. These studies showed that the composition in the '802 Patent reduces the risk of injection site hemolysis in comparison to a formulation with magnesium. (*See* PTX-1; PTX-087; PTX-196.) All experiments tested aqueous solutions with minocycline and magnesium at varying molar ratios and pH levels against the prior art minocycline formulation. The experiments were conducted on mice and human endothelial cells (not injected directly into human veins), but that does not make the experiments less useful. Conducting this type of experiment on humans would have come with a higher risk of harm to any volunteer receiving the prior art minocycline,

which had known tolerability issues. And, as several experts testified, the models used in these experiments are well-known to be reliable methods to evaluate injection site hemolysis in humans because the models study the same cell types that would be damaged in human injection site hemolysis. Because these experiments showed reduced injection site hemolysis in the claimed invention versus the prior art minocycline, it was appropriate for Plaintiffs and the FDA to rely on them. These experiments provide adequate support for the injection site hemolysis reduction element of Claim 1.

Dr. Friedman, who has extensive experience administering intravenous minocycline to patients to treat bacterial infections, also testified that he no longer uses the prior art minocycline because Minocin significantly reduces tolerability issues. Both of Defendant's expert witnesses, Dr. Klibanov and Dr. Chambers, admitted that they do not have any experience administering minocycline to patients intravenously. Dr. Friedman's real-world experience thus weighs heavily in support of Plaintiffs' argument that its product reduces the incidence of hemolysis.

Based on this evidence, the Court holds that a POSA administering the ANDA product would infringe on the injection site hemolysis element of Claim 1 of the '802 Patent. Plaintiffs can justify its injection site hemolysis reduction claim with the experiments it conducted and Dr. Friedman's testimony. And at bottom, the ANDA label, even though it does not explicitly mention hemolysis, will inevitably lead physicians to directly infringe on the hemolysis reduction claim.

2. *Defendant is Liable for Induced Infringement.*

Induced infringement occurs when an alleged infringer actively induces direct infringement by another party. 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."). The patent holder must establish "first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002). But, in pharmaceutical cases, the "mere existence of direct infringement by physicians, while necessary to find liability for induced infringement, is not sufficient" for induced infringement. *Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015.) A plaintiff must prove specific intent, knowledge, and action to induce infringement. *Id.* (citing *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364 (Fed. Cir. 2003)).

The "knowledge" element of induced infringement requires "knowledge of the existence of the patent that is infringed" and "knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765 (2011); *see also Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015). An alleged infringer possesses the requisite intent to induce infringement when there is "[e]vidence of active steps taken to encourage infringement, such as advertising an infringing use or instructing how to engage in an infringing use." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 915 (2005). These actions show "an affirmative intent that the product be used to infringe," thus constituting induced infringement. *Id.*

In pharmaceutical patent cases, the label or instructions on an ANDA can be evidence of an intent to induce infringement. Evidence that the ANDA's labeling or instructions "would inevitably lead some physicians to infringe" would "establish[] the requisite intent for inducement." *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1369 (Fed. Cir. 2017). *See also Sanofi v. Watson Lab'ys Inc.*, 875 F.3d 636, 644–45 (Fed. Cir. 2017) ("inferred intent" to induce infringement present because defendant's proposed labels encouraged physicians to prescribe the medication, knowing that such a prescription would be infringement); *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010) ("The pertinent question is whether the proposed label instructs users to perform the patented method. If so, the proposed label may provide evidence of [defendant's] affirmative intent to induce infringement."); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 n.2 (Fed. Cir. 2009) ("The question is not, however, whether a user following the instruments may end up using the device in an infringing way. Rather it is whether [the defendant's] instructions teach an infringing use of the device such that we are willing to infer from those instructions an affirmative intent to infringe the patent.").

Defendant argues that it did not induce infringement of the osmolality and hemolysis elements in the patents-in-suit because the ANDA product label mentions neither. (Dkt. 250 at 22–25, 27–30; Dkt. 254 at 16–22.) Accordingly, Defendant argues, it cannot possibly encourage or instruct a POSA to infringe on those claim elements. (*Id.*) But, as stated earlier, the Court's infringement analysis does not begin and end with the product label. Infringement of claim elements can occur when the

ANDA label encourages the claimed administration of the product, even when what is claimed is not explicitly stated on the ANDA label. And because both osmolality of less than 500 mOsmol/kg and reduced injection site hemolysis are properties of the patents-in-suits' composition that inevitably result from the proper administration of the composition, a POSA following the identical ANDA label will also inevitably administer a formulation with osmolality less than 500 mOsmol/kg and reduced injection site hemolysis. Accordingly, because Defendant's label will encourage and instruct a POSA to administer the ANDA product in a way that infringes the patents-in-suit, the Court infers Defendant's knowledge and affirmative intent to infringe the patents-in-suit.

In addition, as to the hemolysis reduction claim element of the '802 Patent, Plaintiffs presented evidence of Defendant's knowledge that its ANDA product would infringe when Defendant submitted its ANDA to the FDA. Defendant, in its submission, explicitly stated at multiple times that the function of magnesium in its product was to reduce injection site hemolysis. Dr. deVries testified to this, and Defendant did not dispute it. Defendant's affirmative statements to the FDA that its ANDA product would reduce injection site hemolysis is additional evidence that Defendant had knowledge that its product would infringe. Accordingly, the Court finds that Defendant induced infringement of the disputed claim elements.

3.    *Defendant Is Liable for Contributory Infringement.*

Contributory infringement occurs when the alleged infringer sells a material component of a patented invention for practicing a patented process, and the material

component has no substantial noninfringing use. 35 U.S.C. § 271(c) ("Whoever . . . sells within the United States . . . component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer."). Therefore, a contributory infringement action succeeds if four elements are proven: (1) there is direct infringement; (2) the accused infringer had knowledge of the patent; (3) the component had no substantial non-infringing use; and (4) the component is a material part of the invention. *Fujitsu Ltd. V. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

The "knowledge" element requires that the alleged infringer have had knowledge both that the component was patented, and that the use of it would be infringing. *Commil*, 575 U.S. at 639; *Fujitsu*, 620 F.3d at 1330. Whether a use is considered "substantial" is often the key inquiry. A component has no "substantial" non-infringing use if it is not "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp.*, 581 F.3d at 1327. A court considers "not only the use's frequency, but also the use's practicability, the invention's intended purpose, and the intended market" in assessing whether an asserted non-infringing use was "substantial." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010).

Defendant argues it is not liable for contributory infringement because it did not have knowledge of infringement, and because Plaintiffs cannot prove direct infringement. (Dkt. 250 at 22–23, 27–28.) But Plaintiffs have proven direct infringement, and the Court has found that Defendant had the requisite knowledge of infringement. There is no dispute as to the fourth element of contributory infringement, regarding whether the ANDA product is a material part of the invention, because the ANDA product is identical to the invention in the patents-in-suit.

Defendant argues that as to the third element of contributory infringement, Plaintiff failed to show no "substantial" non-infringing use because some of the injection volumes and pH levels allowed by the ANDA label are outside of the claim elements. (*Id*. at 18–19.) But those injection volumes and pH levels would be, as Dr. deVries and Dr. Friedman testified, outside the standard of care for any POSA administering the product. It would be highly unusual, unsafe, and unlikely for a POSA to administer the ANDA product outside of the measurements within the claim elements. Accordingly, the injection volumes and pH levels that fall outside the claim elements are not "substantial" for purposes of contributory infringement. The purpose for which the ANDA product is to be used is to treat bacterial infections, and a POSA following the ANDA label to treat bacterial infections will administer the ANDA product in a way that meets all of the disputed claim elements. In other words, there is no substantial non-infringing use for the ANDA product. Defendant is also liable for contributory infringement.

### B. Invalidity—Obviousness

A patent is invalid for obviousness when the nature of the differences between the claimed invention and the prior art would have rendered the subject matter of the invention obvious to a POSA. 35 U.S.C. § 103 ("A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."). The party seeking to invalidate a patent based on obviousness "must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.' " *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).

Defendant argues that Minocin was an obvious invention because a POSA would have been motivated to combine three prior art references (the prior art minocycline product, CN'268, and Gibbs) to achieve the claimed invention with a reasonable likelihood of success. (Dkt. 250; Dkt. 254.) Plaintiffs argue that Defendant has not met its burden to show obviousness by clear and convincing evidence, and they present several secondary considerations of non-obviousness. (Dkts. 249; 251.)

1. *A POSA Would Not Have Been Motivated to Combine the Prior Art Minocycline, CN'268, and Gibbs to Achieve the Claimed Invention with a Reasonable Likelihood of Success.*

A court may find a motivation to combine prior art references by looking to (1) teachings in prior art, (2) the common sense of a POSA, or (3) any need or problem known to a POSA that would be addressed by the claimed invention. *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013). But when analyzing a motivation to combine, a court must be careful to not base motivation on hindsight or reading the invention's teachings into the prior art. *See, e.g.*, *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 36 (1966) (Courts must "resist the temptation to read into the prior art the teachings of the invention in issue."); *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) (quoting *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1012 (Fed. Cir. 1983)) ("Care must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.' ").

A "reasonable expectation of success" does not require an absolute expectation of success, just that the prior art have at least provided some indication of "which parameters are critical" and "which of many possible choices is likely to be successful." *In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988)). In summary, when there is a "design need or market pressure to solve a problem" and "a finite number of identified, predictable solutions," a POSA has reason to pursue known options to solve that problem. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 421 (2007). If pursuing those options "leads to

the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense" and therefore is obvious. *Id.*

The extent of Defendant's obviousness argument hangs on three prior art references: the prior art minocycline, CN'268, and Gibbs. Defendant argues that these three prior art references would have motivated a POSA to improve the prior art minocycline by adding magnesium at a higher molar ratio to minocycline and would have reasonably expected to be successful in doing so. Defendant first argues that the prior art minocycline product taught that minocycline treated bacterial infections caused by the Acinetobacter bacteria using a formulation of minocycline reconstituted in 5 mL of water and then further diluted in 500–1,000 mL of a diluent. Defendant then argues that CN'268 taught that the addition of magnesium to a parenteral doxycycline formulation would improve solubility, stability, and tolerability, and this teaching could be extended to minocycline. Finally, Defendant argues that Gibbs taught that adding magnesium to tetracyclines at a molar ratio of up to 8:1 would improve a formulation. Defendant contends that these prior art references are very similar to the claims at issue in this case because they generally taught that the addition of magnesium to tetracyclines could improve the pH, and because doxycycline and minocycline can be used interchangeably because they have similar chemical structures.

But there are significant differences between these three prior art references and Minocin that Defendant fails properly to account for. As to the first prior art reference, it is true that the prior art minocycline teaches a minocycline formulation

to treat bacterial infections. But the prior art minocycline teaches a formulation with a much lower reconstituted pH of 2.0 to 2.8. Minocin teaches a minocycline formulation that adds magnesium to achieve a higher reconstituted pH. Defendant argues that the prior art minocycline does teach a higher pH covered by the patents-in-suit when the prior art minocycline is diluted with Lactated Ringer's. This argument is of no matter because the Court has defined the pH levels in the patents-in-suit to refer to the reconstituted solution, not the diluted solution. But even if the Court did agree with Defendant's proposed construction, the higher pH of Lactated Ringer's stated in the prior art minocycline label is still not covered by the claims at issue because, as Dr. Friedman testified, that diluent is not within the standard of care for intravenous administrations and would be considered inappropriate for intravenous use by a POSA.

As to the other two prior art references Defendant cites, CN'268 and Gibbs, a POSA would not have been motivated to combine them with the prior art minocycline product to achieve the claimed invention. CN'268 and Gibbs contain several important differences from Minocin. First, both concern doxycycline formulations, not minocycline formulations. Second, both disclose only intramuscular formulations, not intravenous formulations. Third, both teach the addition of a surfactant, dissolvent, or antioxidant to improve solubility and stability. Fourth, neither mention hemolysis or the significance of an increased molar ratio of magnesium to minocycline. The Court will address each of these differences in turn.

First, the Court cannot agree with Defendant that a POSA would be motivated to extrapolate findings in CN'268 and Gibbs about doxycycline to minocycline. Even though the two tetracyclines share structural similarities, there are sufficient differences between the two. The parties agree that minocycline and doxycycline share a chemical structure made up of four fused rings as shown in the figure below.



The parties also agree that minocycline and doxycycline differ in the upper rings (notated by the letter R) but have the same bottom rings. They agree that magnesium binds to the lower rings. Defendant uses this similarity to argue that because magnesium binds to the lower rings in both doxycycline and minocycline, a POSA could extrapolate findings about a magnesium-doxycycline formulation to a magnesium-minocycline formulation.

But it is not that simple. Defendant relies on the Nelson reference to support its argument that magnesium binds with doxycycline and minocycline at the exact same location. But Defendant fails to mention that Nelson also teaches that the upper region of the two tetracyclines is also implicated when binding with a metal cation like magnesium. When the upper regions are different, as they are in doxycycline and minocycline, the two compounds can act in dramatically different ways when they interact with magnesium. Dr. deVries testified to this fact, and Dr. Klibanov also

agreed that small structural differences in two similar compounds can nevertheless lead to significant differences in how the compounds interact with metal cations.

In addition, Dr. Friedman, the only witness who had any experience administering and treating patients with minocycline, testified credibly that minocycline was specifically effective against the Acinetobacter bacteria. Defendant also agreed that minocycline was more effective than doxycycline against this particular bacteria, which Minocin is intended to treat.

Defendant also argues that the Gibbs reference confirms the relevance of doxycycline formulations to minocycline formulations because Gibbs represents that the two can be used interchangeably. But, as Dr. deVries testified, and Defendant does not dispute, Gibbs does not provide any data on minocycline formulations. The entirety of Gibbs discusses and provides examples and experiments on doxycycline formulations, not minocycline formulations.

Second, both CN'268 and Gibbs disclose intramuscular formulations, not intravenous formulations. Defendant argues that findings on intramuscular formulations can be extrapolated to intravenous formulation because the only difference between the two is the injection site: a muscle versus a vein. But, as Dr. deVries testified, there are more differences than just the injection site. Importantly, an intramuscular formulation can be injected into the muscle without being a fully aqueous solution. But an intravenous formulation cannot be injected into the vein unless it is fully solubilized, meaning all components must be dissolved. Full solubility is, therefore, extremely important for an intravenous formulation such as

what is described in the patents-in-suit. Accordingly, two intramuscular formulations studied by CN'268 and Gibbs would not have been helpful to a POSA because they do not necessarily require complete solubility.

Relatedly, to improve solubility in the CN'268 and Gibbs intramuscular formulations, both discuss the addition of a solubilizing agent such as oil to improve the solubility of both formulations. But the patents-in-suit do not allow for the addition of a solubilizing agent. And to improve stability, CN'268 and Gibbs discuss the addition of a stabilizing agent. Neither discusses that magnesium would have any effect, much less a positive effect, on stability and solubility in the doxycycline formulations that they studied. A POSA would thus understand that CN'268 and Gibbs teach that adding solubilizing and stabilizing agents are necessary to improve stability and solubility for doxycycline formulations. They would not, as Defendant argues, learn from these prior art references that magnesium could improve solubility and stability in a minocycline formulation.

Finally, neither CN'268 nor Gibbs discusses anything about reduced injection site hemolysis or the significance of a high molar ratio of magnesium to minocycline. Defendant points out that Gibbs teaches a formulation in molar ratios up to 8:1, which overlaps with the claimed 4:1 range. But, as Plaintiffs counter, Gibbs does not teach anything about the significance of a higher molar ratio, thus not teaching a POSA to create a formulation with a higher magnesium-minocycline ratio. And CN'268 teaches nothing about a higher molar ratio; instead, it teaches the opposite ratio than the molar ratio that is claimed. CN'268 teaches an excess of doxycycline to

magnesium—the opposite of the claimed excess of magnesium to minocycline. Thus, neither CN'268 nor Gibbs would motivate a POSA to combine magnesium with the prior art minocycline at a high molar ratio of magnesium to minocycline.

Defendant makes brief references to a handful of additional prior art references to support their arguments. But these references suffer from the same faults as CN'268 and Gibbs—they only study doxycycline, they discuss intramuscular formulations, and they require the addition of stabilizing and solubilizing agents.

Accordingly, for these reasons, Defendant has not shown by clear and convincing evidence that a POSA would have been motivated to combine the prior art minocycline, CN'268, and Gibbs to create the claimed invention. Even if a POSA was so motivated, the POSA would not have a reasonable expectation of success. First, doxycycline and minocycline are similar compounds with similar structures, but they have important differences, especially in how they respond to magnesium binding. Second, CN'268 and Gibbs teach very different formulations than the claimed invention. A POSA would not be motivated to extrapolate findings about doxycycline-based intramuscular formulations to a minocycline-based intravenous formulation. The claims at issue are thus not obvious.

### 2. Secondary Considerations

Plaintiffs' evidence of secondary considerations support this Court's finding that the Asserted Claims are not obvious. A party attempting to refute an assertion of obviousness may present objective evidence of non-obviousness (also referred to as "secondary considerations") such as (1) commercial success, (2) long-felt but unmet

need, (3) failure of others to solve the problem, (4) unexpected results created by the claimed invention, (5) prior art teaching away, and (6) copying. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013). These objective considerations are important because they counteract any potential prejudice of hindsight bias. *See id.* In fact, they may often be the "most probative and cogent evidence in the record," because secondary considerations may "establish that an invention appearing to have been obvious in light of the prior art was not." *Apple Inc.*, 839 F.3d at 1052–53 (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir. 1983)). Secondary considerations must be considered as part of all the evidence, and "not just when the decisionmaker remains in doubt after reviewing the art." *Id.* Evidence of non-obviousness through secondary considerations does not, however, necessarily overcome a strong prima facie showing of obviousness. *Asyst Techs., Inc.*, 544 F.3d at 1316.

(a) <u>Prior Art Taught Away from the Patents-in-Suit.</u>

The initial secondary consideration Plaintiffs offer is that prior art taught away from the claimed invention. Prior art "may be said to teach away when a person of ordinary skill, upon reading the [prior art], would be discouraged from following the path set out . . . or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

Plaintiffs presented five prior art references that teach away from the claimed invention. Dr. deVries testified about each reference in detail. Defendant's experts provided limited testimony in response to these references.

First, the deVries 2006 reference teaches away from the claimed invention in the patents-in-suit. The deVries 2006 reference studied a formulation of minocycline and magnesium at a molar ratio of up to 3:1 with an increased pH. DeVries's experiments consistently resulted in minocycline precipitating out of solution and becoming insoluble, making it unsuitable and dangerous for intravenous administration. This reference taught away from the claimed invention because it would teach a POSA that any minocycline-magnesium formulation formulated with a molar ratio of greater than 3:1 would be expected to be insoluble. Defendant argues in its post-trial briefing (neither expert testified about deVries 2006) that deVries 2006 was irrelevant to a POSA because it studies oral formulations. True enough, but those oral formulations were aqueous solutions, making them more suitable for comparison to the claimed invention, which is also an aqueous solution. Thus, deVries 2006 still teaches a POSA to not mix magnesium and minocycline at a molar ratio higher than 3:1 if the POSA wants to create a safe aqueous solution.

Second, the Barringer 1974 reference teaches away from the claimed invention for the same reason deVries 2006 does—magnesium-minocycline formulations become insoluble at a molar ratio higher than 2:1. Dr. Klibanov testified that Barringer was irrelevant to a POSA because it discussed oral absorption. But Dr. Klibanov also testified that Barringer relevantly taught that adding magnesium to minocycline in aqueous solutions causes insolubility and precipitation, which is relevant to whether such a solution would be suitable for intravenous administration.

Third, the Berthon 1983 and Allen 1967 references teach away from the claimed invention because they teach that the solubility of minocycline decreases when mixed with magnesium and an increased pH. These references would teach a POSA to avoid mixing magnesium with minocycline at a higher pH because it would not lead to a suitable soluble intravenous formulation.

Fourth, the Pawelczyk 1982 reference teaches away from the claimed invention because it teaches that minocycline is more stable at a lower pH and begins to degrade at a pH around 4. Pawelczyk also teaches that the addition of magnesium does nothing to improve stability of minocycline in aqueous solutions in comparison to aqueous minocycline solutions without magnesium. Accordingly, the Pawelczyk reference teaches a POSA that a minocycline formulation with a higher pH would be unstable, and the addition of magnesium would not do anything to improve stability.

These prior art references thus teach away from the claimed invention. They teach that a magnesium-minocycline formulation at a higher molar ratio and a higher pH level would not result in a stable and soluble formulation. But the patents-in-suit found the opposite—a magnesium-minocycline formulation at a molar ratio of greater than 4:1 would result in a soluble and stable formulation at a higher pH.

(b)    Plaintiffs Presented Evidence of Unexpected Results.

Evidence of unexpected results includes evidence that the new invention contains a combination of known elements that resulted in superior and unexpected properties as compared to the prior art. *See, e.g.*, *Procter & Gamble Co.*, 566 F.3d at 997–98. Unexpected results are also important to a showing of non-obviousness

because the fact that the results were unexpected means that a POSA would not have had a reasonable expectation of success. *See Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1309 (Fed. Cir. 2010).

The prior art references discussed above taught an avoidance of adding magnesium to minocycline at a molar ratio of 3:1 because it would lead to solubility and stability problems. But the inventors of the patents-in-suit found that a molar ratio of greater than 3:1 could successfully create an aqueous solution suitable for intravenous administration at a higher pH and a lower volume of administration. These were unexpected results in the light of the prior art which taught away from these results, and these unexpected results were a clear improvement over the prior art minocycline.

(c)  <u>The Claimed Invention Met a Long-Felt But Unmet Need.</u>

Evidence of a long-felt but unmet need that was met by the new invention is important to a showing of non-obviousness because it shows that if there was a need for a solution to a problem for a long time that took a long time to resolve, the eventual resolution was likely not obvious. *See Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1380 (Fed. Cir. 2006).

The prior art minocycline was first published in 1973 and never substantively changed until Minocin was approved in 2015. A POSA knew that the prior art minocycline had solubility and stability problems requiring it to be administered at a lower pH and a higher injection volume. A POSA also knew that low pH levels caused irritability and injection site hemolysis. These issues made the prior art

minocycline highly unfavored for use in treating bacterial infections, as Dr. Friedman testified. Attempts to improve the solution were unsuccessful and ran into similar solubility and stability problems.

Minocin successfully solved these solubility and stability problems because of the addition of magnesium at a higher molar ratio. This addition enabled the formulation to be administered a higher and more tolerable pH level and a lower injection volume, which led to reduced tolerability and injection site hemolysis issues. Dr. Friedman, who has treated numerous patients with Minocin and no longer uses the prior art minocycline at all, testified that Minocin resolved all the solubility and stability issues that came with the prior art minocycline. Defendant's experts, who have never administered minocycline, disagreed at first but later agreed that the addition of magnesium in Minocin improves solubility and stability.

Thus, the prior art minocycline's shortcomings presented a need for improvement, a need that was unmet for over forty years until Minocin entered the market.

(d)     Plaintiffs Presented Evidence that Defendant Copied Minocin, But Copying Is Required in Hatch-Waxman Litigation.

Evidence that the alleged infringer copied the invention can be a secondary consideration of non-obviousness, because a presumption exists that a POSA would have tried to obtain the same results as the invention but without copying. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1336 (Fed. Cir. 2016). In Hatch-Waxman pharmaceutical cases, however, evidence of copying is often not probative because "a showing of bioequivalence is required for FDA approval" in those cases. *Bayer*

*Healthcare Pharms., Inc. v. Watson Pharms., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013).

Plaintiffs argue that because Defendant chose to copy the Minocin product instead of the prior art minocycline product, this choice shows that Defendant knew the Minocin product had some benefit over the prior art minocycline. This choice thus points to non-obviousness, according to Plaintiffs. It may be true that Defendant chose to copy Minocin over the prior art minocycline because Defendant believed that Minocin had benefits that the prior art minocycline did not have. But such copying is less persuasive evidence of non-obviousness in Hatch-Waxman litigation, because the FDA requires that an ANDA product be the exact same as the patented product, so copying is necessary.

## C.    Section 112 Invalidity Defenses

Defendant asserts that indefiniteness, lack of written description, and lack of written enablement render the patents-in-suit invalid. Section 112 requires patent specifications to distinctly define the subject matter of the patent, contain a written description of the invention, and contain an explanation on the manner and process of using the invention. 35 U.S.C. § 112. Failure of a patent to satisfy these requirements may render the patent invalid. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010).

### 1.    Indefiniteness

An inventor must distinctly claim the subject matter of the invention in the patent claims. 35 U.S.C. § 112(b) ("The specification shall conclude with one or more

claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention."). A patent that fails to do so may be invalid for indefiniteness. Specifically, a patent is "invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

Defendant argues that Claims 1, 7, and 18 of the '802 Patent are invalid for indefiniteness because each claim requires that injection site hemolysis be reduced as compared to a formulation without magnesium, but the '802 Patent does not define injection site hemolysis or instruct how to measure it. Because, according to Defendant, the claim term creates a "zone of uncertainty," the '802 Patent claims are invalid for indefiniteness. (Dkt. 250 at 56.)

Defendant's indefiniteness argument appears to the Court to be the same argument it made about the term "injection site hemolysis" in its claim construction briefings, an issue the Court has resolved in a previous Part of this Memorandum. The term "injection site hemolysis" is now properly construed, so Defendant's indefiniteness argument is moot. The '802 Patent is not invalid for indefiniteness.

2.   *Lack of Enablement and Lack of Written Description.*

Defendant argues that all Asserted Claims in both patents-in-suit are invalid for lack of written description and lack of enablement. Specifically, Defendant argues that the Asserted Claims are invalid for (1) the injection site hemolysis reduction claim (Claims 1, 7, and 18 of the '802 Patent); (2) the pH limitations (Claims 1 and 18

of the '802 Patent, and Claim 27 of the '105 Patent); (3) the claimed volume range (Claim 18 of the '802 Patent); and (4) the osmolality range (Claim 27 of the '105 Patent).

A patent that fails to include a specification with sufficient specificity such that a POSA can use the invention without too much experimentation based on that specification may be invalid for lack of enablement. 35 U.S.C. § 112(a) ("The specification shall contain . . . the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same . . . ."). The accused infringer can successfully hold a patent invalid for lack of enablement by showing that a POSA would not be able to use the claimed invention "without undue experimentation." *In re Wands*, 858 F.2d 731, 736–37 (Fed. Cir. 1988).

Some experimentation, of course, is permissible. A specification does not need to "describe with particularity how to make and use every single embodiment within a claimed class" and is not inadequate "just because it leaves the skilled artist to engage in some measure of adaptation or testing." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610–11 (2023). A "reasonable amount of experimentation to make and use a patented invention" is expected and will not invalidate the patent. *Id.* at 612. What counts as "reasonable" in any patent case "will depend on the nature of the invention and the underlying art." *Id.* The question is whether the amount of experimentation required will "detract from the basic statutory requirement that a patent's specification describe the invention 'in such full, clear, concise, and exact terms as to enable any

person skilled in the art' to 'make and use' the invention." *Id.* (quoting 35 U.S.C. § 112(a)).

A patent's specification that fails to provide a sufficient written description may leave the patent invalid for lack of written description. 35 U.S.C. § 112(a) ("The specification shall contain a written description of the invention."). This written description "must 'clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.' " *Ariad Pharms., Inc.*, 598 F.3d at 1351 (quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562–63 (Fed. Cir. 1991)). The test for sufficiency of the written description is "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* The written description in the specification must accurately represent the scope of the patent, not broadening or overreaching the actual scope of the invention. *Id.* at 1353–54.

Defendant first argues that the pH claim elements are invalid for lack of written description and lack of enablement because under some conditions that fall within the scope of the claims, a POSA would not be able to make formulations at some of the claimed pH levels because they would become insoluble and thus unsuitable for intravenous administration. Next, Defendant argues that the osmolality and volume claim elements are invalid for lack of enablement and written description because neither specify a lower limit. According to Defendant, administering the formulation at an osmolality of 0 mOsmol/kg (which would fit

within the claim term of "less than about 500 mOsmol/kg") or at a volume of 1 mL (which would fit within the claim term of "less than 500 mL") would be dangerous and unsuitable for intravenous administration. But Defendant's expert witnesses also testified that a POSA would be able to adjust the intravenous formulation such that it would be administered at an appropriate and safe pH level, osmolality, and injection volume. A POSA would know the appropriate and safe ranges for each element and would adjust them accordingly to ensure that the administered formulation was not insoluble, toxic, or intolerable for the patient. A POSA would never administer—or even consider administering—a drug at a dangerously low osmolality or pH, or a dangerously high injection volume. A POSA would not need to do an unduly amount of experimentation to discover what the appropriate pH, osmolality, and volume should be. A POSA would be able to understand the purpose of the invention and how to use it effectively. Accordingly, the patents-in-suit are not invalid for lack of written description or for lack of enablement.

## VI.    CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court concludes that Plaintiffs have shown by a preponderance of the evidence that Defendant has infringed on the '105 Patent and the '802 Patent, and that Defendant has failed to show by clear and convincing evidence that the Asserted Claims of the patents-in-suit are invalid for obviousness, indefiniteness, lack of written description, or lack of enablement. Accordingly, the Court finds that the Asserted Claims of the

'802 Patent and the '105 Patent are valid and enforceable and thus enters judgment in favor of Plaintiffs Melinta and against Defendant Nexus.[14]

SO ORDERED in No. 21-cv-02636.

Date: November 15, 2024

_____

JOHN F. KNESS
United States District Judge

---

[14] For the reasons set forth in this Memorandum, the Court finds for Plaintiffs. But Plaintiffs' litigation position was not so strong, nor was the manner in which Defendant litigated so unreasonable, as to justify this being an "exceptional" case. Accordingly, Plaintiffs are not entitled to an award of reasonable attorneys' fees under 35 U.S.C. § 285. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) ("an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.").

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

MELINTA THERAPEUTICS, LLC, MELINTA
SUBSIDIARY CORP., and REMPEX
PHARMACEUTICALS, INC.,

Plaintiffs,

v.

NEXUS PHARMACEUTICALS, INC.,

Defendant.

No. 21-cv-02636
Judge John F. Kness

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of Plaintiff(s)
and against Defendant(s)
which ☐ includes         pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiffs shall recover costs from Defendant.

_____

☐ in favor of Defendant(s)
and against Plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

_____

☒ other: in favor of Plaintiffs Melinta and against Defendant Nexus on Counts II and III of the Complaint and Counts I and II of the Counterclaim. The Court also enters a permanent injunction order, which is appended to this final judgment as Attachment A. Count I of the Complaint is dismissed as moot.

_____

This action was *(check one)*:
☐ tried by a jury with Judge John F. Kness presiding, and the jury has rendered a verdict.
☒ tried by Judge John F. Kness without a jury and the above decision was reached.
☐ decided by Judge John F. Kness on a motion.

Date: November 15, 2024

_____
JOHN F. KNESS
United States District Judge

# ATTACHMENT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MELINTA THERAPEUTICS, LLC,
MELINTA SUBSIDIARY CORP, and
REMPEX PHARMACEUTICALS, INC.,

        Plaintiffs,

        v.

NEXUS PHARMACEUTICALS, INC.,

        Defendant.

No. 21-cv-02636

Judge John F. Kness

## PERMANENT INJUNCTION ORDER

Defendant has been found liable of induced and contributory infringement of Claims 1, 7, and 18 of Plaintiffs' Patent No. 9,084,802 and Claim 27 of Plaintiffs' Patent No. 9,278,105. Plaintiffs have proved direct, induced, and contributory infringement by a preponderance of the evidence. Defendant has failed to prove invalidity for obviousness, indefiniteness, lack of enablement, or lack of written description by clear and convincing evidence. For these reasons, the Court finds that permanent injunctive relief enjoining Defendant from manufacturing, using, offering for sale, or selling its ANDA product until the expiration of Plaintiffs' patents is appropriate. 35 U.S.C. §§ 271(a)–(c), (e).

1.    Defendant's submission of the ANDA No. 214934 infringed the '802 Patent and the '105 Patent pursuant to 35 U.S.C. § 271(e)(2)(A);

2.    The commercial manufacture, use, offer for sale, and / or sale of the ANDA product within the United States, and / or the importation of the ANDA

product into the United States, will infringe on the '802 Patent and the '105 Patent pursuant to 35 U.S.C. §§ 271(a)–(c).

3.     Defendant and its affiliates, subsidiaries, officers, agents, attorneys, employees, and those acting in privity or concert with them are permanently enjoined from the manufacture, use, offer for sale, or sale within the United States, or importation into the United States, of Defendant's ANDA product until after the expiration of Plaintiffs' '802 Patent and '105 Patent, including any extensions and / or additional periods of exclusivity to which Plaintiffs are or become entitled;

4.     The effective date of FDA approval of the ANDA product is a date that is no earlier than the expiration of the '802 Patent and the '105 Patent, including any extensions and / or additional periods of exclusivity to which Plaintiffs are or become entitled;

5.     Claims 1, 7, and 18 of the '802 Patent are valid and enforceable;

6.     Claim 27 of the '105 Patent is valid and enforceable; and

7.     Plaintiffs are awarded money damages or any other appropriate relief if Defendant makes, uses, sells, or offers to sell its ANDA product within the United States, or imports its ANDA product into the United States, prior to the expiration of the '802 Patent and the '105 Patent, including any extensions and / or additional periods of exclusivity to which Plaintiffs are or become entitled.

SO ORDERED in No. 21-cv-02636.

Date: November 15, 2024

_____
JOHN F. KNESS
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

MELINTA THERAPEUTICS, LLC, MELINTA
SUBSIDIARY CORP., and REMPEX
PHARMACEUTICALS, INC.,

Plaintiffs,

v.

NEXUS PHARMACEUTICALS, INC.,

Defendant.

No. 21-cv-05995
Judge John F. Kness

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of Plaintiff(s)
and against Defendant(s)
which ☐ includes pre–judgment interest.
☐ does not include pre-judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiffs shall recover costs from Defendant.

---

☐ in favor of Defendant(s)
and against Plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☒ other: in favor of Plaintiffs Melinta and against Defendant Nexus on Counts II and III of the Complaint and Counts I and II of the Counterclaim. The Court also enters a permanent injunction order, which is appended to this final judgment as Attachment A. Count I of the Complaint is dismissed as moot.

---

This action was *(check one)*:
☐ tried by a jury with Judge John F. Kness presiding, and the jury has rendered a verdict.
☒ tried by Judge John F. Kness without a jury and the above decision was reached.
☐ decided by Judge John F. Kness on a motion.

Date: November 15, 2024

JOHN F. KNESS
United States District Judge

APPX000130

Case: 25-5281 Document: 54-4 Filed: 04/29/2025 Page: 1 Page #:623

# ATTACHMENT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MELINTA THERAPEUTICS, LLC,
MELINTA SUBSIDIARY CORP, and
REMPEX PHARMACEUTICALS, INC.,

        Plaintiffs,

        v.

NEXUS PHARMACEUTICALS, INC.,

        Defendant.

No. 21-cv-05995

Judge John F. Kness

## PERMANENT INJUNCTION ORDER

Defendant has been found liable of induced and contributory infringement of Claims 1, 7, and 18 of Plaintiffs' Patent No. 9,084,802 and Claim 27 of Plaintiffs' Patent No. 9,278,105. Plaintiffs have proved direct, induced, and contributory infringement by a preponderance of the evidence. Defendant has failed to prove invalidity for obviousness, indefiniteness, lack of enablement, or lack of written description by clear and convincing evidence. For these reasons, the Court finds that permanent injunctive relief enjoining Defendant from manufacturing, using, offering for sale, or selling its ANDA product until the expiration of Plaintiffs' patents is appropriate. 35 U.S.C. §§ 271(a)–(c), (e).

1.    Defendant's submission of the ANDA No. 214934 infringed the '802 Patent and the '105 Patent pursuant to 35 U.S.C. § 271(e)(2)(A);

2.    The commercial manufacture, use, offer for sale, and / or sale of the ANDA product within the United States, and / or the importation of the ANDA

product into the United States, will infringe on the '802 Patent and the '105 Patent pursuant to 35 U.S.C. §§ 271(a)–(c).

3.      Defendant and its affiliates, subsidiaries, officers, agents, attorneys, employees, and those acting in privity or concert with them are permanently enjoined from the manufacture, use, offer for sale, or sale within the United States, or importation into the United States, of Defendant's ANDA product until after the expiration of Plaintiffs' '802 Patent and '105 Patent, including any extensions and / or additional periods of exclusivity to which Plaintiffs are or become entitled;

4.      The effective date of FDA approval of the ANDA product is a date that is no earlier than the expiration of the '802 Patent and the '105 Patent, including any extensions and / or additional periods of exclusivity to which Plaintiffs are or become entitled;

5.      Claims 1, 7, and 18 of the '802 Patent are valid and enforceable;

6.      Claim 27 of the '105 Patent is valid and enforceable; and

7.      Plaintiffs are awarded money damages or any other appropriate relief if Defendant makes, uses, sells, or offers to sell its ANDA product within the United States, or imports its ANDA product into the United States, prior to the expiration of the '802 Patent and the '105 Patent, including any extensions and / or additional periods of exclusivity to which Plaintiffs are or become entitled.

SO ORDERED in No. 21-cv-05995.

Date: November 15, 2024

_____
JOHN F. KNESS
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.8 (rev. 1.8.1)
### Eastern Division

Melinta Therapeutics, LLC, et al.

                                      Plaintiff,

v.                                                Case No.: 1:21−cv−02636

                                                Honorable John F. Kness

Nexus Pharmaceuticals, Inc.

                                      Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, November 15, 2024:

       MINUTE entry before the Honorable John F. Kness: For the reasons stated in the accompanying opinion, which shall serve as the Court's required findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, the Court holds that Plaintiffs have proven by a preponderance of the evidence that Defendant has infringed on its patents (Counts II and III), and Defendant has failed to prove by clear and convincing evidence that Plaintiffs' patents are invalid (Counts I and II of the counterclaim). Count I of the Complaint is dismissed as moot. Enter separate findings of fact and conclusions of law. Enter separate final judgment order with an appended permanent injunction order. The Court offers its sincere gratitude to counsel for both parties for their well−presented arguments. Civil case terminated. Mailed notice. (exr, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.8 (rev. 1.8.1)
### Eastern Division

Melinta Therapeutics, LLC, et al.

Plaintiff,

v.

Case No.: 1:21−cv−05995
Honorable John F. Kness

Nexus pharmaceuticals, Inc., et al.

Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, November 15, 2024:

    MINUTE entry before the Honorable John F. Kness: This action is a companion case to Case No. 21−cv−02636, which was tried to the Court on a bench trial from June 6, 2023 to June 9, 2023. By separate orders in related case no. 21−cv−2636, the Court entered Findings of Fact and Conclusions of Law, and a final judgment in Plaintiffs' favor. In the time since the cases were consolidated on 12/07/2021, neither party has addressed this companion action, nor suggested or offered a suggestion that it remains open or different than 21−cv−2636 in any way. Accordingly, the Court will enter a final judgment in this companion case identical to the final judgment it entered in 21−cv−2636 and terminate this case. If the parties believe that the Court has misapprehended the status of this companion case in any way, they may file an appropriate motion. Mailed notice. (exr, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

US009084802B2

(12) **United States Patent**
   Griffith et al.

(10) **Patent No.:**       **US 9,084,802 B2**
(45) **Date of Patent:**       **Jul. 21, 2015**

(54) **TETRACYCLINE COMPOSITIONS**

(71) Applicant: **Rempex Pharmaceuticals, Inc.**, San Diego, CA (US)

(72) Inventors: **David C. Griffith**, San Marcos, CA (US); **Serge Boyer**, San Diego, CA (US); **Scott Hecker**, Del Mar, CA (US); **Michael N. Dudley**, San Diego, CA (US)

(73) Assignee: **REMPEX PHARMACEUTICALS, INC.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/204,881**

(22) Filed: **Mar. 11, 2014**

(65) **Prior Publication Data**

US 2014/0194393 A1     Jul. 10, 2014

**Related U.S. Application Data**

(60) Division of application No. 13/654,018, filed on Oct. 17, 2012, which is a continuation of application No. PCT/US2011/036351, filed on May 12, 2011.

(60) Provisional application No. 61/392,304, filed on Oct. 12, 2010, provisional application No. 61/334,106, filed on May 12, 2010.

(51) **Int. Cl.**
| | |
|---|---|
| *A01N 47/00* | (2006.01) |
| *A61K 31/21* | (2006.01) |
| *A61K 31/65* | (2006.01) |
| *A61K 9/00* | (2006.01) |
| *A61K 47/02* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *A61K 31/65* (2013.01); *A61K 9/0019* (2013.01); *A61K 47/02* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,736,725 | A | 2/1956 | Ritter |
| 2,980,584 | A | 4/1961 | Hammer |
| 3,166,474 | A | 1/1965 | Remmers et al. |
| 3,226,436 | A | 12/1965 | Petlsi |
| 3,232,834 | A | 2/1966 | Gordon et al. |
| 3,275,513 | A | 9/1966 | Nash |
| 3,335,055 | A | 8/1967 | Weidenheimer |
| 3,957,980 | A | 5/1976 | Noseworthy |
| 4,038,315 | A | 7/1977 | Tobkes |
| 4,060,605 | A | 11/1977 | Cotti |
| 4,086,332 | A | 4/1978 | Armstrong |
| 4,701,320 | A | 10/1987 | Hasegawa et al. |
| 5,075,295 | A | 12/1991 | Zupan et al. |
| 5,494,903 | A | 2/1996 | Hlavka et al. |
| 6,193,994 | B1 | 2/2001 | Lee et al. |

| | | | |
|---|---|---|---|
| 6,245,735 | B1 | 6/2001 | Pier |
| 6,310,053 | B1 | 10/2001 | Patterson et al. |
| 6,375,982 | B1 | 4/2002 | Cherukuri |
| 6,406,717 | B2 | 6/2002 | Cherukuri |
| 6,589,556 | B2 | 7/2003 | Cherukuri |
| 6,825,178 | B1 | 11/2004 | Pier |
| 7,229,641 | B2 | 6/2007 | Cherukuri |
| 7,485,319 | B2 | 2/2009 | Devries et al. |
| 7,820,641 | B2 | 10/2010 | Nelson et al. |
| 7,879,828 | B2 | 2/2011 | Fawzi et al. |
| 2002/0042394 | A1 | 4/2002 | Hogenkamp et al. |
| 2002/0187188 | A1 | 12/2002 | Cherukuri |
| 2003/0083318 | A1 | 5/2003 | Julien et al. |
| 2003/0171340 | A1 | 9/2003 | Isbister |
| 2004/0077601 | A1 | 4/2004 | Adams et al. |
| 2004/0131628 | A1 | 7/2004 | Bratzler et al. |
| 2004/0202725 | A1 | 10/2004 | Dascalu |
| 2004/0235801 | A1 | 11/2004 | Julien et al. |
| 2005/0019396 | A1 | 1/2005 | deVries et al. |
| 2005/0038002 | A1* | 2/2005 | Nelson et al. ................ 514/152 |
| 2005/0084490 | A1 | 4/2005 | Adams et al. |
| 2006/0141054 | A1 | 6/2006 | Piccariello |
| 2006/0183719 | A1 | 8/2006 | deVries et al. |
| 2006/0247181 | A1 | 11/2006 | Fawzi et al. |
| 2007/0243244 | A1 | 10/2007 | Shah et al. |
| 2007/0282001 | A1 | 12/2007 | Chi |
| 2008/0015352 | A1 | 1/2008 | Piccariello |
| 2008/0020065 | A1 | 1/2008 | Cherukuri |
| 2008/0188445 | A1 | 8/2008 | Muldoon et al. |
| 2008/0233206 | A1* | 9/2008 | Chomczynski ............... 424/641 |
| 2008/0248124 | A1 | 10/2008 | Eguchi et al. |
| 2009/0035293 | A1 | 2/2009 | Eirew |
| 2009/0035393 | A1 | 2/2009 | Geibel et al. |
| 2009/0111780 | A1 | 4/2009 | Giordano |
| 2009/0275660 | A1 | 11/2009 | Chauhan |
| 2010/0010101 | A1 | 1/2010 | Cherukuri |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| BE | 905528 | 2/1987 |
| BR | 9804395 | 6/2000 |

(Continued)

OTHER PUBLICATIONS

Bogardus et al., "Solubility of doxycycline in aqueous solutions" Journal of Pharmaceutical Sciences (1979) 68:188-194.

(Continued)

*Primary Examiner* — Craig Ricci

*Assistant Examiner* — Jared D Barsky

(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

The present invention relates to compositions, pharmaceutical compositions, and methods for preparing the same, comprising a tetracycline with improved stability and solubility. Some embodiments include a tetracycline with an excess of a divalent or trivalent cation.

**31 Claims, 7 Drawing Sheets**

Melinta v. Nexus
21-cv-02636
**PTX 1**

QPEX001489

US 9,084,802 B2

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| 2010/0129448 A1 | 5/2010 | Talton |
| 2011/0059177 A1 | 3/2011 | Thatte |
| 2013/0040918 A1 | 2/2013 | Griffith et al. |

FOREIGN PATENT DOCUMENTS

| CN | 1390550 | 1/2003 |
| CN | 1562045 | 1/2005 |
| CN | 101254156 | 9/2008 |
| CN | 101607086 | 12/2009 |
| CN | 101822650 | 9/2010 |
| CN | 101940560 | 1/2011 |
| DE | 1228252 | 1/1957 |
| DE | 1053734 | 6/1957 |
| DE | 1144721 | 4/1961 |
| DE | 2659152 | 12/1976 |
| EP | 0184389 | 6/1986 |
| EP | 0271374 | 11/1987 |
| EP | 337733 | 10/1988 |
| EP | 536515 | 4/1993 |
| EP | 1578434 | 9/2005 |
| EP | 1902706 | 3/2008 |
| ES | 324597 | 7/1989 |
| GB | 793558 | 4/1958 |
| GB | 809015 | 2/1959 |
| GB | 812138 | 4/1959 |
| GB | 845454 | 9/1960 |
| GB | 879629 | 10/1961 |
| GB | 901107 | 7/1962 |
| GB | 947601 | 1/1964 |
| GB | 948090 | 1/1964 |
| GB | 1120821 | 7/1968 |
| IN | 183807 | 4/2000 |
| JP | 61130228 | 6/1986 |
| JP | 11286448 | 10/1999 |
| JP | 11292767 | 10/1999 |
| JP | 2008-533146 | 8/2008 |
| RU | 2273232 C2 | 1/2005 |
| WO | WO96/01634 | 1/1996 |
| WO | WO 00/07601 | 2/2000 |
| WO | WO 01/92288 | 12/2001 |
| WO | WO 02/15848 | 2/2002 |
| WO | WO 03/066064 | 9/2003 |
| WO | WO 04/000223 | 12/2003 |
| WO | WO 2004/004658 | 1/2004 |
| WO | WO 2005/009416 | 2/2005 |
| WO | WO 2005/011707 | 2/2005 |
| WO | WO 2006/002868 | 1/2006 |
| WO | WO 2006/078925 | 7/2006 |
| WO | WO 2006/130501 | 12/2006 |
| WO | WO 2007/075794 | 7/2007 |
| WO | WO 2008/121107 | 10/2008 |
| WO | WO 2009/035818 | 3/2009 |
| WO | WO 2009/059191 | 5/2009 |
| WO | WO 2009/076454 | 6/2009 |
| WO | WO 2009/120389 | 10/2009 |
| WO | WO 2009/155931 | 12/2009 |
| WO | WO 2010/022031 | 2/2010 |
| WO | WO 2010/034003 | 3/2010 |
| WO | WO 2010/034011 | 3/2010 |
| WO | WO 2010033800 A2 * | 3/2010 |
| WO | WO 2010/046932 | 4/2010 |
| WO | WO 2010/091124 | 8/2010 |
| WO | WO 2011/008760 | 1/2011 |

OTHER PUBLICATIONS

Chinese Journal of Antibiotics, 2008.8, 33(8): 483-486, 498.

Chow et al., "Formulation of hydrophilic non-aqueous gel: drug stability in different solvents and rheological behavior of gel matrices", Pharm Res. (2008) 25(1):207-217. Epub Oct. 2, 2007.

Jochsberger T. "Differential Pulse Polarography of Tetracycline: Determination of Complexing Tendencies of Tetracycline Analogs in the Presence of Cations", Journal of Pharmaceutical Sciences I (1979) vol. 68 1061-1063.

Light, Richard W., et al., Laboratory and Animal Investigations Comparison of the Effectiveness of Tetracycline and Minocycline as Pleural Sclerosing Agents in Rabbits*, Aug. 1994, pp. 577-582, 106 / 2; downloaded from http://journal.publications.chestnet.org, on May 9, 2013.

Miyazaki S. et al., "A comparison of solubility characteristics of free bases and hydrochloride salts of tetracycline antibiotics in hycrochloric acid solutions" Chem. Pharm. Bull. (1975) 23:1197-1204.

Paweł Łczyk et al., "Kinetics of drug decomposition. Part 74. Kinetics of degradation of minocycline in aqueous solution", Pol J Pharmacol Pharm. (1982) 34(5-6):409-421.

Triax Pharmaceuticals, LLC, Minocin® Minocycline for Injection 100 Mg/Vial Intravenous, Aug. 2010, pp. 3-19, NDA 50-444/S-047.

Gonzales et al., "Effect of intravenous magnesium sulfate on chronic obstructive pulmonary disease exacerbations requiring hospitalization: a randomized placebo-controlled trial", Arch Bronconeumol. (2006) 42(10:491.

Mason et al., "Pharmacology of tetracycline water medication in swine", J Anim Sci (2009) 85:3179-3186.

Schramm, G., "Some Experiments on the Incompatibility of semisynthetic Tetracyclines", Schweizerische Apotheker-Zeitung (1976), 114(6), 361-6.

Xuan et al., "Hydrolysis and photolysis of oxytetracycline in aqueous solution", J Environ Scie Health, Part B (2010) 45(1):73-81.

Yamaguchi et al., "Transport of Divalent Cations with Tetracycline as Mediated by the Transposon Tn10-encoded Tetracycline Resistance Protein", J Biol Chem. (1990) 265(9):4809-4813.

International Search Report and Written Opinion dated Nov. 11, 2011 for International Patent Application No. PCT/US2011/036351, filed May 12, 2011.

International Preliminary Report on Patentability dated Jul. 31, 2012 for International Patent Application No. PCT/US2011/036351, filed May 12, 2011.

Chinese First Office Action dated Feb. 10, 2014 for Application No. 201180033194.X, filed Jan. 4, 2013.

Chinese First Office Action dated Nov. 3, 2014 for Application No. 201180033194.X, filed Jan. 4, 2013.

Columbian Technical Report/Search dated Jul. 11, 2014 for Application No. 12-225411, filed Dec. 12, 2012.

European Supplementary Search Report dated May 8, 2014 for Application No. 11781314.7, filed Dec. 10, 2012.

New Zealand Examination Report dated Jul. 11, 2013 for Application No. 603764, filed May 12, 2011.

New Zealand Further Examination Report dated Nov. 24, 2014 for Application No. 603764, filed May 12, 2011.

Singapore Search Report and Written Opinion dated Dec. 18, 2014 for Application No. 2012082905, filed May 12, 2011.

Anonymous, Russian Website Medstream, "The antibiotic is able to treat stroke", Online Oct. 9, 2009 at http://medstream.ru/news/ 28775.html.; 4 pages.

Radar Medication Guide, "Omnipak (Omipaque)", last update Jul. 31, 2003; Russian website at http://www.rlsnet.ru/tn__index__id__ 2438.htm; 14 pages.

Pfizer Drug Instructions; "Sirmione (SERMION)", Dec. 2010, Russian Website at http://medi.ru/doc/g84neu68.htm; 11 pages.

Russian Office Action dated Apr. 1, 2015 for Application No. 2012147527, filed Nov. 8, 2012.

Japanese Office Action dated Apr. 6, 2015 for Application No. 2013-510322, filed May 12, 2011.

* cited by examiner

QPEX001490

Case: 25-1281    Document: 14    Page: 182    Filed: 02/20/2025



**FIG. 1**

QPEX001491

Case: 25-1281    Document: 14    Page: 183    Filed: 02/20/2025



**FIG. 2**

QPEX001492

Case: 25-1281     Document: 14     Page: 184     Filed: 02/20/2025



Rabbit Red Blood Cell Hemolysis Produced by 2.5 mg/ml of Minocin compared to Mino-Mg (using $MgSO_4$)

FIG. 3

QPEX001493

Case: 25-1281    Document: 14    Page: 185    Filed: 02/20/2025



Rabbit Red Blood Cell Hemolysis Produced by 2.5 mg/ml of Minocin compared to Mino-Mg (using MgCl$_2$)

**FIG. 4**

QPEX001494

Case: 25-1281   Document: 14   Page: 186   Filed: 02/20/2025



FIG. 5

QPEX001495



FIG. 6

QPEX001496



FIG. 7

US 9,084,802 B2

**1**

## TETRACYCLINE COMPOSITIONS

### RELATED APPLICATIONS

This application is a division of U.S. application Ser. No. 13/654,018 filed Oct. 17, 2012 which is a continuation of International Application No. PCT/US2011/036351 filed on May 12, 2011, which claims priority to U.S. Provisional Application No. 61/392,304 filed Oct. 12, 2010, and to U.S. Provisional Application No. 61/334,106 filed May 12, 2010, the contents of which are incorporated herein by reference in their entireties.

### FIELD OF THE INVENTION

The present invention relates to tetracycline compositions and methods for preparing and using the same. Some embodiments include a tetracycline with an excess of a divalent or trivalent cation.

### BACKGROUND OF THE INVENTION

Tetracyclines are used as broad spectrum antibiotics to treat various bacterial infections, such as infections of the respiratory tract, sinuses, middle ear, urinary tract, and intestines, and can be used in the treatment of gonorrhoea, especially in patients allergic to β-lactams and macrolides. Tetracyclines interfere with the protein synthesis of Gram positive and Gram-negative bacteria by preventing the binding of aminoacyl-tRNA to the ribosome. The action of tetracyclines is bacteriostatic (preventing growth of bacteria) rather than killing (bactericidal).

Tetracyclines degrade rapidly to form epitetracycline, anhydrotetracycline, epianhydrotetracycline, and other degradation products. Once degraded, tetracyclines have small therapeutic value, since the degradation products have no therapeutically useful activity. Degradation begins as soon as the antibiotic is in solution, and continues until reaching an equilibrium of antibiotic and epimer concentrations. The equilibrium point is temperature and pH dependent, with more epimer being formed at higher temperatures and lower pH. Oxidation and other side reactions cause further degradation. Thus, tetracyclines can have a limited existence in aqueous environments in their active form. Moreover, the degradation products of tetracyclines are toxic and can cause Fanconi syndrome, a potentially fatal disease affecting proximal tubular function in the nephrons of the kidneys.

There is a need to provide hospital staff with the flexibility and advantages that come with longer admixture and reconstitution times without the need for refrigeration so that for instance, a hospital pharmacist could prepare a solution the day before it is needed. Furthermore, often after a natural disaster such as hurricanes, earthquakes, or tsunamis, access to refrigeration equipment can be scarce and may be further impeded by the lack of electricity. Stable formulations of tetracyclines could be stored as a solution, negating the need for reconstitution, and allowing its use in inhalers or nebulizers for outpatient use.

In addition, some tetracyclines can cause tetracycline-induced hemolysis. This hemolysis can lead to venous phlebitis at the site of injection when administered intravenously, resulting in irritation and potentially limiting the volumes of infusion that can be tolerated. Thus, there is a need for formulations of such tetracyclines that reduce the incidence of hemolysis.

**2**

### SUMMARY OF THE INVENTION

The present invention relates to tetracycline compositions and methods for preparing and using the same. Some embodiments include a tetracycline with an excess of a divalent or trivalent cation.

Some embodiments include pharmaceutical compositions. In some embodiments the pharmaceutical compositions comprise an aqueous solution of minocycline and a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to minocycline is greater than 2:1 and wherein the solution does not comprise a pharmaceutically acceptable oil and is suitable for intravenous administration.

In some embodiments the pharmaceutical compositions comprise an aqueous solution of minocycline and a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to minocycline is greater than 2:1 and wherein the solution has a pH greater than 4 and less than 5 and is suitable for intravenous administration.

In some embodiments the pharmaceutical compositions comprise an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to 7-dimethylamino-tetracycline antibiotic is greater than 3:1 and wherein the solution does not comprise a pharmaceutically acceptable oil, gluconate, or a pyridine-containing compound, has a pH greater than 2 and less than 7, and is suitable for intravenous administration.

In some embodiments, the solution does not comprise polyoxyethylene hydrogenated castor oil.

In some embodiments, the solution does not comprise an antioxidant.

In some embodiments, the solution does not comprise a pyridine-containing compound.

In some embodiments, the solution does not comprise nicotinamide.

In some embodiments, the solution does not comprise an alcohol.

In some embodiments, the solution does not comprise glycerol.

In some embodiments, the solution does not comprise polyethylene glycol.

In some embodiments, the solution does not comprise gluconate.

In some embodiments, the solution does not comprise a pyrrolidone compound.

In some embodiments, the solution does not comprise a water-miscible local anaesthetic.

In some embodiments, the water-miscible local anaesthetic is procaine.

In some embodiments, the solution does not comprise urea.

In some embodiments, the solution does not comprise lactose.

In some embodiments, the solution does not comprise a dehydrating agent. In some embodiments, the dehydrating agent is selected from the group consisting of ethyl acetate, acetic anhydride, absolute ethanol, ethyl acetate, acetic anhydride, and mixtures thereof.

In some embodiments, the solution has a pH of less than 7. In some embodiments, the solution has a pH of less than 6. In some embodiments, the solution has a pH of less than 5.

In some embodiments, the solution has a pH greater than 2 and less than 7. In some embodiments, the solution has a pH greater than 4 and less than 7. In some embodiments, the solution has a pH greater than 4 and less than 6. In some embodiments, the solution has a pH greater than 4 and less than 5.

QPEX001498

US 9,084,802 B2

3

In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 3:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 5:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 8:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 10:1.

In some embodiments, the osmolality of the solution is less than 500 mOsm/kg. In some embodiments, the osmolality of the solution is less than 400 mOsm/kg. In some embodiments, the osmolality of the solution is less than 350 mOsm/kg.

In some embodiments, the concentration of minocycline is at least 1 mg/ml. In some embodiments, the concentration of minocycline is at least 5 mg/ml. In some embodiments, the concentration of minocycline is at least 10 mg/ml.

In some embodiments, the solution comprises magnesium sulfate. In some embodiments, the solution comprises magnesium oxide. In some embodiments, the solution comprises magnesium acetate. In some embodiments, the solution comprises magnesium chloride.

In some embodiments, the solution comprises a buffer. In some embodiments, the solution comprises acetate.

In some embodiments, the solution comprises a base. In some embodiments, the base comprises NaOH.

In some embodiments, the cation is selected from iron, copper, zinc, manganese, nickel, cobalt, aluminum, calcium, magnesium and gallium. In some embodiments, the cation is selected from magnesium, calcium, and zinc. In some embodiments, the cation is magnesium.

In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and a glycylcycline. In some embodiments, the glycylcycline is tigecycline. In some embodiments, the 7-dimethylamino-tetracycline is minocycline. In some embodiments, the 7-dimethylamino-tetracycline is PTK796.

Some embodiments include pharmaceutical compositions comprising 10 mg/ml minocycline, $MgCl_2$, and NaOH, wherein the Mg to minocycline molar ratio is 5:1, and the pH is greater than 4.5 and less than 5.5.

Some embodiments include pharmaceutical compositions comprising 10 mg/ml minocycline, $MgSO_4$, and sodium acetate, wherein the Mg to minocycline molar ratio is 5:1, the pH is greater than 4.5 and less than 5.5, and the osmolality is greater than 275 mOsm/kg and less than 375 mOsm/kg.

Some embodiments include pharmaceutical compositions comprising 10 mg/ml minocycline and $Mg(C_2H_3O_2)_2$, wherein the Mg to minocycline molar ratio is 5:1, and the pH is greater than 4.5 and less than 5.5.

Some embodiments include pharmaceutical compositions comprising 10 mg/ml minocycline, $MgSO_4$, and NaOH, wherein the Mg to minocycline molar ratio is 5:1, the pH is greater than 4.5 and less than 5.5, and the osmolality is greater than 150 mOsm/kg and less than 250 mOsm/kg.

Some embodiments include pharmaceutical compositions comprising 5 mg/ml tigecycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 5:1, and the pH is greater than 5.5 and less than 6.5.

Some embodiments include pharmaceutical compositions comprising 5 mg/ml tigecycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 12:1, and the pH is greater than 5.5 and less than 6.5.

Some embodiments include pharmaceutical compositions comprising 5 mg/ml tigecycline, $MgCl_2$, and NaOH, wherein the Mg to tigecycline molar ratio is 5:1, and the pH is greater than 5.5 and less than 6.5.

4

Some embodiments include pharmaceutical compositions comprising 5 mg/ml tigecycline, $MgCl_2$, and NaOH, wherein the Mg to tigecycline molar ratio is 12:1, and the pH is greater than 5.5 and less than 6.5.

Some embodiments include pharmaceutical compositions suitable for topical administration comprising 5 mg/ml tigecycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 5:1, and the pH is greater than 6.0 and less than 7.0.

Some embodiments include pharmaceutical compositions suitable for topical administration comprising 5 mg/ml tigecycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 12:1, and the pH is greater than 6.0 and less than 7.0.

Some embodiments include pharmaceutical compositions suitable for topical administration comprising 5 mg/ml tigecycline, $CaCl_2$, and NaOH, wherein the Ca to tigecycline molar ratio is 5:1, and the pH is greater than 6.0 and less than 7.0.

Some embodiments include pharmaceutical compositions suitable for topical administration comprising 5 mg/ml tigecycline, $CaCl_2$, and NaOH, wherein the Ca to tigecycline molar ratio is 12:1, and the pH is greater than 6.0 and less than 7.0.

Some embodiments include water-soluble solid compositions comprising minocycline or a salt thereof and a salt that comprises a divalent or trivalent cation.

Some embodiments include water-soluble solid compositions comprising a 7-dimethylamino-tetracycline antibiotic or a salt thereof and a salt comprising a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to 7-dimethylamino-tetracycline antibiotic is greater than 3:1 and wherein the composition does not comprise gluconate or a pyridine-containing compound.

In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 1:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 2:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 3:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is greater than 5:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is at greater than 8:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is greater than 10:1.

Some embodiments include compositions in the form of a lyophile.

In some embodiments, the salt is magnesium sulfate.

In some embodiments, the salt is calcium chloride.

In some embodiments, the composition comprises sodium acetate.

In some embodiments, the composition comprises NaOH.

In some embodiments, the salt is selected from magnesium chloride, magnesium bromide, magnesium sulfate, calcium chloride, calcium bromide, calcium sulfate, zinc chloride, gallium chloride, magnesium malate, magnesium citrate, magnesium acetate, calcium citrate, zinc acetate, and zinc citrate.

In some embodiments, the composition does not comprise an antioxidant.

In some embodiments, the composition does not comprise a pyridine-containing compound. In some embodiments, the composition does not comprise nicotinamide.

In some embodiments, the composition does not comprise gluconate.

QPEX001499

US 9,084,802 B2

5

In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and a glycylcycline. In some embodiments, the glycylcycline is tigecycline. In some embodiments, the 7-dimethylamino-tetracycline is minocycline. In some embodiments, the 7-dimethylamino-tetracycline is PTK796.

Some embodiments include methods for preparing a pharmaceutical composition comprising dissolving the water-soluble solid composition of any one of the water-soluble solid compositions provided herein in water to form a solution

Some embodiments include methods for preparing a pharmaceutical composition comprising dissolving a 7-dimethylamino-tetracycline in a solution comprising a divalent or trivalent cation.

Some embodiments include methods for preparing a pharmaceutical composition comprising dissolving a 7-dimethylamino-tetracycline in a solution comprising a divalent or trivalent cation; adjusting the pH of the solution; and lyophilizing the composition.

In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and a glycylcycline. In some embodiments, the glycylcycline is tigecycline.

In some embodiments, the pH of the solution is adjusted to be less than 6. In some embodiments, the pH of the solution is adjusted to be less than 5.

In some embodiments, the pH of the solution is adjusted to be greater than 2 and less than 7. In some embodiments, the pH of the solution is adjusted to be greater than 4 and less than 7. In some embodiments, the pH of the solution is adjusted to be greater than 4 and less than 6. In some embodiments, the pH of the solution is adjusted to be greater than 4 and less than 5.

In some embodiments, adjusting the pH comprises adding an acid. In some embodiments, the acid is HCl.

In some embodiments, adjusting the pH comprises adding a base. In some embodiments, the base is NaOH.

In some embodiments, adjusting the pH comprises forming a buffer. In some embodiments, forming the buffer comprises adding sodium acetate.

In some embodiments, the divalent or trivalent cation is selected from iron, copper, zinc, manganese, nickel, cobalt, aluminum, calcium, magnesium and gallium. In some embodiments, the cation is selected from magnesium, calcium, and zinc. In some embodiments, the cation is magnesium.

Some embodiments include kits comprising a first container comprising a diluent that comprises an aqueous solution of a divalent or trivalent cation; and a second container comprising a solid composition soluble in the diluent, wherein the solid composition comprises minocycline in an amount such that the molar ratio of the divalent or trivalent cation to minocycline is greater than 2:1.

Some embodiments include kits comprising a first container comprising a diluent that comprises an aqueous solution of a divalent or trivalent cation; and a second container comprising a solid composition soluble in the diluent, wherein the solid composition comprises a 7-dimethylamino-tetracycline antibiotic in an amount such that the molar ratio of the divalent or trivalent cation to 7-dimethylamino-tetracycline antibiotic is greater than 3:1.

In some embodiments, the diluent comprises an acid. In some embodiments, the acid is HCl.

In some embodiments, the diluent comprises a base. In some embodiments, the base is NaOH.

In some embodiments, the diluent comprises a buffer. In some embodiments, the diluent comprises sodium acetate.

6

In some embodiments, the pH of the diluent is greater than pH 6 and less than pH 8.

In some embodiments, the divalent or trivalent cation is selected from iron, copper, zinc, manganese, nickel, cobalt, aluminum, calcium, magnesium and gallium. In some embodiments, the cation is selected from magnesium, calcium, and zinc. In some embodiments, the cation is magnesium.

In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 3:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is greater than 5:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is at greater than 8:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is greater than 10:1.

In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and a glycylcycline. In some embodiments, the glycylcycline is tigecycline. In some embodiments, the 7-dimethylamino-tetracycline is minocycline. In some embodiments, the 7-dimethylamino-tetracycline is PTK796.

Some embodiments include methods of treating or preventing a bacterial infection in a subject, comprising administering the pharmaceutical composition of any one of the pharmaceutical compositions provided herein to the subject via an intravenous route.

Some embodiments include methods of treating or preventing a bacterial infection in a subject, comprising administering the pharmaceutical composition made according to any one of the methods of preparing a pharmaceutical compositions provided herein to the subject via an intravenous route.

In some embodiments, the intravenous administration includes administering less than 200 ml of the composition.

In some embodiments, the intravenous administration includes administering the composition in less than 60 minutes.

Some embodiments include methods of treating or preventing a bacterial infection in a subject, comprising administering the pharmaceutical composition of any one of the pharmaceutical compositions provided herein to the subject via a topical route.

Some embodiments include methods of treating or preventing a bacterial infection in a subject, comprising administering the pharmaceutical composition made according to any one of the methods of preparing a pharmaceutical compositions provided herein to the subject via a topical route.

Some embodiments include compositions comprising tigecycline and a divalent or trivalent cation, wherein the molar ratio of said divalent or trivalent cation to said tigecycline is greater than 1:1.

In some embodiments, the tigecycline and divalent or trivalent cation are in aqueous solution.

In some embodiments, the molar ratio of said divalent or trivalent cation to said tigecycline is greater than 3:1.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a graph of percent hemolysis of rabbit red blood cells incubated with various concentrations of minocycline in various solutions relative to hemolysis in water, in which the minocycline solutions formulated with divalent cations were adjusted to ph 5.85.

QPEX001500

US 9,084,802 B2

7      8

FIG. **2** shows a graph of percent hemolysis of rabbit red blood cells incubated with various concentrations of minocycline in various solutions relative to hemolysis in water.

FIG. **3** depicts a graph of rabbit RBC hemolysis caused by minocycline formulated in different ratios of $MgSO_4$.

FIG. **4** depicts a graph of rabbit RBC hemolysis caused by minocycline formulated in different ratios of $MgCl_2$.

FIG. **5** depicts a graph of rabbit RBC hemolysis caused by minocycline formulated in different ratios of $CaCl_2$.

FIG. **6** depicts a graph for minocycline uptake by HVEC at various concentrations of divalent cation.

FIG. **7** depicts a graph for minocycline uptake by HVEC at various concentrations of divalent cation.

DETAILED DESCRIPTION

The present invention relates to tetracycline compositions and methods for preparing and using the same. Some embodiments include a tetracycline with an excess of a metal cation. In some embodiments, the compositions have improved stability against both oxidative degradation and epimerization. Some such compositions are therefore more stable when dissolved, lyophilized, reconstituted, and/or diluted than other compositions. Some embodiments also provide compositions having a lower level of tetracycline-induced hemolysis and resulting phlebitis.

It was unexpectedly discovered that the incidence of tetracycline-induced hemolysis can be greatly decreased by formulating the tetracycline with divalent or trivalent cations. In some embodiments, high molar ratios of divalent or trivalent cations to tetracycline antibiotics significantly decreases hemolysis.

It was also unexpectedly discovered that the stability of aqueous solutions of tetracyclines can be greatly increased by the addition of divalent or trivalent cations. In some embodiments, the stability of aqueous solutions of tetracyclines increase with higher molar ratios of divalent or trivalent cations to tetracycline. Indeed, some such solutions were found to be stable for several weeks at 37° C.

In certain compositions, the solubility of a tetracycline antibiotic is decreased in an aqueous solution comprising a multivalent cation. It has been unexpectedly discovered that increasing the molar ratio of multivalent cation to such tetracycline antibiotics can increase the solubility of the tetracycline. Accordingly, some embodiments described herein provide solutions of a tetracycline with improved solubility.

Compositions

Some embodiments include compositions comprising a tetracycline antibiotic or a salt thereof in combination with a divalent or trivalent cation. Tetracyclines include a family of structurally-related compounds that may have broad-spectrum antibiotic activities. Examples of tetracyclines include Tetracycline, Chlortetracycline, Oxytetracycline, Demeclocycline, Doxycycline, Lymecycline, Meclocycline, Methacycline, Minocycline, Rolitetracycline, Minocycline, Tigecycline, Chlorocycline, Glycylcyclines, Aminomethylcyclines, TP434, and PTK796, (also known as BAY 73-7388 and MK2764). The structure of TP434 is provided below:



In one embodiment, the tetracycline antibiotic is selected from the group consisting of tetracycline, oxytetracycline, doxycycline, chlorocycline, minocycline, glycylcyclines and aminomethylcyclines. In one embodiment, the tetracycline is a glycylcycline. In one embodiment, the glycylcycline is tigecycline. In one embodiment, the tetracycline is an aminomethylcycline. In one embodiment, the aminomethylcycline is PTK796, also known as BAY 73-7388 and MK2764. In another embodiment, the tetracycline is selected from the group consisting of tetracycline, minocycline, tigecycline and PTK796. In one embodiment, the tetracycline antibiotic is tetracycline. In one embodiment, of the invention, the tetracycline is minocycline. In one embodiment, of the invention, the tetracycline is tigecycline. In yet another embodiment, of the invention, the tetracycline is PTK796. Some embodiments include a salt of a tetracycline antibiotic.

In some embodiments, the tetracycline antibiotic is a 7-dimethylamino-tetracycline. 7-dimethylamino-tetracyclines contain an additional dimethylamino substituent at the 7-position on the four-ring core. The 7-position is indicated on following numbered structure of minocycline:



Examples of 7-dimethylamino-tetracyclines include minocycline, a glycylcycline (e.g., tigecycline) and PTK796. Example structures of such compounds include:

Minocycline:



Tigecycline:

US 9,084,802 B2

**9**

-continued

PTK796:



As used herein, "glycylcyclines" are 7-dimethylamino-tetracylines having an N-alkylglycylamido side chain at position **9** of the four-ring core.

In some embodiments, the 7-dimethylamino-tetracycline antibiotic has the structure:



or tautomers thereof, wherein:

$R^1$ is selected from H, —$(CH_2)_n$NHC(O)$(CH_2)_n$$R^{10}$, and —$(CH_2)_n$$R^{10}$, where each n is independently an integer from 0 to 3, and

$R^{10}$ is selected from —NH—$C_{1-8}$alkyl, —NH—$C_{1-8}$cycloalkyl, and a saturated 4-to-7-membered heterocycle containing one nitrogen atom, wherein if the connecting atom of $R^{10}$ is carbon, the nitrogen atom is optionally substituted by $C_1$-$C_4$alkyl;

Y is $CR^2$ or N; and

$R^2$, $R^3$, $R^4$, $R^5$, $R^6$, $R^7$, $R^8$, and $R^9$ are each independently selected from H, —OH, halogen, and $C_{1-4}$ alkyl; or

optionally $R^1$ and $R^2$ together form a 6-membered aryl or heteroaryl ring, optionally substituted by one or two groups independently selected from H, $R^1$, —OH, halogen, and $C_{1-4}$ alkyl.

In some embodiments, each of $R^3$, $R^4$, $R^5$, $R^6$, $R^7$, $R^8$, and $R^9$ are hydrogen.

As used herein, "alkyl" refers to a straight- or branched-chain moiety containing only carbon and hydrogen. Alkyls may have any degree of saturation. Examples include methyl, ethyl, propyl, isopropyl, butyl, isobutyl, and tertbutyl.

As used herein, "cycloalkyl" refers to a ring or ring system comprising only carbon in the ring backbone. Cycloalkyls may include one or more fused or bridged rings. Cycloalkyls may have any degree of saturation provided that at least one ring is not aromatic. Examples include cyclopropyl, cyclobutyl, cyclopentyl, cyclohexyl, and cyclohexenyl.

As used herein, "heterocycle" refers to a ring or ring system comprising at least one heteroatom in the ring backbone. Heterocycles may include one or more fused or bridged rings. Heterocycles may have any degree of saturation provided that at least one ring is not aromatic. Examples include pyrrolidine, piperidine, piperazine, and morpholino.

As used herein, "aryl" refers to an aromatic ring or ring system comprising only carbon in the ring backbone. Aryls may include one or more fused rings. Examples include phenyl and naphthyl.

As used herein, "heteroaryl" refers to an aromatic ring or ring system comprising at least one heteroatom in the ring

**10**

backbone. Heteroaryls may include one or more fused rings. Examples include imidazole, oxazole, pyridine, and quinoline.

Some compositions include at least one multivalent cation. Multivalent cations include bivalent and trivalent cations, e.g., metal cations. The metal cations include common multivalent metal cations. In some embodiments, the metal cations include iron, copper, zinc, manganese, nickel, cobalt, aluminum, calcium, magnesium and gallium.

Some compositions include a salt that comprises the cation. In one embodiment, the salts are inorganic metal salts and can include anhydrous, hydrated and solvated forms of the salts. In another embodiment, the salts are organic metal salts and include but are not limited to the anhydrous, hydrated and solvated forms of the salt. In one embodiment, the anion in the inorganic metal salts can include chloride, bromide, oxide, and sulfate salts. In one embodiment, the organic metal salts are those where the anion of the salt is selected from the GRAS (generally regarded as safe) list such as but not limited to acetate, citrate, gluconate, and malate salts. Suitable anions may also be found in see Remington's Pharmaceutical Sciences, Mack Publishing Company, Easton, Pa. In some embodiments, a composition can include more than one type of metal cation. In some such embodiments, the anions for each metal salt can be the same. In another embodiment, the anions for each metal salt are different. In another embodiment, the metal cation is included in the compositions provided herein as different salts of the same cation. In one embodiment the metal salts are all inorganic. In another embodiment, the metal salts are all organic. In yet another embodiment, the metal salts are a combination of organic and inorganic salts.

Examples of inorganic metal salts that may be included in the compositions provided herein include magnesium chloride (including the hexahydrate), magnesium bromide, magnesium sulfate (including the heptahydrate), magnesium oxide, calcium chloride, calcium bromide, calcium sulfate, zinc chloride, and gallium chloride. Examples of inorganic metal salts that may be included in the compositions provided herein include magnesium malate, magnesium gluconate, magnesium citrate, magnesium acetate (including the trihydrate), calcium gluconate, calcium citrate, zinc gluconate, zinc acetate, and zinc citrate. The salts described herein include both their anhydrous and hydrated forms.

Some compositions provided herein include a tetracycline and divalent or trivalent cation, e.g., metal cation at particular molar ratios of divalent or trivalent cation to tetracycline. For example, some embodiments include compositions comprising a tetracycline and a divalent or trivalent cation, wherein the molar ratio of said divalent or trivalent cation to said tetracycline is greater than about 1:1. In some such embodiments, the molar ratio of the divalent or trivalent cation to the tetracycline is greater than about 2:1, greater than about 3:1, greater than about 4:1, greater than about 5:1, greater than about 6:1, greater than about 7:1, greater than about 8:1, greater than about 9:1, greater than about 10:1, greater than about 11:1, greater than about 12:1, greater than about 13:1, greater than about 14:1, greater than about 15:1, greater than about 16:1, greater than about 17:1, greater than about 18:1, greater than about 19:1, greater than about 20:1, greater than about 21:1, greater than about 22:1, greater than about 23:1, greater than about 24:1, greater than about 25:1, greater than about 26:1, greater than about 27:1, greater than about 28:1, greater than about 29:1, and greater than about 30:1. In some embodiments, the molar ratio is greater than about 35:1, greater than about 40:1, greater than about 45:1, and greater than about 50:1,

US 9,084,802 B2

11

In some such embodiments, the molar ratio of the divalent or trivalent cation to the tetracycline is between about 1:1 to about 30:1, between about 5:1 to about 30:1, between about 10:1 to about 30:1, and between about 20:1 to about 30:1. In some embodiments, the molar ratio of the divalent or trivalent cation to the tetracycline is between about 1:1 to about 50:1, between about 5:1 to about 50:1, between about 10:1 to about 50:1, and between about 20:1 to about 50:1.

In some embodiments, the relative amounts of metal cation present in the compositions of the invention are those amounts which are in excess of the 1:1 metal cation: a tetracycline stoichiometry for each metal cation. In one embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 5:1 to 100:1. In another embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 5:1 to 50:1. In yet another embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 5:1 to 30:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 5:1 to 10:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 10:1 to 20:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 10:1 to 15:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 5:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 10:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 12:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 15:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 20:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 30:1.

Some compositions include carbohydrates in addition to a divalent or trivalent cation. Suitable carbohydrates are those carbohydrates capable of reducing degradation of the tetracycline in at least one solid form prepared in at least one pH environment when compared to a solid form of a tetracycline prepared at the same pH environment lacking suitable carbohydrates. In one embodiment, the pH environment ranges from 3.0 to about 7.0, such as pHs ranging from about 4.0 to about 6.5, from about 5.0 to about 6.5, and from about 5.5 to about 6.5. In one embodiment, at least one solid form is chosen from powders and lyophilized cakes of a tetracycline. In another embodiment of the invention, carbohydrates are those carbohydrates capable of reducing degradation of the tetracycline in solution prepared in at least one pH environment when compared to a solution of a tetracycline prepared at the same pH environment lacking suitable carbohydrates. In one embodiment, the pH environment ranges from 3.0 to about 7.0, such as pHs ranging from about 4.0 to about 6.5, from about 5.0 to about 6.5, and from about 5.5 to about 6.5.

Suitable carbohydrates include mono and disaccharides e.g. an aldose monosaccharide or a disaccharide. Examples of suitable carbohydrates include but are not limited to the anhydrous, hydrated and solvated forms of compounds such as trehalose, lactose, mannose, sucrose and glucose. In one embodiment of the invention, the carbohydrate is a disaccharide. In another embodiment of the invention, the disaccharide is trehalose, lactose or sucrose. In yet another embodiment of the invention, the carbohydrate is lactose, including its different forms such as anhydrous lactose, lactose monohydrate or any other hydrated or solvated form of lactose. In one embodiment of the invention, the carbohydrate is trehalose, including its different forms such as anhydrous trehalose, trehalose dihydrate or any other hydrated or solvated form of trehalose.

12

In one embodiment of the invention, the suitable carbohydrate used is lactose monohydrate and the molar ratio of tigecycline to lactose monohydrate in the lyophilized powder or cake is between 1:0.2 to about 1:5. In another embodiment of the invention, the tigecycline to lactose monohydrate molar ratio is between 1:1.6 to about 1:3.3.

Some compositions include an antioxidant. Antioxidants can be used to prevent or reduce the oxidation of tetracyclines either in solution or in the solid state. Examples of antioxidants include ascorbic acid, citric acid, trehalose, butylated hydroxyl toluene (BHT), butylated hydroxyl anisole (BHA), sodium metabisulfite, d,l-$\alpha$-tocopherol, and gentisic acid.

It will be appreciated that the compositions provided herein can include aerosols, liquids, and solids. Solids can include, for example, lyophilized compositions, such as powders, cakes, or the like. Such solids may be water soluble so that they may be used to prepare aqueous solutions. Liquids can include solutions or suspensions, which may be prepared from solid compositions. Liquids include solutions that may be prepared prior to manufacturing procedures such as lyophilization. In one embodiment, the solution may be stored for several hours prior to lyophilization in order to provide greater manufacturing flexibility. Liquids also include solutions that are prepared by reconstitution for use in administration to a patient. Some compositions include solutions made from the lyophilized powder or cake by, for example, reconstitution with saline or other pharmaceutically acceptable diluents. Pharmaceutically acceptable diluents are those listed by USP such as but not limited to water for injection, saline solution, lactated Ringer's solution for injection or dextrose solution. Some compositions include solutions resulting from diluting those reconstituted solutions with pharmaceutically acceptable diluents for use in intravenous bags.

In some embodiments, the pH of a liquid composition provided herein, such as an aqueous solution, is between about pH 2.0 to about pH 8.0, between about pH 2.5 to about pH 7.5. In some embodiments, the pH of the composition is between about pH 3.0 to about pH 7.0, between about pH 3.5 to about pH 6.5, between about pH 4.0 to about pH 6.5, between about pH 4.0 to about pH 6.0, between about pH 4.5 to about pH 6.0, between about pH 4.5 to about pH 5.5, between about pH 5.0 to about pH 5.5, between about pH 5.5 to about pH 6.5, between about pH 3.5 to about pH 4.5. In some embodiments, the pH of the solution is less than pH 7, less than pH 6, less than pH 5, less than pH 4, less than pH 3, and less than pH 2. In some embodiments the pH of the solution is greater than pH 2 and less than pH 7, greater than pH 4 and less than pH 7, greater than pH 4 and less than pH 6, and greater than pH 4 and less than pH 5.

In some embodiments, liquid compositions, such as an aqueous solution, can have an osmolality from about 300 mOsmol/kg to about 500 mOsmol/kg, from about 325 mOsmol/kg to about 450 mOsmol/kg, from about 350 mOsmol/kg to about 425 mOsmol/kg, or from about 350 mOsmol/kg to about 400 mOsmol/kg. In some embodiments, the osmolality of the formulation is greater than about 300 mOsmol/kg, about 325 mOsmol/kg, about 350 mOsmol/kg, about 375 mOsmol/kg, about 400 mOsmol/kg, about 425 mOsmol/kg, about 450 mOsmol/kg, about 475 mOsmol/kg, or about 500 mOsmol/kg. In some embodiments, liquid compositions can have an osmolality from about 200 mOsmol/kg to about 1250 mOsmol/kg. In another embodiment, the osmolality is between about 250 mOsmol/kg and about 1050 mOsmol/kg. In another embodiment, the osmolality is between about 250 mOsmol/kg and about 750 mOsmol/kg. In another embodiment, the osmolality is between about 350 mOsmol/kg and

QPEX001503

US 9,084,802 B2

13

about 500 mOsmol/kg. In some embodiments, the osmolality of the solution is less than 500 mOsmol/kg, 450 mOsmol/kg, 400 mOsmol/kg, 350 mOsmol/kg, or 300 mOsmol/kg.

Some embodiments include an aqueous solution comprising a tetracycline having a concentration of at least 1 mg/ml, 5 mg/ml, 10 mg/ml, 15 mg/ml, 20 mg/ml, 25 mg/ml, 30 mg/ml, 35 mg/ml, 40 mg/ml, 45 mg/ml, or 50 mg/ml.

Some embodiments include an aqueous solution comprising a buffer, such as an acetate buffer (e.g., provided as sodium acetate), wherein the acetate has a concentration of at least 0.01 M, 0.02 M, 0.03 M, 0.04 M, 0.05 M, 0.1 M, 0.15 M, 0.20 M, 0.25 M, 0.30 M, 0.35 M, 0.40 M, 0.45 M, 0.50 M, 0.55 M, 0.60 M, 0.65 M, 0.70 M, 0.75 M, 0.80 M, 0.85 M, 0.90 M, or 0.95 M.

Some embodiments include an aqueous solution comprising a salt comprising divalent or trivalent cation, such as a magnesium salt (e.g., magnesium chloride or magnesium sulfate), having a concentration of at least 0.01 M, 0.02 M, 0.03 M, 0.04 M, 0.05 M, 0.1 M, 0.15 M, 0.20 M, 0.25 M, 0.30 M, 0.35 M, 0.40 M, 0.45 M, 0.50 M, 0.55 M, 0.60 M, 0.65 M, 0.70 M, 0.75 M, 0.80 M, 0.85 M, 0.90 M, or 0.95 M.

In one embodiment, liquid compositions, such as aqueous solutions, have a permeant ion concentration from about 30 mM to about 300 mM. In another embodiment, the permeant ion concentration is between 50 mM and 200 mM. In another embodiment, the permeant ion is selected from the list consisting of chloride and bromide. In another embodiment the permeant ion is chloride. In another embodiment, the permeant ion is bromide.

In some embodiments, aqueous solution compositions comprise a buffer. For example, in some embodiments, the solution comprises acetate. In some embodiments, aqueous solution compositions comprise a base such as NaOH. In some embodiments, aqueous solution compositions comprise an acid such as HCl.

It is contemplated that in some embodiments, reconstituted solutions may be stored in a reconstituted state at room temperature prior to further dilution for injection or topical administration. In some embodiments, storage times at room temperature after reconstitution are much longer than current compositions. In some embodiments, admixing can occur, for example, in an intravenous bag. To prepare an admixture, sufficient reconstituted solution is mixed in an intravenous bag containing a pharmaceutically acceptable diluent such as saline or dextrose solution such as 5 DW.

The concentration of admixtures may easily be determined by those of ordinary skill in the art. The time available for admixture of reconstituted solutions from the compositions may be much longer than those of previously described formulations. Storage times of the admixtures at room temperature may also be much longer than those of the existing compositions. Once admixed, the tetracycline solution is ready for administration by or to the patient. The admixture may be administered alone or together with another pharmaceutical agent or composition.

In some embodiments, the composition does not comprise a pharmaceutically acceptable oil. In some embodiments, an oil can refer to a hydrocarbon compound that is liquid at room temperature and insoluble in water. Examples of pharmaceutically acceptable oils include polyoxyethylene hydrogenated castor oils such as PEG-40 hydrogenated castor oil and PEG-50 hydrogenated castor oil. More examples of pharmaceutically acceptable oils include olive oil, sesame oil, soybean oil, safflower oil, cottonseed oil, corn oil, sunflower oil, arachis oil, coconut oil, an omega-3 polyunsaturated oil, and an omega-3 marine triglyceride.

14

In some embodiments, the composition does not comprise a pyridine-containing compound. In one embodiment, the pyridine-containing compound is nicotinamide.

Although some embodiments include gluconate (e.g., as the gluconate salt of a divalent or trivalent metal cation), other embodiments include compositions that do not comprise gluconate.

In some embodiments, the composition does not comprise a non-aqueous tetracycline-solubilizing co-solvent. Such solubilizing co-solvents can include the oil, pyridine-containing compound, and gluconate described above.

Although some embodiments include an antioxidant, other embodiments include compositions that do not comprise an antioxidant (e.g., sodium or magnesium formaldehyde sulfoxylate; sodium sulfite, metabisulfite or bisulfite; sodium sulfide; alpha-monothioglycerol (also referred to as thioglycerol); and thiosorbitol).

Other various embodiments include compositions that do not include one or more of an alcohol (e.g., a polyhydric alcohol, such as, propylene glycol, ethylene glycol), glycerol, polyethylene glycol, a pyrrolidone-containing compound, a water-miscible local anaesthetic (e.g., procaine, tetracaine), urea, lactose, or a dehydrating agent (e.g., ethyl acetate, acetic anhydride, absolute ethanol, ethyl acetate, acetic anhydride, and mixtures thereof).

Some embodiments include compositions comprising a 7-dimethylamino-tetracycline and a cation. In some such embodiments the 7-dimethylamino-tetracycline is minocycline. In some embodiments, the minocycline is minocycline HCl. In some embodiments the cation comprises $Mg^{2+}$. In some embodiments, the compositions include a salt selected from $MgCl_2$ (e.g., $MgCl_2.6H_2O$), $MgSO_4$ (e.g. $MgSO_4.7H_2O$) and magnesium acetate (e.g., $Mg(CH_3COO)_2.3H_2O$). In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 1:1, 2:1, 3:1, 4:1, 5:1, 6:1, 7:1, 8:1, 9:1, or 10:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 10:1, 20:1, 30:1, 40:1, or 50:1. Some embodiments include a buffer. In some such embodiments, the buffer includes NaOH, or sodium acetate (e.g., $NaCH_3COO.3H_2O$).

Some compositions comprise minocycline and $MgCl_2.6H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a base comprising NaOH. Some such embodiments are suitable for intravenous use.

Some compositions comprise minocycline and $MgSO_4.7H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a buffer comprising $NaCH_3COO.3H_2O$ with a pH in the range 4.5-5.5 and an osmolality in the range of about 275-375 mOsm/kg. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH and osmolality of a reconstituted solution can have a pH in the range 4.5-5.5 and an osmolality in the range of about 275-375 mOsm/kg. Some such embodiments are suitable for intravenous use.

Some embodiments comprise minocycline and $Mg(CH_3COO)_2.3H_2O$ with a Mg to minocycline molar ratio of about 5:1 with no buffer added. Some such embodiments are suitable for intravenous use.

Some embodiments include minocycline and $MgSO_4.7H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a base comprising NaOH with a pH in the range 5.5-6.5. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH of a reconstituted solution can have a pH in the range 5.5-6.5. Some such embodiments are suitable for intravenous use.

QPEX001504

US 9,084,802 B2

15                                                16

Some embodiments comprise tigecycline and $MgSO_4.7H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a buffer comprising NaOH with a pH in the range 5.5-6.5. Some embodiments comprise tigecycline and $MgSO_4.7H_2O$ with a Mg to minocycline molar ratio of about 12:1 in a base comprising NaOH with a pH in the range 5.5-6.5. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH of a reconstituted solution can have a pH in the range 5.5-6.5. Some such embodiments are suitable for intravenous use.

Some embodiments comprise tigecycline and $MgCl_2.6H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a buffer comprising NaOH with a pH in the range 5.5-6.5. Some embodiments comprise tigecycline and $MgCl_2.6H_2O$ with a Mg to minocycline molar ratio of about 12:1 in a base comprising NaOH with a pH in the range 5.5-6.5. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH of a reconstituted solution can have a pH in the range 5.5-6.5. Some such embodiments are suitable for intravenous use.

Some embodiments comprise tigecycline and $MgSO_4.7H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a buffer comprising NaOH with a pH in the range 6.0-7.0. Some embodiments comprise tigecycline and $MgSO_4.7H_2O$ with a Mg to minocycline molar ratio of about 12:1 in a base comprising NaOH with a pH in the range 6.0-7.0. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH of a reconstituted solution can have a pH in the range 6.0-7.0. Some such embodiments are suitable for topical use. Some such compositions comprise tigecycline with greater than 90%, 95%, or 98% stability for at least 30 days. Some embodiments include compositions comprising an additional constituent such as benzalkonium chloride, a steroid such as hydrocortisone, dexamethasone, thonzonium bromide, tyloxapol, an antiseptic agent such as boric acid, a preservative such as benzalkonium chloride.

Some embodiments comprise tigecycline and $CaCl_2.6H_2O$ with a Ca:minocycline:molar ratio of about 5:1 in a base comprising NaOH with a pH in the range 6.0-7.0. Some embodiments comprise tigecycline and $CaCl_2.6H_2O$ with a Ca to tigecycline molar ratio of about 12:1 in a base comprising NaOH with a pH in the range 6.0-7.0. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH of a reconstituted solution can have a pH in the range 6.0-7.0. Some such compositions are suitable for topical use. Some such compositions comprise tigecycline with greater than 90%, 95%, 98% stability for at least 30 days. Some embodiments include compositions comprising an additional constituent such as benzalkonium chloride, a steroid such as hydrocortisone, dexamethasone, thonzonium bromide, tyloxapol, an antiseptic agent such as boric acid, a preservative such as benzalkonium chloride.

Some embodiments include pharmaceutical compositions comprising an aqueous solution of minocycline and a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to minocycline is greater than 2:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than about 3:1, greater than about 5:1, greater than about 8:1, greater than about 10:1. In some embodiments, the divalent or trivalent cation is selected from iron, copper, zinc, manganese, nickel, cobalt, aluminum, calcium, magnesium and gallium. In particular embodiments, the divalent or trivalent cation is selected from magnesium,

calcium, and zinc. In some embodiments, the solution comprises magnesium sulfate and/or magnesium chloride. In particular embodiments, the composition is suitable for intravenous administration.

More embodiments include a pharmaceutical composition comprising an aqueous solution of an 7-dimethylamino-tetracycline antibiotic and a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to tetracycline antibiotic is greater than 3:1 and wherein the solution does not comprise an oil, gluconate, or a pyridine-containing compound, has a pH greater than 2 and less than 7, and is suitable for intravenous administration. In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and glycylcyclines (e.g. tigecycline).

Some embodiments include a water-soluble composition, comprising minocycline or a salt thereof and a salt that comprises a divalent or trivalent cation. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than about 1:1, greater than about 2:1, greater than about 3:1, greater than about 5:1, greater than about 8:1, greater than about 10:1. In some embodiments, the salt is selected from magnesium chloride, magnesium bromide, magnesium sulfate, calcium chloride, calcium bromide, calcium sulfate, zinc chloride, gallium chloride, magnesium malate, magnesium gluconate, magnesium citrate, calcium gluconate, calcium citrate, zinc gluconate, zinc acetate, and zinc citrate. In preferred embodiments, the salt is magnesium sulfate. In some embodiments, the composition comprises sodium acetate. In certain embodiments, the composition does not comprise an antioxidant, a pyridine-containing compound (e.g., nicotinamide), or gluconate.

More embodiments include water-soluble solid compositions comprising a 7-dimethylamino-tetracycline antibiotic and a salt comprising a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to tetracycline antibiotic is greater than 3:1 and wherein the composition does not comprise gluconate or a pyridine-containing compound. In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, glycylcyclines (e.g. tigecycline) and PTK796.

In some embodiments, the water-soluble compositions described above are in the form of a lyophile.

Methods of Preparation

Some embodiments of the present invention include methods for preparing the compositions described herein. Some such methods include combining a tetracycline antibiotic and a divalent or trivalent cation. Some methods further comprise modifying the pH of the compositions. In some methods, modifying the pH comprises adjusting the pH with a pH modifying agent. Examples of pH modifying agents include hydrochloric acid, gentisic acid, lactic acid, citric acid, acetic acid, phosphoric acid, sodium hydroxide, sodium bicarbonate and sodium carbonate. In some embodiments, the pH-modifying agent includes any pharmaceutically acceptable acid, base or buffer capable of adjusting the pH of a tetracycline antibiotic/metal cation solution to between about 3.0 to about 7.0, about 4.0 to about 5.0, about 5.0 to 6.0, about 5.5 to 6.5, about 6.0 to 6.5 or about 4.2 to 4.8. In some embodiments, the acid, base or buffer is used to adjust the pH of a tetracycline antibiotic/metal cation solution to a pH less than 7, 6, 5, or 4. In some embodiments, the acid, base or buffer is used to adjust the pH of a tetracycline antibiotic/metal cation solution to a pH greater than 2 and less than 7, greater than 4 and less than 7, greater than 4 and less than 6, and greater than 4 and less than 5. Examples of such acids include but are not limited to hydrochloric acid, including 1.0 N HCl, gentisic acid, lactic acid, citric acid, acetic acid and phosphoric acid.

QPEX001505

US 9,084,802 B2

17

Examples of suitable buffers include as components succinates and acetate. Examples of such bases include but are not limited to aqueous solutions of sodium hydroxide, including 1.0 N NaOH solution, sodium bicarbonate and sodium carbonate.

Compositions of the invention may be prepared via a number of acceptable methods. For example, the metal salts are dissolved in water and the tetracycline antibiotic is added to this solution. Alternatively, the antibiotic is dissolved first and the metal salt is added to the solution. The pH of the solution is then adjusted with an acid, a base or buffer. Other optional agents such as an antioxidant or carbohydrate are then dissolved in the solution. The final solution may be then be used directly in therapy or lyophilized to dryness to form a lyophilized powder or cake for later reconstitution.

In another example, a tetracycline antibiotic may be dry blended with the metal salts and other optional ingredients, and the residual mixture dissolved in water. After the pH of the solution is adjusted, the solution may then be used in therapy or lyophilized to dryness to form a powder or cake.

Lyophilization of solutions described herein may be accomplished by any pharmaceutically acceptable means. Once lyophilized, the compositions of the invention may be stored under an inert gas, such as nitrogen, to further slow the degradation process.

The tetracycline antibiotic used in the various preparation techniques may be any solid-state form of the tetracycline that is sufficiently soluble in water. Such solid-state forms include crystalline tetracycline polymorphs, amorphous forms and salts.

One embodiment for preparing a minocycline-containing pharmaceutical composition includes dissolving minocycline and a salt that comprises a divalent of trivalent cation in water to form a solution and adjusting the pH of the solution to be less than about 7, less than about 6, less than about 5, less than about 4, or less than about 3. In some embodiments, the pH of the solution is adjusted to be greater than about 2 and less than about 7, greater than about 4 and less than about 7, or greater than about 4 and less than about 6. In some embodiments, adjusting the pH comprises adding a base, e.g., NaOH. In some embodiments, adjusting the pH comprises forming a buffer. In some embodiments, forming the buffer comprises adding sodium acetate.

More embodiments for methods of preparing a minocycline-containing pharmaceutical composition includes dissolving minocycline in a solution comprising a divalent or trivalent cation; and adjusting the pH of the solution to be less than 7.

In some embodiments, a solution of a 7-dimethylamino-tetracycline can be prepared by adding a 7-dimethylamino-tetracycline, an aqueous solution of divalent or trivalent salt to provide a certain divalent or trivalent salt to 7-dimethylamino-tetracycline molar ratio. The pH of the solution can be adjusted to a certain pH with a buffer, acid, or a base. The osmolality of the solution can be adjusted to a certain osmolality. The solution can be lyophilized. The lyophilized solution can be reconstituted with a diluent such as water.

In some embodiments, a solution of a 7-dimethylamino-tetracycline can be prepared by adding a 7-dimethylamino-tetracycline to an acid, such as HCl. The solution can be lyophilized. The lyophilized solution can be reconstituted with a diluent comprising a divalent or trivalent salt to provide a certain divalent or trivalent salt to 7-dimethylamino-tetracycline molar ratio. The diluent can further comprise an acid, base, or buffer, such as sodium acetate, to provide a solution of a certain pH.

18

In some embodiments, minocycline can be in a buffer comprising $MgSO_4$ at pH 5. The solution can be lyophilized. The lyophilisate can be reconstituted in an aqueous diluent. In some embodiments, minocycline can be solubilized in an aqueous solution comprising HCl, MgSO4 and sodium acetate. The solution can be lyophilized. In some embodiments, minocycline can be solubilized in an aqueous solution comprising HCl. The solution can be lyophilized. The lyophilisate can be reconstituted in an aqueous solution. In some embodiments, the reconstituting solution can lack Mg.

Kits

Some embodiments of the present invention include kits comprising a composition described herein. Some kits include a single use container comprising a composition described herein. Single use containers include ampules, vials, and the like. The single-use container can comprise a lyophilized formulation of a composition described herein. Some kits include a diluent for reconstituting the lyophilized formulations of a composition or pharmaceutical composition described herein.

In some embodiments, the compositions of the invention may be prepared for single-dosage use. In this embodiment, the solutions of the invention are lyophilized in individual vials such as 20-mL vials. Upon lyophilization, the vials are stoppered with any acceptable stopper. The stoppered vials are then shipped for use. When needed, the vials can be reconstituted by adding sufficient diluents to achieve the desired concentration of tetracycline. The concentration of reconstituted solutions may be easily determined by those of ordinary skill in the art. Any pharmaceutically acceptable diluent may be used. Examples of such diluents include but are not limited to water, 0.9% saline, Lactated Ringer's injection solution and dextrose solutions including 5% dextrose (5 DW).

In some embodiments, the diluent does not comprise a pharmaceutically acceptable oil (e.g., polyoxyethylene hydrogenated castor oils), a pyridine-containing compound (e.g., nicotinamide), gluconate, an antioxidant, an alcohol (e.g., a polyhydric alcohol, such as, propylene glycol, ethylene glycol), glycerol, polyethylene glycol, a pyrrolidone-containing compound, a water-miscible local anaesthetic (e.g., procaine, tetracaine), urea, lactose, or a dehydrating agent (e.g., ethyl acetate, acetic anhydride, absolute ethanol, ethyl acetate, acetic anhydride, and mixtures thereof). In some embodiments, the diluent does not comprise a tetracycline-solubilizing cosolvent.

In some embodiments, the diluent contains the divalent or trivalent cation. For example, some embodiments include kits that comprise a first container comprising a diluent that comprises an aqueous solution of a divalent or trivalent cation; and a second container comprising a solid composition soluble in the diluent, wherein the solid composition comprises minocycline in an amount such that the molar ratio of the divalent or trivalent cation to minocycline is greater than about 2:1. In some embodiments, the diluent comprises an acid, e.g., HCl. In some embodiments, the diluent comprises a buffer. In some embodiments, the buffer is sodium acetate.

More embodiments include kits comprising a first container comprising a diluent that comprises an aqueous solution of a divalent or trivalent cation; and a second container comprising a solid composition soluble in the diluent, wherein the solid composition comprises a tetracycline antibiotic in an amount such that the molar ratio of the divalent or trivalent cation to tetracycline antibiotic is greater than 3:1.

More embodiments include single use vials comprising any composition wherein the vial comprises an amount of a tetracycline of at least 100 µg, 200 µg, 300 µg, 400 µg, 500 µg,

QPEX001506

US 9,084,802 B2

19

600 μg, 700 μg, 800 μg, 900 μg, 1000 μg. In some embodiments, the vial comprises an amount of a tetracycline of at least 1 mg, 5 mg, 10 mg, 15 mg, 20 mg, 25 mg, 30 mg, 35 mg, 40 mg, 45 mg, 50 mg, 55 mg, 60 mg, 65 mg, 70 mg, 75 mg, 80 mg, 85 mg, 90 mg, 95 mg, 100 mg, 105 mg, 110 mg, 115 mg, 120 mg, 125 mg, and 130 mg. In some embodiments, the vial comprises an amount of a tetracycline of at least 100 mg, 200 mg, 300 mg, 400 mg, and 500 mg. In some embodiments, the vial comprises about 100 mg of a tetracycline. In some embodiments, the tetracycline is minocycline. In some embodiments, the tetracycline is tigecycline. In some such embodiments, a vial can comprise greater than 30 mg and less than 100 mg tigecycline.

Methods of Treatment

Some embodiments include methods of treating or preventing a bacterial infection in a subject by administering a composition described herein. "Treating," as used herein, refers to administering a pharmaceutical composition for therapeutic purposes to a patient suffering from a bacterial infection. "Preventing," as used herein, refers to treating a patient who is not yet infected, but who is susceptible to, or otherwise at risk of, a particular infection, whereby the treatment reduces the likelihood that the patient will develop an infection.

In some embodiments, the administration is via an intravenous route such as by administering an aqueous solution described herein intravenously.

Some such methods include administering an aqueous solution of minocycline and a divalent or trivalent cation to a subject via an intravenous route. Such solutions are described herein.

Some embodiments include administering an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a divalent or trivalent cation to a subject via an intravenous route, wherein the molar ratio of divalent or trivalent cation to tetracycline antibiotic is greater than about 3:1 and wherein the solution does not comprise gluconate or a pyridine-containing compound and has a pH greater than 2 and less than 7.

In some embodiments of intravenous administration, the compositions described herein permit use of lower volumes and faster infusion times due to increased concentrations of tetracycline antibiotic and reduced injection site phlebitis as compared to currently available intravenous formulations. In some embodiments, the total volume administered is less than 50 ml, less than 60 ml, less than 70 ml, less than 80 ml, less than 90 ml, less than 100 ml, less than 110 ml, less than 120 ml, less than 130 ml, less than 140 ml, less than 150 ml, less than 200 ml, less than 300 ml, less than 400 ml, less than 500 ml, or less than 1000 ml. In some embodiments, about 100 ml is administered. In some embodiments, the entire volume to be administered is administered in less than 10 minutes, less than 20 minutes, less than 30 minutes, less than 40 minutes, less than 50 minutes, less than 60 minutes, less than 70 minutes, less than 80 minutes, less than 90 minutes, less than 2 hours, less than 3 hours, or less than 4 hours. In some embodiments, the entire volume is administered in 20-70 minutes. In some embodiments, the entire volume is administered in 30-60 minutes.

Some embodiments include administering a composition described herein by a topical route. Examples of topical routes include skin, eye, ear, rectal, vaginal, urethral. Methods of such administration are well known in the art and can include aqueous solution, spray, suppository, salve, or an ointment or the like. Accordingly, some embodiments include administering an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a divalent or trivalent cation to a subject via a topical route. In some such embodiments, the

20

molar ratio of divalent or trivalent cation to tetracycline antibiotic is greater than about 3:1. In some embodiments, the solution does not comprise gluconate or a pyridine-containing compound. In some embodiments, the solution has a pH greater than 2 and less than 7.

Other embodiments include administering a composition described herein by pulmonary inhalation. For example, compositions may be administered by inhalation of an aerosol of the composition. The aerosol may be formed using dry particles of the composition or by nebulization of a solution of suspension of the composition. Any suitable aerosolization device may be used, including dry-powder inhalers, metered-dose inhalers, and nebulizers.

The following examples illustrate various embodiments of the invention and are not intended to limit the invention in any way.

EXAMPLES

Example 1

Stability at 37° C. for Solutions of Tigecycline or Tygacil® Containing Metal Cations

General procedures: Some of following examples include experiments in which the stabilities of various aqueous solutions of a tetracycline were analyzed. Some solutions included a carbohydrate and/or various molar amounts of metal salts.

The pH of the solutions were adjusted with hydrochloric acid or sodium hydroxide solution. The solutions were incubated at room temperature (approximately 22° C.) or at 37° C. Incubation of solutions at 37° C. was used as a model for long-term storage of solutions.

The stabilities of various aqueous solutions of a tetracycline were analyzed using HPLC. HPLC analyses were conducted on an Agilent 1200: Column: Eclipse Plus C18 4.6× 150 mm, 5 μm. Detection: UV at 248 nm. Flow rate: 1.2 mL/min. Tigecycline retention time=4.30 min. Gradient: Solvent A=0.1% trifluoroacetic acid in acetonitrile. Solvent B=0.1% trifluoroacetic acid in water. TABLE 1 shows the HPLC gradient used.

TABLE 1

| Time (min) | % Solvent A | % Solvent B |
|---|---|---|
| 0.0 | 5 | 95 |
| 9.5 | 50 | 50 |
| 10.0 | 5 | 95 |
| 15.0 | 5 | 95 |

A 10 mg/mL Tigecycline aqueous solution was prepared and 300 μL aliquots dispensed into polypropylene tubes. The volume of each tube was adjusted to 1 ml with various dilutions of 0.1 M $MgCl_2$, 0.1 M $CaCl_2$ or 0.1 M $ZnCl_2$ to achieve the desired molar ratio of Tigecycline:metal cation. The tubes were incubated in the dark at 37° C. Samples of each solution were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

A 10 mg/mL (17.08 mol/L) aqueous solution of Tygacil® (Lot D 90293, 53 mg), a commercial Tigecycline formulation containing lactose, was prepared, and 240 μL aliquots were dispensed into polypropylene tubes. The volume of each tube was adjusted to 1 ml with various dilutions of 0.1 M $MgCl_2$, 0.1 M $CaCl_2$ or 0.1 M $ZnCl_2$ to achieve the desired molar ratio of Tigecycline:metal cation. The tubes containing the solu-

QPEX001507

US 9,084,802 B2

21

tion were incubated in the dark at 37° C. Samples of each solution were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, and 7 for solutions of Tigecycline at various molar ratios with $MgCl_2$, $CaCl_2$, or $ZnCl_2$ are shown in TABLE 2, TABLE 3, and TABLE 4, respectively. The percentages of Tigecycline remaining at Day 0, 1, 2, 5, and 7 for solutions of Tygacil® at various ratios with $MgCl_2$, $CaCl_2$, or $ZnCl_2$ are shown in TABLE 5, TABLE 6, and TABLE 7, respectively.

TABLE 2

| $MgCl_2$:Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.42 | 98.93 | 97.68 | 92.31 | 85.95 |
| 5:1 | 99.45 | 98.85 | 97.30 | 88.64 | 81.41 |
| 2:1 | 99.50 | 98.57 | 96.85 | 84.95 | 73.95 |
| 1:1 | 99.64 | 98.64 | 96.70 | 82.54 | 67.87 |
| 0.5:1 | 99.60 | 98.45 | 96.52 | 79.39 | 62.20 |
| 0.2:1 | 99.56 | 98.44 | 95.91 | 72.81 | 53.83 |
| 0.1:1 | 99.50 | 98.29 | 95.66 | 67.28 | 48.68 |
| 0:1 | 99.53 | 98.23 | 95.18 | 58.42 | 40.90 |

TABLE 3

| $CaCl_2$:Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.49 | 99.02 | 97.89 | 91.88 | 86.31 |
| 5:1 | 99.44 | 98.66 | 97.31 | 87.13 | 80.87 |
| 2:1 | 99.38 | 98.06 | 96.66 | 83.63 | 75.05 |
| 1:1 | 99.58 | 98.33 | 96.54 | 81.30 | 70.18 |
| 0.5:1 | 99.56 | 98.61 | 96.15 | 76.00 | 64.81 |
| 0.2:1 | 99.58 | 98.47 | 95.99 | 72.84 | 57.19 |
| 0.1:1 | 99.56 | 98.32 | 95.66 | 67.89 | 49.75 |
| 0:1 | 99.49 | 98.17 | 94.98 | 59.11 | 39.31 |

TABLE 4

| $ZnCl_2$:Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.15 | 99.01 | 97.82 | 96.65 | 95.41 |
| 5:1 | 99.21 | 98.66 | 97.76 | 95.81 | 92.85 |
| 2:1 | 99.31 | 98.46 | 97.32 | 91.02 | 85.64 |
| 1:1 | 99.54 | 98.66 | 97.59 | 91.27 | 82.49 |
| 0.5:1 | 99.53 | 98.66 | 97.21 | 87.15 | 76.43 |
| 0.2:1 | 99.52 | 98.38 | 95.95 | 79.08 | 66.83 |
| 0.1:1 | 99.50 | 98.39 | 96.11 | 78.80 | 64.93 |
| 0:1 | 99.46 | 98.37 | 95.02 | 56.30 | 39.05 |

TABLE 5

| $MgCl_2$:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.61 | 99.38 | 98.97 | 96.51 | 93.52 |
| 5:1 | 99.47 | 99.46 | 98.83 | 95.38 | 90.55 |
| 2:1 | 99.49 | 99.32 | 98.72 | 93.20 | 84.03 |
| 1:1 | 99.63 | 99.38 | 98.55 | 89.21 | 74.30 |
| 0.5:1 | 99.59 | 99.28 | 98.36 | 86.97 | 68.84 |
| 0.2:1 | 99.54 | 99.26 | 98.43 | 86.41 | 64.91 |
| 0.1:1 | 99.48 | 99.19 | 98.19 | 72.43 | 44.71 |

22

TABLE 6

| $CaCl_2$:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.41 | 99.41 | 98.88 | 96.51 | 89.98 |
| 5:1 | 99.40 | 99.29 | 98.48 | 95.38 | 85.50 |
| 2:1 | 99.45 | 99.22 | 98.34 | 93.20 | 79.62 |
| 1:1 | 99.71 | 99.44 | 98.44 | 89.21 | 75.34 |
| 0.5:1 | 99.53 | 99.16 | 98.32 | 86.97 | 70.45 |
| 0.2:1 | 99.54 | 99.21 | 98.30 | 86.41 | 63.78 |
| 0:1 | 99.47 | 99.16 | 98.16 | 72.43 | 42.88 |

TABLE 7

| $ZnCl_2$:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.41 | 99.45 | 98.90 | 97.89 | 95.78 |
| 5:1 | 99.44 | 99.27 | 98.68 | 96.87 | 94.30 |
| 2:1 | 99.39 | 99.25 | 98.74 | 96.09 | 92.22 |
| 1:1 | 99.56 | 99.50 | 98.98 | 95.61 | 90.67 |
| 0.5:1 | 99.48 | 99.25 | 98.78 | 93.73 | 86.02 |
| 0.2:1 | 99.52 | 99.35 | 98.43 | 89.34 | 77.79 |
| 0:1 | 99.50 | 99.27 | 98.12 | 69.85 | 42.15 |

While Tigecycline decomposed in all tubes over 7 days, the rate of decomposition was significantly lower in solutions containing higher molar ratios of metal cation. The rates of Tigecycline decomposition in the presence of calcium or magnesium cations were similar; however, the rate of Tigecycline decomposition in the presence of zinc was significantly lower. The presence of lactose in the Tygacil® formulation further decreased the rate of decomposition.

Example 2

Stability at Room Temperature for Solutions of Tigecycline or Tygacil® Containing Metal Cations

A 10 mg/mL Tigecycline aqueous solution was prepared and 240 μL aliquots dispensed into polypropylene tubes. The volume of each tube was adjusted to 1 ml with various dilutions of 0.1 M $MgCl_2$, 0.1 M $CaCl_2$ or 0.1 M $ZnCl_2$ to achieve the desired molar ratio of Tigecycline:metal cation. The tubes were incubated in the dark at 37° C. Samples of each solution were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

A 10 mg/mL aqueous solution of Tygacil® (Lot D 90293, 53 mg) was prepared, and 240 μL aliquots were dispensed into polypropylene tubes. The volume of each tube was adjusted to 1 ml with various dilutions of 0.1 M $MgCl_2$, 0.1 M $CaCl_2$ or 0.1 M $ZnCl_2$ to achieve the desired molar ratio of Tigecycline:metal cation. The tubes were incubated in the dark at 37° C. Samples of each solution were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, 14, 21, 28, and 36 for solutions of Tigecycline at various molar ratios with $MgCl_2$, $CaCl_2$, or $ZnCl_2$ are shown in TABLE 8, TABLE 9, and TABLE 10, respectively. The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, 14, 21, 28, and 36 for solutions of Tygacil® at various ratios with $MgCl_2$, $CaCl_2$, or $ZnCl_2$ are shown in TABLE 11, TABLE 12, and TABLE 13, respectively.

QPEX001508

US 9,084,802 B2

23

24

### TABLE 8

| MgCl$_2$: Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 99.58 | 99.32 | 99.46 | 99.03 | 98.62 | 95.52 | 91.90 | 85.33 | 76.89 |
| 5:1 | 99.45 | 99.32 | 99.41 | 98.74 | 98.16 | 94.04 | 87.10 | 76.71 | 62.60 |
| 2:1 | 99.51 | 99.27 | 99.43 | 98.46 | 96.97 | 89.87 | 76.29 | 58.07 | 40.67 |
| 1:1 | 99.66 | 99.45 | 99.36 | 98.35 | 96.49 | 85.88 | 66.59 | 46.07 | 31.90 |
| 0.5:1 | 99.64 | 99.40 | 99.35 | 97.76 | 96.16 | 81.98 | 59.70 | 39.79 | 28.16 |
| 0.2:1 | 99.56 | 99.37 | 99.28 | 97.93 | 95.45 | 75.81 | 50.38 | 34.00 | 24.19 |
| 0:1 | 99.46 | 99.24 | 99.15 | 97.01 | 94.08 | 61.98 | 38.99 | 24.55 | 16.33 |

### TABLE 9

| CaCl$_2$: Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 99.58 | 99.34 | 99.41 | 99.05 | 98.59 | 95.45 | 92.00 | 86.92 | 82.47 |
| 5:1 | 99.48 | 99.25 | 99.27 | 98.66 | 98.13 | 93.61 | 88.60 | 81.75 | 74.95 |
| 2:1 | 99.37 | 99.27 | 99.25 | 98.03 | 97.16 | 91.36 | 82.92 | 72.83 | 62.43 |
| 1:1 | 99.57 | 99.38 | 99.30 | 98.53 | 96.92 | 89.14 | 78.35 | 65.46 | 53.22 |
| 0.5:1 | 99.59 | 99.30 | 99.30 | 98.32 | 96.54 | 86.26 | 72.73 | 58.20 | 45.11 |
| 0.2:1 | 99.48 | 99.32 | 99.27 | 97.94 | 95.75 | 80.93 | 61.83 | 45.47 | 26.69 |
| 0:1 | 99.44 | 99.29 | 99.17 | 96.76 | 93.75 | 60.72 | 38.08 | 23.94 | 15.72 |

### TABLE 10

| ZnCl$_2$: Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 99.24 | 98.99 | 99.49 | 99.30 | 99.19 | 97.49 | 97.63 | 96.09 | 94.32 |
| 5:1 | 99.29 | 99.13 | 99.05 | 99.27 | 99.16 | 97.40 | 95.98 | 92.80 | 90.60 |
| 2:1 | 99.34 | 99.23 | 99.51 | 99.06 | 98.82 | 95.79 | 93.63 | 86.84 | 80.66 |
| 1:1 | 99.53 | 99.39 | 99.47 | 99.03 | 98.48 | 94.61 | 88.48 | 79.03 | 69.44 |
| 0.5:1 | 99.50 | 99.39 | 99.33 | 98.76 | 96.77 | 90.07 | 78.03 | 65.63 | 54.07 |
| 0.2:1 | 99.46 | 99.37 | 99.33 | 98.24 | 96.50 | 85.72 | 69.89 | 55.13 | 41.97 |
| 0:1 | 99.44 | 99.39 | 99.12 | 97.28 | 93.31 | 59.45 | 37.09 | 23.57 | 15.48 |

### TABLE 11

| MgCl$_2$: Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 99.44 | 99.53 | 99.34 | 99.25 | 99.07 | 97.30 | 95.37 | 92.20 | 86.32 |
| 5:1 | 99.44 | 99.61 | 99.60 | 99.45 | 99.32 | 97.66 | 95.34 | 90.98 | 83.58 |
| 2:1 | 99.48 | 99.63 | 99.56 | 99.43 | 99.19 | 96.67 | 91.94 | 81.95 | 66.57 |
| 1:1 | 99.55 | 99.62 | 99.61 | 99.09 | 99.11 | 96.50 | 89.71 | 74.36 | 55.95 |
| 0.5:1 | 99.49 | 99.64 | 99.60 | 99.33 | 98.70 | 95.10 | 84.39 | 64.70 | 45.04 |
| 0.2:1 | 99.49 | 99.63 | 99.57 | 99.28 | 98.89 | 94.03 | 79.53 | 57.09 | 37.94 |
| 0:1 | 99.44 | 99.57 | 99.57 | 99.25 | 98.78 | 89.19 | 65.09 | 42.56 | 28.38 |

### TABLE 12

| CaCl$_2$: Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 99.32 | 99.51 | 99.45 | 99.50 | 99.26 | 97.41 | 95.08 | 92.06 | 87.88 |
| 5:1 | 99.35 | 99.51 | — | 99.33 | 99.02 | 97.36 | 93.42 | 88.57 | 82.75 |
| 2:1 | 99.40 | 99.67 | 99.46 | 99.25 | 98.97 | 95.76 | 90.00 | 81.77 | 72.75 |
| 1:1 | 99.49 | 99.60 | 99.54 | 99.39 | 99.02 | 95.44 | 88.25 | 77.42 | 65.65 |
| 0.5:1 | 99.48 | 99.60 | 99.49 | 99.30 | 98.55 | 94.80 | 85.57 | 71.96 | 58.07 |
| 0.2:1 | 99.44 | 99.57 | 99.53 | 99.27 | 98.89 | 92.70 | 80.03 | 62.28 | 47.05 |
| 0:1 | 99.45 | 99.60 | 99.55 | 99.18 | 98.70 | 88.02 | 63.58 | 40.77 | 28.00 |

QPEX001509

US 9,084,802 B2

25

26

TABLE 13

| ZnCl₂: Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 98.91 | 99.49 | 99.43 | 99.46 | 99.47 | 98.98 | 98.68 | 98.17 | 98.11 |
| 5:1 | 99.15 | 99.54 | 99.51 | 99.45 | 99.35 | 98.88 | 98.26 | 97.39 | 96.15 |
| 2:1 | 99.29 | 99.57 | 99.55 | 99.35 | 99.37 | 98.60 | 97.42 | 95.30 | 92.37 |
| 1:1 | 99.44 | 99.62 | 99.55 | 99.61 | 99.33 | 97.97 | 96.29 | 92.70 | 87.08 |
| 0.5:1 | 99.47 | 99.62 | 99.59 | 99.48 | 99.25 | 97.60 | 94.10 | 86.46 | 76.49 |
| 0.2:1 | 99.45 | 99.62 | 99.61 | 99.47 | 99.19 | 96.09 | 89.52 | 77.46 | 63.06 |
| 0:1 | 99.42 | 99.54 | 99.52 | 99.14 | 98.71 | 88.25 | 64.08 | 41.19 | 28.09 |

While Tigecycline decomposed in all tubes over 36 days, the rate of decomposition was significantly lower in solutions containing higher molar ratios of metal cation. The rates of Tigecycline decomposition in the presence of calcium or magnesium cations were similar; however, the rate of Tigecycline decomposition in the presence of zinc was significantly lower. The presence of lactose in the Tygacil® formulation further decreased the rate of decomposition.

### Example 3

Stability at 37° C. For Tygacil Solutions Containing High Concentrations of Metal Cations

A 10 mg/mL aqueous solution of Tygacil® (Lot D 90293, 53 mg) was prepared, and 300 μL aliquots were dispensed into polypropylene tubes. The volume of each tube was adjusted to 1 ml with various dilutions of 1 M MgCl₂, 1 M CaCl₂ or 1 M ZnCl₂ to achieve the desired molar ratio of Tigecycline:metal cation. The tubes were incubated in the dark at 37° C. Samples of each solution were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, 14, and 21 for solutions of Tygacil® at various ratios with MgCl₂, CaCl₂, or ZnCl₂ are shown in TABLE 14, TABLE 15, and TABLE 16, respectively.

TABLE 14

| MgCl₂: Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 |
|---|---|---|---|---|---|---|---|
| 30:1 | 99.64 | 99.59 | 99.49 | 98.54 | 97.11 | 89.62 | 77.13 |
| 20:1 | 99.61 | 99.56 | 99.23 | 97.99 | 95.94 | 85.04 | 63.47 |
| 12:1 | 99.58 | 99.53 | 99.14 | 96.74 | 94.45 | 77.71 | 46.81 |
| 5:1 | 99.68 | 99.56 | 99.6 | 96.06 | 91.18 | 59.13 | 25.95 |
| 0:1 | 99.65 | 99.23 | 98.26 | 75.05 | 46.66 | 6.37 | 1.30 |

TABLE 15

| CaCl₂: Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 |
|---|---|---|---|---|---|---|---|
| 30:1 | 99.58 | 99.55 | 99.29 | 97.79 | 95.9 | 86.94 | 69.71 |
| 20:1 | 99.62 | 99.54 | 99.18 | 97.00 | 93.81 | 80.6 | 55.28 |
| 12:1 | 99.60 | 99.41 | 98.94 | 94.94 | 91.13 | 69.3 | 40.59 |
| 5:1 | 99.65 | 99.42 | 98.66 | 92.83 | 85.72 | 53.1 | 24.74 |
| 0:1 | 99.60 | 99.34 | 98.25 | 74.61 | 45.63 | 6.26 | 1.53 |

TABLE 16

| ZnCl₂: Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 |
|---|---|---|---|---|---|---|---|
| 12:1 | 99.44 | 99.27 | 99.49 | 97.42 | 97.66 | 92.50 | 83.58 |
| 5:1 | 99.48 | — | 99.22 | 97.42 | 96.21 | 87.22 | 71.55 |
| 0:1 | 99.62 | — | 98.22 | 73.43 | 43.3 | 6.37 | 1.57 |

While Tigecycline decomposed in all tubes over 21 days, the rate of decomposition was significantly lower in solutions containing higher molar ratios of metal cation. The rates of Tigecycline decomposition in the presence of calcium or magnesium cations were similar; however, the rate of Tigecycline decomposition in the presence of zinc was significantly lower.

### Example 4

Effect of pH on the Stability of Tygacil® Solutions Containing Metal Cations at 37° C.

A 10 mg/mL aqueous solution of Tygacil® (Lot D 90293, 53 mg) was prepared, and 16504 aliquots were dispensed into four 15 mL polypropylene tubes. The volume of each tube was adjusted to 5500 μL with various dilutions of 0.1 M MgCl₂, 0.1 M CaCl₂, or 0.1 M ZnCl₂, or water (control), to achieve the desired molar ratio of a 1:1 ratio of Tigecycline: metal cation. Sample solutions from each 15 ml tube were taken and adjusted to pH 4, 5, or 6 with 0.1 N or 1 N solutions of NaOH or HCl, taking care to minimize volume changes. Samples solutions were incubated in the dark at 37° C. Samples were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline (expressed as a percentage of the starting concentration) in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, and 14 for solutions of Tygacil® at 1:1 ratios with MgCl₂, CaCl₂, or ZnCl₂ at various pHs are shown in TABLE 17, TABLE 18, and TABLE 19, respectively. TABLE 20 shows percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, and 14 for solutions of Tygacil® only at various pHs

TABLE 17

| pH for 1:1 MgCl₂: Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.51 | 98.89 | 98.89 | 95.72 | 90.92 | 54.54 |
| pH 5 | 99.55 | 99.09 | 98.00 | 84.77 | 63.60 | 15.89 |
| pH 6 | 99.53 | 98.36 | 95.79 | 44.81 | 23.71 | 5.19 |

US 9,084,802 B2

27

### TABLE 18

| pH for 1:1 CaCl₂: Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.49 | 99.88 | 98.84 | 94.43 | 90.06 | 55.91 |
| pH 5 | 99.66 | 99.02 | 97.8 | 81.96 | 69.23 | 28.89 |
| pH 6 | 99.62 | 98.70 | 97.87 | 92.45 | 87.40 | 56.79 |

### TABLE 19

| pH for 1:1 ZnCl₂: Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.47 | 98.62 | 99.03 | 96.14 | 93.15 | 73.25 |
| pH 5 | 99.6 | 99.21 | 98.96 | 93.02 | 83.48 | 39.93 |
| pH 6 | 99.54 | 99.3 | 99.16 | 94.58 | 86.35 | 49.21 |

### TABLE 20

| pH for Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.48 | 99.07 | 98.93 | 94.28 | 87.05 | 44.75 |
| pH 5 | 99.6 | 98.94 | 96.89 | 49.21 | 27.49 | 2.16 |
| pH 6 | 99.47 | 95.27 | 59.56 | 10.74 | 2.4 | 5.22 |

28

### TABLE 21

| pH for 12:1 MgCl₂: Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.47 | 98.62 | 99.18 | 97.49 | 95.72 | 83.14 |
| pH 5 | 99.61 | 98.87 | 99.12 | 96.53 | 93.72 | 69.08 |
| pH 6 | 99.58 | 99.26 | 99.21 | 95.6 | 96.96 | 85.86 |

### TABLE 22

| pH for 12:1 CaCl₂: Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.48 | 97.24 | 98.89 | 96.01 | 92.85 | 73.05 |
| pH 5 | 99.74 | 99.36 | 99.41 | 97.64 | 95.94 | 89 |
| pH 6 | 99.61 | 99.44 | 99.48 | 98 | 97.09 | 92.18 |

### TABLE 23

| pH for 12:1 ZnCl₂: Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.49 | 99.29 | 99.36 | 98.73 | 98.35 | 95.19 |
| pH 5 | 99.56 | 99.47 | 99.47 | 98.38 | 98.04 | 93.38 |
| pH 6 | 99.65 | 99.38 | 99.49 | 98.78 | 98.79 | 97.67 |

While Tigecycline decomposed in all tubes over 14 days, the rate of decomposition was significantly lower in solutions with a pH lower than pH 6. The rates of Tigecycline decomposition in the presence of calcium or magnesium cations were similar at pH 4 and 5; however, the rate of Tigecycline decomposition in the presence of magnesium at pH 6 was significantly greater. The rate of Tigecycline decomposition at pH 4 and 5 in solutions containing zinc was lower than solutions containing magnesium or calcium. The rates of Tigecycline decomposition at pH 6, in solutions containing zinc or calcium were similar. The rate of Tigecycline decomposition at all pHs was much lower in the presence of metal cations, especially at higher pH.

### Example 5

Effect of pH on the Stability of Tygacil® Solutions Containing High Concentrations of Metal Cations at 37° C.

A 10 mg/mL aqueous solution of Tygacil® (Lot D 90293, 53 mg) was prepared, and 1650 μL aliquots were dispensed into four 15 mL polypropylene tubes. The volume of each tube was adjusted to 5500 μL with various dilutions of 1 M MgCl₂, 1 M CaCl₂, or 1 M ZnCl₂, or water (control), to achieve the desired molar ratio of a 1:12 ratio of Tigecycline: metal cation. Sample solutions from each 15 ml tube were taken and adjusted to pH 4, 5, or 6 with 0.1 N or 1 N solutions of NaOH or HCl, taking care to minimize volume changes. Samples solutions were incubated in the dark at 37° C. Samples were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, and 14 for solutions of Tygacil® at 1:12 ratios with MgCl₂, CaCl₂, or ZnCl₂ at various pHs are shown in TABLE 21, TABLE 22, and TABLE 23, respectively.

While tigecycline decomposed in all tubes over 14 days, the rate of decomposition was slower in solutions at pH 6. The rates of Tigecycline decomposition in the presence of calcium were slower in solutions at greater pH. When formulated as Tygacil, the rates of tigecycline decomposition in the presence of zinc or magnesium were faster at pH 5.

### Example 6

Effect of pH on the Stability of Minocycline Solutions Containing High Concentrations of MgCl₂ at 37° C.

A 10 mg/mL Minocycline hydrochloride aqueous solution was prepared, and 2500 μL aliquots were dispensed into two 15 mL polypropylene tubes. The volume of each tube was adjusted to 5500 μL with either a dilution of 1 M MgCl₂ to achieve a molar ratio of a 1:10 ratio of Minocycline:metal cation, or water. Sample solutions from each 15 ml tube were taken and adjusted to pH 4, 5, or 6 with 0.1 N or 1 N solutions of NaOH or HCl, taking care to minimize volume changes. Sample solutions were incubated in the dark at 37° C. Samples were taken at various time points and analyzed by HPLC. The fraction of minocycline remaining in each sample was determined.

The percentages of Minocycline remaining at Day 0, 1, 2, 5, 7, and 14 for solutions at various pHs of Minocycline at 1:10 ratio with MgCl₂, or Minocycline alone are shown in TABLE 24, and TABLE 25, respectively.

### TABLE 24

| pH for 10:1 MgCl₂: Minocycline | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 98.63 | 96.97 | 96.46 | 94.76 | 93.43 | 84.32 |
| pH 5 | 98.69 | 97.05 | 96.19 | 93.01 | 89.31 | 75.42 |
| pH 6 | 99.03 | 97.1 | 96.04 | 88.45 | 83.88 | 76.25 |

QPEX001511

US 9,084,802 B2

29

**TABLE 25**

| pH for Minocycline alone | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 98.75 | 96.37 | 96.21 | 94.99 | 92.78 | 81.82 |
| pH 5 | 98.41 | 96.72 | 95.29 | 85.01 | 75.14 | 35.43 |
| pH 6 | 98.19 | 95.47 | 87.55 | 39.17 | 14.56 | 2.2 |

While Minocycline decomposed in all tubes over 14 days, the rate of decomposition was significantly lower in solutions containing magnesium, especially at higher pH.

Example 7

Stability of Tigecycline Solutions Containing Mixtures of CaCl₂ and MgCl₂ at pH 6 and 37° C.

A 10 mg/mL aqueous solution of Tigecycline was prepared, and 450 µL aliquots were dispensed into 15 mL polypropylene tubes. The volume of each tube was adjusted to 1500 µL with various dilutions of 1 M MgCl₂, 1 M CaCl₂, or water (control), to achieve the desired molar ratios of Tigecycline:metal cation. Sample solutions from each 15 ml tube were taken and adjusted to pH 6 with 0.1 N or 1 N solutions of NaOH or HCl, taking care to minimize volume changes. Samples solutions were incubated in the dark at 37° C. Samples were taken at various time points and analyzed by HPLC. The fraction of Tigecycline remaining in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, 14, and 21 for solutions of at various ratios of Tigecycline: MgCl₂:CaCl₂ at pH are shown in TABLE 26.

**TABLE 26**

| MgCl₂:CaCl₂: tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 |
|---|---|---|---|---|---|---|---|
| 5:5:1 | 98.25 | 98.77 | 98.02 | 96.91 | 92.13 | 83.64 | 65.21 |
| 5:10:1 | 98.37 | 98.23 | 98.59 | 97.76 | 96.10 | 89.74 | 79.83 |
| 10:5:1 | 98.17 | 98.21 | 98.46 | 96.59 | 93.90 | 80.00 | 59.39 |
| 10:10:1 | 98.32 | 98.24 | 98.50 | 97.38 | 95.62 | 87.14 | 72.88 |
| 5:0:1 | 98.18 | 97.93 | 97.53 | 90.58 | 76.71 | 40.42 | 12.54 |
| 10:0:1 | 98.16 | 98.00 | 98.23 | 94.91 | 89.12 | 62.54 | 35.75 |
| 15:0:1 | 98.25 | 98.13 | 98.21 | 96.23 | 92.32 | 72.15 | 48.75 |
| 20:0:1 | 98.2 | 98.08 | 98.28 | 96.46 | 93.72 | 78.66 | 57.66 |
| 0:5:1 | 98.11 | 98.15 | 98.28 | 97.19 | 95.68 | 89.2 | 77.2 |
| 0:10:1 | 98.18 | 98.2 | 98.55 | 97.1 | 96.53 | 91.74 | 84.69 |
| 0:15:1 | 98.15 | 98.21 | 98.89 | 97.5 | 96.93 | 92.71 | 86.37 |
| 0:20:1 | 98.28 | 98.63 | 98.57 | 97.4 | 97.35 | 93.09 | 87.45 |
| 0:0:1 | 97.91 | 88.97 | 60.59 | 16.36 | 7.33 | 4.14 | 0 |

While Tigecycline decomposed in all tubes over 21 days, the rate of decomposition was significantly lower in solutions containing greater relative amounts of calcium cations.

Example 8

Effects of MgCl₂ on Minocyline-Induced Hemolysis in an In Vitro Model of Venous Phlebitis

In vitro hemolysis of rabbit red blood cells (RBCs) after exposure to minocycline formulated in MgCl₂ or CaCl₂ was compared to in vitro hemolysis of RBCs after exposure to minocycline in saline, or exposure to amphotericin b. Minocycline HCl (LKT laboratories) stock solutions were prepared with MgCl₂ in saline, saline, or lactated ringer, and the pH was adjusted with NaOH. Rabbit and sheep red blood

30

cells (RBCs) were obtained from Innovative Research laboratory (Michigan, USA). Immediately before use, RBCs were washed three times in 0.9% saline and adjusted to a density of 5% in saline. 200 µl RBCs was added to 800 µl minocycline solution, and mixed by gentle inversion for 2-5 seconds. Samples were incubated at 37° C. or 30 minutes or at 25° C. for 2-5 minutes. Incubated samples were centrifuged at 12000×g for 4 minutes and the supernatants were removed and the hemoglobin absorbance was read at 540 nm. Samples were tested in triplicate. Amphotericin B (MP Biomedicals) and distilled H₂O, or Triton-x and distilled H₂O were used as positive controls; saline was used as a negative control. Percent hemolysis was calculated according to the following formula:

$$\text{Percent hemolysis} = (\text{absorbance of sample}) - (\text{absorbance of blank}) / \text{Absorbance of Distilled } H_2O \times 100 / \text{Absorbance of Distilled } H_2O$$

In a set of experiments, the pH of minocycline solutions formulated with divalent cations was adjusted to pH 5.85. For RBCs incubated in a minocycline saline solution, hemolysis was in the range of 44%-84% (FIG. 1). For RBCs incubated in a minocycline with Mg²⁺ or Ca²⁺, hemolysis was approximately 2%. Results summarizing the percent in vitro hemolysis of rabbit RBCs incubated with different formulations of minocycline or amphoterin B at 25° C. are summarized in Table 27.

**TABLE 27**

| Solution | Hemolysis of RBCs in solution relative to water (%) |
|---|---|
| 5 mg/ml minocycline, 10 equiv Mg, pH 5.85 | 2.8 |
| 2.5 mg/ml minocycline, 10 equiv Mg, pH 5.85 | 3.2 |
| 0.5 mg/ml minocycline, 10 equiv Mg, pH 5.85 | 2.3 |
| 5 mg/ml minocycline, 5 equiv Ca, pH 5.85 | 2.2 |
| 2.5 mg/ml minocycline, 5 equiv Ca, pH 5.85 | 2.94 |
| 0.5 mg/ml minocycline, 5 equiv Ca, pH 5.85 | 2.20 |
| 5 mg/ml minocycline, saline, pH 4.17 | 81.64 |
| 2.5 mg/ml minocycline, saline, pH 4.17 | 84.37 |
| 0.5 mg/ml minocycline, saline, pH 4.17 | 43.82 |
| Amphoterin B | 101.31 |

In another set of experiments, the pH of a minocycline solution formulated with divalent cations was not adjusted and was allowed to fall below the pH of minocycline in saline. For RBCs incubated in a minocycline saline solution, hemolysis was in the range of 44%-84% (FIG. 2). For RBCs incubated in a minocycline with Mg²⁺ or Ca²⁺, hemolysis was in the range of 0%-5%. Results summarizing the percent in vitro hemolysis of rabbit RBCs incubated with different formulations of minocycline at low pH, or amphoterin B at 25° C. are summarized in Table 28.

**TABLE 28**

| Solution | Hemolysis of RBCs in solution relative to water (%) |
|---|---|
| 5 mg/ml minocycline, 10 equiv Mg, pH 3.5 | 0.88 |
| 2.5 mg/ml minocycline, 10 equiv Mg, pH 3.5 | 1.12 |
| 0.5 mg/ml minocycline, 10 equiv Mg, pH 3.5 | 2.20 |
| 5 mg/ml minocycline, 5 equiv Ca, pH 3.64 | — |

US 9,084,802 B2

31

TABLE 28-continued

| Solution | Hemolysis of RBCs in solution relative to water (%) |
|---|---|
| 2.5 mg/ml minocycline, 5 equiv Ca, pH 3.64 | 0.86 |
| 0.5 mg/ml minocycline, 5 equiv Ca, pH 3.64 | 4.92 |
| 5 mg/ml minocycline, saline, pH 4.17 | 81.64 |
| 2.5 mg/ml minocycline, saline, pH 4.17 | 84.37 |
| 0.5 mg/ml minocycline, saline, pH 4.17 | 43.82 |
| Amphoterin B | 101.31 |

Hemolysis of RBCs was reduced in an in vitro model of venous phlebitis with minocycline solutions formulated with divalent cations compared to minocycline solutions formulated without divalent cations.

In another set of experiments, hemolysis of rabbit RBCs was measured after exposure to 2.5 mg/ml minocycline formulated with different rations of divalent cations (MgCl$_2$, MgSO$_4$, or CaCl$_2$). Hemolysis was compared to Minocycline HCl; Triton-x and H$_2$O were used as positive controls. Results are summarized in Table 29 and shown in FIGS. **4-6**.

TABLE 29

| 2.5 mg/ml minocycline solution | | |
|---|---|---|
| Cation | Molar ratio cation:minocycline | Hemolysis of RBCs in solution relative to water (%) |
| MgSO$_4$ | 1:2 | 22.52 |
| | 1:1 | 24.59 |
| | 2:1 | 40.87 |
| | 3:1 | 25.67 |
| | 5:1 | 2.86 |
| | 7:1 | 1.96 |
| | 10:1 | 0.19 |
| MgCl$_2$ | 1:2 | 46.91 |
| | 1:1 | 63.77 |
| | 2:1 | 74.87 |
| | 3:1 | 64.62 |
| | 5:1 | 9.43 |
| | 7:1 | 1.57 |
| | 10:1 | 0.35 |

32

TABLE 29-continued

| 2.5 mg/ml minocycline solution | | |
|---|---|---|
| Cation | Molar ratio cation:minocycline | Hemolysis of RBCs in solution relative to water (%) |
| CaCl$_2$ | 1:2 | 75.22 |
| | 1:1 | 83.89 |
| | 2:1 | 50.84 |
| | 3:1 | 26.58 |
| | 5:1 | 1.16 |
| | 7:1 | 0.75 |
| | 10:1 | 0.40 |
| Minocycline only | | 37.44 |
| Triton-x | | 97.82 |

FIG. **3** and FIG. **4** show the degree of rabbit RBC hemolysis produced by minocycline formulated in different ratios of MgSO$_4$ or MgCl$_2$, respectively, compared to Minocycline only. The data indicates that a 5:1 molar ratio of magnesium to minocycline or greater inhibits the RBC hemolysis observed with minocycline alone. Minocycline (minocin) produced a relative RBC hemolysis of 37%. FIG. **5** shows the degree of rabbit RBC hemolysis produced by minocycline formulated in different ratios of CaCl$_2$. This data shows that a 5:1 molar ratio of calcium to minocycline inhibits the RBC hemolysis observed with minocycline HCl alone.

Overall, these data all suggest that high molar ratios (e.g., a 5:1 molar ratio or greater) of divalent cation (Mg$^{+2}$ or Ca$^{+2}$) to minocycline results in significant inhibition of rabbit RBC hemolysis observed with minocycline HCl.

Example 9

Solubility of Minocycline with Divalent Cations

Mixtures were prepared containing minocycline and divalent cations (Mg$^{2+}$ or Ca$^{2+}$) at varying stoichiometry and pH. The solubility of minocycline was assessed according to the turbidity of the mixture at 0 hr, 24 hr, 48 hr, 72 hr, 96 hr, 120 hr, 144 hr, and 168 hr. A clear solution denoted complete solubility. Table 30 summarizes data for minocycline with Mg$^{2+}$ at 0 hr and 24 hr. Table 31 summarizes data for minocycline with Ca$^{2+}$ at 0 hr and 24 hr.

TABLE 30

| | | Molar ratio cation (Mg$^{2+}$):Minocycline | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0 | | 1:2 | | 1:1 | | 2:1 | | 3:1 | | 5:1 | | 7:1 | | 10:1 |
| Time (hr) | | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 |
| 1 mg/ml minocycline | pH 4 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 5 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 6 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 7 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| 5 mg/ml minocycline | pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 5 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 6 | ○ | ○ | ○ | ● | ● | ● | ● | ● | ● | ● | ○ | ● | ○ | ● | ○ | ○ |
| 10 mg/ml minocycline | pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 5 | ○ | ○ | ○ | ○ | ○ | ● | ○ | ● | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 6 | ○ | ○ | ● | ● | ● | ● | ○ | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| 20 mg/ml minocycline | pH 4 | ○ | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 5 | ○ | ○ | | | | | | | | | ○ | ● | ○ | ● | ○ | ● |
| 30 mg/ml minocycline | pH 4 | ○ | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 5 | ○ | ● | | | | | | | | | ○ | ● | ○ | ● | ○ | ● |

●: insoluble;
○: soluble

APPX000160

US 9,084,802 B2

33

34

TABLE 31

| | | 0 | | 1:2 | | 1:1 | | 2:1 | | 3:1 | | 5:1 | | 7:1 | | 10:1 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time (hr) | | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 |
| 1 mg/ml | pH 4 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 6 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 7 | ○ | ○ | | | | | | | | | ○ | ● | ○ | ● | ○ | ● |
| 5 mg/ml | pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 6 | ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| 10 mg/ml | pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | | | | | | | | | | |
| minocycline | pH 5 | ○ | ○ | ○ | ○ | ○ | ○ | | | | | | | | | | |
| | pH 6 | ○ | ○ | ○ | ○ | ○ | ○ | | | | | | | | | | |
| 20 mg/ml | pH 4 | ○ | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| 30 mg/ml | pH 4 | ○ | ● | | | | | | | | | ○ | ● | ○ | ● | ○ | ● |
| minocycline | pH 5 | ○ | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |

●: insoluble;
○: soluble

The data demonstrates that minocycline stays in solution upon introduction of a cation at concentrations of 10 mg/ml and less if the pH is less than 5. At higher pH, introduction of a cation initially reduces solubility. For example, a 5 mg/ml minocycline solution at pH 6 becomes insoluble on addition of Mg$^{2+}$. Surprisingly, at a molar ratio of cation:minocycline of 5:1 or more, the minocycline of such solutions becomes soluble, suggesting that high ratios of cation increases the solubility of minocycline.

Table 32 summarizes data for minocycline with Mg$^{2+}$ at 48 hr and 72 hr.

TABLE 32

| | | 0 | | 1:2 | | 1:1 | | 2:1 | | 3:1 | | 5:1 | | 7:1 | | 10:1 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time (hr) | | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 |
| 1 mg/ml | pH 4 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 6 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 7 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| 5 mg/ml | pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| | pH 6 | ○ | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ○ | ○ |
| 10 mg/ml | pH 4 | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ● | ● | ○ | ○ | ● | ○ | ● | ● | ● | ● | ● | ○ | ○ | ○ | ● | ○ |
| | pHm 6 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ○ |
| 20 mg/ml | pH 4 | ● | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ● | ● | | | | | | | | | ● | ● | ● | ● | ● | ● |
| 30 mg/ml | pH 4 | ● | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| minocycline | pH 5 | ● | ● | | | | | | | | | ● | ● | ● | ● | ● | ● |

●: insoluble;
○: soluble

## Example 10

### Long-Term Stability of Tigecycline at Various Temperatures

Table 33, Table 34, and Table 35 show percentage remaining tigecycline for different formulations of tigecycline at pH 6, stored at 37° C., room temperature, and 4° C., respectively. Formulations of tigecycline comprising increasing concentrations of tigecycline and increasing concentrations of CaCl$_2$ showed increased stability.

TABLE 33

| Salt | Formulation stored at 37° C. | Stability of tigecycline (%) | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0 day | 1 day | 2 days | 5 days | 7 days | 14 days |
| MgCl$_2$ | 12 eq 20 mg/mL | 97.97 | 97.43 | 96.37 | 92.63 | 88.41 | |
| | 5 eq 20 mg/mL | 98.09 | 97.38 | 96.42 | 88.64 | 81.62 | |

TABLE 33-continued

| Salt | Formulation stored at 37° C. | Stability of tigecycline (%) | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0 day | 1 day | 2 days | 5 days | 7 days | 14 days |
| | 2 eq 20 mg/mL | 97.95 | 97.28 | 94.1 | 80.59 | 69.88 | |
| | 12 eq 3 mg/mL | 98.17 | 98.05 | 97.08 | 93.78 | 88.16 | |

APPX000161

US 9,084,802 B2

35

### TABLE 33-continued

| Salt | Formulation stored at 37° C. | Stability of tigecycline (%) | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0 day | 1 day | 2 days | 5 days | 7 days | 14 days |
| | 5 eq 3 mg/mL | 98.3 | 97.72 | 96.77 | 86.97 | 73.76 | |
| | 2 eq 3 mg/mL | 98.21 | 97.22 | 93.75 | 62.21 | 45.31 | |
| CaCl$_2$ | 12 eq 20 mg/mL | 98.3 | 98 | 97.63 | 96.1 | 95.24 | 91.44 |
| | 5 eq 20 mg/mL | 98.16 | 97.75 | 97.4 | 95.82 | 94.81 | 89.26 |
| | 2 eq 20 mg/mL | 98.25 | 97.85 | 97.22 | 95.28 | 93.64 | 88.61 |
| | 12 eq 3 mg/mL | 98.29 | 98.03 | 97.74 | 96.79 | 95.92 | 91.07 |
| | 5 eq 3 mg/mL | 98.21 | 97.96 | 97.32 | 95.37 | 94.42 | 86.36 |
| ZnCl$_2$ | 2 eq 3 mg/mL | 98.17 | 97.74 | 96.57 | 92.99 | 90.22 | |
| | 1 eq 20 mg/mL | 98.26 | 97.19 | 93.86 | 81.02 | 72.41 | |
| | 1 eq 3 mg/mL | 98.29 | 97.88 | 96.73 | 86.5 | 74.32 | |

### TABLE 34

| Salt | Formulation stored at room temperature | Stability of tigecycline (%) | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0 day | 7 days | 14 days | 28 days | 42 days | 58 days |
| MgCl$_2$ | 12 eq 20 mg/mL | 97.97 | 96.56 | 93.4 | 79.44 | | |
| | 5 eq 20 mg/mL | 98.09 | 94.2 | 82.17 | | | |
| | 2 eq 20 mg/mL | 97.95 | 87.57 | 67.91 | | | |
| | 12 eq 3 mg/mL | 98.17 | 97.22 | 94.91 | 80.14 | | |
| | 5 eq 3 mg/mL | 98.3 | 96.45 | 89.91 | | | |
| | 2 eq 3 mg/mL | 98.21 | 92.66 | 66.91 | | | |
| CaCl$_2$ | 12 eq 20 mg/mL | 98.3 | 97.91 | 97.36 | 95.69 | 95.32 | 93.02 |
| | 5 eq 20 mg/mL | 98.16 | 97.88 | 97.23 | 95.24 | 94.08 | 90.78 |
| | 2 eq 20 mg/mL | 98.25 | 97.97 | 97.08 | 94.42 | 93.08 | 87.95 |
| | 12 eq 3 mg/mL | 98.29 | 98.01 | 97.7 | 96.37 | 95.78 | 93.67 |
| | 5 eq 3 mg/mL | 98.21 | 97.84 | 97.29 | 95.39 | 94.22 | 90.37 |
| | 2 eq 3 mg/mL | 98.17 | 97.53 | 96.47 | 92.85 | 90.07 | 79.52 |
| ZnCl$_2$ | 1 eq 20 mg/mL | 98.26 | 82.44 | 65.73 | | | |
| | 1 eq 3 mg/mL | 98.29 | 97.11 | 93.1 | | | |

### TABLE 35

| Salt | Formulation stored at 4° C. | Stability of tigecycline (%) | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0 day | 14 days | 28 days | 35 days | 58 days | 162 days |
| MgCl$_2$ | 12 eq 20 mg/mL | 97.97 | 97.68 | 96.16 | 95.36 | 89.95 | |

36

### TABLE 35-continued

| Salt | Formulation stored at 4° C. | Stability of tigecycline (%) | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0 day | 14 days | 28 days | 35 days | 58 days | 162 days |
| | 5 eq 20 mg/mL | 98.09 | 96.22 | 78.05 | 69.76 | | |
| | 2 eq 20 mg/mL | 97.95 | 91.23 | 54.38 | 43.33 | | |
| | 12 eq 20 mg/mL | 98.17 | 97.76 | 95.76 | 94.19 | 80.31 | |
| | 5 eq 3 mg/mL | 98.3 | 97.48 | 91.75 | 86.21 | | |
| | 2 eq 3 mg/mL | 98.21 | 96.23 | 84.6 | 76.81 | | |
| CaCl$_2$ | 12 eq 20 mg/mL | 98.3 | 98.28 | 97.78 | 97.61 | 97.87 | 96.4 |
| | 5 eq 20 mg/mL | 98.16 | 97.97 | 97.65 | 97.79 | 97.78 | 95.22 |
| | 2 eq 20 mg/mL | 98.25 | 98.08 | 97.69 | 97.8 | 97.75 | 94.9 |
| | 12 eq 3 mg/mL | 98.29 | 98.37 | 98.16 | 97.79 | 98.15 | 97.27 |
| | 5 eq 3 mg/mL | 98.21 | 98.17 | 97.97 | 97.76 | 97.99 | 96.75 |
| | 2 eq 3 mg/mL | 98.17 | 98.14 | 97.45 | 97.53 | 97.56 | 93.35 |
| ZnCl$_2$ | 1 eq 20 mg/mL | 98.26 | 77.12 | 53.06 | 45.63 | | |
| | 1 eq 3 mg/mL | 98.29 | 97.73 | 96.38 | 95.02 | 88.53 | |

### Example 11

Solubility of Tetracycline Formulations

The solubility of four non-dimethylamino tetracyclines, with and without Mg$^{2+}$, was examined. The results are summarized in Table 36.

### TABLE 36

| | | Molar ratio cation (Mg$^{2+}$):antibiotic | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 0 | 0.5:1 | 1:1 | 2:1 | 3:1 | 5:1 | 7:1 | 10:1 |
| 10 mg/ml tetracycline | pH 4 | ● | ● | ● | ● | ● | ● | ● | ● |
| | pH 5 | ● | | | | | | | |
| | pH 6 | ● | ● | ● | ● | ● | | | |
| 10 mg/ml chlortetracycline | pH 4 | ● | | | | | ○ | ○ | ○ |
| | pH 5 | ● | | | | | | ● | ● |
| | pH 6 | ● | | | | | ● | ● | ● |
| 10 mg/ml doxycycline | pH 4 | ○ | | | | | | | |
| | pH 5 | ○ | | | | | | | |
| | pH 6 | | | | | | ○# | ○# | ○# |
| 10 mg/ml oxytetracycline | pH 4 | ● | | | | | | | |
| | pH4 | ● | | | | | ● | ○ | ○ |
| | pH 5 | ● | | | | | ● | ○ | ○ |

●: insoluble;
○: soluble;
# fell out of solution after 24 hrs at room temperature

A comparison with the results for minocycline described in Example 9 indicates that non-dimethylamino-tetracylines, such as tetracycline, chlortetracycline, doxycycline, and oxytetracycline have solubility characteristics that differ from dimethylamino-tetracylines. For example, as summarized in Table 36, tetracycline remains insoluble at various pH and amounts of a divalent cation such as Mg$^{2+}$. Chlortetracycline becomes soluble with increasing concentrations of a divalent cation, but remains insoluble in the absence of any divalent cation, such as Mg$^{2+}$. Doxycycline is soluble in the

QPEX001515

US 9,084,802 B2

37

absence of divalent cations, such as $Mg^{2+}$, but is insoluble in the presence of divalent cations at low pH. Similarly, oxytetracycline remains insoluble in the presence of divalent cations, such as $Mg^{2+}$, at low pH.

## Example 12

### Study of the Effect of $Mg^{2+}$ on the Uptake of Minocycline in Human Umbilical Vein Endothelial Cells (HUVEC)

Cells and reagents: Human umbilical vein endothelial cells (HUVEC) were purchased from Lonza and maintained according to manufacturer's recommendations in EGM-2 media. A 10 mg/mL solution of minocycline was prepared in 13.6 mg/mL Na-acetate without addition of Mg. This stock solution was further diluted in saline to 1 mg/mL with addition of Mg in the form of 1 M $MgSO_4$ to generate the following molar ratios of Mg to minocycline: 0, 1, 2.5, 5, 10, 25.

Uptake experimental conditions: HUVECs were seeded at $4.5 \times 10^5$ cells/well density in 6-well plates in EGM-2 media. Two days after seeding, cells were washed once with 2 mL of saline, and then 2 mL of 1 mg/mL drug solution in saline prepared as described above was placed in each well in triplicate. Plates were incubated in a $CO_2$ incubator at 37° C. for 30 min. Drug solutions were aspirated and cells were washed once with 2 mL of saline. 0.5 mL of saline was placed in each well and the cell monolayer was scraped using a plastic cell scraper. Cell suspensions were transferred to 1.5 mL plastic tubes and sonicated for 30 sec at maximal power. Cell lysates were spun down for 10 min on a table top microcentrifuge at maximum speed and supernatants were collected. Several wells of HUVEC cells were treated with saline only and processed the same way as drug-treated cells to generate mock cell lysate which was used below for calibration curve preparation.

Sample preparation for LCMS analysis: To prepare a calibration curve, 1 mg/mL minocycline solution in water was diluted in mock cell lysate to produce 100 µl of standards with the following concentrations: 10, 5, 2, 1, 0.5, 0.2, 0.1, 0.05, 0.02, 0.01 µg/ml.

50 µl of supernatants from drug-treated samples or standards were mixed with 200 µl of 1% trifluoroacetic acid in acetonitrile containing 1 µg/mL of gatifloxacin, vortexed and centrifuged at 3000 g for 30 min at RT. 150 µl of supernatants was removed and mixed with 450 µl of water. After vortexing, the mixture was centrifuged at 3000 g for 5 min at RT. Supernatants were collected and subjected to LCMS analysis to determine minocycline concentration.

Data processing: Uptake data were presented as percentage relative to the sample with no Mg present, which was considered as 100%.

Uptake of minocycline at 1 mg/mL in saline with various Mg/minocycline ratios was tested in HUVEC with an incubation time was 30 min. The results are summarized in FIG. 6 and FIG. 7. FIGS. 6 and 7 demonstrate that a decrease in intracellular uptake of minocycline is observed as the concentration of a divalent cation, such as $Mg^{2+}$ increases. While not being bound by any particular theory, this result suggests that the mechanism for the reduction in hemolysis observed in the minocycline/cation formulations described herein may be attributed to reduced RBC uptake.

38

## Example 13

### Preparing Certain Formulations of Dimethylamino-Tetracyclines

Formulation 1

A formulation comprising minocycline with $MgCl_2$ and NaOH suitable for intravenous administration is prepared. 100 mg minocycline is added to a 10 ml aqueous solution of $MgCl_2.6H_2O$ to provide a cation to minocycline molar ratio of 5:1 and a 10 mg/ml minocycline solution. The pH of the mixture is adjusted by adding NaOH to a pH in the range of pH 4.5-pH 5.5. A single attempt of lyophilization resulted in a non-flocculent solid.

Formulation 2

A formulation comprising minocycline with $MgSO_4$ and sodium acetate suitable for intravenous administration is prepared. 100 mg minocycline is added to an aqueous solution of $MgSO_4.7H_2O$ to provide a cation to minocycline molar ratio of 5:1 and a 10 mg/ml minocycline solution. The pH of the solution is adjusted by adding sodium acetate to a pH in the range of pH 4.5-pH 5.5. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 4.5-pH 5.5 and an osmolality in the range of 275 mOsm/kg-375 mOsm/kg.

Formulation 3

A formulation comprising minocycline with $Mg(C_2H_3O_2)_2$ suitable for intravenous administration is prepared. 100 mg minocycline is added to an aqueous solution of $Mg(C_2H_3O_2)_2.3H_2O$ to provide a cation to minocycline molar ratio of 5:1 and a 10 mg/ml minocycline solution. The solution is then lyophilized to dryness.

Formulation 4

A formulation comprising minocycline with $MgSO_4$ and NaOH suitable for intravenous administration is prepared. 100 mg minocycline is added to an aqueous solution of $MgSO_4.7H_2O$ to provide a cation to minocycline molar ratio of 5:1 and a 10 mg/ml minocycline solution. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 4.5-pH 5.5. The solution is lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 4.5-pH 5.5 and an osmolality in the range of 150 mOsm/kg-250 mOsm/kg.

Formulation 5

A formulation comprising tigecycline with $MgSO_4$ and NaOH suitable for intravenous administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $MgSO_4.7H_2O$ to provide a cation to tigecycline molar ratio of 5:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 5.5-pH 6.5. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 5.5-pH 6.5.

Formulation 6

A formulation comprising tigecycline with $MgSO_4$ and NaOH suitable for intravenous administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $MgSO_4.7H_2O$ to provide a cation to tigecycline molar ratio of 12:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 5.5-pH 6.5. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 5.5-pH 6.5.

Formulation 7

A formulation comprising tigecycline with $MgCl_2$ and NaOH suitable for intravenous administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of

QPEX001516

**39**

$MgCl_2.6H_2O$ to provide a cation to tigecycline molar ratio of 5:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 5.5-pH 6.5. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 5.5-pH 6.5.

Formulation 8

A formulation comprising tigecycline with $MgCl_2$ and NaOH suitable for intravenous administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $MgCl_2.6H_2O$ to provide a cation to tigecycline molar ratio of 12:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 5.5-pH 6.5. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 5.5-pH 6.5.

Formulation 9

A formulation comprising tigecycline with $MgSO_4$ and NaOH suitable for topical administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $MgSO_4.7H_2O$ to provide a cation to tigecycline molar ratio of 5:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 6.0-pH 7.0. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 6.0-pH 7.0.

Formulation 10

A formulation comprising tigecycline with $MgSO_4$ and NaOH suitable for topical administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $MgSO_4.7H_2O$ to provide a cation to tigecycline molar ratio of 12:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 6.0-pH 7.0. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 6.0-pH 7.0.

Formulation 11

A formulation comprising tigecycline with $CaCl_2$ and NaOH suitable for topical administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $CaCl_2.6H_2O$ to provide a cation to tigecycline molar ratio of 5:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 6.0-pH 7.0. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 6.0-pH 7.0.

Formulation 12

A formulation comprising tigecycline with $CaCl_2$ and NaOH suitable for topical administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $CaCl_2.6H_2O$ to provide a cation to tigecycline molar ratio of 12:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 6.0-pH 7.0. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 6.0-pH 7.0.

Example 14

Minocycline Kits

Kit 1

A kit is prepared comprising two vials. The first vial is prepared by dissolving 108 mg minocycline HCl in an acidic solution. The solution is lyophilized to dryness. The second vial contains 10 ml diluent that includes 26.9 mg/ml $MgSO_4.7H_2O$ and 13.6 mg/mL $Na(C_2H_3O_2)_2.3H_2O$. The lyophile is then reconstituted with the diluent prior to use.

**40**

Kit 2

A kit is prepared comprising two vials. The first vial is prepared by dissolving 108 mg minocycline HCl in an acidic solution. The solution is lyophilized to dryness. The second vial contains 10 ml diluent that includes 26.9 mg/ml $MgSO_4.7H_2O$ and enough NaOH to adjust the pH to approximately 5. The lyophile is then reconstituted with the diluent prior to use.

All references cited herein, including but not limited to published and unpublished applications, patents, and literature references, are incorporated herein by reference in their entirety and are hereby made a part of this specification. To the extent publications and patents or patent applications incorporated by reference contradict the disclosure contained in the specification, the specification is intended to supersede and/or take precedence over any such contradictory material. The term "comprising" as used herein is synonymous with "including," "containing," or "characterized by," and is inclusive or open-ended and does not exclude additional, unrecited elements or method steps. All numbers expressing quantities of ingredients, reaction conditions, and so forth used in the specification are to be understood as being modified in all instances by the term "about." Accordingly, unless indicated to the contrary, the numerical parameters set forth herein are approximations that may vary depending upon the desired properties sought to be obtained. At the very least, and not as an attempt to limit the application of the doctrine of equivalents to the scope of any claims in any application claiming priority to the present application, each numerical parameter should be construed in light of the number of significant digits and ordinary rounding approaches.

The above description discloses several methods and materials of the present invention. This invention is susceptible to modifications in the methods and materials, as well as alterations in the fabrication methods and equipment. Such modifications will become apparent to those skilled in the art from a consideration of this disclosure or practice of the invention disclosed herein. Consequently, it is not intended that this invention be limited to the specific embodiments disclosed herein, but that it cover all modifications and alternatives coming within the true scope and spirit of the invention.

What is claimed is:

**1**. A method of treating a bacterial infection in a subject, wherein the method consists of:

    administering a therapeutically effective amount of a composition to a subject in need thereof via an intravenous route of administration,

    wherein the composition consists of an aqueous solution consisting of minocycline or a salt thereof, a salt that comprises a magnesium cation, and a base,

    wherein the molar ratio of magnesium cation to minocycline is greater than about 4:1, and

    wherein the composition has a pH that is no less than 4 and no greater than 6,

    whereby injection site hemolysis of red blood cells is reduced relative to intravenous administration of a composition that does not include magnesium.

**2**. The method of claim **1**, wherein the concentration of minocycline in the composition is at least 0.1 mg/ml.

**3**. The method of claim **1**, wherein the concentration of minocycline in the composition is at least 1 mg/ml.

**4**. The method of claim **1**, wherein the concentration of minocycline in the composition is at least 5 mg/ml.

**5**. The method of claim **1**, wherein the concentration of minocycline in the composition is at least 10 mg/ml.

**6**. The method of claim **1**, wherein the composition has a pH between about 4.5 to about 6.

US 9,084,802 B2

41

**7**. The method of claim **1**, wherein the composition has a pH between about 4.5 to about 5.5.

**8**. The method of claim **1**, wherein the molar ratio of magnesium cation to minocycline is greater than or equal to 5:1.

**9**. The method of claim **1**, wherein the molar ratio of magnesium cation to minocycline is from 5:1 to 10:1.

**10**. The method of claim **1**, wherein the osmolality of the solution is less than 500 mOsm/kg.

**11**. The method of claim **1**, wherein the osmolality of the solution is less than 400 mOsm/kg.

**12**. The method of claim **1**, wherein the osmolality of the solution is less than 350 mOsm/kg.

**13**. The method of claim **1**, wherein the salt that comprises a magnesium cation is magnesium sulfate.

**14**. The method of claim **1**, wherein the salt that comprises a magnesium cation is magnesium acetate.

**15**. The method of claim **1**, wherein the salt that comprises a magnesium cation is magnesium chloride.

**16**. The method of claim **1**, wherein the base is NaOH.

**17**. The method of claim **1**, wherein the total volume of the composition administered is less than 1000 ml.

**18**. The method of claim **1**, wherein the total volume of the composition administered is less than 500 ml.

**19**. The method of claim **1**, wherein the total volume of the composition administered is less than 200 ml.

42

**20**. The method of claim **1**, wherein the total volume of the composition administered is less than 110 ml.

**21**. The method of claim **1**, wherein the composition is administered in less than 60 minutes.

**22**. The method of claim **1**, wherein the composition is administered in less than 40 minutes.

**23**. The method of claim **1**, wherein the composition is administered in less than 20 minutes.

**24**. The method of claim **1**, wherein the amount of minocycline in the composition is at least 80 mg.

**25**. The method of claim **1**, wherein the amount of minocycline in the composition is at least 100 mg.

**26**. The method of claim **1**, wherein the amount of minocycline in the composition is about 100 mg.

**27**. The method of claim **1**, wherein the amount of minocycline in the composition is at least 130 mg.

**28**. The method of claim **1**, wherein the amount of minocycline in the composition is at least 200 mg.

**29**. The method of claim **1**, wherein the amount of minocycline in the composition is at least 300 mg.

**30**. The method of claim **1**, wherein the amount of minocycline in the composition is at least 400 mg.

**31**. The method of claim **1**, wherein the amount of minocycline in the composition is at least 500 mg.

*     *     *     *     *

QPEX001518

US009278105B2

(12) **United States Patent**       (10) **Patent No.:**      **US 9,278,105 B2**
Griffith et al.                      (45) **Date of Patent:**      ***Mar. 8, 2016**

(54) **TETRACYCLINE COMPOSITIONS**

(71) Applicant: **Rempex Pharmaceuticals, Inc.**, San Diego, CA (US)

(72) Inventors: **David C. Griffith**, San Marcose, CA (US); **Serge Boyer**, San Diego, CA (US); **Michael N. Dudley**, San Diego, CA (US); **Scott Hecker**, Del Mar, CA (US)

(73) Assignee: **Rempex Pharmaceuticals, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/654,018**

(22) Filed: **Oct. 17, 2012**

(65) **Prior Publication Data**

US 2013/0040918 A1     Feb. 14, 2013

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US2011/036351, filed on May 12, 2011.

(60) Provisional application No. 61/334,106, filed on May 12, 2010, provisional application No. 61/392,304, filed on Oct. 12, 2010.

(51) **Int. Cl.**
*A01N 47/00* (2006.01)
*A61K 31/21* (2006.01)
*A61K 31/65* (2006.01)
*A61K 9/00* (2006.01)
*A61K 47/02* (2006.01)

(52) **U.S. Cl.**
CPC .............. *A61K 31/65* (2013.01); *A61K 9/0019* (2013.01); *A61K 47/02* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,736,725 A | 2/1956 | Ritter |
| 2,980,584 A | 4/1961 | Hammer |
| 3,166,474 A | 1/1965 | Remmers et al. |
| 3,226,436 A | 12/1965 | Petisi et al. |
| 3,232,834 A | 2/1966 | Gordon et al. |
| 3,275,513 A | 9/1966 | Nash |
| 3,335,055 A | 8/1967 | Weidenheimer |
| 3,957,980 A | 5/1976 | Noseworthy |
| 4,038,315 A | 7/1977 | Tobkes |
| 4,060,605 A | 11/1977 | Cotti |
| 4,086,332 A | 4/1978 | Armstrong |
| 4,701,320 A | 10/1987 | Hasegawa et al. |
| 5,075,295 A | 12/1991 | Zupan et al. |
| 5,494,903 A | 2/1996 | Hlavka |

| | | |
|---|---|---|
| 6,193,994 B1 | 2/2001 | Lee et al. |
| 6,245,735 B1 | 6/2001 | Pier |
| 6,310,053 B1 | 10/2001 | Patterson |
| 6,375,982 B1 | 4/2002 | Cherukuri |
| 6,406,717 B2 | 6/2002 | Cherukuri |
| 6,589,556 B2 | 7/2003 | Cherukuri |
| 6,825,178 B1 | 11/2004 | Pier |
| 7,229,641 B2 | 6/2007 | Cherukuri |
| 7,485,319 B2 | 2/2009 | Devries et al. |
| 7,820,641 B2 | 10/2010 | Nelson et al. |
| 7,879,828 B2 | 2/2011 | Fawzi et al. |
| 2002/0042394 A1 | 4/2002 | Hogenkamp et al. |
| 2002/0187188 A1 | 12/2002 | Cherukuri |
| 2003/0083318 A1 | 5/2003 | Julien et al. |
| 2003/0171340 A1 | 9/2003 | Isbister |
| 2004/0077601 A1 | 4/2004 | Adams et al. |
| 2004/0131628 A1 | 7/2004 | Bratzler et al. |
| 2004/0202725 A1 | 10/2004 | Dascalu |
| 2004/0235801 A1 | 11/2004 | Julien et al. |
| 2005/0019396 A1 | 1/2005 | deVries et al. |
| 2005/0038002 A1* | 2/2005 | Nelson et al. ................. 514/152 |
| 2005/0084490 A1 | 4/2005 | Adams et al. |
| 2006/0141054 A1 | 6/2006 | Piccariello |
| 2006/0183719 A1* | 8/2006 | deVries et al. ............... 514/152 |
| 2006/0247181 A1 | 11/2006 | Fawzi et al. |
| 2007/0243244 A1* | 10/2007 | Shah et al. ................. 424/456 |
| 2007/0282001 A1 | 12/2007 | Chi |
| 2008/0015352 A1 | 1/2008 | Piccariello |
| 2008/0020065 A1 | 1/2008 | Cherukuri |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| BE | 905528 | 2/1987 |
| BR | 9804395 | 6/2000 |
| CN | 1390550 | 1/2003 |
| CN | 1562045 | 1/2005 |
| CN | 101254156 | 9/2008 |
| CN | 101607086 | 12/2009 |
| CN | 101822650 | 9/2010 |
| CN | 101940560 | 1/2011 |
| DE | 1228252 | 11/1957 |
| DE | 1053734 | 6/1957 |
| DE | 1144721 | 4/1961 |
| DE | 2659152 | 12/1976 |

(Continued)

OTHER PUBLICATIONS

Yamaguchi et al., "Transport of Divalent Cations with Tetracycline as Mediated by the Transposon Tn10-encoded Tetracycline Resistance Protein," The Journal of Biological Chemistry, vol. 265, No. 9, Issue of Mar. 25, 1990, pp. 4809-4813.*

(Continued)

*Primary Examiner* — Craig Ricci
*Assistant Examiner* — Jared D Barsky
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear LLP

(57)       **ABSTRACT**

The present invention relates to compositions, pharmaceutical compositions, and methods for preparing the same, comprising a tetracycline with improved stability and solubility. Some embodiments include a tetracycline with an excess of a divalent or trivalent cation.

**60 Claims, 7 Drawing Sheets**

Melinta v. Nexus
21-cv-02636
**PTX 2**

APPX000166

QPEX001344

**US 9,278,105 B2**

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2008/0188445 A1 | 8/2008 | Muldoon et al. |
| 2008/0233206 A1* | 9/2008 | Chomczynski ............... 424/641 |
| 2008/0248124 A1 | 10/2008 | Eguchi |
| 2009/0035229 A1 | 2/2009 | Eirew |
| 2009/0035393 A1 | 2/2009 | Geibel et al. |
| 2009/0111780 A1 | 4/2009 | Giordano |
| 2009/0275660 A1 | 11/2009 | Chauhan |
| 2010/0010101 A1 | 1/2010 | Cherukuri |
| 2010/0129448 A1 | 5/2010 | Talton |
| 2011/0059177 A1 | 3/2011 | Thatte |
| 2014/0194393 A1 | 7/2014 | Griffith et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0184389 | 6/1986 |
| EP | 0271374 | 11/1987 |
| EP | 337733 | 10/1988 |
| EP | 0536515 | 4/1993 |
| EP | 1578434 | 9/2005 |
| EP | 1902706 | 3/2008 |
| ES | 324597 | 7/1989 |
| GB | 793558 | 4/1958 |
| GB | 809015 | 2/1959 |
| GB | 812138 | 4/1959 |
| GB | 845454 | 9/1960 |
| GB | 879629 | 10/1961 |
| GB | 901107 | 7/1962 |
| GB | 947601 | 1/1964 |
| GB | 948090 | 1/1964 |
| GB | 1120821 | 7/1968 |
| IN | 183807 | 4/2000 |
| JP | 61130228 | 6/1986 |
| JP | 11286448 | 10/1999 |
| JP | 11292767 | 10/1999 |
| JP | 2008-533146 | 8/2008 |
| RU | 2273232 C2 | 1/2005 |
| WO | WO 96/01634 | 1/1996 |
| WO | WO 00/07601 | 2/2000 |
| WO | WO 01/92288 | 12/2001 |
| WO | WO 02/15848 | 2/2002 |
| WO | WO 03/066064 | 9/2003 |
| WO | WO 2004/000223 | 12/2003 |
| WO | WO 2004/004658 | 1/2004 |
| WO | WO 2005/009416 | 2/2005 |
| WO | WO 2005/011707 | 2/2005 |
| WO | WO 2006/002868 | 1/2006 |
| WO | WO 2006/078925 | 7/2006 |
| WO | WO 2006/130501 | 12/2006 |
| WO | WO 2007/075794 | 7/2007 |
| WO | WO 2008/121107 | 10/2008 |
| WO | WO 2009/035818 | 3/2009 |
| WO | WO 2009/059191 | 5/2009 |
| WO | WO 2009/076454 | 6/2009 |
| WO | WO 2009/120389 | 10/2009 |
| WO | WO 2009155931 A1 * | 12/2009 |
| WO | WO 2010/022031 | 2/2010 |
| WO | WO 2010/034003 | 3/2010 |
| WO | WO 2010/034011 | 3/2010 |
| WO | WO 2010033800 A2 * | 3/2010 |
| WO | WO 2010/046932 | 4/2010 |
| WO | WO 2010/091124 | 8/2010 |
| WO | WO 2011/008760 | 1/2011 |

OTHER PUBLICATIONS

Mason et al. "Pharmacology of Tetracycline Water Medication in Swine," Journal of Animal Science, Oct. 2009, vol. 87, No. 10, pp. 3179-3186 (Abstract).*

Gonzales et al., "Effect of intravenous magnesium sulfate on chronic obstructive pulmonary disease exacerbations requiring hospitalization: a randomized placebo-controlled trial," Arch Bronconeumol, Oct. 2006;42(10):491.*

Jian-Chu et al., "A multi-center randomized clinical study of minocycline hydrochloride on the treatment of respiratory and urinary track infections", Chinese J Antibiot. (2008) 8:0483-0486, 0498.

Xuan et al., "Hydrolysis and photolysis of oxytetracycline in aqueous solution", J Environ Scie Health, Part B (2010) 45(1):73-81.

International Search Report and Written Opinion dated Nov. 11, 2011 for International Patent Application No. PCT/US2011/036351, filed May 12, 2011.

International Preliminary Report on Patentability dated Jul. 31, 2012 for International Patent Application No. PCT/US2011/036351, filed May 12, 2011.

Chinese First Office Action dated Feb. 10, 2014 for Application No. 201180033194.X, filed Jan. 4, 2013.

Chinese First Office Action dated Nov. 3, 2014 for Application No. 201180033194.X, filed Jan. 4, 2013.

Columbian Technical Report/Search dated Jul. 11, 2014 for Application No. 12-225411, filed Dec. 2012.

European Supplementary Search Report dated May 8, 2014 for Application No. 11781314.7, filed Dec. 10, 2012.

New Zealand Examination Report dated Jul. 11, 2013 for Application No. 603764, filed May 12, 2011.

New Zealand Further Examination Report dated Nov. 24, 2014 for Application No. 603764, filed May 12, 2011.

Singapore Search Report and Written Opinion dated Dec. 18, 2014 for Application No. 2012082905, filed May 12, 2011.

Light, Richard W., et al., Laboratory and Animal Investigations Comparison of the Effectiveness of Tetracycline and Minocycline as Pleural Sclerosing Agents in Rabbits*, Aug. 1994, pp. 577-582, 106 / 2; downloaded from http://journal.publications.chestnet.org, on May 9, 2013.

Triax Pharmaceuticals, LLC, Minocin® Minocycline for Injection 100 Mg/Vial Intravenous, Aug. 2010, pp. 3-19, NDA 50-444/S-047.

Bogardus et al., "Solubility of doxycycline in aqueous solutions" Journal of Pharmaceutical Sciences (1979) 68:188-194.

Chow et al., "Formulation of hydrophilic non-aqueous gel: drug stability in different solvents and rheological behavior of gel matrices", Pharm Res. (2008) 25(1):207-217. Epub Oct. 2, 2007.

Jochsberger T. "Differential Pulse Polarography of Tetracycline: Determination of Complexing Tendencies of Tetracycline Analogs in the Presence of Cations", Journal of Pharmaceutical Sciences 1 (1979) vol. 68 1061-1063.

Miyazaki S. et al., "A comparison of solubility characteristics of free bases and hydrochloride salts of tetracycline antibiotics in hycrochloric acid solutions" Chem. Pharm. Bull. (1975) 23:1197-1204.

Pawelczyk et al., "Kinetics of drug decomposition. Part 74. Kinetics of degradation of minocycline in aqueous solution", Pol J Pharmacol Pharm. (1982) 34(5-6):409-421.

Schramm, G., Schweizerische Apotheker-Zeitung (1976), 114(16), 361-6.

Anonymous, Russian Website Medstream, "The antibiotic is able to treat stroke", Online Oct. 9, 2009 at http://medstream.ru/news/28775.html.; 4 pages.

Radar Medication Guide, "Omnipak (Omipaque)", last update Jul. 31, 2003; Russian website at http://www.rlsnet.ru/tn__index_id__2438.htm; 14 pages.

Pfizer Drug Instructions; "Sirmione (SERMION)", Dec. 2010, Russian Website at http://medi.ru/doc/g84gnou68.htm; 11 pages.

Russian Office Action dated Apr. 1, 2015 for Application No. 2012147527, filed Nov. 8, 2012.

Japanese Office Action dated Apr. 6, 2015 for Application No. 2013-510322, filed May 12, 2011.

* cited by examiner

Case: 25-1281     Document: 14     Page: 212     Filed: 02/20/2025



In Vitro Hemolysis of Rabbit Red Blood Cell With Amphotericin B and Different Formulations of Minocycline at 25°C

*FIG. 1*

QPEX001346

Case: 25-1281       Document: 14       Page: 213       Filed: 02/20/2025



*FIG. 2*

APPX000169

QPEX001347

Case: 25-1281    Document: 14    Page: 214    Filed: 02/20/2025



Rabbit Red Blood Cell Hemolysis Produced by 2.5 mg/ml of Minocin compared to Mino-Mg (using MgSO₄)

*FIG. 3*

QPEX001348

Case: 25-1281      Document: 14      Page: 215      Filed: 02/20/2025



Rabbit Red Blood Cell Hemolysis Produced by 2.5 mg/ml of Minocin compared to Mino-Mg (using $MgCl_2$)

*FIG. 4*

QPEX001349

Case: 25-1281     Document: 14     Page: 216     Filed: 02/20/2025



Rabbit Red Blood Cell Hemolysis Produced by 2.5 mg/ml of Minocin compared to Mino-Ca (using $CaCl_2$)

*FIG. 5*

QPEX001350



*FIG. 6*

QPEX001351



*FIG. 7*

US 9,278,105 B2

1

# TETRACYCLINE COMPOSITIONS

## RELATED APPLICATIONS

This application is a continuation of International Application No. PCT/US2011/036351 filed on May 12, 2011, which claims priority to U.S. Provisional Application No. 61/392,304 filed Oct. 12, 2010, and to U.S. Provisional Application No. 61/334,106 filed May 12, 2010, the contents of which are incorporated herein by reference in their entireties.

## FIELD OF THE INVENTION

The present invention relates to tetracycline compositions and methods for preparing and using the same. Some embodiments include a tetracycline with an excess of a divalent or trivalent cation.

## BACKGROUND OF THE INVENTION

Tetracyclines are used as broad spectrum antibiotics to treat various bacterial infections, such as infections of the respiratory tract, sinuses, middle ear, urinary tract, and intestines, and can be used in the treatment of gonorrhoea, especially in patients allergic to β-lactams and macrolides. Tetracyclines interfere with the protein synthesis of Gram positive and Gram-negative bacteria by preventing the binding of aminoacyl-tRNA to the ribosome. The action of tetracyclines is bacteriostatic (preventing growth of bacteria) rather than killing (bactericidal).

Tetracyclines degrade rapidly to form epitetracycline, anhydrotetracycline, epianhydrotetracycline, and other degradation products. Once degraded, tetracyclines have small therapeutic value, since the degradation products have no therapeutically useful activity. Degradation begins as soon as the antibiotic is in solution, and continues until reaching an equilibrium of antibiotic and epimer concentrations. The equilibrium point is temperature and pH dependent, with more epimer being formed at higher temperatures and lower pH. Oxidation and other side reactions cause further degradation. Thus, tetracyclines can have a limited existence in aqueous environments in their active form. Moreover, the degradation products of tetracyclines are toxic and can cause Fanconi syndrome, a potentially fatal disease affecting proximal tubular function in the nephrons of the kidneys.

There is a need to provide hospital staff with the flexibility and advantages that come with longer admixture and reconstitution times without the need for refrigeration so that for instance, a hospital pharmacist could prepare a solution the day before it is needed. Furthermore, often after a natural disaster such as hurricanes, earthquakes, or tsunamis, access to refrigeration equipment can be scarce and may be further impeded by the lack of electricity. Stable formulations of tetracyclines could be stored as a solution, negating the need for reconstitution, and allowing its use in inhalers or nebulizers for outpatient use.

In addition, some tetracyclines can cause tetracycline-induced hemolysis. This hemolysis can lead to venous phlebitis at the site of injection when administered intravenously, resulting in irritation and potentially limiting the volumes of infusion that can be tolerated. Thus, there is a need for formulations of such tetracyclines that reduce the incidence of hemolysis.

## SUMMARY OF THE INVENTION

The present invention relates to tetracycline compositions and methods for preparing and using the same. Some embodiments include a tetracycline with an excess of a divalent or trivalent cation.

2

Some embodiments include pharmaceutical compositions. In some embodiments the pharmaceutical compositions comprise an aqueous solution of minocycline and a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to minocycline is greater than 2:1 and wherein the solution does not comprise a pharmaceutically acceptable oil and is suitable for intravenous administration.

In some embodiments the pharmaceutical compositions comprise an aqueous solution of minocycline and a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to minocycline is greater than 2:1 and wherein the solution has a pH greater than 4 and less than 5 and is suitable for intravenous administration.

In some embodiments the pharmaceutical compositions comprise an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to 7-dimethylamino-tetracycline antibiotic is greater than 3:1 and wherein the solution does not comprise a pharmaceutically acceptable oil, gluconate, or a pyridine-containing compound, has a pH greater than 2 and less than 7, and is suitable for intravenous administration.

In some embodiments, the solution does not comprise polyoxyethylene hydrogenated castor oil.

In some embodiments, the solution does not comprise an antioxidant.

In some embodiments, the solution does not comprise a pyridine-containing compound.

In some embodiments, the solution does not comprise nicotinamide.

In some embodiments, the solution does not comprise an alcohol.

In some embodiments, the solution does not comprise glycerol.

In some embodiments, the solution does not comprise polyethylene glycol.

In some embodiments, the solution does not comprise gluconate.

In some embodiments, the solution does not comprise a pyrrolidone compound.

In some embodiments, the solution does not comprise a water-miscible local anaesthetic.

In some embodiments, the water-miscible local anaesthetic is procaine.

In some embodiments, the solution does not comprise urea.

In some embodiments, the solution does not comprise lactose.

In some embodiments, the solution does not comprise a dehydrating agent. In some embodiments, the dehydrating agent is selected from the group consisting of ethyl acetate, acetic anhydride, absolute ethanol, ethyl acetate, acetic anhydride, and mixtures thereof.

In some embodiments, the solution has a pH of less than 7. In some embodiments, the solution has a pH of less than 6. In some embodiments, the solution has a pH of less than 5. In some embodiments, the solution has a pH greater than 2 and less than 7. In some embodiments, the solution has a pH greater than 4 and less than 7. In some embodiments, the solution has a pH greater than 4 and less than 6. In some embodiments, the solution has a pH greater than 4 and less than 5.

In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 3:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 5:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is

QPEX001353

US 9,278,105 B2

3

greater than 8:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 10:1.

In some embodiments, the osmolality of the solution is less than 500 mOsm/kg. In some embodiments, the osmolality of the solution is less than 400 mOsm/kg.

In some embodiments, the osmolality of the solution is less than 350 mOsm/kg. In some embodiments, the concentration of minocycline is at least 1 mg/ml. In some embodiments, the concentration of minocycline is at least 5 mg/ml. In some embodiments, the concentration of minocycline is at least 10 mg/ml.

In some embodiments, the solution comprises magnesium sulfate. In some embodiments, the solution comprises magnesium oxide. In some embodiments, the solution comprises magnesium acetate. In some embodiments, the solution comprises magnesium chloride.

In some embodiments, the solution comprises a buffer. In some embodiments, the solution comprises acetate.

In some embodiments, the solution comprises a base. In some embodiments, the base comprises NaOH.

In some embodiments, the cation is selected from iron, copper, zinc, manganese, nickel, cobalt, aluminum, calcium, magnesium and gallium. In some embodiments, the cation is selected from magnesium, calcium, and zinc. In some embodiments, the cation is magnesium.

In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and a glycylcycline. In some embodiments, the glycylcycline is tigecycline. In some embodiments, the 7-dimethylamino-tetracycline is minocycline. In some embodiments, the 7-dimethylamino-tetracycline is PTK796.

Some embodiments include pharmaceutical compositions comprising 10 mg/ml minocycline, $MgCl_2$, and NaOH, wherein the Mg to minocycline molar ratio is 5:1, and the pH is greater than 4.5 and less than 5.5.

Some embodiments include pharmaceutical compositions comprising 10 mg/ml minocycline, $MgSO_4$, and sodium acetate, wherein the Mg to minocycline molar ratio is 5:1, the pH is greater than 4.5 and less than 5.5, and the osmolality is greater than 275 mOsm/kg and less than 375 mOsm/kg.

Some embodiments include pharmaceutical compositions comprising 10 mg/ml minocycline and $Mg(C_2H_3O_2)_2$, wherein the Mg to minocycline molar ratio is 5:1, and the pH is greater than 4.5 and less than 5.5.

Some embodiments include pharmaceutical compositions comprising 10 mg/ml minocycline, $MgSO_4$, and NaOH, wherein the Mg to minocycline molar ratio is 5:1, the pH is greater than 4.5 and less than 5.5, and the osmolality is greater than 150 mOsm/kg and less than 250 mOsm/kg.

Some embodiments include pharmaceutical compositions comprising 5 mg/ml tigecycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 5:1, and the pH is greater than 5.5 and less than 6.5.

Some embodiments include pharmaceutical compositions comprising 5 mg/ml tigecycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 12:1, and the pH is greater than 5.5 and less than 6.5.

Some embodiments include pharmaceutical compositions comprising 5 mg/ml tigecycline, $MgCl_2$, and NaOH, wherein the Mg to tigecycline molar ratio is 5:1, and the pH is greater than 5.5 and less than 6.5.

Some embodiments include pharmaceutical compositions comprising 5 mg/ml tigecycline, $MgCl_2$, and NaOH, wherein the Mg to tigecycline molar ratio is 12:1, and the pH is greater than 5.5 and less than 6.5.

Some embodiments include pharmaceutical compositions suitable for topical administration comprising 5 mg/ml tige-

4

cycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 5:1, and the pH is greater than 6.0 and less than 7.0.

Some embodiments include pharmaceutical compositions suitable for topical administration comprising 5 mg/ml tige-cycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 12:1, and the pH is greater than 6.0 and less than 7.0.

Some embodiments include pharmaceutical compositions suitable for topical administration comprising 5 mg/ml tige-cycline, $CaCl_2$, and NaOH, wherein the Ca to tigecycline molar ratio is 5:1, and the pH is greater than 6.0 and less than 7.0.

Some embodiments include pharmaceutical compositions suitable for topical administration comprising 5 mg/ml tige-cycline, $CaCl_2$, and NaOH, wherein the Ca to tigecycline molar ratio is 12:1, and the pH is greater than 6.0 and less than 7.0.

Some embodiments include water-soluble solid compositions comprising minocycline or a salt thereof and a salt that comprises a divalent or trivalent cation.

Some embodiments include water-soluble solid compositions comprising a 7-dimethylamino-tetracycline antibiotic or a salt thereof and a salt comprising a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to 7-dimethylamino-tetracycline antibiotic is greater than 3:1 and wherein the composition does not comprise gluconate or a pyridine-containing compound.

In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 1:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 2:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 3:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is greater than 5:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is at greater than 8:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is greater than 10:1.

Some embodiments include compositions in the form of a lyophile.

In some embodiments, the salt is magnesium sulfate.

In some embodiments, the salt is calcium chloride.

In some embodiments, the composition comprises sodium acetate.

In some embodiments, the composition comprises NaOH.

In some embodiments, the salt is selected from magnesium chloride, magnesium bromide, magnesium sulfate, calcium chloride, calcium bromide, calcium sulfate, zinc chloride, gallium chloride, magnesium malate, magnesium citrate, magnesium acetate, calcium citrate, zinc acetate, and zinc citrate.

In some embodiments, the composition does not comprise an antioxidant.

In some embodiments, the composition does not comprise a pyridine-containing compound. In some embodiments, the composition does not comprise nicotinamide.

In some embodiments, the composition does not comprise gluconate.

In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and a glycylcycline. In some embodiments, the glycylcycline is tigecycline. In some embodiments, the 7-dimethylamino-tetracycline is minocycline. In some embodiments, the 7-dimethylamino-tetracycline is PTK796.

US 9,278,105 B2

5 | 6

Some embodiments include methods for preparing a pharmaceutical composition comprising dissolving the water-soluble solid composition of any one of the water-soluble solid compositions provided herein in water to form a solution

Some embodiments include methods for preparing a pharmaceutical composition comprising dissolving a 7-dimethylamino-tetracycline in a solution comprising a divalent or trivalent cation.

Some embodiments include methods for preparing a pharmaceutical composition comprising dissolving a 7-dimethylamino-tetracycline in a solution comprising a divalent or trivalent cation; adjusting the pH of the solution; and lyophilizing the composition.

In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and a glycylcycline. In some embodiments, the glycylcycline is tigecycline.

In some embodiments, the pH of the solution is adjusted to be less than 6. In some embodiments, the pH of the solution is adjusted to be less than 5.

In some embodiments, the pH of the solution is adjusted to be greater than 2 and less than 7. In some embodiments, the pH of the solution is adjusted to be greater than 4 and less than 7. In some embodiments, the pH of the solution is adjusted to be greater than 4 and less than 6. In some embodiments, the pH of the solution is adjusted to be greater than 4 and less than 5.

In some embodiments, adjusting the pH comprises adding an acid. In some embodiments, the acid is HCl.

In some embodiments, adjusting the pH comprises adding a base. In some embodiments, the base is NaOH.

In some embodiments, adjusting the pH comprises forming a buffer. In some embodiments, forming the buffer comprises adding sodium acetate.

In some embodiments, the divalent or trivalent cation is selected from iron, copper, zinc, manganese, nickel, cobalt, aluminum, calcium, magnesium and gallium. In some embodiments, the cation is selected from magnesium, calcium, and zinc. In some embodiments, the cation is magnesium.

Some embodiments include kits comprising a first container comprising a diluent that comprises an aqueous solution of a divalent or trivalent cation; and a second container comprising a solid composition soluble in the diluent, wherein the solid composition comprises minocycline in an amount such that the molar ratio of the divalent or trivalent cation to minocycline is greater than 2:1.

Some embodiments include kits comprising a first container comprising a diluent that comprises an aqueous solution of a divalent or trivalent cation; and a second container comprising a solid composition soluble in the diluent, wherein the solid composition comprises a 7-dimethylamino-tetracycline antibiotic in an amount such that the molar ratio of the divalent or trivalent cation to 7-dimethylamino-tetracycline antibiotic is greater than 3:1.

In some embodiments, the diluent comprises an acid. In some embodiments, the acid is HCl.

In some embodiments, the diluent comprises a base. In some embodiments, the base is NaOH.

In some embodiments, the diluent comprises a buffer. In some embodiments, the diluent comprises sodium acetate.

In some embodiments, the pH of the diluent is greater than pH 6 and less than pH 8.

In some embodiments, the divalent or trivalent cation is selected from iron, copper, zinc, manganese, nickel, cobalt, aluminum, calcium, magnesium and gallium. In some embodiments, the cation is selected from magnesium, calcium, and zinc. In some embodiments, the cation is magnesium.

In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 3:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is greater than 5:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is at greater than 8:1. In some embodiments, the molar ratio of divalent or trivalent cation to the minocycline or the 7-dimethylamino-tetracycline antibiotic is greater than 10:1.

In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and a glycylcycline. In some embodiments, the glycylcycline is tigecycline. In some embodiments, the 7-dimethylamino-tetracycline is minocycline. In some embodiments, the 7-dimethylamino-tetracycline is PTK796.

Some embodiments include methods of treating or preventing a bacterial infection in a subject, comprising administering the pharmaceutical composition of any one of the pharmaceutical compositions provided herein to the subject via an intravenous route.

Some embodiments include methods of treating or preventing a bacterial infection in a subject, comprising administering the pharmaceutical composition made according to any one of the methods of preparing a pharmaceutical compositions provided herein to the subject via an intravenous route.

In some embodiments, the intravenous administration includes administering less than 200 ml of the composition.

In some embodiments, the intravenous administration includes administering the composition in less than 60 minutes.

Some embodiments include methods of treating or preventing a bacterial infection in a subject, comprising administering the pharmaceutical composition of any one of the pharmaceutical compositions provided herein to the subject via a topical route.

Some embodiments include methods of treating or preventing a bacterial infection in a subject, comprising administering the pharmaceutical composition made according to any one of the methods of preparing a pharmaceutical compositions provided herein to the subject via a topical route.

Some embodiments include compositions comprising tigecycline and a divalent or trivalent cation, wherein the molar ratio of said divalent or trivalent cation to said tigecycline is greater than 1:1.

In some embodiments, the tigecycline and divalent or trivalent cation are in aqueous solution.

In some embodiments, the molar ratio of said divalent or trivalent cation to said tigecycline is greater than 3:1.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a graph of percent hemolysis of rabbit red blood cells incubated with various concentrations of minocycline in various solutions relative to hemolysis in water, in which the minocycline solutions formulated with divalent cations were adjusted to ph 5.85.

FIG. 2 shows a graph of percent hemolysis of rabbit red blood cells incubated with various concentrations of minocycline in various solutions relative to hemolysis in water.

FIG. 3 depicts a graph of rabbit RBC hemolysis caused by minocycline formulated in different ratios of $MgSO_4$.

FIG. 4 depicts a graph of rabbit RBC hemolysis caused by minocycline formulated in different ratios of $MgCl_2$.

FIG. 5 depicts a graph of rabbit RBC hemolysis caused by minocycline formulated in different ratios of $CaCl_2$.

7

FIG. **6** depicts a graph for minocycline uptake by HVEC at various concentrations of divalent cation.

FIG. **7** depicts a graph for minocycline uptake by HVEC at various concentrations of divalent cation.

### DETAILED DESCRIPTION

The present invention relates to tetracycline compositions and methods for preparing and using the same. Some embodiments include a tetracycline with an excess of a metal cation. In some embodiments, the compositions have improved stability against both oxidative degradation and epimerization. Some such compositions are therefore more stable when dissolved, lyophilized, reconstituted, and/or diluted than other compositions. Some embodiments also provide compositions having a lower level of tetracycline-induced hemolysis and resulting phlebitis.

It was unexpectedly discovered that the incidence of tetracycline-induced hemolysis can be greatly decreased by formulating the tetracycline with divalent or trivalent cations. In some embodiments, high molar ratios of divalent or trivalent cations to tetracycline antibiotics significantly decreases hemolysis.

It was also unexpectedly discovered that the stability of aqueous solutions of tetracyclines can be greatly increased by the addition of divalent or trivalent cations. In some embodiments, the stability of aqueous solutions of tetracyclines increase with higher molar ratios of divalent or trivalent cations to tetracycline. Indeed, some such solutions were found to be stable for several weeks at $37^\circ$ C.

In certain compositions, the solubility of a tetracycline antibiotic is decreased in an aqueous solution comprising a multivalent cation. It has been unexpectedly discovered that increasing the molar ratio of multivalent cation to such tetracycline antibiotics can increase the solubility of the tetracycline. Accordingly, some embodiments described herein provide solutions of a tetracycline with improved solubility.

Compositions

Some embodiments include compositions comprising a tetracycline antibiotic or a salt thereof in combination with a divalent or trivalent cation. Tetracyclines include a family of structurally-related compounds that may have broad-spectrum antibiotic activities. Examples of tetracyclines include Tetracycline, Chlortetracycline, Oxytetracycline, Demeclocycline, Doxycycline, Lymecycline, Meclocycline, Methacycline, Minocycline, Rolitetracycline, Minocycline, Tigecycline, Chlorocycline, Glycylcyclines, Aminomethylcyclines, TP434, and PTK796, (also known as BAY 73-7388 and MK2764). The structure of TP434 is provided below:



In one embodiment, the tetracycline antibiotic is selected from the group consisting of tetracycline, oxytetracycline, doxycycline, chlorocycline, minocycline, glycylcyclines and aminomethylcyclines. In one embodiment, the tetracycline is a glycylcycline. In one embodiment, the glycylcycline is tigecycline. In one embodiment, the tetracycline is an aminomethylcycline. In one embodiment, the aminomethylcycline is

8

PTK796, also known as BAY 73-7388 and MK2764. In another embodiment, the tetracycline is selected from the group consisting of tetracycline, minocycline, tigecycline and PTK796. In one embodiment, the tetracycline antibiotic is tetracycline. In one embodiment, of the invention, the tetracycline is minocycline. In one embodiment, of the invention, the tetracycline is tigecycline. In yet another embodiment, of the invention, the tetracycline is PTK796. Some embodiments include a salt of a tetracycline antibiotic.

In some embodiments, the tetracycline antibiotic is a 7-dimethylamino-tetracycline. 7-dimethylamino-tetracyclines contain an additional dimethylamino substituent at the 7-position on the four-ring core. The 7-position is indicated on following numbered structure of minocycline:



Examples of 7-dimethylamino-tetracyclines include minocycline, a glycylcycline (e.g., tigecycline) and PTK796. Example structures of such compounds include:

Minocycline:



Tigecycline:



and

PTK796:



As used herein, "glycylcyclines" are 7-dimethylamino-tetracyclines having an N-alkylglycylamido side chain at position 9 of the four-ring core.

US 9,278,105 B2

9                                                  10

In some embodiments, the 7-dimethylamino-tetracycline antibiotic has the structure:



or tautomers thereof, wherein:

$R^1$ is selected from H, —$(CH_2)_n$NHC(O)$(CH_2)_n$$R^{10}$, and —$(CH_2)_n$$R^{10}$, where each n is independently an integer from 0 to 3, and

$R^{10}$ is selected from —NH—$C_{1-8}$alkyl, —NH—$C_{1-8}$cycloalkyl, and a saturated 4-to-7-membered heterocycle containing one nitrogen atom, wherein if the connecting atom of $R^{10}$ is carbon, the nitrogen atom is optionally substituted by $C_1$-$C_4$alkyl;

Y is $CR^2$ or N; and

$R^2$, $R^3$, $R^4$, $R^5$, $R^6$, $R^7$, $R^8$, and $R^9$ are each independently selected from H, —OH, halogen, and $C_{1-8}$alkyl; or

optionally $R^1$ and $R^2$ together form a 6-membered aryl or heteroaryl ring, optionally substituted by one or two groups independently selected from H, $R^1$, —OH, halogen, and $C_{1-4}$alkyl.

In some embodiments, each of $R^3$, $R^4$, $R^5$, $R^6$, $R^7$, $R^8$, and $R^9$ are hydrogen.

As used herein, "alkyl" refers to a straight- or branched-chain moiety containing only carbon and hydrogen. Alkyls may have any degree of saturation. Examples include methyl, ethyl, propyl, isopropyl, butyl, isobutyl, and tertbutyl.

As used herein, "cycloalkyl" refers to a ring or ring system comprising only carbon in the ring backbone. Cycloalkyls may include one or more fused or bridged rings. Cycloalkyls may have any degree of saturation provided that at least one ring is not aromatic. Examples include cyclopropyl, cyclobutyl, cyclopentyl, cyclohexyl, and cyclohexenyl.

As used herein, "heterocycle" refers to a ring or ring system comprising at least one heteroatom in the ring backbone. Heterocycles may include one or more fused or bridged rings. Heterocycles may have any degree of saturation provided that at least one ring is not aromatic. Examples include pyrrolidine, piperidine, piperazine, and morpholino.

As used herein, "aryl" refers to an aromatic ring or ring system comprising only carbon in the ring backbone. Aryls may include one or more fused rings. Examples include phenyl and naphthyl.

As used herein, "heteroaryl" refers to an aromatic ring or ring system comprising at least one heteroatom in the ring backbone. Heteroaryls may include one or more fused rings. Examples include imidazole, oxazole, pyridine, and quinoline.

Some compositions include at least one multivalent cation. Multivalent cations include bivalent and trivalent cations, e.g., metal cations. The metal cations include common multivalent metal cations. In some embodiments, the metal cations include iron, copper, zinc, manganese, nickel, cobalt, aluminum, calcium, magnesium and gallium.

Some compositions include a salt that comprises the cation. In one embodiment, the salts are inorganic metal salts and can include anhydrous, hydrated and solvated forms of the salts. In another embodiment, the salts are organic metal salts

and include but are not limited to the anhydrous, hydrated and solvated forms of the salt. In one embodiment, the anion in the inorganic metal salts can include chloride, bromide, oxide, and sulfate salts. In one embodiment, the organic metal salts are those where the anion of the salt is selected from the GRAS (generally regarded as safe) list such as but not limited to acetate, citrate, gluconate, and malate salts. Suitable anions may also be found in see Remington's Pharmaceutical Sciences, Mack Publishing Company, Easton, Pa. In some embodiments, a composition can include more than one type of metal cation. In some such embodiments, the anions for each metal salt can be the same. In another embodiment, the anions for each metal salt are different. In another embodiment, the metal cation is included in the compositions provided herein as different salts of the same cation. In one embodiment the metal salts are all inorganic. In another embodiment, the metal salts are all organic. In yet another embodiment, the metal salts are a combination of organic and inorganic salts.

Examples of inorganic metal salts that may be included in the compositions provided herein include magnesium chloride (including the hexahydrate), magnesium bromide, magnesium sulfate (including the heptahydrate), magnesium oxide, calcium chloride, calcium bromide, calcium sulfate, zinc chloride, and gallium chloride. Examples of inorganic metal salts that may be included in the compositions provided herein include magnesium malate, magnesium gluconate, magnesium citrate, magnesium acetate (including the trihydrate), calcium gluconate, calcium citrate, zinc gluconate, zinc acetate, and zinc citrate. The salts described herein include both their anhydrous and hydrated forms.

Some compositions provided herein include a tetracycline and divalent or trivalent cation, e.g., metal cation at particular molar ratios of divalent or trivalent cation to tetracycline. For example, some embodiments include compositions comprising a tetracycline and a divalent or trivalent cation, wherein the molar ratio of said divalent or trivalent cation to said tetracycline is greater than about 1:1. In some such embodiments, the molar ratio of the divalent or trivalent cation to the tetracycline is greater than about 2:1, greater than about 3:1, greater than about 4:1, greater than about 5:1, greater than about 6:1, greater than about 7:1, greater than about 8:1, greater than about 9:1, greater than about 10:1, greater than about 11:1, greater than about 12:1, greater than about 13:1, greater than about 14:1, greater than about 15:1, greater than about 16:1, greater than about 17:1, greater than about 18:1, greater than about 19:1, greater than about 20:1, greater than about 21:1, greater than about 22:1, greater than about 23:1, greater than about 24:1, greater than about 25:1, greater than about 26:1, greater than about 27:1, greater than about 28:1, greater than about 29:1, and greater than about 30:1. In some embodiments, the molar ratio is greater than about 35:1, greater than about 40:1, greater than about 45:1, and greater than about 50:1,

In some such embodiments, the molar ratio of the divalent or trivalent cation to the tetracycline is between about 1:1 to about 30:1, between about 5:1 to about 30:1, between about 10:1 to about 30:1, and between about 20:1 to about 30:1. In some such embodiments, the molar ratio of the divalent or trivalent cation to the tetracycline is between about 1:1 to about 50:1, between about 5:1 to about 50:1, between about 10:1 to about 50:1, and between about 20:1 to about 50:1.

In some embodiments, the relative amounts of metal cation present in the compositions of the invention are those amounts which are in excess of the 1:1 metal cation: a tetracycline stoichiometry for each metal cation. In one embodiment of the invention, the metal cation to a tetracycline molar

US 9,278,105 B2

11 12

ratio ranges from 5:1 to 100:1. In another embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 5:1 to 50:1. In yet another embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 5:1 to 30:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 5:1 to 10:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 10:1 to 20:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio ranges from 10:1 to 15:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 5:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 10:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 12:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 15:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 20:1. In one embodiment of the invention, the metal cation to a tetracycline molar ratio is 30:1.

Some compositions include carbohydrates in addition to a divalent or trivalent cation. Suitable carbohydrates are those carbohydrates capable of reducing degradation of the tetracycline in at least one solid form prepared in at least one pH environment when compared to a solid form of a tetracycline prepared at the same pH environment lacking suitable carbohydrates. In one embodiment, the pH environment ranges from 3.0 to about 7.0, such as pHs ranging from about 4.0 to about 6.5, from about 5.0 to about 6.5, and from about 5.5 to about 6.5. In one embodiment, at least one solid form is chosen from powders and lyophilized cakes of a tetracycline. In another embodiment of the invention, carbohydrates are those carbohydrates capable of reducing degradation of the tetracycline in solution prepared in at least one pH environment when compared to a solution of a tetracycline prepared at the same pH environment lacking suitable carbohydrates. In one embodiment, the pH environment ranges from 3.0 to about 7.0, such as pHs ranging from about 4.0 to about 6.5, from about 5.0 to about 6.5, and from about 5.5 to about 6.5.

Suitable carbohydrates include mono and disaccharides e.g. an aldose monosaccharide or a disaccharide. Examples of suitable carbohydrates include but are not limited to the anhydrous, hydrated and solvated forms of compounds such as trehalose, lactose, mannose, sucrose and glucose. In one embodiment of the invention, the carbohydrate is a disaccharide. In another embodiment of the invention, the disaccharide is trehalose, lactose or sucrose. In yet another embodiment of the invention, the carbohydrate is lactose, including its different forms such as anhydrous lactose, lactose monohydrate or any other hydrated or solvated form of lactose. In one embodiment of the invention, the carbohydrate is trehalose, including its different forms such as anhydrous trehalose, trehalose dihydrate or any other hydrated or solvated form of trehalose.

In one embodiment of the invention, the suitable carbohydrate used is lactose monohydrate and the molar ratio of tigecycline to lactose monohydrate in the lyophilized powder or cake is between 1:0.2 to about 1:5. In another embodiment of the invention, the tigecycline to lactose monohydrate molar ratio is between 1:1.6 to about 1:3.3.

Some compositions include an antioxidant. Antioxidants can be used to prevent or reduce the oxidation of tetracyclines either in solution or in the solid state. Examples of antioxidants include ascorbic acid, citric acid, trehalose, butylated hydroxyl toluene (BHT), butylated hydroxyl anisole (BHA), sodium metabisulfite, d,l-α-tocopherol, and gentisic acid.

It will be appreciated that the compositions provided herein can include aerosols, liquids, and solids. Solids can include, for example, lyophilized compositions, such as powders, cakes, or the like. Such solids may be water soluble so that they may be used to prepare aqueous solutions. Liquids can include solutions or suspensions, which may be prepared from solid compositions. Liquids include solutions that may be prepared prior to manufacturing procedures such as lyophilization. In one embodiment, the solution may be stored for several hours prior to lyophilization in order to provide greater manufacturing flexibility. Liquids also include solutions that are prepared by reconstitution for use in administration to a patient. Some compositions include solutions made from the lyophilized powder or cake by, for example, reconstitution with saline or other pharmaceutically acceptable diluents. Pharmaceutically acceptable diluents are those listed by USP such as but not limited to water for injection, saline solution, lactated Ringer's solution for injection or dextrose solution. Some compositions include solutions resulting from diluting those reconstituted solutions with pharmaceutically acceptable diluents for use in intravenous bags.

In some embodiments, the pH of a liquid composition provided herein, such as an aqueous solution, is between about pH 2.0 to about pH 8.0, between about pH 2.5 to about pH 7.5. In some embodiments, the pH of the composition is between about pH 3.0 to about pH 7.0, between about pH 3.5 to about pH 6.5, between about pH 4.0 to about pH 6.5, between about pH 4.0 to about pH 6.0, between about pH 4.5 to about pH 6.0, between about pH 4.5 to about pH 5.5, between about pH 5.0 to about pH 5.5, between about pH 5.0 to about pH 6.5, between about pH 3.5 to about pH 4.5. In some embodiments, the pH of the solution is less than pH 7, less than pH 6, less than pH 5, less than pH 4, less than pH 3, and less than pH 2. In some embodiments the pH of the solution is greater than pH 2 and less than pH 7, greater than pH 4 and less than pH 7, greater than pH 4 and less than pH 6, and greater than pH 4 and less than pH 5.

In some embodiments, liquid compositions, such as an aqueous solution, can have an osmolality from about 300 mOsmol/kg to about 500 mOsmol/kg, from about 325 mOsmol/kg to about 450 mOsmol/kg, from about 350 mOsmol/kg to about 425 mOsmol/kg, or from about 350 mOsmol/kg to about 400 mOsmol/kg. In some embodiments, the osmolality of the formulation is greater than about 300 mOsmol/kg, about 325 mOsmol/kg, about 350 mOsmol/kg, about 375 mOsmol/kg, about 400 mOsmol/kg, about 425 mOsmol/kg, about 450 mOsmol/kg, about 475 mOsmol/kg, or about 500 mOsmol/kg. In some embodiments, liquid compositions can have an osmolality from about 200 mOsmol/kg to about 1250 mOsmol/kg. In another embodiment, the osmolality is between about 250 mOsmol/kg and about 1050 mOsmol/kg. In another embodiment, the osmolality is between about 250 mOsmol/kg and about 750 mOsmol/kg. In another embodiment, the osmolality is between about 350 mOsmol/kg and about 500 mOsmol/kg. In some embodiments, the osmolality of the solution is less than 500 mOsmol/kg, 450 mOsmol/kg, 400 mOsmol/kg, 350 mOsmol/kg, or 300 mOsmol/kg.

Some embodiments include an aqueous solution comprising a tetracycline having a concentration of at least 1 mg/ml, 5 mg/ml, 10 mg/ml, 15 mg/ml, 20 mg/ml, 25 mg/ml, 30 mg/ml, 35 mg/ml, 40 mg/ml, 45 mg/ml, or 50 mg/ml.

Some embodiments include an aqueous solution comprising a buffer, such as an acetate buffer (e.g., provided as sodium acetate), wherein the acetate has a concentration of at least 0.01 M, 0.02 M, 0.03 M, 0.04 M, 0.05 M, 0.1 M, 0.15 M, 0.20 M, 0.25 M, 0.30 M, 0.35 M, 0.40 M, 0.45 M, 0.50 M, 0.55 M, 0.60 M, 0.65 M, 0.70 M, 0.75 M, 0.80 M, 0.85 M, 0.90 M, or 0.95 M.

QPEX001358

US 9,278,105 B2

13

Some embodiments include an aqueous solution comprising a salt comprising divalent or trivalent cation, such as a magnesium salt (e.g., magnesium chloride or magnesium sulfate), having a concentration of at least 0.01 M, 0.02 M, 0.03 M, 0.04 M, 0.05 M, 0.1 M, 0.15 M, 0.20 M, 0.25 M, 0.30 M, 0.35 M, 0.40 M, 0.45 M, 0.50 M, 0.55 M, 0.60 M, 0.65 M, 0.70 M, 0.75 M, 0.80 M, 0.85 M, 0.90 M, or 0.95 M.

In one embodiment, liquid compositions, such as aqueous solutions, have a permeant ion concentration from about 30 mM to about 300 mM. In another embodiment, the permeant ion concentration is between 50 mM and 200 mM. In another embodiment, the permeant ion is selected from the list consisting of chloride and bromide. In another embodiment the permeant ion is chloride. In another embodiment, the permeant ion is bromide.

In some embodiments, aqueous solution compositions comprise a buffer. For example, in some embodiments, the solution comprises acetate. In some embodiments, aqueous solution compositions comprise a base such as NaOH. In some embodiments, aqueous solution compositions comprise an acid such as HCl.

It is contemplated that in some embodiments, reconstituted solutions may be stored in a reconstituted state at room temperature prior to further dilution for injection or topical administration. In some embodiments, storage times at room temperature after reconstitution are much longer than current compositions. In some embodiments, admixing can occur, for example, in an intravenous bag. To prepare an admixture, sufficient reconstituted solution is mixed in an intravenous bag containing a pharmaceutically acceptable diluent such as saline or dextrose solution such as 5DW.

The concentration of admixtures may easily be determined by those of ordinary skill in the art. The time available for admixture of reconstituted solutions from the compositions may be much longer than those of previously described formulations. Storage times of the admixtures at room temperature may also be much longer than those of the existing compositions. Once admixed, the tetracycline solution is ready for administration by or to the patient. The admixture may be administered alone or together with another pharmaceutical agent or composition.

In some embodiments, the composition does not comprise a pharmaceutically acceptable oil. In some embodiments, an oil can refer to a hydrocarbon compound that is liquid at room temperature and insoluble in water. Examples of pharmaceutically acceptable oils include polyoxyethylene hydrogenated castor oils such as PEG-40 hydrogenated castor oil and PEG-50 hydrogenated castor oil. More examples of pharmaceutically acceptable oils include olive oil, sesame oil, soybean oil, safflower oil, cottonseed oil, corn oil, sunflower oil, arachis oil, coconut oil, an omega-3 polyunsaturated oil, and an omega-3 marine triglyceride.

In some embodiments, the composition does not comprise a pyridine-containing compound. In one embodiment, the pyridine-containing compound is nicotinamide.

Although some embodiments include gluconate (e.g., as the gluconate salt of a divalent or trivalent metal cation), other embodiments include compositions that do not comprise gluconate.

In some embodiments, the composition does not comprise a non-aqueous tetracycline-solubilizing co-solvent. Such solubilizing co-solvents can include the oil, pyridine-containing compound, and gluconate described above.

Although some embodiments include an antioxidant, other embodiments include compositions that do not comprise an antioxidant (e.g., sodium or magnesium formaldehyde sulfoxylate; sodium sulfite, metabisulfite or bisulfite; sodium sulfide; alpha-monothioglycerol (also referred to as thioglycerol); and thiosorbitol).

14

Other various embodiments include compositions that do not include one or more of an alcohol (e.g., a polyhydric alcohol, such as, propylene glycol, ethylene glycol), glycerol, polyethylene glycol, a pyrrolidone-containing compound, a water-miscible local anaesthetic (e.g., procaine, tetracaine), urea, lactose, or a dehydrating agent (e.g., ethyl acetate, acetic anhydride, absolute ethanol, ethyl acetate, acetic anhydride, and mixtures thereof).

Some embodiments include compositions comprising a 7-dimethylamino-tetracycline and a cation. In some such embodiments the 7-dimethylamino-tetracycline is minocycline. In some embodiments, the minocycline is minocycline HCl. In some embodiments the cation comprises $Mg^{2+}$. In some embodiments, the compositions include a salt selected from $MgCl_2$ (e.g., $MgCl_2.6H_2O$), $MgSO_4$ (e.g. $MgSO_4.7H_2O$) and magnesium acetate (e.g., $Mg(CH_3COO)_2.3H_2O$). In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 1:1, 2:1, 3:1, 4:1, 5:1, 6:1, 7:1, 8:1, 9:1, or 10:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than 10:1, 20:1, 30:1, 40:1, or 50:1. Some embodiments include a buffer. In some such embodiments, the buffer includes NaOH, or sodium acetate (e.g., $NaCH_3COO.3H_2O$).

Some compositions comprise minocycline and $MgCl_2.6H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a base comprising NaOH. Some such embodiments are suitable for intravenous use.

Some compositions comprise minocycline and $MgSO_4.7H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a buffer comprising $NaCH_3COO.3H_2O$ with a pH in the range 4.5-5.5 and an osmolality in the range of about 275-375 mOsm/kg. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH and osmolality of a reconstituted solution can have a pH in the range 4.5-5.5 and an osmolality in the range of about 275-375 mOsm/kg. Some such embodiments are suitable for intravenous use.

Some embodiments comprise minocycline and $Mg(CH_3COO)_2.3H_2O$ with a Mg to minocycline molar ratio of about 5:1 with no buffer added. Some such embodiments are suitable for intravenous use.

Some embodiments include minocycline and $MgSO_4.7H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a base comprising NaOH with a pH in the range 5.5-6.5. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH of a reconstituted solution can have a pH in the range 5.5-6.5. Some such embodiments are suitable for intravenous use.

Some embodiments comprise tigecycline and $MgSO_4.7H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a buffer comprising NaOH with a pH in the range 5.5-6.5. Some embodiments comprise tigecycline and $MgSO_4.7H_2O$ with a Mg to minocycline molar ratio of about 12:1 in a base comprising NaOH with a pH in the range 5.5-6.5. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH of a reconstituted solution can have a pH in the range 5.5-6.5. Some such embodiments are suitable for intravenous use.

Some embodiments comprise tigecycline and $MgCl_2.6H_2O$ with a Mg to minocycline molar ratio of about 5:1 in a buffer comprising NaOH with a pH in the range

QPEX001359

US 9,278,105 B2

15

5.5-6.5. Some embodiments comprise tigecycline and MgCl$_2$.6H$_2$O with a Mg to minocycline molar ratio of about 12:1 in a base comprising NaOH with a pH in the range 5.5-6.5. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH of a reconstituted solution can have a pH in the range 5.5-6.5. Some such embodiments are suitable for intravenous use.

Some embodiments comprise tigecycline and MgSO$_4$.7H$_2$O with a Mg to minocycline molar ratio of about 5:1 in a buffer comprising NaOH with a pH in the range 6.0-7.0. Some embodiments comprise tigecycline and MgSO$_4$.7H$_2$O with a Mg to minocycline molar ratio of about 12:1 in a base comprising NaOH with a pH in the range 6.0-7.0. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH of a reconstituted solution can have a pH in the range 6.0-7.0. Some such embodiments are suitable for topical use. Some such compositions comprise tigecycline with greater than 90%, 95%, or 98% stability for at least 30 days. Some embodiments include compositions comprising an additional constituent such as benzalkonium chloride, a steroid such as hydrocortisone, dexamethasone, thonzonium bromide, tyloxapol, an antiseptic agent such as boric acid, a preservative such as benzalkonium chloride.

Some embodiments comprise tigecycline and CaCl$_2$.6H$_2$O with a Ca:minocycline:molar ratio of about 5:1 in a base comprising NaOH with a pH in the range 6.0-7.0. Some embodiments comprise tigecycline and CaCl$_2$.6H$_2$O with a Ca to tigecycline molar ratio of about 12:1 in a base comprising NaOH with a pH in the range 6.0-7.0. Some such compositions can be prepared as an aqueous solution and lyophilized. As will be understood by a skilled artisan, the pH of a reconstituted solution can have a pH in the range 6.0-7.0. Some such embodiments are suitable for topical use. Some such compositions comprise tigecycline with greater than 90%, 95%, 98% stability for at least 30 days. Some embodiments include compositions comprising an additional constituent such as benzalkonium chloride, a steroid such as hydrocortisone, dexamethasone, thonzonium bromide, tyloxapol, an antiseptic agent such as boric acid, a preservative such as benzalkonium chloride.

Some embodiments include pharmaceutical compositions comprising an aqueous solution of minocycline and a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to minocycline is greater than 2:1. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than about 3:1, greater than about 5:1, greater than about 8:1, greater than about 10:1. In some embodiments, the divalent or trivalent cation is selected from iron, copper, zinc, manganese, nickel, cobalt, aluminum, calcium, magnesium and gallium. In particular embodiments, the divalent or trivalent cation is selected from magnesium, calcium, and zinc. In some embodiments, the solution comprises magnesium sulfate and/or magnesium oxide. In particular embodiments, the composition is suitable for intravenous administration.

More embodiments include a pharmaceutical composition comprising an aqueous solution of an 7-dimethylamino-tetracycline antibiotic and a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to tetracycline antibiotic is greater than 3:1 and wherein the solution does not comprise an oil, gluconate, or a pyridine-containing compound, has a pH greater than 2 and less than 7, and is suitable for intravenous administration. In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and glycylcyclines (e.g. tigecycline).

16

Some embodiments include a water-soluble solid composition, comprising minocycline or a salt thereof and a salt that comprises a divalent or trivalent cation. In some embodiments, the molar ratio of divalent or trivalent cation to minocycline is greater than about 1:1, greater than about 2:1, greater than about 3:1, greater than about 5:1, greater than about 8:1, greater than about 10:1. In some embodiments, the salt is selected from magnesium chloride, magnesium bromide, magnesium sulfate, calcium chloride, calcium bromide, calcium sulfate, zinc chloride, gallium chloride, magnesium malate, magnesium gluconate, magnesium citrate, calcium gluconate, calcium citrate, zinc gluconate, zinc acetate, and zinc citrate. In preferred embodiments, the salt is magnesium sulfate. In some embodiments, the composition comprises sodium acetate. In certain embodiments, the composition does not comprise an antioxidant, a pyridine-containing compound (e.g., nicotinamide), or gluconate.

More embodiments include water-soluble solid compositions comprising a 7-dimethylamino-tetracycline antibiotic and a salt comprising a divalent or trivalent cation, wherein the molar ratio of divalent or trivalent cation to tetracycline antibiotic is greater than 3:1 and wherein the composition does not comprise gluconate or a pyridine-containing compound. In some embodiments, the 7-dimethylamino-tetracycline is selected from minocycline, glycylcyclines (e.g. tigecycline) and PTK796.

In some embodiments, the water-soluble compositions described above are in the form of a lyophile.

Methods of Preparation

Some embodiments of the present invention include methods for preparing the compositions described herein. Some such methods include combining a tetracycline antibiotic and a divalent or trivalent cation. Some methods further comprise modifying the pH of the compositions. In some methods, modifying the pH comprises adjusting the pH with a pH modifying agent. Examples of pH modifying agents include hydrochloric acid, gentisic acid, lactic acid, citric acid, acetic acid, phosphoric acid, sodium hydroxide, sodium bicarbonate and sodium carbonate. In some embodiments, the pH-modifying agent includes any pharmaceutically acceptable acid, base or buffer capable of adjusting the pH of a tetracycline antibiotic/metal cation solution to between about 3.0 to about 7.0, about 4.0 to about 5.0, about 5.0 to 6.0, about 5.5 to 6.5, about 6.0 to 6.5 or about 4.2 to 4.8. In some embodiments, the acid, base or buffer is used to adjust the pH of a tetracycline antibiotic/metal cation solution to a pH less than 7, 6, 5, or 4. In some embodiments, the acid, base or buffer is used to adjust the pH of a tetracycline antibiotic/metal cation solution to a pH greater than 2 and less than 7, greater than 4 and less than 7, greater than 4 and less than 6, and greater than 4 and less than 5. Examples of such acids include but are not limited to hydrochloric acid, including 1.0 N HCl, gentisic acid, lactic acid, citric acid, acetic acid and phosphoric acid. Examples of suitable buffers include as components succinates and acetate. Examples of such bases include but are not limited to aqueous solutions of sodium hydroxide, including 1.0 N NaOH solution, sodium bicarbonate and sodium carbonate.

Compositions of the invention may be prepared via a number of acceptable methods. For example, the metal salts are dissolved in water and the tetracycline antibiotic is added to this solution. Alternatively, the antibiotic is dissolved first and the metal salt is added to the solution. The pH of the solution is then adjusted with an acid, a base or buffer. Other optional agents such as an antioxidant or carbohydrate are then dissolved in the solution. The final solution may be then be used

APPX000182

US 9,278,105 B2

17

directly in therapy or lyophilized to dryness to form a lyo-philized powder or cake for later reconstitution.

In another example, a tetracycline antibiotic may be dry blended with the metal salts and other optional ingredients, and the residual mixture dissolved in water. After the pH of the solution is adjusted, the solution may then be used in therapy or lyophilized to dryness to form a powder or cake.

Lyophilization of solutions described herein may be accomplished by any pharmaceutically acceptable means. Once lyophilized, the compositions of the invention may be stored under an inert gas, such as nitrogen, to further slow the degradation process.

The tetracycline antibiotic used in the various preparation techniques may be any solid-state form of the tetracycline that is sufficiently soluble in water. Such solid-state forms include crystalline tetracycline polymorphs, amorphous forms and salts.

One embodiment for preparing aminocycline-containing pharmaceutical composition includes dissolving minocy-cline and a salt that comprises a divalent of trivalent cation in water to form a solution and adjusting the pH of the solution to be less than about 7, less than about 6, less than about 5, less than about 4, or less than about 3. In some embodiments, the pH of the solution is adjusted to be greater than about 2 and less than about 7, greater than about 4 and less than about 7, or greater than about 4 and less than about 6. In some embodi-ments, adjusting the pH comprises adding a base, e.g., NaOH. In some embodiments, adjusting the pH comprises forming a buffer. In some embodiments, forming the buffer comprises adding sodium acetate.

More embodiments for methods of preparing a minocy-cline-containing pharmaceutical composition includes dis-solving minocycline in a solution comprising a divalent or trivalent cation; and adjusting the pH of the solution to be less than 7.

In some embodiments, a solution of a 7-dimethylamino-tetracycline can be prepared by adding a 7-dimethylamino-tetracycline, an aqueous solution of divalent or trivalent salt to provide a certain divalent or trivalent salt to 7-dimethy-lamino-tetracycline molar ratio. The pH of the solution can be adjusted to a certain pH with a buffer, acid, or a base. The osmolality of the solution can be adjusted to a certain osmo-lality. The solution can be lyophilized. The lyophilized solu-tion can be reconstituted with a diluent such as water.

In some embodiments, a solution of a 7-dimethylamino-tetracycline can be prepared by adding a 7-dimethylamino-tetracycline to an acid, such as HCl. The solution can be lyophilized. The lyophilized solution can be reconstituted with a diluent comprising a divalent or trivalent salt to provide a certain divalent or trivalent salt to 7-dimethylamino-tetra-cycline molar ratio. The diluent can further comprise an acid, base, or buffer, such as sodium acetate, to provide a solution of a certain pH.

In some embodiments, minocycline can be in a buffer comprising MgSO$_4$ at pH 5. The solution can be lyophilized. The lyophilisate can be reconstituted in an aqueous diluent. In some embodiments, minocycline can be solubilized in an aqueous solution comprising HCl, MgSO4 and sodium acetate. The solution can be lyophilized. In some embodi-ments, minocycline can be solubilized in an aqueous solution comprising HCl. The solution can be lyophilized. The lyo-philisate can be reconstituted in an aqueous solution. In some embodiments, the reconstituting solution can lack Mg.

Kits

Some embodiments of the present invention include kits comprising a composition described herein. Some kits include a single use container comprising a composition

18

described herein. Single use containers include ampules, vials, and the like. The single-use container can comprise a lyophilized formulation of a composition described herein. Some kits include a diluent for reconstituting the lyophilized formulations of a composition or pharmaceutical composi-tion described herein.

In some embodiments, the compositions of the invention may be prepared for single-dosage use. In this embodiment, the solutions of the invention are lyophilized in individual vials such as 20-mL vials. Upon lyophilization, the vials are stoppered with any acceptable stopper. The stoppered vials are then shipped for use. When needed, the vials can be reconstituted by adding sufficient diluents to achieve the desired concentration of tetracycline. The concentration of reconstituted solutions may be easily determined by those of ordinary skill in the art. Any pharmaceutically acceptable diluent may be used. Examples of such diluents include but are not limited to water, 0.9% saline, Lactated Ringer's injec-tion solution and dextrose solutions including 5% dextrose (5DW).

In some embodiments, the diluent does not comprise a pharmaceutically acceptable oil (e.g., polyoxyethylene hydrogenated castor oils), a pyridine-containing compound (e.g., nicotinamide), gluconate, an antioxidant, an alcohol (e.g., a polyhydric alcohol, such as, propylene glycol, ethyl-ene glycol), glycerol, polyethylene glycol, a pyrrolidone-containing compound, a water-miscible local anaesthetic (e.g., procaine, tetracaine), urea, lactose, or a dehydrating agent (e.g., ethyl acetate, acetic anhydride, absolute ethanol, ethyl acetate, acetic anhydride, and mixtures thereof). In some embodiments, the diluent does not comprise a tetracy-cline-solubilizing cosolvent.

In some embodiments, the diluent contains the divalent or trivalent cation. For example, some embodiments include kits that comprise a first container comprising a diluent that com-prises an aqueous solution of a divalent or trivalent cation; and a second container comprising a solid composition soluble in the diluent, wherein the solid composition com-prises minocycline in an amount such that the molar ratio of the divalent or trivalent cation to minocycline is greater than about 2:1. In some embodiments, the diluent comprises an acid, e.g., HCl. In some embodiments, the diluent comprises a buffer. In some embodiments, the buffer is sodium acetate.

More embodiments include kits comprising a first con-tainer comprising a diluent that comprises an aqueous solu-tion of a divalent or trivalent cation; and a second container comprising a solid composition soluble in the diluent, wherein the solid composition comprises a tetracycline anti-biotic in an amount such that the molar ratio of the divalent or trivalent cation to tetracycline antibiotic is greater than 3:1.

More embodiments include single use vials comprising any composition wherein the vial comprises an amount of a tetracycline of at least 100 µg, 200 µg, 300 µg, 400 µg, 500 µg, 600 µg, 700 µg, 800 µg, 900 µg, 1000 µg. In some embodi-ments, the vial comprises an amount of a tetracycline of at least 1 mg, 5 mg, 10 mg, 15 mg, 20 mg, 25 mg, 30 mg, 35 mg, 40 mg, 45 mg, 50 mg, 55 mg, 60 mg, 65 mg, 70 mg, 75 mg, 80 mg, 85 mg, 90 mg, 95 mg, 100 mg, 105 mg, 110 mg, 115 mg, 120 mg, 125 mg, and 130 mg. In some embodiments, the vial comprises an amount of a tetracycline of at least 100 mg, 200 mg, 300 mg, 400 mg, and 500 mg. In some embodiments, the vial comprises about 100 mg of a tetracycline. In some embodiments, the tetracycline is minocycline. In some embodiments, the tetracycline is tigecycline. In some such embodiments, a vial can comprise greater than 30 mg and less than 100 mg tigecycline.

QPEX001361

US 9,278,105 B2

19

Methods of Treatment

Some embodiments include methods of treating or preventing a bacterial infection in a subject by administering a composition described herein. "Treating," as used herein, refers to administering a pharmaceutical composition for therapeutic purposes to a patient suffering from a bacterial infection. "Preventing," as used herein, refers to treating a patient who is not yet infected, but who is susceptible to, or otherwise at risk of, a particular infection, whereby the treatment reduces the likelihood that the patient will develop an infection.

In some embodiments, the administration is via an intravenous route such as by administering an aqueous solution described herein intravenously.

Some such methods include administering an aqueous solution of minocycline and a divalent or trivalent cation to a subject via an intravenous route. Such solutions are described herein.

Some embodiments include administering an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a divalent or trivalent cation to a subject via an intravenous route, wherein the molar ratio of divalent or trivalent cation to tetracycline antibiotic is greater than about 3:1 and wherein the solution does not comprise gluconate or a pyridine-containing compound and has a pH greater than 2 and less than 7.

In some embodiments of intravenous administration, the compositions described herein permit use of lower volumes and faster infusion times due to increased concentrations of tetracycline antibiotic and reduced injection site phlebitis as compared to currently available intravenous formulations. In some embodiments, the total volume administered is less than 50 ml, less than 60 ml, less than 70 ml, less than 80 ml, less than 90 ml, less than 100 ml, less than 110 ml, less than 120 ml, less than 130 ml, less than 140 ml, less than 150 ml, less than 200 ml, less than 300 ml, less than 400 ml, less than 500 ml, or less than 1000 ml. In some embodiments, about 100 ml is administered. In some embodiments, the entire volume to be administered is administered in less than 10 minutes, less than 20 minutes, less than 30 minutes, less than 40 minutes, less than 50 minutes, less than 60 minutes, less than 70 minutes, less than 80 minutes, less than 90 minutes, less than 2 hours, less than 3 hours, or less than 4 hours. In some embodiments, the entire volume is administered in 20-70 minutes. In some embodiments, the entire volume is administered in 30-60 minutes.

Some embodiments include administering a composition described herein by a topical route. Examples of topical routes include skin, eye, ear, rectal, vaginal, urethral. Methods of such administration are well known in the art and can include aqueous solution, spray, suppository, salve, or an ointment or the like. Accordingly, some embodiments include administering an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a divalent or trivalent cation to a subject via a topical route. In some such embodiments, the molar ratio of divalent or trivalent cation to tetracycline antibiotic is greater than about 3:1. In some embodiments, the solution does not comprise gluconate or a pyridine-containing compound. In some embodiments, the solution has a pH greater than 2 and less than 7.

Other embodiments include administering a composition described herein by pulmonary inhalation. For example, compositions may be administered by inhalation of an aerosol of the composition. The aerosol may be formed using dry particles of the composition or by nebulization of a solution or suspension of the composition. Any suitable aerosolization device may be used, including dry-powder inhalers, metered-dose inhalers, and nebulizers.

20

The following examples illustrate various embodiments of the invention and are not intended to limit the invention in any way.

EXAMPLES

Example 1

Stability at 37° C. for Solutions of Tigecycline or Tygacil® Containing Metal Cations

General Procedures: Some of following examples include experiments in which the stabilities of various aqueous solutions of a tetracycline were analyzed. Some solutions included a carbohydrate and/or various molar amounts of metal salts.

The pH of the solutions were adjusted with hydrochloric acid or sodium hydroxide solution. The solutions were incubated at room temperature (approximately 22° C.) or at 37° C. Incubation of solutions at 37° C. was used as a model for long-term storage of solutions.

The stabilities of various aqueous solutions of a tetracycline were analyzed using HPLC. HPLC analyses were conducted on an Agilent **1200**: Column: Eclipse Plus C18 4.6× 150 mm, 5 μm. Detection: UV at 248 nm. Flow rate: 1.2 mL/min. Tigecycline retention time=4.30 min. Gradient: Solvent A=0.1% trifluoroacetic acid in acetonitrile. Solvent B=0.1% trifluoroacetic acid in water. TABLE 1 shows the HPLC gradient used.

TABLE 1

| Time (min) | % Solvent A | % Solvent B |
|---|---|---|
| 0.0 | 5 | 95 |
| 9.5 | 50 | 50 |
| 10.0 | 5 | 95 |
| 15.0 | 5 | 95 |

A 10 mg/mL Tigecycline aqueous solution was prepared and 300 μL aliquots dispensed into polypropylene tubes. The volume of each tube was adjusted to 1 ml with various dilutions of 0.1 M $MgCl_2$, 0.1 M $CaCl_2$ or 0.1 M $ZnCl_2$ to achieve the desired molar ratio of Tigecycline:metal cation. The tubes were incubated in the dark at 37° C. Samples of each solution were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

A 10 mg/mL (17.08 mol/L) aqueous solution of Tygacil® (Lot D 90293, 53 mg), a commercial Tigecycline formulation containing lactose, was prepared, and 240 μL aliquots were dispensed into polypropylene tubes. The volume of each tube was adjusted to 1 ml with various dilutions of 0.1 M $MgCl_2$, 0.1 M $CaCl_2$ or 0.1 M $ZnCl_2$ to achieve the desired molar ratio of Tigecycline:metal cation. The tubes containing the solution were incubated in the dark at 37° C. Samples of each solution were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, and 7 for solutions of Tigecycline at various molar ratios with $MgCl_2$, $CaCl_2$, or $ZnCl_2$ are shown in TABLE 2, TABLE 3, and TABLE 4, respectively. The percentages of Tigecycline remaining at Day 0, 1, 2, 5, and 7 for solutions of Tygacil® at various ratios with $MgCl_2$, $CaCl_2$, or $ZnCl_2$ are shown in TABLE 5, TABLE 6, and TABLE 7, respectively.

APPX000184

US 9,278,105 B2

21

TABLE 2

| MgCl₂:Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.42 | 98.93 | 97.68 | 92.31 | 85.95 |
| 5:1 | 99.45 | 98.85 | 97.30 | 88.64 | 81.41 |
| 2:1 | 99.50 | 98.57 | 96.85 | 84.95 | 73.95 |
| 1:1 | 99.64 | 98.64 | 96.70 | 82.54 | 67.87 |
| 0.5:1 | 99.60 | 98.45 | 96.52 | 79.39 | 62.20 |
| 0.2:1 | 99.56 | 98.44 | 95.91 | 72.81 | 53.83 |
| 0.1:1 | 99.50 | 98.29 | 95.66 | 67.28 | 48.68 |
| 0:1 | 99.53 | 98.23 | 95.18 | 58.42 | 40.90 |

TABLE 3

| CaCl₂:Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.49 | 99.02 | 97.89 | 91.88 | 86.31 |
| 5:1 | 99.44 | 98.66 | 97.31 | 87.13 | 80.87 |
| 2:1 | 99.38 | 98.06 | 96.66 | 83.63 | 75.05 |
| 1:1 | 99.58 | 98.33 | 96.54 | 81.30 | 70.18 |
| 0.5:1 | 99.56 | 98.61 | 96.15 | 76.00 | 64.81 |
| 0.2:1 | 99.58 | 98.47 | 95.99 | 72.84 | 57.19 |
| 0.1:1 | 99.56 | 98.32 | 95.66 | 67.89 | 49.75 |
| 0:1 | 99.49 | 98.17 | 94.98 | 59.11 | 39.31 |

TABLE 4

| ZnCl₂:Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.15 | 99.01 | 97.82 | 96.65 | 95.41 |
| 5:1 | 99.21 | 98.66 | 97.76 | 95.81 | 92.85 |
| 2:1 | 99.31 | 98.46 | 97.32 | 91.02 | 85.64 |
| 1:1 | 99.54 | 98.66 | 97.59 | 91.27 | 82.49 |
| 0.5:1 | 99.53 | 98.66 | 97.21 | 87.15 | 76.43 |
| 0.2:1 | 99.52 | 98.38 | 95.95 | 79.08 | 66.83 |
| 0.1:1 | 99.50 | 98.39 | 96.11 | 78.80 | 64.93 |
| 0:1 | 99.46 | 98.37 | 95.02 | 56.30 | 39.05 |

TABLE 5

| MgCl₂:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.61 | 99.38 | 98.97 | 96.51 | 93.52 |
| 5:1 | 99.47 | 99.46 | 98.83 | 95.38 | 90.55 |
| 2:1 | 99.49 | 99.32 | 98.72 | 93.20 | 84.03 |
| 1:1 | 99.63 | 99.38 | 98.55 | 89.21 | 74.30 |
| 0.5:1 | 99.59 | 99.28 | 98.36 | 86.97 | 68.84 |
| 0.2:1 | 99.54 | 99.26 | 98.43 | 86.41 | 64.91 |
| 0.1:1 | 99.48 | 99.19 | 98.19 | 72.43 | 44.71 |

TABLE 6

| CaCl₂:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.41 | 99.41 | 98.88 | 96.51 | 89.98 |
| 5:1 | 99.40 | 99.29 | 98.48 | 95.38 | 85.50 |
| 2:1 | 99.45 | 99.22 | 98.34 | 93.20 | 79.62 |
| 1:1 | 99.71 | 99.44 | 98.44 | 89.21 | 75.34 |

22

TABLE 6-continued

| CaCl₂:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 0.5:1 | 99.53 | 99.16 | 98.32 | 86.97 | 70.45 |
| 0.2:1 | 99.54 | 99.21 | 98.30 | 86.41 | 63.78 |
| 0:1 | 99.47 | 99.16 | 98.16 | 72.43 | 42.88 |

TABLE 7

| ZnCl₂:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 |
|---|---|---|---|---|---|
| 10:1 | 99.41 | 99.45 | 98.90 | 97.89 | 95.78 |
| 5:1 | 99.44 | 99.27 | 98.68 | 96.87 | 94.30 |
| 2:1 | 99.39 | 99.25 | 98.74 | 96.09 | 92.22 |
| 1:1 | 99.56 | 99.50 | 98.98 | 95.60 | 90.67 |
| 0.5:1 | 99.48 | 99.25 | 98.78 | 93.73 | 86.02 |
| 0.2:1 | 99.52 | 99.35 | 98.43 | 89.34 | 77.79 |
| 0:1 | 99.50 | 99.27 | 98.11 | 69.85 | 42.15 |

While Tigecycline decomposed in all tubes over 7 days, the rate of decomposition was significantly lower in solutions containing higher molar ratios of metal cation. The rates of Tigecycline decomposition in the presence of calcium or magnesium cations were similar; however, the rate of Tigecycline decomposition in the presence of zinc was significantly lower. The presence of lactose in the Tygacil® formulation further decreased the rate of decomposition.

Example 2

Stability at Room Temperature for Solutions of Tigecycline or Tygacil® Containing Metal Cations

A 10 mg/mL Tigecycline aqueous solution was prepared and 240 μL aliquots dispensed into polypropylene tubes. The volume of each tube was adjusted to 1 ml with various dilutions of 0.1 M MgCl₂, 0.1 M CaCl₂ or 0.1 M ZnCl₂ to achieve the desired molar ratio of Tigecycline:metal cation. The tubes were incubated in the dark at 37° C. Samples of each solution were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

A 10 mg/mL aqueous solution of Tygacil® (Lot D 90293, 53 mg) was prepared, and 240 μL aliquots were dispensed into polypropylene tubes. The volume of each tube was adjusted to 1 ml with various dilutions of 0.1 M MgCl₂, 0.1 M CaCl₂ or 0.1 M ZnCl₂ to achieve the desired molar ratio of Tigecycline:metal cation. The tubes were incubated in the dark at 37° C. Samples of each solution were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, 14, 21, 28, and 36 for solutions of Tigecycline at various molar ratios with MgCl₂, CaCl₂, or ZnCl₂ are shown in TABLE 8, TABLE 9, and TABLE 10, respectively. The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, 14, 21, 28, and 36 for solutions of Tygacil® at various ratios with MgCl₂, CaCl₂, or ZnCl₂ are shown in TABLE 11, TABLE 12, and TABLE 13, respectively.

US 9,278,105 B2

23

24

TABLE 8

| MgCl₂:Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 99.58 | 99.32 | 99.46 | 99.03 | 98.62 | 95.52 | 91.90 | 85.33 | 76.89 |
| 5:1 | 99.45 | 99.32 | 99.41 | 98.74 | 98.16 | 94.04 | 87.10 | 76.71 | 62.60 |
| 2:1 | 99.51 | 99.27 | 99.43 | 98.46 | 96.97 | 89.87 | 76.29 | 58.07 | 40.67 |
| 1:1 | 99.66 | 99.45 | 99.36 | 98.35 | 96.49 | 85.88 | 66.59 | 46.07 | 31.90 |
| 0.5:1 | 99.64 | 99.40 | 99.35 | 97.76 | 96.16 | 81.98 | 59.70 | 39.79 | 28.16 |
| 0.2:1 | 99.56 | 99.37 | 99.28 | 97.93 | 95.45 | 75.81 | 50.38 | 34.00 | 24.19 |
| 0:1 | 99.46 | 99.24 | 99.15 | 97.01 | 94.08 | 61.98 | 38.99 | 24.55 | 16.33 |

TABLE 9

| CaCl₂:Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 99.58 | 99.34 | 99.41 | 99.05 | 98.59 | 95.45 | 92.00 | 86.92 | 82.47 |
| 5:1 | 99.48 | 99.25 | 99.27 | 98.66 | 98.13 | 93.61 | 88.60 | 81.75 | 74.95 |
| 2:1 | 99.37 | 99.27 | 99.25 | 98.03 | 97.16 | 91.36 | 82.92 | 72.83 | 62.43 |
| 1:1 | 99.57 | 99.38 | 99.30 | 98.53 | 96.92 | 89.14 | 78.35 | 65.46 | 53.22 |
| 0.5:1 | 99.59 | 99.30 | 99.30 | 98.32 | 96.54 | 86.26 | 72.73 | 58.20 | 45.11 |
| 0.2:1 | 99.48 | 99.32 | 99.27 | 97.94 | 95.75 | 80.39 | 61.83 | 45.47 | 26.69 |
| 0:1 | 99.44 | 99.29 | 99.17 | 96.76 | 93.75 | 60.72 | 38.08 | 23.94 | 15.72 |

TABLE 10

| ZnCl₂:Tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 99.24 | 98.99 | 99.49 | 99.30 | 99.19 | 97.49 | 97.63 | 96.09 | 94.32 |
| 5:1 | 99.29 | 99.13 | 99.05 | 99.27 | 99.16 | 97.40 | 95.98 | 92.80 | 90.60 |
| 2:1 | 99.34 | 99.23 | 99.51 | 99.06 | 98.82 | 95.79 | 93.63 | 86.84 | 80.66 |
| 1:1 | 99.53 | 99.39 | 99.47 | 99.03 | 98.48 | 94.61 | 88.48 | 79.03 | 69.44 |
| 0.5:1 | 99.50 | 99.39 | 99.33 | 98.76 | 96.77 | 90.07 | 78.03 | 65.63 | 54.07 |
| 0.2:1 | 99.46 | 99.37 | 99.33 | 98.24 | 96.50 | 85.72 | 69.89 | 55.13 | 41.97 |
| 0:1 | 99.44 | 99.39 | 99.12 | 97.28 | 93.31 | 59.45 | 37.09 | 23.57 | 15.48 |

TABLE 11

| MgCl₂:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 99.44 | 99.53 | 99.34 | 99.25 | 99.07 | 97.30 | 95.37 | 92.20 | 86.32 |
| 5:1 | 99.44 | 99.61 | 99.60 | 99.45 | 99.32 | 97.66 | 95.34 | 90.98 | 83.58 |
| 2:1 | 99.48 | 99.63 | 99.56 | 99.43 | 99.19 | 96.67 | 91.94 | 81.95 | 66.57 |
| 1:1 | 99.55 | 99.62 | 99.61 | 99.09 | 99.11 | 96.50 | 89.71 | 74.36 | 55.95 |
| 0.5:1 | 99.49 | 99.64 | 99.60 | 99.33 | 98.70 | 95.10 | 84.39 | 64.70 | 45.04 |
| 0.2:1 | 99.49 | 99.63 | 99.57 | 99.28 | 98.89 | 94.03 | 79.53 | 57.09 | 37.94 |
| 0:1 | 99.44 | 99.57 | 99.57 | 99.25 | 98.78 | 89.19 | 65.09 | 42.56 | 28.38 |

TABLE 12

| CaCl₂:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 99.32 | 99.51 | 99.45 | 99.50 | 99.26 | 97.41 | 95.08 | 92.06 | 87.88 |
| 5:1 | 99.35 | 99.51 | — | 99.33 | 99.02 | 97.36 | 93.42 | 88.57 | 82.75 |
| 2:1 | 99.40 | 99.67 | 99.46 | 99.25 | 98.97 | 95.76 | 90.00 | 81.77 | 72.75 |
| 1:1 | 99.49 | 99.60 | 99.54 | 99.39 | 99.02 | 95.44 | 88.25 | 77.42 | 65.65 |
| 0.5:1 | 99.48 | 99.60 | 99.49 | 99.30 | 98.55 | 94.80 | 85.57 | 71.96 | 58.07 |
| 0.2:1 | 99.44 | 99.57 | 99.53 | 99.27 | 98.89 | 92.70 | 80.03 | 62.28 | 47.05 |
| 0:1 | 99.45 | 99.60 | 99.55 | 99.18 | 98.70 | 88.02 | 63.58 | 40.77 | 28.00 |

US 9,278,105 B2

25

26

TABLE 13

| ZnCl$_2$:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 | Day 28 | Day 36 |
|---|---|---|---|---|---|---|---|---|---|
| 10:1 | 98.91 | 99.49 | 99.43 | 99.46 | 99.47 | 98.98 | 98.68 | 98.17 | 98.11 |
| 5:1 | 99.15 | 99.54 | 99.51 | 99.45 | 99.35 | 98.88 | 98.26 | 97.39 | 96.15 |
| 2:1 | 99.29 | 99.57 | 99.55 | 99.35 | 99.37 | 98.60 | 97.42 | 95.30 | 92.37 |
| 1:1 | 99.44 | 99.62 | 99.55 | 99.61 | 99.33 | 97.97 | 96.29 | 92.70 | 87.08 |
| 0.5:1 | 99.47 | 99.62 | 99.59 | 99.48 | 99.25 | 97.60 | 94.10 | 86.46 | 76.49 |
| 0.2:1 | 99.45 | 99.62 | 99.61 | 99.47 | 99.19 | 96.09 | 89.52 | 77.46 | 63.06 |
| 0:1 | 99.42 | 99.54 | 99.52 | 99.14 | 98.71 | 88.25 | 64.08 | 41.19 | 28.09 |

While Tigecycline decomposed in all tubes over 36 days, the rate of decomposition was significantly lower in solutions containing higher molar ratios of metal cation. The rates of Tigecycline decomposition in the presence of calcium or magnesium cations were similar; however, the rate of Tigecycline decomposition in the presence of zinc was significantly lower. The presence of lactose in the Tygacil® formulation further decreased the ratio of decomposition.

Example 3

Stability at 37° C. for Tygacil Solutions Containing High Concentrations of Metal Cations

A 10 mg/mL aqueous solution of Tygacil® (Lot D 90293, 53 mg) was prepared, and 300 μL aliquots were dispensed into polypropylene tubes. The volume of each tube was adjusted to 1 ml with various dilutions of 1 M MgCl$_2$, 1 M CaCl$_2$ or 1 M ZnCl$_2$ to achieve the desired molar ratio of Tigecycline:metal cation. The tubes were incubated in the dark at 37° C. Samples of each solution were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, 14, and 21 for solutions of Tygacil® at various ratios with MgCl$_2$, CaCl$_2$, or ZnCl$_2$ are shown in TABLE 14, TABLE 15, and TABLE 16, respectively.

TABLE 14

| MgCl$_2$:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 |
|---|---|---|---|---|---|---|---|
| 30:1 | 99.64 | 99.59 | 99.49 | 98.54 | 97.11 | 89.62 | 77.13 |
| 20:1 | 99.61 | 99.56 | 99.23 | 97.99 | 95.94 | 85.04 | 63.47 |
| 12:1 | 99.58 | 99.53 | 99.14 | 96.74 | 94.45 | 77.71 | 46.81 |
| 5:1 | 99.68 | 99.56 | 99.6 | 96.06 | 91.18 | 59.13 | 25.95 |
| 0:1 | 99.65 | 99.23 | 98.26 | 75.05 | 46.66 | 6.37 | 1.30 |

TABLE 15

| CaCl$_2$:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 |
|---|---|---|---|---|---|---|---|
| 30:1 | 99.58 | 99.55 | 99.29 | 97.79 | 95.9 | 86.94 | 69.71 |
| 20:1 | 99.62 | 99.51 | 99.18 | 97.00 | 93.81 | 80.6 | 55.28 |
| 12:1 | 99.60 | 99.41 | 98.94 | 94.94 | 91.13 | 69.3 | 40.59 |
| 5:1 | 99.65 | 99.42 | 98.66 | 92.83 | 85.72 | 53.1 | 24.74 |
| 0:1 | 99.60 | 99.34 | 98.25 | 74.61 | 45.63 | 6.26 | 1.53 |

TABLE 16

| ZnCl$_2$:Tygacil ® Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 |
|---|---|---|---|---|---|---|---|
| 12:1 | 99.44 | 99.27 | 99.49 | 98.60 | 97.66 | 92.50 | 83.58 |
| 5:1 | 99.48 | — | 99.22 | 97.42 | 96.21 | 87.22 | 71.55 |
| 0:1 | 99.62 | — | 98.22 | 73.43 | 43.3 | 6.37 | 1.57 |

APPX000187

US 9,278,105 B2

27

While Tigecycline decomposed in all tubes over 21 days, the rate of decomposition was significantly lower in solutions containing higher molar ratios of metal cation. The rates of Tigecycline decomposition in the presence of calcium or magnesium cations were similar, however, the rate of Tigecycline decomposition in the presence of zinc was significantly lower.

Example 4

Effect of pH on the Stability of Tygacil® Solutions Containing Metal Cations at 37° C.

A 10 mg/mL aqueous solution of Tygacil® (Lot D 90293, 53 mg) was prepared, and 16504 aliquots were dispensed into four 15 mL polypropylene tubes. The volume of each tube was adjusted to 5500 μL with various dilutions of 0.1 M MgCl₂, 0.1 M CaCl₂, or 0.1 M ZnCl₂, or water (control), to achieve the desired molar ratio of a 1:1 ratio of Tigecycline: metal cation. Sample solutions from each 15 ml tube were taken and adjusted to pH 4, 5, or 6 with 0.1 N or 1 N solutions of NaOH or HCl, taking care to minimize volume changes. Samples were incubated in the dark at 37° C. Samples were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline (expressed as a percentage of the starting concentration) in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, and 14 for solutions of Tygacil® at 1:1 ratios with MgCl₂, CaCl₂, or ZnCl₂ at various pHs are shown in TABLE 17, TABLE 18, and TABLE 19, respectively. TABLE 20 shows percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, and 14 for solutions of Tygacil® only at various pHs

TABLE 17

| pH for 1:1 MgCl₂:Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.51 | 98.89 | 98.89 | 95.72 | 90.92 | 54.54 |
| pH 5 | 99.55 | 99.09 | 98.00 | 84.77 | 63.60 | 15.89 |
| pH 6 | 99.53 | 98.36 | 95.79 | 44.81 | 23.71 | 5.19 |

TABLE 18

| pH for 1:1 CaCl₂:Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.49 | 98.88 | 98.84 | 94.43 | 90.06 | 55.91 |
| pH 5 | 99.66 | 99.02 | 97.8 | 81.96 | 69.23 | 28.89 |
| pH 6 | 99.62 | 98.70 | 97.87 | 92.45 | 87.40 | 56.79 |

TABLE 19

| pH for 1:1 ZnCl₂: Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.47 | 98.62 | 99.03 | 96.14 | 93.15 | 73.25 |
| pH 5 | 99.6 | 99.21 | 98.96 | 93.02 | 83.48 | 39.93 |
| pH 6 | 99.54 | 99.3 | 99.16 | 94.58 | 86.35 | 49.21 |

28

TABLE 20

| pH for Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.48 | 99.07 | 98.93 | 94.28 | 87.05 | 44.75 |
| pH 5 | 99.6 | 98.94 | 96.89 | 49.21 | 27.49 | 2.16 |
| pH 6 | 99.47 | 95.27 | 59.56 | 10.74 | 2.4 | 5.22 |

While Tigecycline decomposed in all tubes over 14 days, the rate of decomposition was significantly lower in solutions with a pH lower than pH 6. The rates of Tigecycline decomposition in the presence of calcium or magnesium cations were similar at pH 4 and 5; however, the rate of Tigecycline decomposition in the presence of magnesium at pH 6 was significantly greater. The rate of Tigecycline decomposition at pH 4 and 5 in solutions containing zinc was lower than solutions containing magnesium or calcium. The rates of Tigecycline decomposition at pH 6, in solutions containing zinc or calcium were similar. The rate of Tigecycline decomposition at all pHs was much lower in the presence of metal cations, especially at higher pH.

Example 5

Effect of pH on the Stability of Tygacil® Solutions Containing High Concentrations of Metal Cations at 37° C.

A 10 mg/mL aqueous solution of Tygacil® (Lot D 90293, 53 mg) was prepared, and 1650 μL aliquots were dispensed into four 15 mL polypropylene tubes. The volume of each tube was adjusted to 5500 μL with various dilutions of 1 M MgCl₂, 1 M CaCl₂, or 1 M ZnCl₂, or water (control), to achieve the desired molar ratio of a 1:12 ratio of Tigecycline: metal cation. Sample solutions from each 15 ml tube were taken and adjusted to pH 4, 5, or 6 with 0.1 N or 1 N solutions of NaOH or HCl, taking care to minimize volume changes. Samples solutions were incubated in the dark at 37° C. Samples were taken at various time points and analyzed by HPLC. The fraction of remaining Tigecycline in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, and 14 for solutions of Tygacil® at 1:12 ratios with MgCl₂, CaCl₂, or ZnCl₂ at various pHs are shown in TABLE 21, TABLE 22, and TABLE 23, respectively.

TABLE 21

| pH for 12:1 MgCl₂: Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.47 | 98.62 | 99.18 | 97.49 | 95.72 | 83.14 |
| pH 5 | 99.61 | 98.87 | 99.12 | 96.53 | 93.72 | 69.08 |
| pH 6 | 99.58 | 99.26 | 99.21 | 95.6 | 96.96 | 85.86 |

TABLE 22

| pH for 12:1 CaCl₂: Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.48 | 97.24 | 98.89 | 96.01 | 92.85 | 73.05 |
| pH 5 | 99.74 | 99.36 | 99.41 | 97.64 | 95.94 | 89 |
| pH 6 | 99.61 | 99.44 | 99.48 | 98 | 97.09 | 92.18 |

US 9,278,105 B2

**29**

TABLE 23

| pH for 12:1 ZnCl₂: Tygacil ® | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 99.49 | 99.29 | 99.36 | 98.73 | 98.35 | 95.19 |
| pH 5 | 99.56 | 99.47 | 99.47 | 98.38 | 98.04 | 93.38 |
| pH 6 | 99.65 | 99.38 | 99.49 | 98.78 | 98.79 | 97.67 |

While tigecycline decomposed in all tubes over 14 days, the rate of decomposition was slower in solutions at pH 6. The rates of Tigecycline decomposition in the presence of calcium were slower in solutions at greater pH. When formulated as Tygacil, the rates of tigecycline decomposition in the presence of zinc or magnesium were faster at pH 5.

### Example 6

Effect of pH on the Stability of Minocycline Solutions Containing High Concentrations of MgCl₂ at 37° C.

A 10 mg/mL Minocycline hydrochloride aqueous solution was prepared, and 2500 µL aliquots were dispensed into two 15 mL polypropylene tubes. The volume of each tube was adjusted to 5500 µL with either a dilution of 1 M MgCl₂ to achieve a molar ratio of a 1:10 ratio of Minocycline:metal cation, or water. Sample solutions from each 15 ml tube were taken and adjusted to pH 4, 5, or 6 with 0.1 N or 1 N solutions of NaOH or HCl, taking care to minimize volume changes. Sample solutions were incubated in the dark at 37° C. Samples were taken at various time points and analyzed by HPLC. The fraction of minocycline remaining in each sample was determined.

The percentages of Minocycline remaining at Day 0, 1, 2, 5, 7, and 14 for solutions at various pHs of Minocycline at 1:10 ratio with MgCl₂, or Minocycline solutions alone are shown in TABLE 24, and TABLE 25, respectively.

TABLE 24

| pH for 10:1 MgCl₂: Minocycline | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 98.63 | 96.97 | 96.46 | 94.76 | 93.43 | 84.32 |
| pH 5 | 98.69 | 97.05 | 96.19 | 93.01 | 89.31 | 75.42 |
| pH 6 | 99.03 | 97.1 | 96.04 | 88.45 | 83.88 | 76.25 |

TABLE 25

| pH for Minocycline alone | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 |
|---|---|---|---|---|---|---|
| pH 4 | 98.75 | 96.37 | 96.21 | 94.99 | 92.78 | 81.82 |
| pH 5 | 98.41 | 96.72 | 95.29 | 85.01 | 75.14 | 35.43 |
| pH 6 | 98.19 | 95.47 | 87.55 | 39.17 | 14.56 | 2.2 |

While Minocycline decomposed in all tubes over 14 days, the rate of decomposition was significantly lower in solutions containing magnesium, especially at higher pH.

### Example 7

Stability of Tigecycline Solutions Containing Mixtures of CaCl₂ and MgCl₂ at pH 6 and 37° C.

A 10 mg/mL aqueous solution of Tigecycline was prepared, and 450 µL aliquots were dispensed into 15 mL

**30**

polypropylene tubes. The volume of each tube was adjusted to 1500 µL, with various dilutions of 1 M MgCl₂ or CaCl₂, or water (control), to achieve the desired molar ratios of Tigecycline:metal cation. Sample solutions from each 15 ml tube were taken and adjusted to pH 6 with 0.1 N or 1 N solutions of NaOH or HCl, taking care to minimize volume changes. Sample solutions were incubated in the dark at 37° C. Samples were taken at various time points and analyzed by HPLC. The fraction of Tigecycline remaining in each sample was determined.

The percentages of Tigecycline remaining at Day 0, 1, 2, 5, 7, 14, and 21 for solutions of at various ratios of Tigecycline: MgCl₂:CaCl₂ at pH 6 are shown in TABLE 26.

TABLE 26

| MgCl₂:CaCl₂: tigecycline Molar ratio | Day 0 | Day 1 | Day 2 | Day 5 | Day 7 | Day 14 | Day 21 |
|---|---|---|---|---|---|---|---|
| 5:5:1 | 98.25 | 98.77 | 98.23 | 96.91 | 92.13 | 83.64 | 65.21 |
| 5:10:1 | 98.37 | 98.23 | 98.59 | 97.76 | 96.10 | 89.74 | 79.83 |
| 10:5:1 | 98.17 | 98.21 | 98.46 | 96.59 | 93.90 | 80.00 | 59.39 |
| 10:10:1 | 98.32 | 98.24 | 98.50 | 97.38 | 95.62 | 87.14 | 72.88 |
| 5:0:1 | 98.18 | 97.93 | 97.53 | 96.98 | 76.71 | 40.42 | 12.54 |
| 10:0:1 | 98.16 | 98.00 | 98.23 | 94.91 | 89.12 | 62.54 | 35.75 |
| 15:0:1 | 98.25 | 98.13 | 98.21 | 96.23 | 92.32 | 72.15 | 48.75 |
| 20:0:1 | 98.2 | 98.08 | 98.28 | 96.46 | 93.72 | 78.66 | 57.66 |
| 0:5:1 | 98.11 | 98.15 | 98.28 | 97.19 | 95.68 | 89.2 | 77.2 |
| 0:10:1 | 98.12 | 98.2 | 98.55 | 97.1 | 96.53 | 91.74 | 84.69 |
| 0:15:1 | 98.15 | 98.21 | 98.59 | 97.5 | 96.93 | 92.71 | 86.37 |
| 0:20:1 | 98.28 | 98.63 | 98.57 | 97.4 | 97.35 | 93.09 | 87.45 |
| 0:0:1 | 97.91 | 88.97 | 60.59 | 16.36 | 7.33 | 4.14 | 0 |

While Tigecycline decomposed in all tubes over 21 days, the rate of decomposition was significantly lower in solutions containing greater relative amounts of calcium cations.

### Example 8

Effects of MgCl₂ on Minocycline-Induced Hemolysis in an In Vitro Model of Venous Phlebitis

In vitro hemolysis of rabbit red blood cells (RBCs) after exposure to minocycline formulated in MgCl₂ or CaCl₂ was compared to in vitro hemolysis of RBCs after exposure to minocycline in saline, or exposure to amphotericin B. Minocycline HCl (LKT laboratories) stock solutions were prepared with MgCl₂ in saline, saline, or lactated ringer, and the pH was adjusted with NaOH. Rabbit and sheep red blood cells (RBCs) were obtained from Innovative Research laboratory (Michigan, USA). Immediately before use, RBCs were washed three times in 0.9% saline and adjusted to a density of 5% in saline. 200 µl RBCs was added to 800 µl minocycline solution, and mixed by gentle inversion for 2-5 seconds. Samples were incubated at 37° C. or 30 minutes or at 25° C. for 2-5 minutes. Incubated samples were centrifuged at 12000×g for 4 minutes and the supernatants were removed and the hemoglobin absorbance was read at 540 nm. Samples were tested in triplicate. Amphotericin B (MP Biomedicals) and distilled H₂O, or Triton-x and distilled H₂O were used as positive controls; saline was used as a negative control. Percent hemolysis was calculated according to the following formula:

$$\text{Percent hemolysis} = \frac{(\text{absorbance of sample}) - (\text{absorbance of blank})}{\text{Absorbance of Distilled } H_2O} \times 100$$

US 9,278,105 B2

31

In a set of experiments, the pH of minocycline solutions formulated with divalent cations was adjusted to pH 5.85. For RBCs incubated in aminocycline saline solution, hemolysis was in the range of 44%-84% (FIG. 1). For RBCs incubated in aminocycline with Mg²⁺ or Ca²⁺, hemolysis was approximately 2%. Results summarizing the percent in vitro hemolysis of rabbit RBCs incubated with different formulations of minocycline or amphoterin B at 25° C. are summarized in Table 27.

TABLE 27

| Solution | Hemolysis of RBCs in solution relative to water (%) |
|---|---|
| 5 mg/ml minocycline, 10 equiv Mg, pH 5.85 | 2.8 |
| 2.5 mg/ml minocycline, 10 equiv Mg, pH 5.85 | 3.2 |
| 0.5 mg/ml minocycline, 10 equiv Mg, pH 5.85 | 2.3 |
| 5 mg/ml minocycline, 5 equiv Ca, pH 5.85 | 2.2 |
| 2.5 mg/ml minocycline, 5 equiv Ca, pH 5.85 | 2.94 |
| 0.5 mg/ml minocycline, 5 equiv Ca, pH 5.85 | 2.20 |
| 5 mg/ml minocycline, saline, pH 4.17 | 81.64 |
| 2.5 mg/ml minocycline, saline, pH 4.17 | 84.37 |
| 0.5 mg/ml minocycline, saline, pH 4.17 | 43.82 |
| Amphoterin B | 101.31 |

In another set of experiments, the pH of aminocycline solution formulated with divalent cations was not adjusted and was allowed to fall below the pH of minocycline in saline. For RBCs incubated in aminocycline saline solution, hemolysis was in the range of 44%-84% (FIG. 2). For RBCs incubated in aminocycline with Mg²⁺ or Ca²⁺, hemolysis was in the range of 0%-5%. Results summarizing the percent in vitro hemolysis of rabbit RBCs incubated with different formulations of minocycline at low pH, or amphoterin B at 25° C. are summarized in Table 28.

TABLE 28

| Solution | Hemolysis of RBCs in solution relative to water (%) |
|---|---|
| 5 mg/ml minocycline, 10 equiv Mg, pH 3.5 | 0.88 |
| 2.5 mg/ml minocycline, 10 equiv Mg, pH 3.5 | 1.12 |
| 0.5 mg/ml minocycline, 10 equiv Mg, pH 3.5 | 2.20 |
| 5 mg/ml minocycline, 5 equiv Ca, pH 3.64 | — |
| 2.5 mg/ml minocycline, 5 equiv Ca, pH 3.64 | 0.86 |
| 0.5 mg/ml minocycline, 5 equiv Ca, pH 3.64 | 4.92 |
| 5 mg/ml minocycline, saline, pH 4.17 | 81.64 |
| 2.5 mg/ml minocycline, saline, pH 4.17 | 84.37 |
| 0.5 mg/ml minocycline, saline, pH 4.17 | 43.82 |
| Amphoterin B | 101.31 |

Hemolysis of RBCs was reduced in an in vitro model of venous phlebitis with minocycline solutions formulated with divalent cations compared to minocycline solutions formulated without divalent cations.

In another set of experiments, hemolysis of rabbit RBCs was measured after exposure to 2.5 mg/ml minocycline formulated with different rations of divalent cations (MgCl₂, Mg SO₄, or CaCl₂). Hemolysis was compared to Minocycline HCl; Triton-x and H₂O were used as positive controls. Results are summarized in Table 29 and shown in FIGS. 4-6.

32

TABLE 29

| 2.5 mg/ml minocycline solution | | Hemolysis of RBCs |
|---|---|---|
| Cation | Molar ratio cation:minocycline | in solution relative to water (%) |
| MgSO₄ | 1:2 | 22.52 |
| | 1:1 | 24.59 |
| | 2:1 | 40.87 |
| | 3:1 | 25.67 |
| | 5:1 | 2.86 |
| | 7:1 | 1.96 |
| | 10:1 | 0.19 |
| MgCl₂ | 1:2 | 46.91 |
| | 1:1 | 63.77 |
| | 2:1 | 74.87 |
| | 3:1 | 64.62 |
| | 5:1 | 9.43 |
| | 7:1 | 1.57 |
| | 10:1 | 0.35 |
| CaCl₂ | 1:2 | 75.22 |
| | 1:1 | 83.89 |
| | 2:1 | 50.84 |
| | 3:1 | 26.58 |
| | 5:1 | 1.16 |
| | 7:1 | 0.75 |
| | 10:1 | 0.40 |
| Minocycline only | | 37.44 |
| Triton-x | | 97.82 |

FIG. 3 and FIG. 4 show the degree of rabbit RBC hemolysis produced by minocycline formulated in different ratios of MgSO₄ or MgCl₂, respectively, compared to Minocycline only. This data indicates that a 5:1 molar ratio of magnesium to minocycline or greater inhibits the RBC hemolysis observed with minocycline alone. Minocycline (minocin) produced a relative RBC hemolysis of 37%. FIG. 5 shows the degree of rabbit RBC hemolysis produced by minocycline formulated in different ratios of CaCl₂. This data shows that a 5:1 molar ratio of calcium to minocycline inhibits the RBC hemolysis observed with minocycline HCl alone.

Overall, these data all suggest that high molar ratios (e.g., a 5:1 molar ratio or greater) of divalent cation (Mg⁺² or Ca⁺²) to minocycline results in significant inhibition of rabbit RBC hemolysis observed with minocycline HCl.

Example 9

Solubility of Minocycline with Divalent Cations

Mixtures were prepared containing minocycline and divalent cations (Mg²⁺ or Ca²⁺) at varying stoichiometry and pH. The solubility of minocycline was assessed according to the turbidity of the mixture at 0 hr, 24 hr, 48 hr, 72 hr, 96 hr, 120 hr, 144 hr, and 168 hr. A clear solution denoted complete solubility. Table 30 summarizes data for minocycline with Mg²⁺ at 0 hr and 24 hr. Table 31 summarizes data for minocycline with Ca²⁺ at 0 hr and 24 hr.

QPEX001368

US 9,278,105 B2

33 34

TABLE 30

| | Molar ratio cation (Mg²⁺): minocycline | | | | | | | | | | | | | | | |
| | 0 | | 1:2 | | 1:1 | | 2:1 | | 3:1 | | 5:1 | | 7:1 | | 10:1 | |
| | Time (hr) | | | | | | | | | | | | | | | |
| | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 |
| 1 mg/ml minocycline pH 4 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 5 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 6 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 7 | ○ | ○ | | | | | | | | | | | | | | |
| 5 mg/ml minocycline pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 5 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 6 | ○ | ○ | ● | ● | ● | ● | ● | ● | ● | ● | ● | ○ | ● | ○ | ● | ○ |
| 10 mg/ml minocycline pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 5 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ● | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 6 | ○ | ○ | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| 20 mg/ml minocycline pH 4 | ○ | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 5 | ○ | ○ | | | | | | | | | ○ | ● | ○ | ● | ○ | ● |
| 30 mg/ml minocycline pH 4 | ○ | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 5 | ○ | ● | | | | | | | | | ○ | ● | ○ | ● | ○ | ● |

●: insoluble;
○: soluble

TABLE 31

| | Molar ratio cation (Ca²⁺): minocycline | | | | | | | | | | | | | | | |
| | 0 | | 1:2 | | 1:1 | | 2:1 | | 3:1 | | 5:1 | | 7:1 | | 10:1 | |
| | Time (hr) | | | | | | | | | | | | | | | |
| | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 | 0 | 24 |
| 1 mg/ml minocycline pH 4 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 5 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 6 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 7 | ○ | ○ | | | | | | | | | ○ | ● | ○ | ● | ○ | ● |
| 5 mg/ml minocycline pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 5 | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 6 | ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| 10 mg/ml minocycline pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | | | | | | | | |
| pH 5 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | | | | | | | | |
| pH 6 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | | | | | | | | |
| 20 mg/ml minocycline pH 4 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 5 | ○ | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| 30 mg/ml minocycline pH 4 | ○ | ● | | | | | | | | | ○ | ● | ○ | ● | ○ | ● |
| pH 5 | ○ | ● | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |

●: insoluble;
○: soluble

The data demonstrates that minocycline stays in solution upon introduction of a cation at concentrations of 10 mg/ml and less if the pH is less than 5. At higher pH, introduction of a cation initially reduces solubility. For example, a 5 mg/ml minocycline solution at pH 6 becomes insoluble on addition of $Mg^{2+}$. Surprisingly, at a molar ratio of cation:minocycline of 5:1 or more, the minocycline of such solutions becomes soluble, suggesting that high ratios of cation increases the solubility of minocycline.

Table 32 summarizes data for minocycline with $Mg^{2+}$ at 48 hr and 72 hr.

TABLE 32

| | Molar ratio cation (Mg²⁺): minocycline | | | | | | | | | | | | | | | |
| | 0 | | 1:2 | | 1:1 | | 2:1 | | 3:1 | | 5:1 | | 7:1 | | 10:1 | |
| | Time (hr) | | | | | | | | | | | | | | | |
| | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 |
| 1 mg/ml minocycline pH 4 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 5 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 6 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 7 | ○ | ○ | | | | | | | | | ○ | ○ | ○ | ○ | ○ | ○ |
| 5 mg/ml minocycline pH 4 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 5 | ○ | ○ | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| pH 6 | ○ | ○ | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ○ | ● |

QPEX001369

US 9,278,105 B2

35                                                                 36

TABLE 32-continued

| | | Molar ratio cation (Mg²⁺): minocycline | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0 | | 1:2 | | 1:1 | | 2:1 | | 3:1 | | 5:1 | | 7:1 | | 10:1 | |
| | | Time (hr) | | | | | | | | | | | | | | | |
| | | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 | 48 | 72 |
| 10 mg/ml minocycline | pH 4 | ● | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| | pH 5 | ● | ● | ○ | ○ | ○ | ○ | ● | ○ | ● | ○ | ○ | ○ | ● | ○ | ● | ○ |
| | pH 6 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ○ | ● | ○ |
| 20 mg/ml minocycline | pH 4 | ● | ● | | | | | | | | | ● | ● | ● | ○ | ● | ○ |
| | pH 5 | ● | ● | | | | | | | | | ● | ● | ○ | ○ | ● | ○ |
| 30 mg/ml minocycline | pH 4 | ● | ● | | | | | | | | | ● | ● | ● | ● | ● | ● |
| | pH 5 | ● | ● | | | | | | | | | ● | ● | ● | ● | ● | ● |

● : insoluble;
○ : soluble

### Example 10

### Long-Term Stability of Tigecycline at Various Temperatures

Table 33, Table 34, and Table 35 show percentage remaining tigecycline for different formulations of tigecycline at pH 6, stored at 37° C., room temperature, and 4° C., respectively. Formulations of tigecycline comprising increasing concentrations of tigecycline and increasing concentrations of CaCl₂ showed increased stability.

TABLE 33

| | Formulation | Stability of tigecycline (%) | | | | | |
|---|---|---|---|---|---|---|---|
| Salt | stored at 37° C. | 0 day | 1 day | 2 days | 5 days | 7 days | 14 days |
| MgCl₂ | 12 eq 20 mg/mL | 97.97 | 97.43 | 96.37 | 92.63 | 88.41 | |
| | 5 eq 20 mg/mL | 98.09 | 97.38 | 96.42 | 88.64 | 81.62 | |
| | 2 eq 20 mg/mL | 97.95 | 97.28 | 94.1 | 80.59 | 69.88 | |
| | 12 eq 3 mg/mL | 98.17 | 98.05 | 97.08 | 93.78 | 88.16 | |
| | 5 eq 3 mg/mL | 98.3 | 97.72 | 96.77 | 86.97 | 73.76 | |
| | 2 eq 3 mg/mL | 98.21 | 97.22 | 93.75 | 62.21 | 45.31 | |
| CaCl₂ | 12 eq 20 mg/mL | 98.3 | 98 | 97.63 | 96.1 | 95.24 | 91.44 |
| | 5 eq 20 mg/mL | 98.16 | 97.75 | 97.4 | 95.82 | 94.81 | 89.26 |
| | 2 eq 20 mg/mL | 98.25 | 97.85 | 97.22 | 95.28 | 93.64 | 88.61 |
| | 12 eq 3 mg/mL | 98.29 | 98.03 | 97.74 | 96.79 | 95.92 | 91.07 |
| | 5 eq 3 mg/mL | 98.21 | 97.96 | 97.32 | 95.37 | 94.42 | 86.36 |
| | 2 eq 3 mg/mL | 98.17 | 97.74 | 96.57 | 92.99 | 90.22 | |
| ZnCl₂ | 1 eq 20 mg/mL | 98.26 | 97.19 | 93.86 | 81.02 | 72.41 | |
| | 1 eq 3 mg/mL | 98.29 | 97.88 | 96.73 | 86.5 | 74.32 | |

TABLE 34

| | Formulation stored at room temperature | Stability of tigecycline (%) | | | | | |
|---|---|---|---|---|---|---|---|
| Salt | | 0 day | 7 days | 14 days | 28 days | 42 days | 58 days |
| MgCl₂ | 12 eq 20 mg/mL | 97.97 | 96.56 | 93.4 | 79.44 | | |
| | 5 eq 20 mg/mL | 98.09 | 94.2 | 82.17 | | | |
| | 2 eq 20 mg/mL | 97.95 | 87.57 | 67.91 | | | |
| | 12 eq 3 mg/mL | 98.17 | 97.22 | 94.91 | 80.14 | | |
| | 5 eq 3 mg/mL | 98.3 | 96.45 | 89.91 | | | |
| | 2 eq 3 mg/mL | 98.21 | 92.66 | 66.91 | | | |
| CaCl₂ | 12 eq 20 mg/mL | 98.3 | 97.91 | 97.36 | 95.69 | 95.32 | 93.02 |
| | 5 eq 20 mg/mL | 98.16 | 97.88 | 97.23 | 95.24 | 94.08 | 90.78 |
| | 2 eq 20 mg/mL | 98.25 | 97.97 | 97.08 | 94.42 | 93.08 | 87.95 |
| | 12 eq 3 mg/mL | 98.29 | 98.01 | 97.7 | 96.37 | 95.78 | 93.67 |
| | 5 eq 3 mg/mL | 98.21 | 97.84 | 97.29 | 95.39 | 94.22 | 90.37 |
| | 2 eq 3 mg/mL | 98.17 | 97.53 | 96.47 | 92.85 | 90.07 | 79.52 |
| ZnCl₂ | 1 eq 20 mg/mL | 98.26 | 82.44 | 65.73 | | | |
| | 1 eq 3 mg/mL | 98.29 | 97.11 | 93.1 | | | |

TABLE 35

| | Formulation stored at 4° C. | Stability of tigecycline (%) | | | | | |
|---|---|---|---|---|---|---|---|
| Salt | | 0 day | 14 day | 28 days | 35 days | 58 days | 162 days |
| MgCl₂ | 12 eq 20 mg/mL | 97.97 | 97.68 | 96.16 | 95.36 | 89.95 | |
| | 5 eq 20 mg/mL | 98.09 | 96.22 | 78.05 | 69.76 | | |
| | 2 eq 20 mg/mL | 97.95 | 91.23 | 54.38 | 43.33 | | |
| | 12 eq 3 mg/mL | 98.17 | 97.76 | 95.76 | 94.19 | 80.31 | |

APPX000192

37

TABLE 35-continued

| Salt | Formulation stored at 4° C. | Stability of tigecycline (%) | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0 day | 14 day | 28 days | 35 days | 58 days | 162 days |
| | 5 eq 3 mg/mL | 98.3 | 97.48 | 91.75 | 86.21 | | |
| | 2 eq 3 mg/mL | 98.21 | 96.23 | 84.6 | 76.81 | | |
| CaCl$_2$ | 12 eq 20 mg/mL | 98.3 | 98.28 | 97.78 | 97.61 | 97.87 | 96.4 |
| | 5 eq 20 mg/mL | 98.16 | 97.97 | 97.65 | 97.79 | 97.78 | 95.22 |
| | 2 eq 20 mg/mL | 98.25 | 98.08 | 97.69 | 97.8 | 97.75 | 94.9 |
| | 12 eq 3 mg/mL | 98.29 | 98.37 | 98.16 | 97.79 | 98.15 | 97.27 |
| | 5 eq 3 mg/mL | 98.21 | 98.17 | 97.97 | 97.76 | 97.99 | 96.75 |
| ZnCl$_2$ | 2 eq 3 mg/mL | 98.17 | 98.14 | 97.45 | 97.53 | 97.56 | 93.35 |
| | 1 eq 20 mg/mL | 98.26 | 77.12 | 53.06 | 45.63 | | |
| | 1 eq 3 mg/mL | 98.29 | 97.73 | 96.38 | 95.02 | 88.53 | |

Example 11

Solubility of Tetracycline Formulations

The solubility of four non-dimethlyamino tetracyclines, with and without Mg$^{2+}$, was examined. The results are summarized in Table 36.

TABLE 36

| | | Molar ratio cation (Mg$^{2+}$): antibiotic | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 0 | 0.5:1 | 1:1 | 2:1 | 3:1 | 5:1 | 7:1 | 10:1 |
| 10 mg/ml tetracycline | pH 4 | ● | ● | ● | ● | ● | ● | ● | ● |
| | pH 5 | ● | ● | ● | ● | ● | ● | ● | ● |
| | pH 6 | ● | ● | ● | ● | ● | | | |
| 10 mg/ml chlortetracycline | pH 4 | ● | | | | | ○ | ○ | ○ |
| | pH 5 | ● | | | | | | | |
| | pH 6 | ● | | | | | | | |
| 10 mg/ml doxycycline | pH 4 | ○ | | | | | ● | ● | ● |
| | pH 5 | ○ | | | | | ● | ● | ● |
| | pH 6 | | | | | | ○# | ○# | ○# |
| 10 mg/ml oxytetracycline | pH 4 | ● | | | | | ● | ● | ● |
| | pH 5 | ● | | | | | ● | ○ | ○ |
| | pH 5 | ● | | | | | ● | ○ | ○ |

●: insoluble;
○: soluble;
#fell out of solution after 24 hrs at room temperature

A comparison with the results for minocycline described in Example 9 indicates that non-dimethlyamino-tetracyclines, such as tetracycline, chlortetracycline, doxycycline, and oxytetracycline have solubility characteristics that differ from dimethylamino-tetraclines. For example, as summarized in Table 36, tetracycline remains insoluble at various pH and amounts of a divalent cation such as Mg$^{2+}$. Chlortetracycline becomes soluble with increasing concentrations of a divalent cation, but remains insoluble in the absence of any divalent cation, such as Mg$^{2+}$. Doxycycline is soluble in the absence of divalent cations, such as Mg$^{2+}$, but is insoluble in the presence of divalent cations at low pH. Similarly, oxytetracycline remains insoluble in the presence of divalent cations, such as Mg$^{2+}$, at low pH.

38

Example 12

Study of the Effect of Mg$^{2+}$ on the Uptake of Minocycline in Human Umbilical Vein Endothelial Cells (HUVEC)

Cells and reagents: Human umbilical vein endothelial cells (HUVEC) were purchased from Lonza and maintained according to manufacturer's recommendations in EGM-2 media. A 10 mg/mL solution of minocycline was prepared in 13.6 mg/mL Na-acetate without addition of Mg. This stock solution was further diluted in saline to 1 mg/mL with addition of Mg in the form of 1 M MgSO$_4$ to generate the following molar ratios of Mg to minocycline: 0, 1, 2.5, 5, 10, 25.

Uptake experimental conditions: HUVECs were seeded at 4.5×10$^5$ cells/well density in 6-well plates in EGM-2 media. Two days after seeding, cells were washed once with 2 mL of saline, and then 2 mL of 1 mg/mL drug solution in saline prepared as described above was placed in each well in triplicate. Plates were incubated in a CO$_2$ incubator at 37° C. for 30 min. Drug solutions were aspirated and cells were washed once with 2 mL of saline. 0.5 mL of saline was placed in each well and the cell monolayer was scraped using a plastic cell scraper. Cell suspensions were transferred to 1.5 mL plastic tubes and sonicated for 30 sec at maximal power. Cell lysates were spun down for 10 min on a table top microcentrifuge at maximum speed and supernatants were collected. Several wells of HUVEC cells were treated with saline only and processed the same way as drug-treated cells to generate mock cell lysate which was used below for calibration curve preparation.

Sample preparation for LCMS analysis: To prepare a calibration curve, 1 mg/mL minocycline solution in water was diluted in mock cell lysate to produce 100 μl of standards with the following concentrations: 10, 5, 2, 1, 0.5, 0.2, 0.1, 0.05, 0.02, 0.01 μg/ml.

50 μl of supernatants from drug-treated samples or standards were mixed with 200 μl of 1% trifluoroacetic acid in acetonitrile containing 1 μg/mL of gatifloxacin, vortexed and centrifuged at 3000 g for 30 min at RT. 150 μl of supernatants was removed and mixed with 450 μl of water. After vortexing, the mixture was centrifuged at 3000 g for 5 min at RT. Supernatants were collected and subjected to LCMS analysis to determine minocycline concentration.

Data processing: Uptake data were presented as percentage relative to the sample with no Mg present, which was considered as 100%.

Uptake of minocycline at 1 mg/mL in saline with various Mg/minocycline ratios was tested in HUVEC with an incubation time was 30 min. The results are summarized in FIG. 6 and FIG. 7. FIGS. 6 and 7 demonstrate that a decrease in intracellular uptake of minocycline is observed as the concentration of a divalent cation, such as Mg$^{2+}$ increases. While not being bound by any particular theory, this result suggests that the mechanism for the reduction in hemolysis observed in the minocycline/cation formulations described herein may be attributed to reduced RBC uptake.

Example 13

Preparing Certain Formulations of Dimethylamino-Tetraclines

Formulation 1

A formulation comprising minocycline with MgCl$_2$ and NaOH suitable for intravenous administration is prepared. 100 mg minocycline is added to a 10 ml aqueous solution of

US 9,278,105 B2

39 40

$MgCl_2.6H_2O$ to provide a cation to minocycline molar ratio of 5:1 and a 10 mg/ml minocycline solution. The pH of the mixture is adjusted by adding NaOH to a pH in the range of pH 4.5-pH 5.5. A single attempt of lyophilization resulted in a non-flocculent solid.

Formulation 2

A formulation comprising minocycline with $MgSO_4$ and sodium acetate suitable for intravenous administration is prepared. 100 mg minocycline is added to an aqueous solution of $MgSO_4.7H_2O$ to provide a cation to minocycline molar ratio of 5:1 and a 10 mg/ml minocycline solution. The pH of the solution is adjusted by adding sodium acetate to a pH in the range of pH 4.5-pH 5.5. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH of pH 4.5-pH 5.5 and an osmolality in the range of 275 mOsm/kg-375 mOsm/kg.

Formulation 3

A formulation comprising minocycline with $Mg(C_2H_3O_2)_2$ suitable for intravenous administration is prepared. 100 mg minocycline is added to an aqueous solution of $Mg(C_2H_3O_2)_2.3H_2O$ to provide a cation to minocycline molar ratio of 5:1 and a 10 mg/ml minocycline solution. The solution is then lyophilized to dryness.

Formulation 4

A formulation comprising minocycline with $MgSO_4$ and NaOH suitable for intravenous administration is prepared. 100 mg minocycline is added to an aqueous solution of $MgSO_4.7H_2O$ to provide a cation to minocycline molar ratio of 5:1 and a 10 mg/ml minocycline solution. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 4.5-pH 5.5. The solution is lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 4.5-pH 5.5 and an osmolality in the range of 150 mOsm/kg-250 mOsm/kg.

Formulation 5

A formulation comprising tigecycline with $MgSO_4$ and NaOH suitable for intravenous administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $MgSO_4.7H_2O$ to provide a cation to tigecycline molar ratio of 5:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 5.5-pH 6.5. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 5.5-pH 6.5.

Formulation 6

A formulation comprising tigecycline with $MgSO_4$ and NaOH suitable for intravenous administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $MgSO_4.7H_2O$ to provide a cation to tigecycline molar ratio of 12:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 5.5-pH 6.5. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 5.5-pH 6.5.

Formulation 7

A formulation comprising tigecycline with $MgCl_2$ and NaOH suitable for intravenous administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $MgCl_2.6H_2O$ to provide a cation to tigecycline molar ratio of 5:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 5.5-pH 6.5. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 5.5-pH 6.5.

Formulation 8

A formulation comprising tigecycline with $MgCl_2$ and NaOH suitable for intravenous administration is prepared. 50

mg tigecycline is added to 10 ml aqueous solution of $MgCl_2.6H_2O$ to provide a cation to tigecycline molar ratio of 12:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 5.5-pH 6.5. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 5.5-pH 6.5.

Formulation 9

A formulation comprising tigecycline with $MgSO_4$ and NaOH suitable for topical administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $MgSO_4.7H_2O$ to provide a cation to tigecycline molar ratio of 5:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 6.0-pH 7.0. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 6.0-pH 7.0.

Formulation 10

A formulation comprising tigecycline with $MgSO_4$ and NaOH suitable for topical administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $MgSO_4.7H_2O$ to provide a cation to tigecycline molar ratio of 12:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 6.0-pH 7.0. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 6.0-pH 7.0.

Formulation 11

A formulation comprising tigecycline with $CaCl_2$ and NaOH suitable for topical administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $CaCl_2.6H_2O$ to provide a cation to tigecycline molar ratio of 5:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 6.0-pH 7.0. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 6.0-pH 7.0.

Formulation 12

A formulation comprising tigecycline with $CaCl_2$ and NaOH suitable for topical administration is prepared. 50 mg tigecycline is added to 10 ml aqueous solution of $CaCl_2.6H_2O$ to provide a cation to tigecycline molar ratio of 12:1. The pH of the solution is adjusted by adding NaOH to a pH in the range of pH 6.0-pH 7.0. The solution is then lyophilized to dryness. Reconstitution of the lyophile in 10 ml water results in a solution having a pH in the range of pH 6.0-pH 7.0.

Example 14

Minocycline Kits

Kit 1

A kit is prepared comprising two vials. The first vial is prepared by dissolving 108 mg minocycline HCl in an acidic solution. The solution is lyophilized to dryness. The second vial contains 10 ml diluent that includes 26.9 mg/ml $MgSO_4.7H_2O$ and 13.6 mg/mL $Na(C_2H_3O_2)_2.3H_2O$. The lyophile is then reconstituted with the diluent prior to use.

Kit 2

A kit is prepared comprising two vials. The first vial is prepared by dissolving 108 mg minocycline HCl in an acidic solution. The solution is lyophilized to dryness. The second vial contains 10 ml diluent that includes 26.9 mg/ml $MgSO_4.7H_2O$ and enough NaOH to adjust the pH to approximately 5. The lyophile is then reconstituted with the diluent prior to use.

All references cited herein, including but not limited to published and unpublished applications, patents, and litera-

US 9,278,105 B2

41

ture references, are incorporated herein by reference in their entirety and are hereby made a part of this specification. To the extent publications and patents or patent applications incorporated by reference contradict the disclosure contained in the specification, the specification is intended to supersede and/or take precedence over any such contradictory material. The term "comprising" as used herein is synonymous with "including," "containing," or "characterized by," and is inclusive or open-ended and does not exclude additional, unrecited elements or method steps. All numbers expressing quantities of ingredients, reaction conditions, and so forth used in the specification are to be understood as being modified in all instances by the term "about." Accordingly, unless indicated to the contrary, the numerical parameters set forth herein are approximations that may vary depending upon the desired properties sought to be obtained. At the very least, and not as an attempt to limit the application of the doctrine of equivalents to the scope of any claims in any application claiming priority to the present application, each numerical parameter should be construed in light of the number of significant digits and ordinary rounding approaches.

The above description discloses several methods and materials of the present invention. This invention is susceptible to modifications in the methods and materials, as well as alterations in the fabrication methods and equipment. Such modifications will become apparent to those skilled in the art from a consideration of this disclosure or practice of the invention disclosed herein. Consequently, it is not intended that this invention be limited to the specific embodiments disclosed herein, but that it cover all modifications and alternatives coming within the true scope and spirit of the invention.

What is claimed is:

1. A method of treating a bacterial infection in a subject, wherein the method comprises administering a therapeutically effective amount of a composition to a subject in need thereof via an intravenous route of administration, wherein the composition comprises an aqueous solution of a 7-dimethylamino-tetracycline antibiotic and a magnesium cation, wherein the molar ratio of magnesium cation to 7-dimethylamino-tetracycline antibiotic is greater than 3:1 and wherein the solution does not comprise a pharmaceutically acceptable oil, has a pH greater than 4 and less than 7, and has an osmolality less than about 500 mOsmol/kg.

2. The method of claim 1, wherein the solution does not comprise an antioxidant, a pyridine-containing compound, gluconate, an alcohol, glycerol, polyethylene glycol, a pyrrolidone-containing compound, a water-miscible local anaesthetic, urea, lactose, or a dehydrating agent.

3. The method of claim 1, wherein solution does not comprise nicotinamide, procaine, or a dehydrating agent selected from the group consisting of ethyl acetate, acetic anhydride, absolute ethanol, and mixtures thereof.

4. The method of claim 1, wherein the solution has a pH of less than 6.

5. The method of claim 1, wherein the solution has a pH of less than 5.

6. The method of claim 1, wherein the molar ratio of magnesium cation to 7-dimethylamino-tetracycline antibiotic is greater than or equal to 5:1.

7. The method of claim 1, wherein the molar ratio of magnesium cation to 7-dimethylamino-tetracycline antibiotic is greater than 8:1.

8. The method of claim 1, wherein the molar ratio of magnesium cation to 7-dimethylamino-tetracycline antibiotic is greater than or equal to 10:1.

9. The method of claim 1, wherein the osmolality of the solution is less than 400 mOsm/kg.

42

10. The method of claim 1, wherein the osmolality of the solution is less than 350 mOsm/kg.

11. The method of claim 1, wherein the solution comprises magnesium sulfate.

12. The method of claim 1, wherein the solution comprises magnesium acetate.

13. The method of claim 1, wherein the solution comprises magnesium chloride.

14. The method of claim 1, wherein the solution comprises a buffer.

15. The method of claim 14, wherein the solution comprises acetate.

16. The method of claim 1, wherein the solution comprises a base.

17. The method of claim 16, wherein the base is NaOH.

18. The method of claim 1, wherein the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and a glycylcycline.

19. The method of claim 18, wherein the glycylcycline is tigecycline.

20. The method of claim 19, wherein the composition comprises 5 mg/ml tigecycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 5:1, and the pH is greater than 5.5 and less than 6.5.

21. The method of claim 19, wherein the composition comprises 5 mg/ml tigecycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 12:1, and the pH is greater than 5.5 and less than 6.5.

22. The method of claim 19, wherein the composition comprises 5 mg/ml tigecycline, $MgCl_2$, and NaOH, wherein the Mg to tigecycline molar ratio is 5:1, and the pH is greater than 5.5 and less than 6.5.

23. The method of claim 19, wherein the composition comprises 5 mg/ml tigecycline, $MgCl_2$, and NaOH, wherein the Mg to tigecycline molar ratio is 12:1, and the pH is greater than 5.5 and less than 6.5.

24. The method of claim 19, wherein the composition comprises 5 mg/ml tigecycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 5:1, and the pH is greater than 6.0 and less than 7.0.

25. The method of claim 19, wherein the composition comprises 5 mg/ml tigecycline, $MgSO_4$, and NaOH, wherein the Mg to tigecycline molar ratio is 12:1, and the pH is greater than 6.0 and less than 7.0.

26. The method of claim 1, wherein the 7-dimethylamino-tetracycline is PTK796.

27. The method of claim 1, wherein the 7-dimethylamino-tetracycline is minocycline.

28. The method of claim 27, wherein the concentration of minocycline is at least 5 mg/ml.

29. The method of claim 27, wherein the concentration of minocycline is at least 10 mg/ml.

30. The method of claim 27, wherein the composition comprises 10 mg/ml minocycline, $MgCl_2$, and NaOH, wherein the Mg to minocycline molar ratio is 5:1, and the pH is greater than 4.5 and less than 5.5.

31. The method of claim 27, wherein the composition comprises 10 mg/ml minocycline, $MgSO_4$, and sodium acetate, wherein the Mg to minocycline molar ratio is 5:1, the pH is greater than 4.5 and less than 5.5, and the osmolality is greater than 275 mOsm/kg and less than 375 mOsm/kg.

32. The method of claim 27, wherein the composition comprises 10 mg/ml minocycline and $Mg(CH_3O_2)_2$, wherein the Mg to minocycline molar ratio is 5:1, and the pH is greater than 4.5 and less than 5.5.

33. The method of claim 27, wherein the composition comprises 10 mg/ml minocycline, $MgSO_4$, and NaOH,

US 9,278,105 B2

43

44

wherein the Mg to minocycline molar ratio is 5:1, the pH is greater than 4.5 and less than 5.5, and the osmolality is greater than 150 mOsm/kg and less than 250 mOsm/kg.

**34**. A method of treating a bacterial infection in a subject, wherein the method comprises:

reconstituting a water-soluble solid composition in a pharmaceutically acceptable diluent to form a first solution;

diluting the reconstituted solution with a pharmaceutically acceptable diluent to form a second solution; and

administering a therapeutically effective amount of the second solution to a subject in need thereof via an intravenous route of administration, wherein the water-soluble solid composition comprises a 7-dimethylamino-tetracycline antibiotic or a salt thereof and a salt comprising a divalent or trivalent metal cation, wherein the molar ratio of divalent or trivalent cation to 7-dimethylamino-tetracycline is greater than 3:1 and wherein the second solution has a pH greater than 4 and less than 7 and an osmolality less than 500 mOsmol/kg.

**35**. The method of claim **34**, wherein the molar ratio of divalent or trivalent metal cation to 7-dimethylamino-tetracycline antibiotic is greater than or equal to 5:1.

**36**. The method of claim **34**, wherein the molar ratio of divalent or trivalent metal cation to 7-dimethylamino-tetracycline antibiotic is greater than 8:1.

**37**. The method of claim **34**, wherein the molar ratio of divalent or trivalent metal cation to 7-dimethylamino-tetracycline antibiotic is greater than or equal to 10:1.

**38**. The method of claim **34**, wherein the water-soluble solid composition is in the form of a lyophile.

**39**. The method of claim **34**, wherein the salt comprising a divalent or trivalent metal cation is magnesium sulfate.

**40**. The method of claim **34**, wherein the salt comprising a divalent or trivalent metal cation is calcium chloride.

**41**. The method of claim **34**, wherein the water-soluble solid composition comprises sodium acetate.

**42**. The method of claim **34**, wherein the water-soluble solid composition comprises NaOH.

**43**. The method of claim **34**, wherein the salt comprising a divalent or trivalent metal cation is selected from magnesium chloride, magnesium bromide, magnesium sulfate, calcium chloride, calcium bromide, zinc chloride, gallium chloride, magnesium malate, magnesium citrate, magnesium acetate, and zinc acetate.

**44**. The method of claim **34**, wherein the water-soluble solid composition does not comprise an antioxidant, a pyridine-containing compound, nicotinamide, or gluconate.

**45**. The method of claim **34**, wherein the 7-dimethylamino-tetracycline is selected from minocycline, PTK796, and a glycylcycline.

**46**. The method of claim **45**, wherein the glycylcycline is tigecycline.

**47**. The method of claim **34**, wherein the 7-dimethylamino-tetracycline is minocycline.

**48**. The method of claim **34**, wherein the 7-dimethylamino-tetracycline is PTK796.

**49**. The method of claim **1**, wherein the molar ratio of magnesium cation to 7-dimethylamino-tetracylcine antibiotic is from 5:1 to 10:1.

**50**. The method of claim **49**, wherein the molar ratio of magnesium cation to 7-dimethylamino-tetracylcine antibiotic is 5:1.

**51**. The method of claim **34** wherein the molar ratio of divalent or trivalent metal cation to 7-dimethylamino-tetracylcine antibiotic is from 5:1 to 10:1.

**52**. The method of claim **51**, wherein the molar ratio of divalent or trivalent metal cation to 7-dimethylamino-tetracylcine antibiotic is 5:1.

**53**. The method of claim **1**, wherein less than 1000 ml of the solution is administered to the subject.

**54**. The method of claim **1**, wherein less than 500 ml of the solution is administered to the subject.

**55**. The method of claim **1**, wherein less than 200 ml of the solution is administered to the subject.

**56**. The method of claim **1**, wherein less than 110 ml of the solution is administered to the subject.

**57**. The method of claim **34**, wherein less than 1000 ml of the second solution is administered to the subject.

**58**. The method of claim **34**, wherein less than 500 ml of the second solution is administered to the subject.

**59**. The method of claim **34**, wherein less than 200 ml of the second solution is administered to the subject.

**60**. The method of claim **34**, wherein less than 110 ml of the second solution is administered to the subject.

\*    \*    \*    \*    \*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  25-1281

**Short Case Caption:**  Melinta Therapeutics, LLC, et al. v. Nexus Pharmaceuticals, Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✔]  the filing has been prepared using a proportionally-spaced typeface and includes  7,057  words.

[ ]  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ]  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 02/20/2025

Signature:  /s/ Helen H. Ji

Name:  Helen H. Ji